**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 00-6224-CIV-DIMITROULEAS/JOHNSON

JAMES BUSH,

Plaintiff,

v.

THE WHITING-TURNER CONTRACTING CO., a Maryland corporation,

Defendant.
______________________/

FILED BY ___ D.C.
00 OCT 26 PM 12:04
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.-FTL

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Defendant, **THE WHITING-TURNER CONTRACTING CO.** ("Whiting-Turner"), pursuant to Fed. R. Civ. P. 56, moves the Court to enter an Order granting summary judgment against Plaintiff **JAMES BUSH** ("Plaintiff").

**SUMMARY OF ARGUMENT**[1]

Plaintiff filed the instant lawsuit alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Count I), the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621 *et seq.* (Count II), the Florida Civil Rights Act of 1992, § 760.01, *et seq.* Fla. Stat. (the "FCRA") (Counts III and IV), and § 448.08, Fla. Stat. ("§ 448.08") (Count V). Specifically, Plaintiff claims that Whiting-Turner discriminated against him as a result of his race and age.

In 1964, Plaintiff (an African-American) entered the construction industry as a laborer. From 1968 until late 1997, Plaintiff worked as a laborer foreman (a non-management position) at various construction sites. During those 33 years in the construction industry, no construction company ever offered Plaintiff the opportunity to be promoted to the assistant superintendent position, a managerial position. The assistant superintendent supervises and orchestrates the work performed by

[1] The page references for the depositions and exhibits supporting the Summary of Argument are reflected in Whiting-Turner's Rule 7.5 Statement, which is contemporaneously filed herewith.





subcontractors, carpenters, and laborer foremen to ensure that the construction project follows architectural designs, plans, and time-sensitive schedules.

Whiting-Turner is a national construction company in which the vast majority of work is conducted through project-specific job sites. Whiting-Turner hires its construction employees for each specific project pursuant to the terms of various collective bargaining agreements it has entered into with several trade unions in the construction industry. All laborers and laborer foremen at Whiting-Turner projects in South Florida are hired pursuant to the collective bargaining agreement (the "Laborers' union contract") between Whiting-Turner and the Southeast Florida Laborers' District Council for Local Union Nos. 478, 767, and 800 (the "Laborers' Union").

In May 1997, Plotke asked the Laborers' union to provide candidates for a foreman position in a construction project at the Bloomingdale's store in Aventura Mall. Pursuant to the request, on May 19, 1997, the Laborers' union referred Plaintiff for the position, and Plotke hired Plaintiff to be a laborer foreman at the Bloomingdale's project. Pursuant to the Laborers' union contract, Plaintiff, as a laborer foreman, earned an hourly wage of $9.82.

While at the Bloomingdale's project, Plotke witnessed Plaintiff's skills as a laborer foreman and thought that Plaintiff showed the potential to become an assistant superintendent. Whiting-Turner has 2 types of assistant superintendent positions: (1) union-benefits assistant superintendent ("assistant superintendent-UB"), a ***non***-management position used for trainees during their probationary period, and (2) company-benefits assistant superintendent ("assistant superintendent-CB"), a management position.

Assistant superintendents-UB are those individuals employed pursuant to a union contract and who continue to receive union benefits; that is, assistant superintendents-UB are ***not*** members of management. In contrast, assistant superintendents-CB are individuals directly employed by Whiting-Turner and are members of management. The assistant superintendent-UB position is simply a probationary position where, if the employee properly performs his/her job, Whiting-Turner will promote the employee to a permanent assistant superintendent-CB managerial position. The assistant superintendent-UB position was created so that a union member could accept a promotion on a probationary basis without the fear of losing his/her union benefits (such as seniority and pension) if the employee did not meet the job requirements during the probationary period. The probationary period could last several years: in fact, Plotke had previously been an assistant superintendent-UB for over 1.5 years before he was promoted to the assistant superintendent-CB position.

As the Bloomingdale's project was concluding, Plotke offered Plaintiff the opportunity to replace the assistant superintendent-UB, Doug Houghton (who is white and younger than Plaintiff), and become one of the two assistant superintendents at a new construction project at the Sawgrass Mills mall. Houghton was terminated for poor performance. Plotke told Plaintiff that he would recommend to Whiting-Turner's Vice President, Robert H. Mitchell, that Plaintiff be promoted to an assistant superintendent-UB so that, if Plaintiff properly performed, Plaintiff would be promoted to Whiting-Turner's management as an assistant superintendent-CB. Plaintiff was nearly 51 years old when Plotke offered him the assistant superintendent-UB position. Pursuant to Plotke's recommendation, Mitchell approved Plaintiff's promotion.

In October 1997, Plaintiff started work at the Sawgrass Mills project. During the first few months, Plaintiff had little to do. During this slow period when the project was getting set up, employees hired, and construction permits obtained, Plaintiff's salary was increased to $10.82 per hour, even though the Laborers' union contract did not require Whiting-Turner to do so.

On February 16, 1998, Whiting-Turner hired Bender, a carpenter foreman, also as an assistant superintendent-UB for the Sawgrass Mills project. Like Plaintiff, Bender's salary with Whiting-Turner was based on the collective bargaining agreement (the "Carpenters' union contract") between Whiting-Turner and the South Florida Carpenters District Council (the "Carpenters' union"). Pursuant to the Carpenters' union contract, a carpenter foreman's hourly wage at the time was $16.10, 64% higher than a laborer foreman's salary ($9.82). The wage difference between a carpenter foreman and laborer foreman is due to the higher skill level that carpenters possess.

As assistant superintendents-UB, Bender and Plaintiff had the same duties, but each was responsible for 3 of the 6 buildings on the Sawgrass Mills project. Like Plaintiff, Bender was told that if he properly performed, he would be promoted to assistant superintendent-CB. According to Plaintiff, Plotke stated that Plaintiff and Bender would spend at least 6 months before being reviewed and, if they properly performed their job, would be promoted to an assistant superintendents-CB.

In March 1998, Whiting-Turner decided to increase Plaintiff's wages and make him a salaried employee, even though it was not required under the Laborers' union contract. Bender's salary was $700 gross per week, which is $17.50 per hour; thus, Bender was given a 7% wage increase from the carpenter foreman's salary. Plaintiff's salary was increased to $628 gross per week, which is $15.70 per hour; thus, Plaintiff was given a 60% wage increase from the laborer foreman's salary (obviously, Plaintiff lost his overtime pay). Plaintiff's and Bender's salary differential of $1.80 not only resulted from the disparity in the union contracts (a carpenter foreman

earns $6.28 more per hour than a laborer foreman), but also due to their different skill levels.

Early in the project, Plotke observed that he had overestimated Plaintiff's capabilities and that Plaintiff was having performance problems. For example, Plaintiff failed to (i) verify the placement of anchor bolts which supported the building's structural steel; (ii) accurately measure 19 building columns causing the dismantling of 1 week's worth of work and a 3-week delay; (iii) provide sufficient QC (Quality Control) reports; (iv) properly measure the concrete on an entry feature between two buildings; (v) plant trees in the proper location and with the correct elevation; (vi) know how to use equipment that an assistant superintendent must use; (vii) correct field problems once they were identified; and (viii) supervise work to ensure that it was completed by the scheduled date. Although Plotke expressed his concerns to Plaintiff, Plotke did not take any disciplinary action, but considered Plaintiff's failing performance as caused by his lack of experience and skills in the carpenter trade. In fact, Plotke gave Plaintiff less complex tasks to perform so as to help Plaintiff succeed; however, Plaintiff continued to have below-standard performance.

In August 1998, Bender approached Whiting-Turner for his review. Since Bender had properly performed his job duties, Bender was promoted to assistant superintendent-CB. Unlike Bender, Plaintiff did not approach anyone at Whiting-Turner for a performance review or promotion (presumably because of his performance problems). Moreover, Bender's promotion to management within 6 months was uncommon since Plotke himself took over 1.5 years as an assistant superintendent-UB before he was promoted.

On April 13, 1999, Plaintiff resigned from Whiting-Turner. After receiving Plaintiff's resignation letter, Mitchell asked Plaintiff to stay at Whiting-Turner. However, Plaintiff refused. This lawsuit followed.

The Court should grant summary judgment on Counts I through IV because Plaintiff has not established a *prima facie* case demonstrating that Whiting-Turner discriminated against him because of his race or age. Plaintiff cannot establish that he was qualified for the assistant superintendent-CB position, evidenced by his poor performance. Plaintiff also cannot show that Whiting-Turner treated similarly situated non-Black and/or younger employees more favorably. Plaintiff was simply not promoted to the assistant superintendent-CB position because of his numerous performance problems. As set forth below in detail, Whiting-Turner has provided legitimate nondiscriminatory reasons for its actions. Plaintiff cannot show that Whiting-Turner's actions are a pretext for discrimination.

The Court should also grant summary judgment on Count V because this lawsuit is not an

action for unpaid wages, but rather an action involving race and age discrimination. Plaintiff is not complaining that Whiting-Turner refused to pay his salary, since Plaintiff was paid and received a substantial salary increase. Instead, Plaintiff complains that Whiting-Turner did not pay him the same wage as Bender because of "discrimination." Consequently, Plaintiff's claim for wages is tangential to his race/age discrimination claims and not a separate cause of action for unpaid wages.

## ARGUMENT

### I. PLAINTIFF HAS NOT ESTABLISHED A RACE OR AGE DISCRIMINATION CLAIM UNDER TITLE VII, THE ADEA, OR THE FCRA.

Title VII and the FCRA prohibit an employer from discriminating against an employee on the basis of the employee's race. 42 U.S.C. § 2000e-2(a); § 760.10, Fla. Stat. Similarly, the ADEA and FCRA prohibit an employer from discriminating against an employee on the basis of the employee's age. 29 U.S.C. § 623(a)(1); § 760.10, Fla. Stat. Where no evidence of direct discrimination exists (as in the instant case), Title VII employs the McDonnell Douglas three-part test. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The ADEA and FCRA utilize Title VII's analytical framework to determine whether Plaintiff meets his burden of proving discrimination. Resley v. Ritz-Carlton Hotel Co., 989 F. Supp. 1442, 1446 (M.D. Fla. 1997); Kossow v. St. Thomas University, 42 F. Supp. 2d 1312, 1313 n.1 (S.D. Fla. 1999).

Plaintiff bears the initial burden of establishing a *prima facie* case of race and/or age discrimination. McDonnell Douglas, 411 U.S. at 802. If Plaintiff establishes a *prima facie* case, the burden shifts to Whiting-Turner to provide a legitimate, nondiscriminatory reason for the challenged employment action. Id. If Whiting-Turner offers a legitimate, nondiscriminatory reason, the presumption of discrimination disappears and Plaintiff must come forward with evidence that the proffered reasons are pretextual. Id.

Plaintiff can only overcome a summary judgment motion by either "persuading the court that a discriminatory motive more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997). Even if Plaintiff demonstrates that Whiting-Turner's articulated nondiscriminatory reason is false, Plaintiff must still prove that his adverse employment action was truly based upon unlawful discrimination. St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

In the instant case, Plaintiff alleges that Whiting-Turner discriminated against him because of his race and age since he was (i) paid less than Bender and (ii) not transferred from an assistant

superintendent-UB position to an assistant superintendent-CB position. For the reasons set forth below, the Court should grant summary judgment.

**A. Plaintiff Cannot Establish A *Prima Facie* Case Of Race Or Age Discrimination.**

To establish a *prima facie* case of racial disparate treatment, Plaintiff must prove that:

> (1) [Plaintiff] belongs to a [protected group] (2) [Plaintiff] was subjected to adverse job action; (3) [Plaintiff's] ***employer treated similarly situated employees outside of [his] classification more favorably;*** and (4) [Plaintiff] was ***qualified to do the job.***

Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (emphasis added). To establish a *prima facie* case of age discrimination, Plaintiff must demonstrate:

> (1) that he was a member of the protected group of persons between the ages of forty and seventy; (2) that he was subject to adverse employment action; (3) that a substantially younger person filled the position ... from which he was discharged; and (4) that he was ***qualified to do the job for which he was rejected.***

Bogle v. Orange County Bd., 162 F.3d 653, 657 (11th Cir. 1998) (emphasis added).

Plaintiff cannot establish a *prima facie* case of race or age discrimination because he has not demonstrated that he was qualified for the assistant superintendent-CB position or that Whiting-Turner treated similarly situated non-Black or younger employees more favorably.

**1. Plaintiff Was Not Qualified To Do His Job.**

When Mitchell promoted Plaintiff to the assistant superintendent-UB position on Plotke's recommendation, Plotke started noticing that Plaintiff had performance problems and he considered Plaintiff's performance failures as serious problems. (Plotke Dep. at 36.) Consequently, Plaintiff was not promoted to assistant superintendent-CB because he had repeated performance problems as assistant superintendent-UB. Plaintiff's performance problems during his probationary period (set forth below) demonstrate that he was not qualified to be promoted to the assistant superintendent-CB position.

***First,*** Plaintiff failed to verify the placement of anchor bolts which supported 19 columns of the building's structural steel. (Plotke Dep. at 34-36.) As assistant superintendent, Plaintiff was required to verify the placement of anchor bolts, which are critical to a building's construction success, prior to the time that the concrete is poured, as well as provide a quality control inspection report evidencing his verification of the measurements. Id. Plaintiff admits that his job duties as assistant superintendent entailed detecting mistakes. (Plaintiff Dep. (II) at 35-36.) However,

Plaintiff failed to properly inspect the anchor bolts causing 19 building columns to be 1-foot too low. (Plotke Dep. at 34-36.) As a result, Plaintiff's failure caused the steel erector to dismantle 1 week's worth of work and the Sawgrass Mills project to incur a 3-week delay. Id. at 35-37.

Although Plotke expressed his concern to Plaintiff that he had performed an inspection, had improperly documented the inspection, and had not uncovered the errors with the 19 columns before the concrete was poured and columns erected, Plotke did not take any disciplinary action against Plaintiff. Rather, Plotke considered Plaintiff's failing performance as caused by Plaintiff's lack of experience as an assistant superintendent. (Plotke Dep. at 38.) Consequently, Plotke began to verify Plaintiff's reports. Id. at 46.

***Second,*** Plaintiff improperly measured the concrete on an entry feature between two buildings. (Plotke Dep. at 50.) Plaintiff was responsible for measuring an entry feature footing between buildings two and three. Id. After Plaintiff allegedly measured the entry footing, found it to be in compliance with plans and, consequently, the concrete was poured, Plotke was informed that the entry feature was three inches too high. Id. Plotke, the project manager, and a number of laborers were forced to rake the wet concrete before it hardened so as to get the entry feature measurements back to grade. Id.

***Third,*** Plaintiff improperly failed to plant trees in the proper location and with the correct elevation. (Plotke Dep. at 94-95.) Under Plaintiff's supervision, certain trees were planted in an improper location and an improper elevation which made the brick pavers slope tremendously. Id.

***Fourth,*** Plaintiff was unable to use equipment that an assistant superintendent was required to use. (Plotke Dep. at 59-60.) Plotke would ask Plaintiff if he understood how to use the equipment that an assistant superintendent would use, and Plaintiff would answer affirmatively. Id. However, Plaintiff would never use such equipment, but would rely on others to do his job. Id. For example, when Plotke asked Plaintiff to do some layout verification measurements, Plaintiff would grab the equipment, go to the field, and would instead have a carpenter use the equipment for him, even though Plaintiff was supposed to do the verification. Id.

***Fifth,*** Plaintiff failed to correct field problems once they were identified. (Plotke Dep. at 64-65.) As Plotke explains:

> I think one of the other inherent problems that we had was James -- James would identify problems in the field, but he didn't have -- he didn't have the ability to resolve them. I think despite conversations that he and I had, I think that James thought that his responsibility started and ended in identifying a problem and bringing it to somebody's attention.

A superintendent has to be someone who not only can identify a problem and tell you that there is a problem, but has to be somebody who pursues the repair or the fix, whether it be through a subcontractor, an architect, a structural engineer, a civil engineer, an owner or whomever, to track the problem down, track down the resolution and implement a repair or the resolution to a problem with the minimal schedule and minimal cost impact.

James repeatedly would bring something to somebody's attention, and I would be aware of some of the issues. Three days later, I would ask James whatever happened with that and he would say, well, I told so and so or I told Sergio. He felt that his responsibility ended by identification of a problem and that's not the role of a superintendent.

An example, there was a conduit that was installed and it was a seemingly insignificant issue that went on for three months, and we had an owner's representative screaming at us in our office. An electrician installed an exterior conduit along a masonry wall by a loading dock. The owner's representative in a monthly walk-through pointed it out and we had asked -- it was in James' realm of supervision. It was in one of the areas that he had been delegated. We had asked him to get the conduit lowered. It had to be lowered six inches into the dirt so that it wasn't visible to the public.

It took three months and I finally had to get the electrician over there and showed it to him. He fixed it the next day. That's one example.

Id.

***Sixth,*** Plaintiff was unable to supervise work and ensure that it was completed on the scheduled date. (Plotke Dep. at 66-67.) For example, the project manager would complain to Plotke about Plaintiff's inability to resolve issues and inability to meet scheduled dates. Id. Similarly, the brick paver's superintendent complained about Plaintiff in that areas were unprepared when he and his crew were scheduled to work. Id. Plotke continuously gave Plaintiff the opportunity to undertake tasks that Plaintiff should have excelled. However, Plaintiff's performance was still poor:

Again, we put James in charge of, I testified a little earlier, about some foundations on Main Street that we had asked James to do. We had asked James to do that because he had told me that in his prior experience that he even had his own concrete company and, you know, he was a concrete subcontractor. I thought, here's an opportunity for the guy to shine, if he had a business, owned a company, and he did concrete work, here is something that we can get him in there doing that's going to give him an opportunity to look good. It wasn't a very complicated job. There was a lot of footing. They supported canopies in buildings three and four. There were kiosk footings. It seemed to take forever, for this stuff to get done. I know that it went tremendously over budget. I know that it required more people. We had to hire

> people to put on it just to keep ahead of subcontractors because it just wasn't getting done on time. It just seemed to drag on forever. And my project manager was irate that it went over budget when it shouldn't have. It took too much time.

Id.

As the above litany of performance errors demonstrates, Plotke believed that Plaintiff had serious performance problems as an assistant superintendent. Plaintiff's only "evidence" to contradict his poor performance is that he had 33 or 34 years in the construction industry as a laborer and laborer foreman. However, it is irrelevant whether Plaintiff believes that he was qualified for the assistant superintendent-CB position based on his past experience in a lower position as foreman. What is relevant is Plotke's honest and nondiscriminatory evaluation of Plaintiff's performance as an assistant superintendent and the objective evidence of Plaintiff's errors. As one court stated:

> [Plaintiff] argues that she performed well in her job and offers evidence in an effort to support this contention, including e-mails and memoranda written by [Plaintiff] herself and statements allegedly made by her co-workers. In doing so, [Plaintiff] can prove only the unremarkable fact that she and [her supervisor] disagreed about the quality of her work. But we have repeatedly held that in a wrongful discharge action "'[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'"

Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000) (summary judgment to employer).

Plaintiff was not qualified to perform the job of an assistant superintendent. However, Plotke gave Plaintiff numerous chances for success and improvement and did not discipline Plaintiff for his performance flaws; yet, Plaintiff made mistake after mistake during the training period. Accordingly the Court should grant summary judgment on Plaintiff's race and age discrimination claims because Plaintiff was not qualified to be an assistant superintendent-CB.

**2. Plaintiff Cannot Identify A Similarly Situated Non-Black Or Younger Employee Who Was Treated More Favorably.**

To survive summary judgment, Plaintiff ***must*** identify a similarly situated non-Black or younger employee who received more favorable treatment. Walker v. Mortham, 158 F.3d 1177, 1193 (11th Cir. 1998); Holifield, 115 F.3d at 1562; St. Hilaire v. The Pep Boys, 73 F. Supp. 2d 1350, 1361 (S.D. Fla. 1999) (granting summary judgment because plaintiff did not show that there were similarly-situated employees who were treated differently). "The adequacy of the comparators is crucial." Marshall v. Western Grain Co., Inc., 838 F.2d 1165, 1168 (11th Cir. 1988).

When determining whether employees are similarly situated, "it is necessary to consider

whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Holifield, 115 F.3d at 1562. The comparators "must have dealt with the same supervisor, have been subject to the same standards, and must have also engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment." Weaver v. Tech Data Corp., 66 F. Supp. 2d 1258, 1270 (M.D. Fla. 1999). It is crucial for the Court to consider the "nature of the offenses committed and the nature of the punishments imposed." Jones v. Gerwens, 874 F.2d 1534, 1539-40 (11th Cir. 1989); see Holifield, 115 F.3d at 1562.

In this case, Plaintiff alleges that his comparator is Bender. However, Bender is not similarly situated to Plaintiff for three reasons.

***First,*** Bender, as a carpenter foreman, had more skills than Plaintiff. He thus entered his training period with a vastly higher skill level, while Plaintiff, as a laborer, had to learn these skills. The relevant pay differentials set forth in the respective Carpenters' and Laborers' union contracts evidence that a carpenter foreman's skills are considered greater than a laborer foreman by an hourly pay differential of 64% (nearly $6.28), given that a carpenter foreman received $16.10 per hour while a laborer foreman received $9.82 per hour. (Ex. A, Plotke Aff., ¶ 26.)

***Second,*** in stark contrast to Plaintiff, Bender did not have the extent or severity of Plaintiff's performance problems. Plaintiff cannot provide a single shred of evidence demonstrating that Bender had any performance problems, let alone problems equal to or greater than those of Plaintiff.

***Third,*** Plaintiff has not identified a single non-Black or younger assistant superintendent who was a laborer foreman, became an assistant superintendent-UB, and was promoted to an assistant superintendent-CB. The reason is obvious: all Whiting-Turner assistant superintendents in South Florida are carpenters because they have more pertinent skills for the position than laborers. Excluding Plaintiff, assistant superintendents at Whiting-Turner are always carpenters because, unlike laborers, carpenters extensively deal with building layout, the use of surveyors instruments, a transit and/or level, and interface with a large number of components which are incorporated into the structure. (Ex. A, Plotke Aff., ¶¶ 10-11.)

Clearly, Bender is not similarly situated to Plaintiff because Bender had greater skills and did not have the same performance problems. As the Eleventh Circuit has stated:

> We require that the quantity and quality of the comparators misconduct be nearly identical to prevent courts from second-guessing employer's reasonable decisions and confusing apples and oranges.

Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).

Instead of Bender, Plaintiff's comparator should be Doug Houghton the white and younger assistant superintendent-UB whom Plaintiff replaced. (Plaintiff Dep. (II) at 105-6; Ex. A, Plotke Aff., ¶¶ 16-17 .) Both Houghton and Plaintiff were unable to become assistant superintendents-CB because of their performance problems. Even then, Plaintiff received ***better*** treatment than Houghton because ***Houghton was terminated,*** while Plaintiff was not.

Since Plaintiff did not satisfy the burden of showing that non-Black or younger similarly situated employees were treated more favorably, Plaintiff's case cannot succeed. See Sistrunk v. Neumann, 13 Fla. L. Weekly Fed. D337, D338 (S.D. Fla. March 31, 2000) (granting employer's motion for summary judgment on disparate treatment claim because plaintiff could not identify any similarly situated non-Black employee). Where the plaintiff in a race discrimination claim fails to show that similarly situated non-Black employees were treated more favorably, and where no other evidence of discrimination is present, summary judgment is proper. Holifield, 115 F.3d at 1562. Accordingly, the Court should grant summary judgment on Plaintiff's race and age claims.

**B. Assuming, *Arguendo*, That Plaintiff Establishes A *Prima Facie* Case, Whiting-Turner's Actions Were Taken For Legitimate, Nondiscriminatory Reasons.**

Assuming Plaintiff establishes a *prima facie* case of race or age discrimination, the burden of production (but not proof) shifts to Whiting-Turner to show a legitimate, nondiscriminatory reason for any adverse employment action that it took. McDonnell Douglas 411 U.S. at 802. "Because the defendant need only produce, not prove, a non-discriminatory reason, this burden is 'exceedingly light.'" Barnes v. Cochran, 944 F. Supp. 897, 901 (S.D. Fla. 1996).

**1. Plaintiff Was Not Promoted To An Assistant Superintendent-CB Position Because Of Numerous Performance Problems.**

Plaintiff was not transferred to an assistant superintendent-CB position in August 1998 because he was not qualified for the position due to numerous performance problems. As set forth above in Section I(A), *supra*, Plaintiff's poor performance and inability to complete the job are legitimate, nondiscriminatory reasons why he was not transferred in six months.

The promised six-month status change was contingent on Plaintiff's ability to properly perform his job. In fact, other Whiting-Turner employees whose status changed from assistant superintendents-UB to assistant superintendents-CB took longer than 6 months. For example, Plotke

(Plaintiff's white and younger supervisor), who was initially a carpenter foreman, spent 1.5 years as assistant superintendent-UB before he was promoted to assistant superintendent-CB. (Plotke Dep. at 5-6.)

The instant case is similar to Kounelis v. Mount Sinai Medical Center of Greater Miami, Inc., 987 F. Supp. 1452 (S.D. Fla. 1997), aff'd, 166 F.3d 352 (1998), where the plaintiff – like Plaintiff herein – was hired when she was "52 or 53" years old. Id. at 1454. The plaintiff was terminated for making "input mistakes with the I-9 immigration information." Id. at 1457. This Court (Judge Moore) found that the employer "has met its burden of articulating a legitimate, nondiscriminatory reason for discharging [the plaintiff]." Id. This Court stated: "An employer's good faith belief that an employee's performance is unsatisfactory constitutes a legitimate, nondiscriminatory reason for termination." Id.

In sum, Plaintiff was not promoted to an assistant superintendent-CB position because Plotke believed, in good faith, that Plaintiff was not qualified to perform the job. Accordingly, the Court should grant summary judgment since Whiting-Turner has provided a legitimate, nondiscriminatory reason for its actions.

**2. Bender's And Plaintiff's $1.80 Pay Differential Resulted From The Pay Differential Between A Carpenter And Laborer Foreman Set Forth In The Respective Union Contracts.**

The additional $1.80 paid to Bender as an assistant superintendent-UB resulted from the higher pay that carpenters receive over laborers under their different union contracts. Bender's and Plaintiff's salaries at Whiting-Turner were respectively governed by the Carpenters' and Laborers' union contracts. (Ex. A, Plotke Aff., ¶¶ 5, 8, 25, 27.) Pursuant to the Laborers' union contract, a laborer foreman's hourly wage was $9.82; pursuant to the Carpenters' union contract, a carpenter foreman's hourly wage was $16.10 (64% higher than a laborer foreman's salary). Id. The wage difference between a carpenter and laborer is due to the additional skills possessed by carpenters, which include, but are not limited to the ability to do work with all of the layout equipment, transits, levels, and integrate layouts. (Plotke Dep. at 30; Ex. A, Plotke Aff., ¶¶ 11, 27.)

When Plaintiff and Bender became assistant superintendents-UB, their salaries did not have to increase pursuant to the terms of the Carpenters' or Laborers' union contracts. However, Whiting-Turner chose to increase Plaintiff's salary. As an assistant superintendent-UB, Bender received $700 gross per week, which translated to $17.50 per hour; thus, Bender was given an ***7% wage increase***

from his carpenter foreman's salary ($16.10). (Ex. A, Plotke Aff., ¶ 31.) As an assistant superintendent-UB, Plaintiff received $628 gross per week, which translated to $15.70 per hour; thus, Plaintiff was given a ***60% wage increase*** from his foreman's salary ($9.82). (Plaintiff Dep.(I) at 75-76; Ex. A, Plotke Aff., ¶ 32.) Clearly, Plaintiff received a higher and more favorable wage increase than Bender.

As the above shows, Whiting-Turner's actions are the result of legitimate, nondiscriminatory reasons. Accordingly, the Court should grant summary judgment.

### C. Plaintiff Has Presented No Evidence Of Pretext.

To survive a summary judgment motion, Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." Id. ***Failure to produce sufficient evidence of pretext dictates the entry of judgment against the employee.*** Simmons v Camden County Board of Education, 757 F.2d 1187 (11th Cir. 1985).

Plaintiff's subjective opinion or speculation that Whiting-Turner's actions were discriminatory, without supportive evidence, is insufficient to establish pretext and avoid summary judgment. Carter v. City of Miami, 870 F.2d 578, 585 (11th Cir. 1989) (holding that conclusory and generalized allegations of racial bias such as "there was a racially biased attitude by management towards minority black employees" were properly struck by the district court). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered ... extensive evidence of legitimate, non-discriminatory reasons for its actions." Isenbergh v. Knight-Ridder Newspaper Sales, Inc., 97 F.3d 436, 443-44 (11th Cir. 1996).

In the instant case, Plaintiff has not offered any evidence that his failure to properly perform his job is a pretext for discrimination. Instead, Plaintiff's only "evidence" is his speculation.

***First,*** Plaintiff alleges discrimination because his photograph was not taken when the owners of a proposed construction project visited the Sawgrass Mills site. (Plaintiff Dep. (I) at 101-02.) Plaintiff's "evidence" of someone's failure to take his picture does not imply that Plaintiff's supervisor discriminated against him.

***Second,*** Plaintiff alleges discrimination because he was ordered to leave an EEO training meeting to correct fencing around trees he had just planted. (Plaintiff Dep. (I) at 106.) However, Plaintiff was asked to leave the EEO meeting so that he could correct the placement of certain palm

trees which Plaintiff mis-planted in the wrong location. (Plotke Dep. at 94-95.) A construction crew was waiting to undertake work in the area where the trees were erroneously planted, and could not do so because of the mis-planted palm trees. Id. Instead of attending the meeting after correcting his mistake, Plaintiff did not return. Id. Plaintiff's allegation that he was not allowed to attend the EEO training meeting because he is Black is untrue, given that 2 other Black employees – Omar Sweeney and Samia Blanchett – attended the EEO training meeting. (Plotke Dep. at 95.)

More specifically to Plaintiff's age claim, Plaintiff has not provided any evidence of age discrimination. Plaintiff admits that no one at Whiting-Turner ever mentioned his age. (Plaintiff Dep. (II) at 89.) Plaintiff admits that no one at Whiting-Turner wrote down anything about his age. Id. at 90.

Plaintiff has not provided a single shred of evidence to corroborate his allegations of discrimination or show that Whiting-Turner's legitimate, nondiscriminatory reasons are false. In Vincent v. Wells Fargo Guard Services, Inc. of Fla., 3 F. Supp. 2d 1405, 1413 (S.D. Fla. 1998), a black security guard sued his employer under § 1981 and Title VII claiming race discrimination. This Court found that the plaintiff's lack of evidence– other than his testimony – precluded the entry of summary judgment:

> [Plaintiff], however, provided the Court with nothing more than unsupported, uncorroborated allegations. It is undisputed that a nonmovant may not rely on mere allegations to avoid entry of summary judgment. . . . In sum, [Plaintiff's] claims of racial discrimination boil down to uncorroborated allegations and [Plaintiff's] opinion that he was discriminated against on the basis of race and/or national origin. As the Eleventh Circuit has noted, mere allegations are insufficient to survive summary judgment, and a plaintiff's opinion that he has been discriminated against does not suffice to create a *prima facie* case of race discrimination,

Id. at 1415-16; see also Avril v. Village South, Inc., 934 F. Supp. 412, 417 (S.D. Fla. 1996). Since Plaintiff has not presented any evidence demonstrating that Whiting-Turner's nondiscriminatory reasons were pretextual, the Court should grant summary judgment.

**D. Plaintiff Has Not Established Intentional Discrimination Or Discriminatory Animus.**

To prove intentional discrimination under Title VII, the ADEA, and the FCRA, Plaintiff must establish that (1) Whiting-Turner's discriminatory animus towards Plaintiff was based on his protected characteristic, (2) a discharge or other significant change in the terms or conditions of employment, and (3) a causal link between the two. Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1331 (11th Cir. 1999). Plaintiff must establish that sufficient evidence exists to ***infer a nexus or***

***causal connection*** between his race/age and the disparate treatment. Martinez v. U.S. Sugar Corp., 880 F. Supp. 773, 778 (M.D. Fla. 1995). Plaintiff is required to prove discriminatory animus on the part of Whiting-Turner. Joseph v. Publix Super Markets, Inc., 983 F. Supp. 1431, 1444 (S.D. Fla. 1997); Edwards v. Wallace Comm. College, 49 F.3d 1517, 1520 (11th Cir. 1995).

**1. Plaintiff Lacks Evidence Of Discriminatory Animus By Plotke.**

In the instant case, Plaintiff has not presented any evidence of discriminatory animus by Plotke, the individual who hired and recommended his promotion. Plotke hired Plaintiff. (Plotke Dep. 8-9.) Plaintiff admits that, while at the Bloomingdale's project, Plotke assessed Plaintiff's skills as a laborer foreman and thought that Plaintiff showed the potential to become an assistant superintendent. (Plaintiff Dep. (I) at 33.) Plaintiff admits that Plotke offered him the opportunity to replace the assistant superintendent-UB, Doug Houghton, and to continue his employment at a new construction project (Sawgrass Mills mall). (Plaintiff Dep. (I) at 33; Plaintiff Dep. (II) at 105-6.) Plaintiff testified that Plotke wanted him to be his assistant. (Plaintiff Dep. (I) at 40, 55-56, 91-92.) While at the Sawgrass Mills project, Plaintiff testified that Plotke took him to the construction site to provide him with training. Id. at 74. According to Plaintiff, Plotke offered him the assistant superintendent position stating, ***"'You will never have to look for another job.' This is out of [Plotke's] mouth to my ear."*** Id. at 36.

What is truly telling of Plotke's lack of discriminatory racial animus is Plaintiff's own admission that Plotke is not a racist:

Q. Isn't it true you wouldn't say hello to him?
A. That is crap. I even talked to Eric about going to church. He and his wife, when his wife and kids came on the job, we shared all these things. Eric invited me fishing. Football, basketball games he would bring me tickets. It wasn't like that. I didn't blame Eric. It was just the situation there. I don't blame him today.
Q. So you are not saying Eric is a racist?
A. No. No. I don't think -- I wouldn't say he is a racist. . . .
Q. We are talking about you.
A. I wouldn't say personally that he is a racist. I wouldn't say personally he is a racist, no.

****

Q. Isn't it true, though, that Eric Plotke didn't do or say anything to you that was racist?
A: He didn't say anything to me that was racist. He didn't say anything to me.
Q. Did he do anything to you that was racist?
A. Not to me.

(Plaintiff Dep. (I) at 145, 147.)

What is telling of Plotke's lack of discriminatory animus based on age is that Plotke was the same person (or "actor") who hired Plaintiff at age 51, recommended his promotion to the assistant superintendent-UB position, and declined to recommend a promotion to the assistant superintendent-CB position because of performance problems. See Williams v. Vitro Services Corp, 144 F.3d 1438, 1442 (11th Cir. 1998). Where the individual responsible for hiring an employee also made the ultimate adverse employment decision towards the employee, the Eleventh Circuit states that, "these facts may give rise to a ***permissible inference that no discriminatory animus motivated [the employer's actions].***" Id.; see Smith v. Florida Dept of Transportation, 13 Fla. L. Weekly Fed. D 117, 118 (M.D. Fla. Nov. 30, 1999) (where one of the individuals making the promotion determination was involved in past promotion, the inference falls on the employer that there is no discrimination); Evans v. Technologies Applications & Service Co., 80 F.3d 954, 959 (4th Cir. 1996) ("[B]ecause Houseman is the same person who hired Evans, there is a powerful inference that the failure to promote her was not motivated by discriminatory animus."); E.E.O.C. v. Our Lady of Resurrection Med. Ctr., 77 F.3d 145, 152 (7th Cir. 1996) ("If Boettcher wished to discriminate against Braddy because of her race, she could have refused to hire her in the first place, or she could have discharged her because of her deficient qualifications. Boettcher did neither. . . . The same hirer/firer inference has strong presumptive value."); Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 464 (6th Cir. 1995) ("An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class. This general principle applies regardless of whether the class is age, race, sex, or some other protected classification.").

In addition, ***Plaintiff was nearly 51 years old and part of the protected age group when he was hired by Plotke, who, as Plaintiff testified, "wanted" him.*** (Plaintiff Dep. (II) at 90-1.) "The most important fact here is that the plaintiff was a member of the protected age group both at the time of his hiring and at the time of his firing, and that the same people who hired him also fired him." Dingman v. Delta Health Group, Inc., 26 F. Supp. 2d 1349, 1255 (S.D. Fla. 1998) (citing Lowe v. J.B. Hunt Transport, Inc., 963 F.2d 173, 174 (8th Cir. 1992)). In Dingman, this Court (Judge Moreno) granted the employer's summary judgment motion in an ADEA case because, in part, the plaintiff was in the protected age group when hired and was terminated by the same individual who hired him. This Court stated: "[I]t is highly unlikely that Neuman [the individual hiring the plaintiff], eight months after hiring the 63 year old [plaintiff], suddenly developed an aversion to older people." Dingman, 26 F. Supp. 2d at 1355; see Kossow v. St. Thomas University, 42 F. Supp. 2d 1312 (S.D. Fla. 1999) (granting employer's summary judgment motion).

As the above demonstrates, Plaintiff lacks proof showing that Plotke held any discriminatory animus towards him. Rather, the evidence reveals that Plaintiff was hired by Plotke when he was 51 years old and a protected class member, promoted by Plotke to the assistant superintendent-UB position even though Plaintiff was not a carpenter foreman, and not promoted by Plotke to the assistant superintendent-CB position. For the foregoing reasons, the Court should find that Plaintiff has not established any discriminatory animus by Plotke.

**2. Plaintiff Lacks Evidence Of Discriminatory Animus By Ivan Dean.**

In the instant case, Plaintiff has not presented any evidence that Ivan Dean, a superintendent, held any discriminatory animus against him. (Plaintiff Dep. (II) at 73.) Plaintiff accuses Dean of discrimination because Ivan was rude to him on 2 isolated occasions on a separate project where Plaintiff only spent a few hours. First, Plaintiff claims that he was sent to a project at Car Max where Dean was the superintendent. (Plaintiff Dep. (I) at 156-57.) At the project, he was introduced to Dean who, upon meeting him, purportedly stated, "If you can't find nothing for him to do, then fire him." Id. Second, Plaintiff complains that when he and others were standing around waiting for a concrete truck, Dean drove up and screamed that, "On my jobs, we don't take a 45-minute lunch break" and "I don't know you from Adam." Id. at 160.

Dean's alleged comments are not discriminatory, at most, they are simply rude. Rudeness cannot be transformed into a cause of action for discrimination. Plaintiff has not established any discriminatory animus by Dean.

Moreover, Dean was not a decision-maker in this case or involved in any way with any event relative to Plaintiff's claims. Comments by non-decisionmakers do not raise an inference of discrimination and are irrelevant in a discrimination claim. Mitchell v. USBI Co., 186 F.3d 1352, 1355 (11th Cir. 1999); See Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1329-30 (11th Cir. 1998) (statement by non-decisionmaker that "older people have more go wrong" was not probative of discriminatory intent); Mauter v. Hardy Corp., 825 F.2d 1554, 1558 (11th Cir. 1987) (statement by non-decisionmaker that "[t]he Hardy Corporation was going to weed out the old ones" did not raise a genuine issue of material fact regarding discriminatory intent). Comments by non-decisionmakers cannot constitute direct or circumstantial evidence of discrimination as a matter of law. See Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997) (to prove a claim of race discrimination, plaintiff must show that person making adverse employment decision had bias against the plaintiff because of race); Trotter v. Board of Trustees of University of Alabama, 91 F.3d

1449, 1454, 1456 (11th Cir. 1996) (discriminatory comments made by a person not involved in the challenged decision are not probative of discrimination).

**3. Plaintiff Lacks Evidence Of Discriminatory Animus By Mitchell Or Any Member Of Whiting -Turner's Management.**

Plaintiff has not presented any evidence that Mitchell held any discriminatory animus against him. Plaintiff simply speculates that Mitchell discriminated against him. However, Plaintiff cannot explain why Mitchell asked him to stay with Whiting-Turner when Plaintiff handed his resignation notice. (Plaintiff Dep. (I) at 135.)

Plaintiff has not presented any evidence showing a single discriminatory comment was made by any Whiting-Turner member of management. Plaintiff has also not presented any causal connection between his failure to be promoted to the assistant superintendent-CB position and any discriminatory animus. For the foregoing reasons, the Court should grant summary judgment for Whiting-Turner.

## II. THE COURT SHOULD DISMISS THE § 448.08 CLAIM BECAUSE THIS IS NOT AN ACTION FOR UNPAID WAGES.

In Count V, Plaintiff claims that he is owed back wages under § 448.08, because Bender received a higher salary as assistant superintendent. (Plaintiff Dep. (II) at 113-14.) Section 448.08 states in relevant part: "The court may award to the prevailing party in an action for unpaid wages costs of the action and a reasonable attorneys' fees." § 448.08, Fla. Stat. As § 448.08 makes clear, recovery is only applicable in an action for ***unpaid wages.***

This lawsuit is ***not*** an action for unpaid wages, but rather an action involving race and age discrimination. Plaintiff is not complaining that Whiting-Turner refused to pay him his salary. Instead, Plaintiff complains that Whiting-Turner did not pay him the same wage as Bender because of "discrimination." (Plaintiff Dep. (II) at 113-14.) As such, Section 448.08 is inapplicable to the instant race/age discrimination dispute. A general rule of statutory construction in Florida is that courts should not depart from the plain and unambiguous language of the statute. Dade County v. Pena, 664 So. 2d 959, 960 (Fla. 1995) (finding that action seeking reinstatement and back wages for wrongful dismissal did not implicate § 448.08). "[I]t is also a well-established rule in Florida that "statutes awarding attorney's fees must be strictly construed." Id. Consequently, Plaintiff's claim for back wages is tangential to his race/age discrimination claims and not a separate cause of action

for unpaid wages.

In Munsey v. General Telephone Co. of Florida, 538 So. 2d 1328 (Fla. 2d DCA 1989), the plaintiff challenged the trial court's entry of summary judgment in favor of the employer in a sex-based discrimination action under § 725.07, Fla. Stat., as well as the award for attorneys' fees under § 448.08. The plaintiff claimed that she performed services equal to those of her male coworkers, all of whom were paid substantially higher wages. Upon granting summary judgment, the trial court awarded the employer its attorneys' fees pursuant to § 448.08. The appellate court reversed the trial court's award finding that § 448.08 was inapplicable since the plaintiff's lawsuit was for gender discrimination and not unpaid wages:

> On the simplest level, it is apparent that [the plaintiff's] cause of action was not for "unpaid wages" but for sex discrimination. For that alleged violation she sought damages--including punitive damages and attorney's fees. Concededly one component of her damage claim, had she prevailed, might have been the difference between that which she was paid and the compensation she would have received had she not been discriminated against--a sum that could conceivably be denominated "unpaid wages." This is not a case, however, in which the essence of [the plaintiff's] claim was that General Telephone owed her money; its scope and objective were much broader than a wage claim.

Id. at 1332.

If we put aside Plaintiff's discrimination claims, it becomes evident that this is not an action for unpaid wages. As an employer, Whiting-Turner has the right to assign different salaries to different people performing the same job. An employer's determination of an employee's salary is only limited by federal minimum wage laws and discrimination statutes (which we are putting aside for purposes of this argument to illustrate that Plaintiff does not have a separate claim under § 448.08). An employer generally determines an employee's salary based on factors such as expertise, knowledge, and skills. In fact, it is common to see two employees performing the same function and receiving different remuneration. For example, a law firm might have two paralegals in which Paralegal A – who has completed a two-year associate degree in the paralegal field – and Paralegal B – who has no degree but was just promoted from a receptionist position due to her work ethic – may have completely diverse salaries based on each employees' respective skills and knowledge. It would be ridiculous to force an employer to pay both paralegals the same amount.

For these reasons, § 448.08 does not apply to this lawsuit. Plaintiff's remedy for back wages is limited to a damages component in his race/age discrimination claims. Accordingly, the Court should grant summary judgment on Count V.

**CONCLUSION**

Defendant, THE WHITING-TURNER CONTRACTING CO., respectfully requests that the Court enter Summary Judgment on all Counts in its favor and against Plaintiff JAMES BUSH.

Respectfully submitted,

SHUTTS & BOWEN LLP
Attorneys for Defendant
201 South Biscayne Boulevard
1500 Miami Center
Miami, Florida 33131
(305) 358-6300
(305) 347-7386 (facsimile)

By: ____________________
Sheila M. Cesarano
Florida Bar Number 708364
Rene Gonzalez-LLorens
Florida Bar Number 0053790

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via facsimile and regular mail on this 23 day of October 2000 to **DAVID H. POLLACK, ESQ.**, 25 S.E. 2nd Avenue, Suite 1020, The Ingraham Building, Miami, Florida 33131.

____________________
OF COUNSEL

MIADOCS 363495.2 RGL