# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6224-CIV-DIMITROULEAS/JOHNSON

JAMES BUSH,

        Plaintiff,

v.

THE WHITING-TURNER
CONTRACTING CO., a
Maryland corporation,

        Defendant.
_____/

## AFFIDAVIT OF ERIC PLOTKE IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

STATE OF FLORIDA    )
                         ) ss:
COUNTY OF PALM BEACH    )

    I, **ERIC PLOTKE,** state:

    1.    I am over eighteen years of age and make this Affidavit based upon my own personal knowledge and a review of the records kept and maintained by Defendant, THE WHITING-TURNER CONTRACTING CO. ("Whiting-Turner"). I have full authority to make this Affidavit.

    2.    At all relevant times to this lawsuit, I was one of the superintendents at Whiting-Turner where Plaintiff, JAMES BUSH ("Plaintiff"), was employed.

    3.    Whiting-Turner is a national construction company in which the vast majority of work is conducted through project-specific job sites.

    4.    Whiting-Turner hires its construction employees for each specific project pursuant to the terms of various collective bargaining agreements it has entered into with several trade unions in the construction industry.

    5.    All laborers and laborer foremen at Whiting-Turner projects in South Florida are hired pursuant to the collective bargaining agreement (the "Laborers' union contract") between Whiting-Turner and the Southeast Florida Laborers' District Council for Local Union Nos. 478, 767, and 800 dated December 6, 1996 (the "Laborers' Union").



6.  In May 1997, I asked the Laborers' union to provide candidates for a foreman position in a construction project at the Bloomingdale's store in Aventura Mall.

7.  Pursuant to the request, on May 19, 1997, the Laborers' union referred Plaintiff for the position, and I hired Plaintiff to be a laborer foreman at the Bloomingdale's project pursuant to the Laborers' union contract.

8.  Pursuant to the Laborers' union contract, Plaintiff, as a laborer foreman, earned an hourly wage of $9.82.

9.  While at the Bloomingdale's project, I witnessed Plaintiff's skills as a laborer foreman and thought that Plaintiff showed the potential to become an assistant superintendent, even though this position was normally reserved for carpenters due to their skills and expertise.

10. All Whiting-Turner assistant superintendents in South Florida are carpenters because they have more pertinent skills for the position than laborers.

11. Excluding Plaintiff, assistant superintendents at Whiting-Turner in South Florida are always carpenters because, unlike laborers, carpenters extensively deal with building layout, the use of surveyors instruments, a transit and/or level, and interface with a large number of components which are incorporated into the structure.

12. The assistant superintendent supervises and orchestrates the work performed by subcontractors, carpenters, and laborer foremen to ensure that the construction project follows Whiting-Turner's time-sensitive schedules and architectural designs and plans.

13. Whiting-Turner has 2 types of assistant superintendent positions: (1) union-benefits assistant superintendent ("assistant superintendent-UB"), a *non*-management position used for trainees during their probationary period, and (2) company-benefits assistant superintendent ("assistant superintendent-CB"), a management position.

14. Assistant superintendents-UB are those individuals employed pursuant to a union contract and who continue to receive union benefits; that is, assistant superintendents-UB are *not* members of management. In contrast, assistant superintendents-CB are individuals directly employed by Whiting-Turner and are members of management.

15. The assistant superintendent-UB position is simply a probationary position where, if the employee properly performs his/her job, Whiting-Turner will promote the employee to a permanent assistant superintendent-CB managerial position. The assistant superintendent-UB position was created so that a union member could accept a promotion on a probationary basis without the fear of losing his/her union benefits (such as seniority and pension) if the employee did

2

not meet the job requirements during the probationary period. The probationary period could last several years: in fact, I – who was a carpenter foreman – had previously been a assistant superintendent-UB for over 1.5 years before I was promoted to the assistant superintendent-CB position.

16. As the Bloomingdale's project was concluding, I offered Plaintiff the opportunity to replace the assistant superintendent-UB, Doug Houghton (who is a carpenter, white, and younger than Plaintiff), and become one of the two assistant superintendents at a new construction project at the Sawgrass Mills mall.

17. Houghton was terminated for poor performance.

18. I told Plaintiff that I would recommend to Whiting-Turner's Vice President, Robert H. Mitchell, that Plaintiff be promoted to an assistant superintendent-UB so that, if Plaintiff properly performed, Plaintiff would be promoted to Whiting-Turner's management as an assistant superintendent-CB.

19. Plaintiff was nearly 51 years old when I offered him the assistant superintendent-UB position.

20. Pursuant to my recommendation, Mitchell approved Plaintiff's promotion.

21. In October 1997, Plaintiff started work at the Sawgrass Mills project. During the first few months, Plaintiff had little to do.

22. During this slow period when the project was getting set up, employees hired, and construction permits obtained, Plaintiff's salary was increased to $10.82 per hour, even though the Laborers' union contract did not require Whiting-Turner to do so.

23. While at the Sawgrass Mills project, I took Plaintiff to the construction site to provide him with training.

24. On February 16, 1998, Whiting-Turner hired Charles Bender, a carpenter foreman, also as an assistant superintendent-UB for the Sawgrass Mills project.

25. Like Plaintiff, Bender's salary with Whiting-Turner was based on the collective bargaining agreement (the "Carpenters' union contract") between Whiting-Turner and the South Florida Carpenters District Council (the "Carpenters' union").

26. Pursuant to the Carpenters' union contract, a carpenter foreman's hourly wage at the time was $16.10, 64% higher than a laborer foreman's salary ($9.82).

27. The wage difference between a carpenter foreman and laborer foreman is due to the higher skill level that carpenters possess. A carpenter is different from a laborer in the level of skills.

3

28. As assistant superintendents-UB, Bender and Plaintiff had the same duties, but each was responsible for 3 of the 6 buildings on the Sawgrass Mills project.

29. Like Plaintiff, Bender was told that if he properly performed, he would be promoted to assistant superintendent-CB.

30. In March 1998, Whiting-Turner decided to increase Plaintiff's wages and make him a salaried employee, even though it was not required under the laborers' union contract.

31. Bender's salary was $700 gross per week, which is $17.50 per hour; thus, Bender was given a 7% wage increase from the carpenter foreman's salary.

32. Plaintiff's salary was increased to $628.00 gross per week, which is $15.70 per hour; thus, Plaintiff was given a 60% wage increase from the laborer foreman's salary.

33. Plaintiff's and Bender's salary differential of $1.80 not only resulted from the disparity in the union contracts (a carpenter foreman earns $6.28 more per hour than a laborer foreman), but also due to their different skill levels.

34. Early in the project, I observed that I had overestimated Plaintiff's capabilities and that Plaintiff was having performance problems. I considered Plaintiff's performance failures as serious problems.

35. ***First***, Plaintiff failed to verify the placement of anchor bolts which supported 19 columns of the building's structural steel. As assistant superintendent, Plaintiff was required to verify the placement of anchor bolts, which are critical to a building's construction success, prior to the time that the concrete is poured, as well as provide a quality control inspection report evidencing his verification of the measurements. However, Plaintiff failed to properly inspect the anchor bolts causing 19 building columns to be 1-foot too low. As a result, Plaintiff's failure caused the steel erector to dismantle 1 week's worth of work and the Sawgrass Mills project to incur a 3-week delay.

36. Although I expressed my concern to Plaintiff that he had performed an inspection, had improperly documented the inspection, and had not uncovered the errors with the 19 columns before the concrete was poured and columns erected, I did not take any disciplinary action against Plaintiff. Rather, I considered Plaintiff's failing performance as caused by his lack of experience as an assistant superintendent. Consequently, I began to verify Plaintiff's reports.

37. ***Second***, Plaintiff improperly measured the concrete on an entry feature between two buildings. Plaintiff was responsible for measuring an entry feature footing between buildings two and three. After Plaintiff allegedly measured the entry footing, found it to be in compliance with

4

plans and, consequently, the concrete was poured, I was informed that the entry feature was three inches too high. The project manager, a number of laborers, and I were forced to rake the wet concrete before it hardened so as to get the entry feature measurements back to grade.

38. ***Third,*** Plaintiff improperly failed to plant trees in the proper location and with the correct elevation. Under Plaintiff's supervision, certain trees were planted in an improper location and an improper elevation which made the brick pavers slope tremendously.

39. ***Fourth,*** Plaintiff was unable to use equipment that an assistant superintendent was required to use. I would ask Plaintiff if he understood how to use the equipment that an assistant superintendent would use, and Plaintiff would answer affirmatively. However, Plaintiff would never use such equipment, but would rely on others to do his job. For example, when I asked Plaintiff to do some layout verification measurements, Plaintiff would grab the equipment, go to the field, and would instead have a carpenter use the equipment for him, even though Plaintiff was supposed to do the verification.

40. ***Fifth,*** Plaintiff failed to correct field problems once they were identified.

41. ***Sixth,*** Plaintiff was unable to supervise work and ensure that it was completed on the scheduled date. For example, the project manager would complain to me about Plaintiff's inability to resolve issues and inability to meet scheduled dates. Similarly, the brick paver's superintendent complained about Plaintiff in that areas were unprepared when he and his crew were scheduled to work.

42. Plaintiff had other performance problems in addition to the above referenced six areas.

43. I continuously gave Plaintiff the opportunity to undertake tasks in which Plaintiff should have excelled. However, Plaintiff's performance was still poor.

44. In August 1998, Bender approached Whiting-Turner for his review. Since Bender had properly performed his job duties, Bender was promoted to assistant superintendent-CB.

45. Unlike Bender, Plaintiff did not approach anyone at Whiting-Turner for a performance review or promotion (presumably because of his performance problems).

46. Bender's promotion to management within 6 months was uncommon since, for example, I spent 1.5 years as an assistant superintendent-UB before I was promoted.

47. Plaintiff claims that he was improperly ordered to leave an EEO training meeting to correct fencing around recently planted trees. However, Plaintiff was asked to leave the EEO meeting so that he could correct the placement of certain palm trees which he mis-planted in the

5

wrong location. A construction crew was waiting to undertake work in the area where the trees were erroneously planted, and could not do so because of the mis-planted palm trees. Instead of attending the meeting after correcting his mistake, Plaintiff did not return. Plaintiff's allegation that he was not allowed to attend the EEO training meeting because he is Black is untrue, given that 2 other Black employees – Omar Sweeney and Samia Blanchett – attended the EEO training meeting.

48. On April 13, 1999, Plaintiff resigned from Whiting-Turner.

49. After receiving Plaintiff's resignation letter, Mitchell asked Plaintiff to stay at Whiting-Turner.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 23 day of October, 2000.

ERIC PLOTKE

MIADOCS 373813.1 RGL