# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6224-CIV-DIMITROULEAS/JOHNSON

JAMES BUSH,

      Plaintiff,

v.

THE WHITING-TURNER
CONTRACTING CO., a
Maryland corporation,

      Defendant.
_____/



## DEFENDANT'S RULE 7.5 STATEMENT

Defendant, **THE WHITING-TURNER CONTRACTING CO.** ("Whiting-Turner"), pursuant to Local Rule 7.5, submits the following statement of material facts as to which it contends there is no genuine issue to be tried. Whiting-Turner submits this statement in support of its Motion for Summary Judgment filed against Plaintiff **JAMES BUSH** ("Plaintiff").

1. In 1964, Plaintiff (an African-American) entered the construction industry as a laborer. (Plaintiff's Deposition dated June 8, 2000 ("Plaintiff Dep. (I)") at 19-20.)

2. From 1968 until early 1998, Plaintiff worked as a laborer foreman (a non-management position) at various construction sites. (Plaintiff Dep. (I) at 4; Ex. A, Plotke Aff., ¶¶ 16-21.)

3. Whiting-Turner is a national construction company in which the vast majority of work is conducted through project-specific job sites. (Ex. A, Plotke Aff., ¶ 3.)

4. Whiting-Turner hires its construction employees in South Florida for each specific project pursuant to the terms of various collective bargaining agreements it has entered into with several trade unions in the construction industry. (Ex. A, Plotke Aff., ¶ 4.)

5. All laborers and laborer foremen at Whiting-Turner projects in South Florida are hired pursuant to the collective bargaining agreement (the "Laborers' union contract") between Whiting-Turner and the Southeast Florida Laborers' District Council for Local Union Nos. 478, 767,



and 800 dated December 6, 1996 (the "Laborers' Union"). (Plaintiff Dep. (I) at 27-29; Ex. A, Plotke Aff., ¶ 5.)

6. In May 1997, Eric Plotke, a superintendent at Whiting-Turner, asked the Laborers' union to provide candidates for a foreman position in a construction project at the Bloomingdale's store in Aventura Mall. (Plotke Dep. 8-9.)

7. Pursuant to the request, on May 19, 1997, the Laborers' union referred Plaintiff for the position, and Plotke hired Plaintiff to be a laborer foreman at the Bloomingdale's project pursuant to the Laborers' union contract. (Plaintiff Dept. (I) at 27-29; Plotke Dep. 8-10; Ex. A, Plotke Aff., ¶ 7.)

8. Plaintiff has been a member of the Laborers' union since 1964. (Plaintiff Dep. (I) at 4.)

9. Pursuant to the Laborers' union contract, Plaintiff, as a laborer foreman, earned an hourly wage of $9.82. (Ex. A, Plotke Aff., ¶ 8.)

10. While at the Bloomingdale's project, Plotke witnessed Plaintiff's skills as a laborer foreman and thought that Plaintiff showed the potential to become an assistant superintendent, even though this position was normally reserved for carpenters due to their skills and expertise. (Ex. A, Plotke Aff., ¶ 9.)

11. All Whiting-Turner assistant superintendents in South Florida are carpenters because they have more pertinent skills for the position than laborers. (Ex. A, Plotke Aff., ¶¶ 10-11.) Excluding Plaintiff, assistant superintendents at Whiting-Turner are always carpenters because, unlike laborers, carpenters extensively deal with building layout, the use of surveyors instruments, a transit and/or level, and interface with a large number of components which are incorporated into the structure. Id.

12. The assistant superintendent supervises and orchestrates the work performed by subcontractors, carpenters, and laborer foremen to ensure that the construction project follows Whiting-Turner's time-sensitive schedules and architectural designs and plans. (Ex. A, Plotke Aff., ¶ 12.)

13. Whiting-Turner has 2 types of assistant superintendent positions: (1) union-benefits assistant superintendent ("assistant superintendent-UB"), a *non*-management position used for trainees during their probationary period, and (2) company-benefits assistant superintendent ("assistant superintendent-CB"), a management position. (Ex. A, Plotke Aff., ¶ 13.)

2

14. Assistant superintendents-UB are those individuals employed pursuant to a union contract and who continue to receive union benefits; that is, assistant superintendents-UB are *not* members of management. (Ex. A, Plotke Aff., ¶ 14.) In contrast, assistant superintendents-CB are individuals directly employed by Whiting-Turner and are members of management. Id.

15. The assistant superintendent-UB position is simply a probationary position where, if the employee properly performs his/her job, Whiting-Turner will promote the employee to a permanent assistant superintendent-CB managerial position. (Ex. A, Plotke Aff., ¶ 15.) The assistant superintendent-UB position was created so that a union member could accept a promotion on a probationary basis without the fear of losing his/her union benefits (such as seniority and pension) if the employee did not meet the job requirements during the probationary period. Id. The probationary period could last several years: in fact, Plotke – who was a carpenter foreman – had previously been a assistant superintendent-UB for over 1.5 years before he was promoted to the assistant superintendent-CB position. (Plotke Dep. at 5-6.)

16. As the Bloomingdale's project was concluding, Plotke offered Plaintiff the opportunity to replace the assistant superintendent-UB, Doug Houghton (who is a carpenter, white, and younger than Plaintiff), and become one of the two assistant superintendents at a new construction project at the Sawgrass Mills mall. (Plaintiff Dep. (I) at 33; Plaintiff's Deposition dated June 15, 2000 ("Plaintiff Dep. (II)") at 105-6.)

17. Houghton was terminated for poor performance. (Ex. A, Plotke Aff., ¶ 17.)

18. Plotke told Plaintiff that he would recommend to Whiting-Turner's Vice President, Robert H. Mitchell, that Plaintiff be promoted to an assistant superintendent-UB so that, if Plaintiff properly performed, Plaintiff would be promoted to Whiting-Turner's management as an assistant superintendent-CB. (Ex. A, Plotke Aff., ¶ 18.)

19. Plaintiff was nearly 51 years old when Plotke offered him the assistant superintendent-UB position. (Plaintiff Dep. (II) at 91-92.)

20. Pursuant to Plotke's recommendation, Mitchell approved Plaintiff's promotion. (Ex. A, Plotke Aff., ¶ 20.)

21. Plaintiff admits that Plotke wanted him to be his assistant. (Plaintiff Dep. (I) at 33, 40, 55-56, Plaintiff Dep. (II) at 91.)

22. In October 1997, Plaintiff started work at the Sawgrass Mills project. (Ex. A, Plotke Aff., ¶ 21.) During the first few months, Plaintiff had little to do. Id.

3

23. During this slow period when the project was getting set up, employees hired, and construction permits obtained, Plaintiff's salary was increased to $10.82 per hour, even though the Laborers' union contract did not require Whiting-Turner to do so. (Ex. A, Plotke Aff., ¶ 22.)

24. While at the Sawgrass Mills project, Plotke took Plaintiff to the construction site to provide him with training. (Plaintiff Dep.(I) at 74.)

25. On February 16, 1998, Whiting-Turner hired Bender, a carpenter foreman, also as an assistant superintendent-UB for the Sawgrass Mills project. (Plotke Dep. at 21-22; Ex. A, Plotke Aff., ¶ 24.)

26. Like Plaintiff, Bender's salary with Whiting-Turner was based on the collective bargaining agreement (the "Carpenters' union contract") between Whiting-Turner and the South Florida Carpenters District Council (the "Carpenters' union"). (Ex. A, Plotke Aff., ¶ 25.)

27. Pursuant to the Carpenters' union contract, a carpenter foreman's hourly wage at the time was $16.10, 64% higher than a laborer foreman's salary ($9.82). (Ex. A, Plotke Aff., ¶ 26.)

28. The wage difference between a carpenter foreman and laborer foreman is due to the higher skill level that carpenters possess. (Ex. A, Plotke Aff., ¶ 27.) A carpenter is different from a laborer in the level of skills. (Plaintiff Dep. (I) at 58.)

29. Plaintiff admits that Bender was experienced. (Plaintiff Dep. (II) at 71.)

30. As assistant superintendents-UB, Bender and Plaintiff had the same duties, but each was responsible for 3 of the 6 buildings on the Sawgrass Mills project. (Plotke Dep. at 33; Ex. A, Plotke Aff., ¶ 28.)

31. Like Plaintiff, Bender was told that if he properly performed, he would be promoted to assistant superintendent-CB. (Ex. A, Plotke Aff., ¶ 29.)

32. Plotke stated that Plaintiff and Bender would spend at least 6 months before being reviewed and, if they properly performed their job, would be promoted to a assistant superintendents-CB. (Plaintiff Dep. (I) at 75-80, 84; Plaintiff Dep. (II) at 46-47; Ex. A, Plotke Aff., ¶ 29.)

33. In March 1998, Whiting-Turner decided to increase Plaintiff's wages and make him a salaried employee, even though it was not required under the laborers' union contract. (Ex. A, Plotke Aff., ¶ 30.)

34. Bender's salary was $700 gross per week, which is $17.50 per hour; thus, Bender was given a 7% wage increase from the carpenter foreman's salary. (Ex. A, Plotke Aff., ¶ 31.)

4

35.     Plaintiff's salary was increased to $628.00 gross per week, which is $15.70 per hour; thus, Plaintiff was given a 60% wage increase from the laborer foreman's salary (obviously excluding overtime). (Plaintiff Dep.(I) at 75-76; Ex. A, Plotke Aff., ¶ 32.)

36.     Plaintiff's and Bender's salary differential of $1.80 not only resulted from the disparity in the union contracts (a carpenter foreman earns $6.28 more per hour than a laborer foreman), but also due to their different skill levels. (Plotke Dep. at 28. 30 ; Ex. A, Plotke Aff., ¶ 33.)

37.     Early in the project, Plotke observed that he had overestimated Plaintiff's capabilities and that Plaintiff was having performance problems. (Ex. A, Plotke Aff., ¶ 34.) Plotke considered Plaintiff's performance failures as serious problems. (Plotke Dep. at 36.)

38.     *First,* Plaintiff failed to verify the placement of anchor bolts which supported 19 columns of the building's structural steel. (Plotke Dep. at 34-36.) As assistant superintendent, Plaintiff was required to verify the placement of anchor bolts, which are critical to a building's construction success, prior to the time that the concrete is poured, as well as provide a quality control inspection report evidencing his verification of the measurements. Id. Plaintiff admits that his job duties as assistant superintendent entailed detecting   mistakes. (Plaintiff Dep. (II) at 35-36.) However, Plaintiff failed to properly inspect the anchor bolts causing 19 building columns to be 1-foot too low. (Plotke Dep. at 34-36.) As a result, Plaintiff's failure caused the steel erector to dismantle 1 week's worth of work and the Sawgrass Mills project to incur a 3-week delay. Id. at 35-37.

39.     Although Plotke expressed his concern to Plaintiff that he had performed an inspection, had improperly documented the inspection, and had not uncovered the errors with the 19 columns before the concrete was poured and columns erected, Plotke did not take any disciplinary action against Plaintiff. (Ex. A, Plotke Aff., ¶ 36.) Rather, Plotke considered Plaintiff's failing performance as caused by Plaintiff's lack of experience as an assistant superintendent. (Plotke Dep. at 38.) Consequently, Plotke began to verify Plaintiff's reports. Id. at 46.

40.     *Second,* Plaintiff improperly measured the concrete on an entry feature between two buildings. (Plotke Dep. at 50.) Plaintiff was responsible for measuring an entry feature footing between buildings two and three. Id. After Plaintiff allegedly measured the entry footing, found it to be in compliance with plans and, consequently, the concrete was poured, Plotke was informed that the entry feature was three inches too high. Id. Plotke, the project manager, and a number of

laborers were forced to rake the wet concrete before it hardened so as to get the entry feature measurements back to grade. Id.

41.     ***Third,*** Plaintiff improperly failed to plant trees in the proper location and with the correct elevation. (Plotke Dep. at 94-95.) Under Plaintiff's supervision, certain trees were planted in an improper location and an improper elevation which made the brick pavers slope tremendously. Id.

42.     ***Fourth,*** Plaintiff was unable to use equipment that an assistant superintendent was required to use. (Plotke Dep. at 59-60.) Plotke would ask Plaintiff if he understood how to use the equipment that an assistant superintendent would use, and Plaintiff would answer affirmatively. Id. However, Plaintiff would never use such equipment, but would rely on others to do his job. Id. For example, when Plotke asked Plaintiff to do some layout verification measurements, Plaintiff would grab the equipment, go to the field, and would instead have a carpenter use the equipment for him, even though Plaintiff was supposed to do the verification. Id.

43.     ***Fifth,*** Plaintiff failed to correct field problems once they were identified. (Plotke Dep. at 64-65.) As Plotke explains:

> I think one of the other inherent problems that we had was James -- James would identify problems in the field, but he didn't have -- he didn't have the ability to resolve them. I think despite conversations that he and I had, I think that James thought that his responsibility started and ended in identifying a problem and bringing it to somebody's attention.
>
> A superintendent has to be someone who not only can identify a problem and tell you that there is a problem, but has to be somebody who pursues the repair or the fix, whether it be through a subcontractor, an architect, a structural engineer, a civil engineer, an owner or whomever, to track the problem down, track down the resolution and implement a repair or the resolution to a problem with the minimal schedule and minimal cost impact.
>
> James repeatedly would bring something to somebody's attention, and I would be aware of some of the issues. Three days later, I would ask James whatever happened with that and he would say, well, I told so and so or I told Sergio. He felt that his responsibility ended by identification of a problem and that's not the role of a superintendent.
>
> An example, there was a conduit that was installed and it was a seemingly insignificant issue that went on for three months, and we had an owner's representative screaming at us in our office. An electrician installed an exterior conduit along a masonry wall by a loading dock. The owner's representative in a monthly walk-through pointed it out and we had asked -- it was in James' realm of supervision. It was in one of the areas that he had been delegated. We had asked

6

> him to get the conduit lowered. It had to be lowered six inches into the dirt so that it wasn't visible to the public.
>
> It took three months and I finally had to get the electrician over there and showed it to him. He fixed it the next day. That's one example.

Id.

44.  ***Sixth,*** Plaintiff was unable to supervise work and ensure that it was completed on the scheduled date. (Plotke Dep. at 66-67.) For example, the project manager would complain to Plotke about Plaintiff's inability to resolve issues and inability to meet scheduled dates. Id. Similarly, the brick paver's superintendent complained about Plaintiff in that areas were unprepared when he and his crew were scheduled to work. Id.

45.  Plotke continuously gave Plaintiff the opportunity to undertake tasks that Plaintiff should have excelled. (Plotke Dep. at 66-67.) However, Plaintiff's performance was still poor:

> Again, we put James in charge of, I testified a little earlier, about some foundations on Main Street that we had asked James to do. We had asked James to do that because he had told me that in his prior experience that he even had his own concrete company and, you know, he was a concrete subcontractor. I thought, here's an opportunity for the guy to shine, if he had a business, owned a company, and he did concrete work, here is something that we can get him in there doing that's going to give him an opportunity to look good. It wasn't a very complicated job. There was a lot of footing. They supported canopies in buildings three and four. There were kiosk footings. It seemed to take forever, for this stuff to get done. I know that it went tremendously over budget. I know that it required more people. We had to hire people to put on it just to keep ahead of subcontractors because it just wasn't getting done on time. It just seemed to drag on forever. And my project manager was irate that it went over budget when it shouldn't have. It took too much time.

Id.

46.  According to Plaintiff, a discriminatory incident during the 6-month period was that his photograph was not taken when the owners of a proposed construction project visited the Sawgrass Mills site:

> They came on the job site and we were told they was coming, and you know, we were like supposed to showcase what we do, I guess, and you know, let them see how a Whiting-Turner operation was, and I was a part of that. But when they get ready to take pictures, I thought there should have been a picture of me. I mean, you have a Polaroid there, and you take one more picture of one more guy. They took a picture of Chuck Bender, Ray McKean, Eric Plotke, Jeff Cooper.

(Plaintiff Dep. (I) at 101-02.)

7

47. In August 1998, Bender approached Whiting-Turner for his review. (Ex. A, Plotke Aff., ¶ 44.) Since Bender had properly performed his job duties, Bender was promoted to assistant superintendent-CB. Id.

48. Unlike Bender, Plaintiff did not approach anyone at Whiting-Turner for a performance review or promotion (presumably because of his performance problems). (Ex. A, Plotke Aff., ¶ 45.)

49. Bender's promotion to management within 6 months was uncommon since Plotke himself took over 1.5 years as an assistant superintendent-UB before he was promoted. (Ex. A, Plotke Aff., ¶ 46.)

50. The only alleged discriminatory incident Plaintiff identifies that took place after October 1998 is that he was ordered to leave an EEO training meeting to correct fencing around recently planted trees. (Plaintiff Dep. (I) at 106.) However, Plaintiff was asked to leave the EEO meeting so that he could correct the placement of certain palm trees which Plaintiff mis-planted in the wrong location. (Plotke Dep. at 94-95.) A construction crew was waiting to undertake work in the area where the trees were erroneously planted, and could not do so because of the mis-planted palm trees. Id. Instead of attending the meeting after correcting his mistake, Plaintiff did not return. Id. Plaintiff's allegation that he was not allowed to attend the EEO training meeting because he is Black is untrue, given that 2 other Black employees – Omar Sweeney and Samia Blanchett – attended the EEO training meeting. (Plotke Dep. at 95, 96.)

51. On April 13, 1999, Plaintiff resigned from Whiting-Turner. (Plaintiff Dep. (I) at 103.)

52. After receiving Plaintiff's resignation letter, Mitchell asked Plaintiff to stay at Whiting-Turner. (Plaintiff Dep. (I) at 135.)

53. Plaintiff believes that there are three people who discriminated against him at Whiting-Turner: Mitchell, Plotke, and Ivan Dean. (Plaintiff Dep. (II) at 72.)

54. Plaintiff testified that Plotke was not a racist:

Q. Isn't it true you wouldn't say hello to him?
A. That is crap. I even talked to Eric about going to church. He and his wife, when his wife and kids came on the job, we shared all these things. Eric invited me fishing. Football, basketball games he would bring me tickets. It wasn't like that. I didn't blame Eric. It was just the situation there. I don't blame him today.
Q. So you are not saying Eric is a racist?
A. No. No. I don't think -- I wouldn't say he is a racist. . . .
Q. We are talking about you.

8

A.  I wouldn't say personally that he is a racist. I wouldn't say personally he is a racist, no.

\*\*\*\*

Q.  Isn't it true, though, that Eric Plotke didn't do or say anything to you that was racist?
A:  He didn't say anything to me that was racist. He didn't say anything to me.
Q.  Did he do anything to you that was racist?
A.  Not to me.

(Plaintiff Dep. (I) at 145-147.)

55.  Plaintiff has not presented any evidence that Ivan Dean, a superintendent, held any discriminatory animus against him. (Plaintiff Dep. (II) at 73.) Plaintiff accuses Dean of discrimination because he was rude to him on 2 isolated occasions on a separate project where Plaintiff only spent a few hours. Id. First, Plaintiff claims that he was sent to a project at Car Max where Dean was the superintendent. (Plaintiff Dep. (I) at 156-57.) At the project, he was introduced to Dean who, upon meeting him, purportedly stated, "If you can't find nothing for him to do, then fire him." Id. Second, Plaintiff complains that when he and others were standing around waiting for a concrete truck, Dean drove up and screamed that, "On my jobs, we don't take a 45-minute lunch break" and "I don't know you from Adam." Id. at 160.

56.  Dean was not a decision-maker in this case or involved in any way with any event relative to Plaintiff's claims.

57.  Plaintiff admits that no one at Whiting-Turner ever mentioned his age. (Plaintiff Dep. (II) at 89.) Plaintiff stated:

A.  I don't remember them saying anything, but I always let them know how many years I had been in this.
Q.  But did anybody say anything to you about your age?
A.  No.

(Plaintiff Dep. (II) at 89.)

58.  Plaintiff admits that no one at Whiting-Turner wrote down anything about his age (Plaintiff Dep. (II) at 90.)

59.  Plotke stated that he has a great admiration for Plaintiff and would rehire him as a foreman. (Plotke Dep. at 75-76.)

9

Respectfully submitted,

SHUTTS & BOWEN LLP
Attorneys for Defendant
201 South Biscayne Boulevard
1500 Miami Center
Miami, Florida 33131
(305) 358-6300
(305) 347-7386 (facsimile)

By: _____
Sheila M. Cesarano
Florida Bar Number 708364
Rene J. Gonzalez-LLorens
Florida Bar Number 708364

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via facsimile and regular mail on this __23__ day of October 2000 to **DAVID H. POLLACK, ESQ.**, 25 S.E. 2nd Avenue, Suite 1020, The Ingraham Building, Miami, Florida 33131.

_____
OF COUNSEL

MIADOCS 363954.1 RGL

10