# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6224-CIV-DIMITROULEAS/JOHNSON

JAMES BUSH,

        Plaintiff,

v.

THE WHITING-TURNER
CONTRACTING CO., a
Maryland corporation,

        Defendant.

_____/

## DEFENDANT'S NOTICE OF FILING DEPOSITION TRANSCRIPTS

Defendant, **THE WHITING-TURNER CONTRACTING CO.**, hereby files the original

deposition transcripts of Plaintiff, James Bush, Volume I, dated June 8, 2000, and Volume II, dated

June 15, 2000 and Eric Plotke, dated June 16, 2000.

        SHUTTS & BOWEN LLP
        Attorneys for Defendant
        1500 Miami Center
        201 S. Biscayne Boulevard
        Miami, Florida 33131
        (305) 358-6300
        (305) 347-7386 Facsimile

By:_____

        Sheila M. Cesarano
        Florida Bar No. 708364
        Rene Gonzalez-LLorens
        Florida Bar No. 0053790

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this ⟶ 25 ⟵ day of October, 2000 to **DAVID H. POLLACK, ESQ.**, 25 S.E. 2nd Avenue, Suite 1020, The Ingraham Building, Miami, Florida 33131.

OF COUNSEL

MIADOCS 375355.1 MBD

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2          FORT LAUDERDALE DIVISION

3               CASE NO. 00-6224-CIV-DIMITROULEAS

4    JAMES BUSH,

5               Plaintiff,

6    v.

7    THE WHITING-TURNER            ORIGINAL
     CONTRACTING CO., a Maryland
8    corporation,

9               Defendant.

10   - - - - - - - - - - - - - - - - - - x

11

12                    1500 Miami Center
                      201 South Biscayne Boulevard
13                    Miami, Florida
                      June 8, 2000
14                    11:00 a.m. - 1:59 p.m.

15

16

17

18               DEPOSITION OF JAMES BUSH

19

20

21          Taken before Amy Massengale, Registered

22   Professional Reporter and Notary Public for the State

23   of Florida at Large, pursuant to Notice of Taking

24   Deposition filed in the above cause.

Page 2

```
 1                    APPEARANCES

 2

 3        DAVID H. POLLACK, ESQ., of the firm of
          David H. Pollack, on behalf of the
 4        Plaintiff.

 5        SHEILA CESARANO, ESQ., of the firm of
          Shutts and Bowen on behalf of the Defendant.
 6

 7

 8

 9

10

11                    I N D E X

12   Witness              Direct              Cross

13   JAMES BUSH

14

15                   E X H I B I T S

16      Dft.                    For Ident.

17   1.................................................. 133

18

19

20

21

22

23

24
```

1   Thereupon--

2                    JAMES BUSH

3   was called as a witness by the Defendant and, having

4   been first duly sworn, testified as follows:

5                  DIRECT EXAMINATION

6   BY MS. CESARANO:

7       Q.   Mr. Bush, can you please state your entire

8   name for the record and your address and home phone.

9       A.   James Thomas Bush, Sr., 3824 Northwest 15th

10  Avenue, 33142, Miami.

11      Q.   Your Social Security number?

12      A.   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.

13      Q.   What is your date of birth?

14      A.   12/17/46.

15      Q.   Are you married?

16      A.   Yes, I am.

17      Q.   Your wife's name?

18      A.   Henrietta, H E N R I E T T A.

19      Q.   How old is she?

20      A.   She is 52.

21      Q.   Do you have any children?

22      A.   I have got nine.

23      Q.   That's good.  I bet you have a lot of

24  grandchildren, too.

1         A.    Twenty-six.

2         Q.    Wow.  Does your wife work?

3         A.    My wife is basically a housewife.  She helps

4    out an elderly friend of hers.  In fact, one has cancer

5    now.  She just helps her out some days and she goes

6    over some days with her, but she is basically a

7    housewife.  That is what she has been the past 28, 29

8    years.

9         Q.    Are you a union member?

10        A.    Yes, I am.

11        Q.    What union?

12        A.    Local 478.  That is laborers.  That's Miami.

13        Q.    How long have you been a member of that

14   union?

15        A.    Since 1964, September 17th.

16        Q.    As a member of the Laborer's Union, was there

17   a time that you became promoted to a foreman position

18   with the union?

19        A.    I have been a foreman since 1968.  I got my

20   first foreman job in '68, and until 1999, I was in

21   supervision solid.  I mean, I was foreman all those

22   years.

23        Q.    Okay.  For the judge or jury's benefit, what

24   does a foreman do?

1       A.    We have different categories.  At five --

2   after you get five men, you can make a guy foreman.

3   This guy would basically be in charge of those five

4   men, but my category, I was a general foreman.

5            In fact, on this building right here, I

6   worked 65 men in these two buildings.

7            A general foreman, his job, you have more

8   responsibility.  My job, I covered everything, I

9   covered the whole job.  I took orders from the general

10  superintendents, and basically, I was in charge of

11  concrete.  I was in charge of production, getting it

12  done, pouring concrete, form work, like that, safety.

13  All that came under my belt.

14       Q.    As a general foreman?

15       A.    As a general foreman, yes.

16       Q.    Approximately how many men would a general

17  foreman direct, just in terms of the range of numbers?

18       A.    Normally, you would have a general foreman

19  after -- the union says after 15 men, but I have worked

20  as many as 92 per day with seven foremans under me.

21            A general foreman has other foreman under

22  him.  I have had as many as seven foremans work for me

23  in this building here.

24       Q.    That would be the Miami Center building?

1      A.   Here in Miami Center building with seven

2   foremans, The Intercontinental building with seven

3   foremans.   That is where I worked 92 guys at.

4      Q.   Who is in charge of Local 478 for the union?

5      A.   Right now it is Al Houston.

6      Q.   What is his title?

7      A.   President, secretary, treasurer.

8      Q.   Anybody else under him in an official

9   capacity in that local?

10      A.   Me.

11      Q.   You are next in line?

12      A.   Yes.

13      Q.   What is your title with the union?

14      A.   Right now I am a business agent.

15      Q.   Does the union pay you for being a business

16   agent?

17      A.   Yes, I get paid a salary.

18      Q.   Is it a full-time job?

19      A.   Full-time job, yes.

20      Q.   How long have you been a business agent?

21      A.   Since May 10th, '99.

22      Q.   What is your salary as a business agent?

23      A.   $600 a week.

24      Q.   Do you get any other benefits or extra money

1  as a business agent with the union?

2      A.    Also, I'm also a member of the district

3  counsel.  I get $200 a month from the district

4  counsel.

5      Q.    Any other money besides the $600 and the $200

6  you get in any capacity from your union jobs?

7      A.    No, no money at all.

8      Q.    Now, since May of '99 when you became a

9  business agent for the union -- actually, I will change

10 that question.

11          Before May 1999 when you became a business

12 agent for the union, did you have any other jobs for

13 the union, any official job for the union before that?

14     A.    Before that, I was a member of the executive

15 board.

16     Q.    Did you get paid for that?

17     A.    I didn't get paid for that, no.

18     Q.    How long did you hold that position?

19     A.    Since '96.  I think -- no.  It could have

20 been '95.

21     Q.    Okay.

22     A.    I'm just trying to remember dates.  It could

23 have been either the last of '95 or the first of '96

24 when I was appointed as member of the executive board.

1        Q.    How many persons on the executive board for

2    the union?

3        A.    It is a total of seven.  Now it is only six

4    because we lost our business manager.  He was removed

5    from office, so it was only six.  We have six.

6        Q.    Just curious, did he get voted out?

7        A.    No, he get thrown out.

8        Q.    Thrown out, what did he do to earn that?

9        A.    I won't get into it, but we are a pretty

10   strict union.  They are pretty strict.  Business is not

11   going to be business as usual.  It will be done

12   according to what the union rules say, so after all the

13   rules, they picked me.  They figured I was strict

14   enough, so they put me in the position.

15       Q.    Now, since May of '99 when you have been

16   acting as business agent and district council member,

17   have you also been engaged in laborer's jobs outside

18   the union in doing construction?

19       A.    No.  No.

20       Q.    Have you sort of retired from the

21   construction phase at this point?

22       A.    Well, no, I haven't retired.

23             MR. POLLACK:  Object to form.  You can

24       answer.

1          THE WITNESS:  No, I haven't retired.  In

2      fact, I can -- it is up to me as to when I can

3      retire.  We have a good retirement plan, but I

4      haven't retired.  I am just in a supervisor's

5      position with the union now.  That is what I am.

6          I am not retired.  I go to jobs every day.  I

7      have a jurisdiction from Key West all the way to

8      southwest Palm Beach.

9   BY MS. CESARANO:

10      Q.   When you say you go to jobs, you mean in your

11   capacity representing the union?

12      A.   I am a business field rep, yes.  I represent

13   almost 700 people.

14      Q.   Since you last worked for Whiting-Turner,

15   have you had any other paying jobs besides your union

16   job?

17      A.   No, that's it.

18      Q.   Have you had any other source of income at

19   all?

20      A.   None.

21      Q.   Besides the union?

22      A.   No.

23      Q.   Do you get any union benefits?

24      A.   Yes, I do.

1        Q.    What kind of benefits?

2        A.    Well, we have health and welfare.  We have a

3    pension fund.  In fact, I have been paying into my

4    pension since 1969.

5        Q.    Would those benefits with the union be

6    comparable to the benefits you would get if you were

7    working in the construction industry and getting the

8    contribution?

9        A.    If I was in construction, I would get the

10   same benefits.

11       Q.    Okay.  Just for the --

12       A.    As a union member.

13       Q.    This is more for the court reporter's benefit

14   because I have no trouble understanding you.  She can

15   only take one person at time, so she is kind of waiting

16   for me to finish my sentence --

17       A.    Okay.

18       Q.    -- before she gets your answers, even though

19   I know you know what I will say.

20       A.    Okay.

21       Q.    The union pays into the health and welfare

22   pension fund?

23       A.    Yes, ma'am.

24       Q.    For your behalf?

1        A.    Yes.

2        Q.    Are you accredited with 40 hours a week for

3    the union?

4        A.    Yes, ma'am.

5        Q.    Even though I'm sure you work more than that,

6    right?

7        A.    Oh, yeah.

8        Q.    Tell me just real briefly as a business agent

9    what are your responsibilities for the union.

10       A.    Right now I head up the hiring hall.  We have

11   a hiring hall.  It's a procedure that has been in place

12   many years.  I run this hiring hall.

13             This a procedure where we have people come

14   in, do a registration fee and we put them on a work

15   list.

16             My job, I go out there and talk with the

17   contractors.  I find secure jobs for people, and after

18   I get those jobs for people, I call back in and I will

19   come back in that afternoon.  We give them referrals.

20   Those referrals enable them to go out to the job and go

21   to work.

22             Also, we fill out insurance forms at that

23   time so that these people, the first day they start,

24   their insurance and all their health benefits and all

1    starts the same day, and my job is following back up on

2    that to make sure these things are done and make sure

3    the company is paying into the health and welfare,

4    paying into the pension and make sure all these things

5    are done according to our contracts, and I follow up on

6    all that stuff and also I sign contracts.

7         Also, like I said, I'm there to make sure the

8    company is reporting everything they are supposed to

9    report on my members.  If there is any discrepancy in

10   the field, I'm one of the mediators to go out there and

11   get things worked out.

12        Q.   If there was a grievance?

13        A.   Grievance, yeah.  That is just some of the

14   problem.

15        Q.   You sign contracts for the union?

16        A.   Yes.

17        Q.   Are those collective bargaining agreements?

18        A.   Yes.  In fact, that is what we are in the

19   process of doing now.

20        Q.   Do you also do organizing for the union?

21        A.   Yes, ma'am.  Yes, ma'am.  All of the business

22   agents, we have a person that specially is organized by

23   us to help organize, too.  Any time we see an

24   organization we can organize, we do that, too.  We are

```
 1   all capable of doing that.
 2       Q.   I just want to briefly touch on your
 3   educational history.
 4       A.   Uh-huh.
 5       Q.   Where did you go to high school?
 6       A.   Mae's High School in Goulds, Florida.
 7            MR. POLLACK:  That is a high school?  I
 8       thought it was a junior high.
 9            THE WITNESS:  When it started many years back
10       in the late '40s, it was predominantly all black,
11       and then the people that helped put this thing
12       together, talking about Arthur Polly Maes, they
13       started it, and Dade County gave them a thing and
14       I went there for 11 years.
15   BY MS. CESARANO:
16       Q.   Where is that located?
17       A.   That's in Goulds, Southwest 216th Street
18   right on the corner of that and U.S. 1.
19       Q.   Obviously in Miami?
20       A.   Yes, ma'am, Dade County.
21       Q.   What year did you graduate from there?
22       A.   June 9th, 1964.
23       Q.   Did you go on to any schooling after high
24   school?
```

Page 14

1          A.    After high school, I did -- I worked in two
2     restaurants for probably a period of about three
3     months.  Then in September is when I got into this
4     union and started doing construction work, September
5     1964.
6          Q.    From then on, it was on-the-job training,
7     huh?
8          A.    On-the-job training, that is right.
9          Q.    Did you ever have any formalized classes that
10    any of your employers gave you, and I will give you an
11    example.  Like somebody said, why don't you go to Key
12    West and take this one-week training course on
13    something or other in the construction industry, did
14    you ever do anything like that?
15         A.    I did better than that.  I went to Allstate
16    Construction College, October 1978.  I took a class
17    with them.  I took a residential contractors class for
18    the State of Florida.
19         Q.    You are going a little too fast.  I want to
20    do this one at a time.  Let's stay with the Allstate
21    Construction College.
22         A.    Allstate Construction College.
23         Q.    Where is that located?
24         A.    That was in Hollywood at the time.  I don't

1    know if they are still there or not.

2        Q.    How long was that course?

3        A.    That course lasted a month to six weeks,

4    somewhere in that range.

5        Q.    Did you go full time?

6        A.    Full time.

7        Q.    What types of things did you get trained in?

8        A.    I went specifically to be a residential

9    contractor for the State of Florida.

10       Q.    Tell me what is a residential contractor.

11       A.    Okay.    You have different classifications.

12   You have residential.    Then you have a building

13   contractor.    Then you have a general contractor.

14             I wanted to be a residential contractor.

15   That would have been a person who could build houses.

16   You could build up to a two-story house, but you could

17   not build major buildings because that was a different

18   classification.

19             So I went to take the residential

20   contractor's test, because at the time I had an

21   opportunity to get in with somebody to help build some

22   houses.

23       Q.    Have you taken that test?

24       A.    Yes.

1      Q.    What year was that?

2      A.    That was in December of '78.

3      Q.    Did you pass that test?

4      A.    No, I missed by six points.

5      Q.    Did you ever try to take it again?

6      A.    No, I didn't take that test again.

7      Q.    Okay. Did you take any other types of tests

8 relating to the construction industry besides this one?

9      A.    1989, I went and I applied at Dade County. I

10 had a letter from the company I was working for at the

11 time. That was Witters Construction, and I went into

12 business on January 26th, 1989, I started my own

13 company.

14      Q.    What was the name of your company?

15      A.    Concrete Concepts Unlimited.

16      Q.    Was that a corporation?

17      A.    Yes. Yes, ma'am.

18      Q.    Florida state?

19      A.    Florida state.

20      Q.    How many shareholders were there?

21      A.    Just me and my wife and my son, and then we

22 had the stocks, but we didn't put the stocks out at the

23 time. But in fact, we have still got them.

24      Q.    The stock certificates, you mean?

Page 17

```
 1        A.    Yes, we have still got them.

 2        Q.    But it was a family operation?

 3        A.    It was a family, yes.

 4        Q.    Your immediate family owned 100 percent of

 5   the shares?

 6        A.    Uh-huh.  Yes.  Uh-huh.

 7        Q.    How long did you have that company?

 8        A.    I still have the company, but I just can't

 9   operate my company while I'm working for the union.  So

10   what I did -- in fact, I renewed my license up until

11   '98.  Up until '98 my license was renewed.

12        Q.    What license was that?

13        A.    That is an occupational license.

14        Q.    Okay.

15        A.    Yeah, that is through Dade County.

16        Q.    So through what date did you renew it?

17        A.    I think I renewed it for '98.

18        Q.    Then after '98?

19        A.    I could still go back at any time and just

20   pay the money, but you know, it don't make no sense

21   because I can't run it.  Since I can't run a company.

22        Q.    Since '98, you left the occupational license

23   kind of go?

24        A.    Yeah.  Uh-huh.
```

1    Q.    Starting in '89, how long was Concrete

2    Concepts Unlimited actually doing business as, you

3    know, sort of a full-fledged company?

4    A.    I think it was '92.  '92, somewhere in that

5    range, because at the hurricane I lost a lot of stuff,

6    a lot of equipment, and it was kind of hard for me to

7    regroup, but I think about '93.  I think that is the

8    last year I did the income taxes.

9    I'm trying to remember.  I think it is

10    somewhere in that range.

11    Q.    During that time period from approximately

12    '89 to 1992 or '93, were you working for anybody else

13    besides your own company?

14    A.    Yes.

15    Q.    Where else were you working?

16    A.    I was working for Witters Construction.

17    Q.    How many hours per week approximately did you

18    work for Witters?

19    A.    Well, I could work a full week because I had

20    somebody else that could actually go out in the field

21    and take care of my day-to-day operations of my

22    company.

23    Q.    So you had people that work for you?

24    A.    I had people on my payroll that worked for

1   me.  I basically did all the figures, did all the

2   business part, but I had a guy that had 37 years

3   experience back then doing the work for me.

4        He took care of the concrete pouring.  I

5   would set up everything.  My man did the day-to-day

6   things.  He did that for me, and my sons worked there,

7   too.

8        Q.   So you were really having a full-time job?

9        A.   Yes.

10       Q.   As a laborer and also your own company at the

11  same time?

12       A.   At the same time, yes.

13       Q.   I will back up a little bit because I think I

14  skipped some time periods here.  Just starting from the

15  time that you first began working for the union, what

16  companies have you worked for, and before we start, if

17  it is a really long list, you might give me just an

18  approximate.

19       A.   It is not a real long list.

20       Q.   Okay.

21       A.   You want to --

22       Q.   If you could go in order of the first

23  company.

24       A.   The first company I worked with was Acme.

 1    That was in 1964.

 2        Q.    What did you do for them?

 3        A.    We built a missile sight down in Key Largo.

 4        Q.    Was that aimed at Cuba?

 5        A.    That is exactly where it was aimed.

 6        Q.    How long did you work for Acme?

 7        A.    We were down there I think about -- we were

 8    there about three months.  We were basically in on the

 9    finishing part of it.

10        Q.    What happened after that was finished?

11        A.    Then we went to Key Biscayne with a company

12    named Basker, B A S K E R.

13        Q.    Okay.

14        A.    We worked for Basker Construction.  I think

15    we was out there about three and a half months.  We

16    were doing a small apartment building on Key Biscayne.

17        Q.    Okay.

18        A.    Then I went to work for Fred Howland,

19    H O W L A N D.  We did Miami-Dade Community College

20    South Campus.  That should have been '65 there.  '65.

21        Q.    How long --

22        A.    I worked two and a half years there.

23        Q.    Okay.

24        A.    Then we left there.  We went to Florida East

Page 21

```
 1   Coast Properties.  I worked for them for two years.

 2            Then I left there.  We went to -- I went to

 3   work for Ceco.  And it's just like that, C E C O.  Ceco

 4   Corporation, that was South Miami Hospital.

 5        Q.   Another construction company?

 6        A.   Another construction company, yes, ma'am.

 7   Then while I was there, I was hired by Volpe,

 8   V O L P E, Construction, out of Massachusetts.  Then I

 9   put 14 and a half years in with them.

10        Q.   Who operated that company?

11        A.   At the time, it was Harold Gregory.  He was

12   the vice president.  I think he is long retired, and my

13   day-to-day person was George Peres, P E R E S.  I put

14   in 14 years with him.  He was my superintendent.

15        Q.   And then what caused you to leave that

16   company?

17        A.   Well, I had -- in fact, we left.  That was

18   right here on Brickell.  I was with them and they were

19   starting to cutting back.  They transferred the bonding

20   power back up to Massachusetts.  They were in the

21   process of doing a big damn and a bunch of big

22   buildings, so they took the bonding power up and

23   transferred that back up north.

24        Q.   What effect does that have?
```

1  A. When you take the bonding power, that means

2 they weren't going to do anymore work in Dade County.

3   They took the bonding power and took it, so

4 the last building I was on was a 29-story building

5 called Brickell East.  That was the last building they

6 did in Dade County.  If you need to know the jobs, I

7 know all the jobs.

8  Q. Oh, no.  We would be for here three days,

9 right?

10  A. Okay.

11  Q. That's okay.  Did you leave Volpe

12 voluntarily?

13  A. I left Volpe voluntarily.

14  Q. Any of the other companies Acme, Basker, any

15 of the other ones you mentioned so far, any of them you

16 were terminated?

17  A. You work until you run out of work.  That is

18 the way it works.  When we have a need where we have to

19 cut back four or five people, you know, we have to cut

20 back.

21   Florida East Coast Properties and Fred

22 Howland, it was the same superintendent, so when he

23 left, Fred Howland, he took us to Florida East Coast

24 Properties.

1              That is the way it works.  The superintendent

2    says, I want to take my crew, or he will go over here

3    and he will take a lot of people with him, and that is

4    how they do it in construction.

5         Q.   All the companies you have named for me so

6    far, is it true that you were never terminated for any

7    kind of performance issues?

8         A.   No, we just were laid off because the jobs

9    were closing out or coming to an end or sometimes they

10   would keep us in case they would need us.  Keep their

11   main concrete guys or keep their main carpet helpers or

12   something like that.  That is when the decision was

13   made.

14        Q.   After Volpe, you worked 14 and a half years.

15   What year would that take us to?

16        A.   That was '82.

17        Q.   '82?

18        A.   Uh-huh.

19        Q.   What companies did you work for?

20        A.   I came right here, Hollywell Construction.

21   We finished here is what we did.

22        Q.   Hollywell?

23        A.   Hollywell Construction, owner of this

24   building.

1          Q.    How long did you work for them?

2          A.    I came here for about a year, and then they

3    ran out of money here.

4          Q.    What was the next company you worked?

5          A.    Hicks, R. N. Hicks.  I was a general foreman

6    with them also.  We did a building called the

7    Hamilton.  It was on 34th Street right off Biscayne.

8          Q.    How long did you work for that company?

9          A.    I worked there for a year and a half.

10   Forty-seven men there.

11         Q.    So you were a general foreman?

12         A.    Yes, general foreman with them.

13         Q.    Why did you leave Hicks?

14         A.    Well, we finished that building.  We finished

15   at that building.  At the time, there was like a lull,

16   and being in the union all these years with my

17   experience, they never let me take a break.

18               I left there.  I came right back down here to

19   Harding International, right here at 1005 -- 1005 South

20   Bayshore Drive.  We came down to do a 40-story

21   building.  I was the general foreman there with Harding

22   International out of Atlanta.

23         Q.    How long did you work for them?

24         A.    I think I was there about eight months.  I

1   think it was about eight months.

2       Q.   Where did you go to next?

3       A.   I went to B. E. Hinsley right down the

4   street, 2021 Brickell.  That was a 27-story building,

5   ten-story garage.  I worked 55 men there.

6       Q.   Then what happened next?  What other

7   companies?

8       A.   After we left Hinsley, I went to work for

9   Witters.  That should have been '85.

10      Q.   How long did you work for Witters?

11      A.   Nine and a half years.  I left there -- I

12   left there in '95.  So pretty close to ten years.

13      Q.   Why did you leave Witters?

14      A.   Witters had ran out of work and I was their

15   foreman and they paid me well.  I got down to the place

16   where I was just driving a truck.

17           Also, they had me working at the owner's

18   house, Mr. Nagel.  He was the owner, and the owner and

19   his son was running it.  They had me working at his

20   house driving his wife back and forth to the doctor, to

21   dialysis, and he had gotten down to that and they

22   didn't want to let me go and I was working three days a

23   week.

24           And I knew my union would get me something

```
 1  else.  So what I did, I worked with them, and in fact,

 2  I was in his office this week.  I worked with them

 3  until they just ran out of work.

 4          They ran out of work and then I left there.

 5  I went to work for Gaston Thacker as general foreman.

 6      Q.    Gaston?

 7      A.    Thacker, T H A C K E R.

 8          I was a general foreman at Miami

 9  Northwestern.  I worked in excess of 40 guys there.

10      Q.    Doing which building?

11      A.    Miami Northwestern.  That is a great big high

12  school.

13      Q.    Again, general labor foreman?

14      A.    Yes.

15      Q.    How long did you work for that company?

16      A.    I think we were there a year and half.  A

17  year and a half.  I may be a couple of months off,

18  pretty close to a year and a half.

19      Q.    Why did you leave there?

20      A.    We got it so close to finishing, and then

21  they needed a general foreman on in downtown Miami, a

22  54-story building, and the union makes sure the guys

23  with experience go to the biggest jobs, and I was sent

24  down there as a general foreman for MV Professional.
```

Page 27

```
 1    And that was a 54-story condominium, Santa Maria.

 2            Bovis Construction was the general

 3    contractor, but MVP was the contractor I worked for.

 4    MVP Professional.

 5        Q.   How long did you work for MVP?

 6        A.   About a year.  For a year and four months, a

 7    year and five months.  Somewhere in that range.  Right

 8    down to the month it is kind of hard.

 9        Q.   Did you leave there voluntarily?

10        A.   No, we got -- when we get closed down on some

11    jobs, the general foreman, if they don't have enough

12    people for a general foreman to work, then they cut the

13    general foreman back, and so when they cut me back

14    there, that is when I went to work for Whiting-Turner.

15        Q.   So you were laid off from MVP?

16        A.   Yeah.

17        Q.   Then how did you get the job at

18    Whiting-Turner?

19        A.   The business manager at the time called me at

20    home and told me they needed a foreman at

21    Whiting-Turner at the Bloomingdale's store, and then I

22    was sent up there.

23        Q.   That was out of the hiring hall for the

24    union?
```

1       A.    Yes.

2       Q.    Did you go right on to Whiting-Turner's

3   payroll immediately?

4       A.    Yes, I went up there that Friday, and I think

5   I filled out the paperwork and I think I started that

6   Monday.

7       Q.    Do you remember what date was your start

8   date?

9       A.    I have the exact date.  That's probably at

10  your office.  We have got it.  Yeah.

11            What happened, I turned it in with some other

12  stuff that I had.  It should have been the 7th.  I may

13  be a day or so off.

14      Q.    This is the Bloomingdale's project?

15      A.    Yes, ma'am.

16      Q.    Does May 19th, '97 sound about right?

17      A.    Was it May?  Well, that's it then.  I thought

18  it was June, but that's it.

19      Q.    Right around that time period?

20      A.    In that time period, yes.  I thought it was

21  the first of June, but middle of May, that's it.

22      Q.    Now, who is Omar McFarland Sweeney?

23      A.    Omar Sweeney was an engineer with

24  Whiting-Turner.

1        Q.    And he started before you, or do you know?

2        A.    I think he was there when I got there.  I

3    don't know.  I really don't know when he started.

4        Q.    Did he have anything at all to do with

5    getting you the job at Whiting-Turner?

6        A.    Omar?

7        Q.    Yes.

8        A.    Oh, no.

9        Q.    Okay.  When you first were hired at

10   Whiting-Turner, what was your job classification?

11       A.    I came there as a labor foreman.

12       Q.    For whom did you work?

13       A.    Eric Plotke, P L O T K E.

14       Q.    You were working on the Bloomingdale's

15   project?

16       A.    Yes.

17       Q.    What exactly did you do on the project?

18       A.    When I got there, we were in the process

19   doing a lot of cleanup, pouring some concrete.  We had

20   a lot of subs coming in doing different things, so we

21   were just general construction, just everything.

22            Chipping, I had guys chipping.  I had guys

23   grinding.  I had people grouting.  I was in charge of

24   that, making sure we did a lot of grouting in certain

1    places.  We did work inside.

2         The elevators had to be passed and ready for

3    inspection and I took care of that.  I worked with the

4    people pouring the concrete, sidewalks.  I worked with

5    the people putting up the canopies outside.

6         Q.   Was the Bloomingdale's building already

7    completed?

8         A.   No.

9         Q.   At what stage was it?

10        A.   It was in a stage of completion.  Like we

11   were probably getting ready to start putting carpeting

12   in.  We were still putting tile and marble on the

13   floors.  They were still putting windows in.  They were

14   doing some finishing work on the roof.  It was pretty

15   wide open at that time.

16        Q.   But it sounds like it was almost completed?

17        A.   You know, it was entering the completion

18   stages.

19        Q.   So you were beginning to do some cleanup to

20   make the property look nice before the opening; is that

21   right?

22        A.   Well, we were doing the interiors plus we had

23   to do the parking lots and stuff.  We had to do the

24   interior, pour the loading docks with concrete, stuff

Page 31

1    like that.

2        Q.    How long did you work on the Bloomingdale's

3    project?

4        A.    Well, you have got it there, from May until

5    October.

6        Q.    What happened in October?

7        A.    In September, Eric Plotke told me he wanted

8    me to stay with the company and go to Sawgrass Mills

9    with them.  They had a new project coming up.

10           So then in October, he came with me one day

11    and sent me over there to Sawgrass Mills.

12        Q.    When you say he sent you over there, what was

13    happening at Sawgrass Mills?

14        A.    Well, at the time, the job had started.  It

15    was only one man on the bulldozer, and I was told to go

16    over there.  My job, when he told me -- he told me I

17    would go over there as assistant superintendent.  So

18    all I had to do is monitor.

19           I had the one guy on the bulldozer and we had

20    other equipment coming in and out.  They were getting

21    ready to start the parking lot and that was my job.

22    That is where I stayed at every day.

23        Q.    They were starting to build the parking lot?

24        A.    We were starting to build the Target parking

1    lot, yes, ma'am.

2        Q.    When you arrived at the Sawgrass job, tell me

3    what it looked like.  What stage of completion was it?

4        A.    Just a bulldozer pushing dirt.  It was brand

5    new.  Just the bulldozer pushing out dirt.  The over

6    burden had come out.  Trucks were coming in and out

7    hauling dirt and stuff out.  That is all it was.

8        Q.    What was Whiting-Turner going to build there

9    besides doing the parking lot?

10        A.    After the Target parking lot, they were going

11    to do a shopping center.

12        Q.    How much of the shopping center were they

13    responsible for?

14        A.    All of it.

15        Q.    All of Sawgrass?

16        A.    All of the new Phase III.  They were

17    responsible for Phase III.

18        Q.    What was Phase III?

19        A.    Phase III was six buildings, some addition

20    work on the theatre, and the parking lot is included.

21    They did some pedestrian walls, and they redid another

22    parking lot.  That is what they did.

23        Q.    Was Sawgrass Mills already open to the public

24    at this point?

1          A.    Oh, yes.

2          Q.    This is like an add-on?

3          A.    This is an add-on, like Phase III.  It is on

4     the north side.

5          Q.    Let's go back to your Bloomingdale's job with

6     this conversation with Eric.  Tell me exactly, if you

7     can remember, where that conversation took place with

8     Eric.

9          A.    In fact, it took place more than once.  He

10    asked me to stay with the company.

11         Q.    That was the first conversation?

12         A.    Yeah.  He told me he wanted me to stay with

13    the company.  He wanted me to go with them to Sawgrass

14    Mills, and he told me that I was clearly assistant

15    superintendent, that I was not a foreman.

16               He said, "Tell nobody else you are a

17    foreman," because I have the experience, because he and

18    I would have a lot of conversations, and he realized I

19    had been around the block more than once.

20               He told me, "When you get over to Sawgrass,

21    you will be an assistant superintendent."

22         Q.    Now, who is Eric Plotke?

23         A.    He was the general superintendent.

24         Q.    Now, is Jeff Cooper on the Bloomingdale's

1    job?

2        A.    Jeff Cooper, he came in the last part of it,

3    yes.

4        Q.    And is Jeff Cooper in a position above Eric

5    Plotke?

6        A.    Yes, he was a project -- well, at the

7    Bloomingdale's job, he wasn't a project manager.  He

8    was an engineer, but then at the Bloomingdale's -- at

9    the Sawgrass job, they made him a project manager.

10        Q.    Okay.  Are you sure what his title was at

11    Bloomingdale's for Jeff?

12        A.    He came from another job as a project -- as

13    an engineer.  That is all I thought he was.

14        Q.    You are not positive?

15        A.    I'm not positive.

16        Q.    Bloomingdale's, right?

17        A.    Right.

18        Q.    Do you know what he was at Sawgrass?

19        A.    Sawgrass he -- Bloomingdale's he became the

20    project manager.

21        Q.    Sawgrass, he was definitely above Eric?

22        A.    Yeah.

23        Q.    Eric Plotke obviously thought you were doing

24    a very good job, correct?

1          A.    Yes.

2          Q.    When he worked with you at Bloomingdale's?

3          A.    Yes.

4          Q.    At that time, you were a general laborer's

5      foreman?

6          A.    Uh-huh.

7          Q.    Now, is it true Eric Plotke himself alone

8      couldn't right there and then give you a promotion;

9      isn't that right?

10             MR. POLLACK:  Object to form.  You can answer

11         the question.

12             THE WITNESS:  Eric Plotke, a general

13         superintendent, if he wanted to make me his

14         assistant, he could do that.  He could do that.

15         He had the right to do that.

16     BY MS. CESARANO:

17         Q.    Isn't it true he needed authority to give you

18     more money?  He needed to --

19             MR. POLLACK:  Object to the form.  You can

20         answer the question.

21             THE WITNESS:  Yeah.

22     BY MS. CESARANO:

23         Q.    Go ahead.  You can answer.  He is objecting,

24     but you can still answer.

```
 1        A.    Okay.  Let me say this:  Everywhere I ever
 2   worked in this industry in almost 36 years, assistant
 3   superintendent is made by the superintendent, because I
 4   worked -- I worked hand in hand.  The engineers are out
 5   there, but the engineers do a different thing from the
 6   superintendents do.
 7        Q.    I know.
 8        A.    I want this in the records, too.  Eric
 9   Plotke, because I was talking about retirement, he
10   said, "You will never have to look for another job."
11   This is out of his mouth to my ear.
12              "We have got work for you.  Whiting-Turner
13   has a lot of work."
14              He told me I would be an assistant
15   superintendent.  The other guys from the company heard
16   this.
17        Q.    You will be --
18        A.    "You will be assistant superintendent."  That
19   is what he sent me over there to do.
20        Q.    Let's go slowly.  This is very important.
21   Okay.
22        A.    Yes.
23        Q.    You just started working for Whiting-Turner
24   at that time.  You worked from?
```

1     A.   From May to October.

2     Q.   Right.  A few months?

3     A.   Yes.  Uh-huh.

4     Q.   Wouldn't it be fair to say you did not know

5 at that time what approvals might be needed in order

6 for you to get a raise or get promoted?  Wouldn't that

7 be fair to say, you weren't positive --

8     A.   No.

9     Q.   -- what the procedure was?

10    A.   It is not fair to say I didn't know the

11 procedure.  You know, being around this industry for 35

12 years, it is basically the same thing with all the

13 companies.  The general superintendent tells you he

14 will make you his assistant, and then when he gets over

15 there and he introduces me to people as the assistant

16 superintendent --

17    Q.   We haven't got there yet.

18    A.   Okay.

19    Q.   We are talking about your first conversations

20 with Eric Plotke.

21    A.   Eric saw the leader in me.  He knew I wasn't

22 the new kid on the block.  I could do anything in

23 construction.  There is nothing that I'm naive about,

24 and he saw this and that's the reason he asked me to

Page 38

```
 1   stay with the company, and he told me he would make me

 2   assistant superintendent at Sawgrass.

 3       Q.   Let's assume all that is true.  My question

 4   to you is, isn't it true that you honestly can't say

 5   what procedures Whiting-Turner had in place that Eric

 6   would need to follow in order to make you his assistant

 7   superintendent?

 8           MR. POLLACK:  Objection, asked and answered.

 9       You can answer the question.

10   BY MS. CESARANO:

11       Q.   You can answer the question.

12       A.   I feel like this.

13       Q.   First yes or no, and then you can explain.

14       A.   Well, I can't say a yes or no, because what

15   you are saying to me, you are saying that did I know

16   the procedure.

17       Q.   Had you ever seen anything in writing?

18       A.   No, but let me say this.

19       Q.   Well --

20       A.   Since I answered like that, he should know

21   the procedure before he tells me these things.  You

22   know, I'm not a kid.  I'm a 35-year veteran.  Before he

23   tells me these things, he should be looking to what he

24   can do as to how far his power should go, his
```

1   authority, and tells me these things putting me in this
2   capacity.
3       I mean, I know I could do it, but you have to
4   remember this also, because he knows this and all of
5   them know this.  I could easily leave Whiting-Turner.
6   I could have went and made more money.
7       Q.   We all can.
8       A.   Also, listen to this.  The Diplomat Hotel,
9   $600 million job, that job was mine.  I was going to
10  leave Whiting-Turner.  I was supposed to get that.  I
11  could have gone there and made a lot of money.
12      Q.   You are going way beyond my question.
13      A.   You asked the question.  I'm saying when I'm
14  job foreman, if I tell one of my guys, I will get you a
15  dollar and a half over scale, I can do that.
16      Q.   Let's go back to Eric Plotke.
17      A.   Yeah.
18      Q.   Let's keep to Whiting-Turner and Eric Plotke,
19  because I don't care what every other company does.
20  Would it be fair to say Whiting-Turner is a big
21  company?
22      A.   Oh, yeah.
23      Q.   And Whiting-Turner has its own procedures?
24      A.   Uh-huh.

1          Q.    You have to say yes or no so she can get it.

2     You can't say uh-huh.  She has to get yes or no.

3          A.    Yes.

4          Q.    Isn't it true in these conversations you had

5     with Eric Plotke over at Bloomingdale's he didn't tell

6     you any particular amount of money that you were going

7     to be getting; isn't that true?

8          A.    That's true.

9          Q.    And clearly, Eric thought you were great,

10    there is no question about that?

11         A.    Uh-huh.

12         Q.    That is correct, right?

13         A.    Oh, yes.

14         Q.    Clearly, Eric wanted you to stay with him on

15    his team, that's correct?

16         A.    Yes.

17         Q.    And Eric is telling you he wants you to be

18    his assistant, correct?

19         A.    Yes.

20         Q.    But isn't it true Eric never told you how

21    long that would take or what the steps would be for

22    that process?  Isn't it true he didn't give you an

23    exact date?

24         A.    Well, I can say this, and I know you want to

1   do this in sequence, later on, he did tell me six

2   months.

3       Q.   Okay.  Let's keep it going.  We will go in

4   chronological order.

5       A.   Later, he told me six months.

6       Q.   We are still at Bloomingdale's?

7       A.   Oh, Bloomingdale's?

8       Q.   Yes.  At that time, did he tell you any exact

9   date when this would happen?

10      A.   No, he told me when I go over there I would

11  be assistant superintendent to him on that job, and

12  that is as far as it got.  You know, we -- he mentioned

13  it two or three times.

14           Plus he and I went over there together and he

15  showed me around the job, what we will build and what

16  we will build over here, and that is probably while we

17  were still at Bloomingdale's, and he was giving me some

18  idea, because I hadn't said whether I was going to stay

19  with Whiting-Turner or not.

20      Q.   You weren't sure if you were going to stay?

21      A.   I wasn't sure if I wanted to stay or not.

22      Q.   So Eric showed around the new job?

23      A.   Yes.  He introduced me to some people over

24  there, yes.

1      Q.    At that time, did that job at Sawgrass have

2    any people?

3      A.    I was the first man Whiting-Turner sent

4    there.

5      Q.    There wasn't a whole lot of need at that

6    point in time for a superintendent and assistant

7    superintendent and a foreman?

8          MR. POLLACK:  Object to form.  You can

9          answer.

10   BY MS. CESARANO:

11     Q.    I'm talking when you first started at

12   Sawgrass.

13     A.    When I first started the job, it was only one

14   guy on a bulldozer.

15     Q.    Right.  So when you first went over to

16   Sawgrass, isn't it true there was no need for an

17   assistant superintendent because there was nobody on

18   the job at that point?

19          MR. POLLACK:  Object to form.  You can answer

20          the question.

21          THE WITNESS:  Let me answer like this here:

22          You can send a guy's assistant superintendent over

23          there when there is nobody there, especially when

24          he is going to monitor the job.  That is my job,

Page 43

```
 1        to monitor the job.

 2             So I could be sent over there that day with

 3        nobody on the job, but me as superintendent.  It

 4        is done all the time.  Whiting-Turner does it.

 5   BY MS. CESARANO:

 6        Q.   Your position the first day you arrived in

 7   Sawgrass, which is you say October?

 8        A.   October, yes.

 9        Q.   Of '97?

10        A.   Yes.

11        Q.   That you were assistant superintendent?

12        A.   Yes.

13        Q.   That is your position?

14        A.   That's my position.

15        Q.   Let me ask you this:  How often were you paid

16   in October?

17        A.   Weekly.

18        Q.   Weekly?

19        A.   Weekly.

20        Q.   Isn't it true the management or salaried

21   people are not paid weekly; isn't that right?

22             MR. POLLACK:  Object to the form.  You can

23        answer if you know.

24             THE WITNESS:  They are paid weekly.
```

 1   BY MS. CESARANO:

 2       Q.   Whiting-Turner managers are paid weekly?

 3       A.   I don't know about managers.  No, I can't

 4   answer about managers.  I'm answering about assistant

 5   superintendent.

 6       Q.   You are saying assistant superintendents are

 7   paid weekly?

 8       A.   That is what I was.  I got paid weekly.

 9       Q.   Now, isn't it true that this scheme that Eric

10   had in mind for you was for you to be trained as an

11   assistant superintendent; isn't that true?

12           MR. POLLACK:   Object to form.

13           THE WITNESS:   No.  No.  No.

14   BY MS. CESARANO:

15       Q.   There was no training involved?

16       A.   There was no training.  Eric Plotke had been

17   in construction 16 years.  I had been in construction

18   34.  Nobody in the trailer had over 12, ten years, so

19   who is going to train who?

20           Who is going to train me if I've got 34

21   years? He had 16, and clearly, I told him about some

22   companies and stuff.  I took him way back to the early

23   '60s when these guys weren't in construction.  Who is

24   going to train me?

1          Q.    Isn't it true all your training was as a

2     laborer?

3          A.    No, my construction -- I was in supervision

4     since I think I told you 1969.

5          Q.    Isn't it true a foreman is not a managerial

6     position?

7               MR. POLLACK:   Object to form.   You can answer

8          if you can.

9               THE WITNESS:   If you are working 97 men --

10    BY MS. CESARANO:

11         Q.    Let me stop you.   For us to get anywhere in

12    this deposition, you will have to help me out a little

13    bit.   I'm okay with you explaining.

14         A.    I'm just trying to answer the best way I can.

15         Q.    No.   I need a yes or no at the beginning, and

16    then you need to explain.   Most of my questions can be

17    answered yes or no.

18               If they can't, you can tell me why you can't

19    answer it, but it's a very simple question I asked

20    you.   Isn't it true that a union foreman is not a

21    member of management of the company?

22               MR. POLLACK:   Let me just --

23    BY MS. CESARANO:

24         Q.    Yes or no?

Page 46

```
 1              MR. POLLACK:  Let me object.

 2              MS. CESARANO:  You can object, but it's a

 3         simple answer.

 4              MR. POLLACK:  For the record, you are telling

 5         the witness that questions can be answered with a

 6         yes or no, and your questions, a number of them

 7         call for speculation on the part of the witness

 8         that me might not know.

 9              MS. CESARANO:  He has been in the

10         construction industry more than 30 years.

11              MR. POLLACK:  That is the not the question

12         the way you asked it.

13              THE WITNESS:  That is not what you are

14         asking.

15    BY MS. CESARANO:

16         Q.   Let me ask it again.  You are a union member,

17    correct?

18         A.   Yes.

19         Q.   You are a union foreman, correct?

20         A.   Uh-huh.

21         Q.   Is the union foreman in management?

22         A.   You are part of management.

23              MR. POLLACK:  Object to form.

24    BY MS. CESARANO:
```

1     Q.   You are saying yes, is that what you are

2  saying?

3     A.   I'm out there to do a job.

4     Q.   It is very simple.

5     A.   But I'm not a manager, but I'm part of the

6  company -- I'm a part of supervision.  That is the

7  word.  I'm a part of supervision.

8     Q.   Isn't it true you can not be a union member

9  and a supervisor at the same time?

10    A.   No.

11    Q.   That's not true?

12    A.   No.

13    Q.   Okay.  Let me --

14    A.   You want me to answer it, right?

15    Q.   Just stop when you have answered.  Okay.  I

16  will ask you another question.

17    A.   Okay.

18    Q.   You're a union business agent, correct?

19    A.   Yes.

20    Q.   You are familiar with what is called a

21  bargaining unit, correct?

22    A.   Yes.

23    Q.   Foreman are members of bargaining units,

24  correct?

1          A.    Bargaining unit, yes.

2          Q.    Correct?

3          A.    Uh-huh.

4          Q.    You are familiar with an agency called the

5     National Labor Relations Board, correct?

6          A.    Yes.

7          Q.    That is an agency that conducts union

8     elections, correct?

9          A.    Uh-huh.

10         Q.    Isn't it true that if you are in a supervisor

11    capacity you are excluded right in the description of

12    the bargaining agreement from being in the bargaining

13    unit?

14         A.    I can't answer that.  I don't know.

15         Q.    Okay.

16         A.    I don't know.

17         Q.    Have you ever --

18         A.    I have seen the book.  I haven't read the

19    whole book.

20         Q.    I will ask you some more questions.  I will

21    give you a chance to explain, but we can't have 20-page

22    answers.  I need this in short doses.

23               Okay.  Have you ever seen a collective

24    bargaining agreement?

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

1      A.    Uh-huh.

2      Q.    Isn't it true that all collective bargaining

3    agreements have what is called a little paragraph that

4    describes who is in and who is out of the union?

5           MR. POLLACK:  Object to the form.  If you

6      know that.

7    BY MS. CESARANO:

8      Q.    If you know?

9           MR. POLLACK:  You can answer if you know.

10          THE WITNESS:  I don't know.

11   BY MS. CESARANO:

12     Q.    You don't know?

13     A.    I don't know that.

14     Q.    Do you know whether under the National Labor

15   Relations Board, the statute that they administer,

16   whether supervisors can vote in a union election?

17     A.    That would be the company supervisors?

18     Q.    Right.

19          MR. POLLACK:  If you know, say yes.  If you

20     don't know, say no.

21          THE WITNESS:  I don't think so.

22   BY MS. CESARANO:

23     Q.    You think supervisors cannot vote?

24     A.    I don't think so.

1          Q.   Is that because they are not members of the

2     bargaining unit?

3               MR. POLLACK:  Object to form.  You can answer

4          if you know.

5               THE WITNESS:  I'm not sure.  I have seen this

6          stuff more than one way so I can't answer that.

7     BY MS. CESARANO:

8          Q.   Now, is Eric Plotke, he is a superintendent,

9     correct?

10         A.   Yes.

11         Q.   Is he a member of the union?  I mean as a

12    superintendent?

13              MR. POLLACK:  If you know, say yes.  If you

14         don't know, say no.

15              THE WITNESS:  I think he was a member of the

16         union.

17    BY MS. CESARANO:

18         Q.   I don't mean was --

19         A.   I don't know.  I don't know the status.  I

20    really don't know.

21         Q.   You don't know.  Okay.

22         A.   I don't know the status of it.

23         Q.   Let's not take Eric.  Let take any

24    superintendent, any superintendent on any job.

1    A.    There are some superintendents that are still

2    union because of their affiliation with the union, and

3    a lot of superintendents have elected to keep their

4    cards because of their benefits.

5    Q.    All right.  You have heard about Chuck

6    Bender?

7    A.    Chuck Bender, yes.

8    Q.    Correct?

9    A.    Uh-huh.

10    Q.    Isn't it true he was in the training program

11    to become an assistant superintendent prior to the time

12    -- from the date he was hired until six months later

13    when he became an assistant superintendent?

14    A.    No.

15    Q.    He wasn't in any training program?

16    A.    He did the same thing I did.

17    Q.    He wasn't called a person with union benefits

18    during that six months?

19    A.    Was he called a person with union benefits?

20        MR. POLLACK:  Object to the form.  If you

21    know, you can answer.

22        THE WITNESS:  I read that somewhere in

23    Whiting-Turner's records.  I read that, but he

24    came there just like I did.  He was a person that

Page 52

1        came there to work, and he just was reviewed in

2        six months.

3   BY MS. CESARANO:

4        Q.    I understand.  We will get to that.  That is

5   not my question about his review.  My question was

6   when --

7        A.    But he wasn't in no particular training.

8        Q.    When he was first hired, are you telling me

9   he was immediately placed as an assistant

10  superintendent in management?

11       A.    No.  That is the title he and I both had, but

12  he wasn't put directly into it.

13       Q.    He was not put directly into management?

14       A.    We carried the title of assistant

15  superintendent, he and I both.

16       Q.    But my question is was he immediately upon

17  hire put into management?

18       A.    When he was put into Whiting-Turner's

19  management, I don't know when he was put into it.

20       Q.    You know when he was hired?

21       A.    I know when he was hired, yes.

22       Q.    You worked in the same office?

23       A.    Shared the same space, shared the same

24  office.

```
 1        Q.    Talked to him every day?

 2        A.    Every day.

 3        Q.    Was he in management on the day he first came

 4   to work?

 5             MR. POLLACK:  Object to form.  Asked and

 6        answered.

 7             MS. CESARANO:  He hasn't answered it yet.

 8             MR. POLLACK:  If you know, answer it.

 9             You are asking him questions he may not know

10        the answers to.

11             MS. CESARANO:  Let him answer instead of your

12        answering.

13             MR. POLLACK:  I'm not answering for him.

14             MS. CESARANO:  It is his deposition and you

15        are suggesting he doesn't know the answers.  I'm

16        suggesting he probably does know the answers.

17             MR. POLLACK:  It is a clear question.  If you

18        know it, answer it.  If you don't, don't answer.

19             THE WITNESS:  Was he put in management, or

20        was he put into supervision?

21   BY MS. CESARANO:

22        Q.    Management.

23        A.    I don't think he was put into management.

24             MR. POLLACK:  Answered.
```

1    BY MS. CESARANO:

2        Q.    Now, you have drawn a distinction between

3    supervision and management.  Tell me what your

4    distinction is.

5        A.    Supervision is what we were doing every day.

6    We were in charge of men.  We were charge in of

7    building density reports, safety.  We were in charge of

8    all these things.  We were doing this every day, so we

9    are part of supervision.

10       Q.    You would say a foreman is a supervisor?

11       A.    That is what I told you a while ago.

12       Q.    You would agree with that?

13       A.    A foreman is part of supervision, right.

14       Q.    You would agree with that?

15       A.    Yeah.

16       Q.    Would you say a foreman is a part of

17   management?

18             MR. POLLACK:  Object, form.  You asked this a

19        while ago.

20   BY MS. CESARANO:

21       Q.    Give me a simple answer.

22             MR. POLLACK:  Object to form.

23             THE WITNESS:  You work for management.  That

24        is the way you have to look at it.  Let's say

1    that.  You have to look at it as the foreman, that

2    guy works for management.  The orders come from

3    management, so that is the best way I can put it.

4    I can't explain it any other way than that.

5    BY MS. CESARANO:

6        Q.    Therefore, isn't it true that the foreman is

7    not in management?

8        A.    He works for management.

9        Q.    So he is not in management?

10       A.    No, he works for management.

11       Q.    Okay.  Now going back to Eric Plotke?

12       A.    Uh-huh.

13       Q.    I want to try to do the conversations in some

14   kind of order that you had with him about this

15   assistant superintendent job.  You said you had more

16   than one conversation.

17       A.    Uh-huh.

18       Q.    What was the first conversation you had about

19   it?

20       A.    Well, where he said he wanted me to stay with

21   the company because he had seen my experience.  He told

22   me out of his mouth, he said, "Tell nobody else you are

23   a foreman.  You are clearly assistant superintendent

24   quality."

1         Those are his words.

2     Q.   Okay. Assistant superintendent quality?

3     A.   Yeah, to him.

4     Q.   To him?

5     A.   Yeah. I had been working.

6     Q.   In Eric's opinion?

7     A.   In his opinion, yeah.

8     Q.   Now, what if anything makes you say that Eric

9 could appoint you instantly assistant superintendent

10 with no approval from anyone above him?

11         MR. POLLACK: Object to the form. Asked and

12     answered. You can answer it.

13         THE WITNESS: When you start a job and you

14     are basically putting your people together around

15     you, and Eric being the general superintendent

16     over construction, he made the call that is what

17     he wanted me to do.

18 BY MS. CESARANO:

19     Q.   Isn't there a project manager?

20     A.   There is a project manager, yes.

21     Q.   Isn't it true the project manager's approval

22 is needed?

23     A.   Yes.

24     Q.   On jobs --

1  A. I would think so.  Now, I know you want to do

2 this in a systematic order.

3  Q. Because I need you --

4  A. I have something very good to let you know.

5 If you put a star by that, we will come back later.  I

6 will come back and give you a statement that involved

7 both of them on this same issue, but you don't want

8 that now.  I will give it to you when you get ready.

9  Q. We can't do everything at once.

10  A. I know.  Put a star by that point, and when

11 we get to a point, I will give you some information.

12  Q. Remember that your attorney can ask you

13 whatever questions he would like to ask you.  These are

14 just my questions.

15  A. I know.  I know.  I know.

16  Q. They may not be your questions.

17  A. I know.  I know.  Uh-huh.

18  Q. Okay.  But I don't want you to think you have

19 to tell me your entire story in five minutes.  We can

20 go more slowly because I can only take notes so

21 quickly.

22  A. Okay.

23  Q. Now let me back up.  What, if any, are the

24 differences between what a laborer does on a job and

Page 58

1   what a carpenter does on a job?

2        Maybe first tell me what a laborer does.

3    A.   That's a lot of -- well, laborers pour all

4   the concrete like columns, walls.  Laborers work with

5   carpenters doing form work.

6    Q.   Laborers do form work?

7    A.   Help with the carpenters with the form work.

8    Q.   The carpenters do the form work?

9    A.   The carpenter will be nailing the stuff, and

10   they supply them handing them nails or whatever.

11    Q.   The materials?

12    A.   The laborers are like helpers with the

13   carpenter.

14    Q.   And the laborers do?

15    A.   The laborers do all the clean-up.  Laborers

16   unload the trucks.  You have laborers that work with

17   the block masons setting up the blocks, build the

18   scaffold.

19        Same thing with plasterers.  We build

20   scaffolds, hang swings up off the top of the

21   buildings.  We do the stripping.  We do the stripping

22   of the buildings.  That is when you strip forms down.

23   We do that.

24    Q.   What would you do if you stripped a form?

1      A.   Putting a pour up here to pour concrete, we

2  would strip those down. We would hall material.

3      Q.   Once the concrete gets hardened?

4      A.   Yeah. We would hall the forms, stack the

5  forms. Load, unload trucks, clean up, and then in some

6  places, some places our guys also, we have concrete

7  finishers in our union also.

8         Our guys do concrete patching, concrete

9  rubbing. We do pour curbs and gutters, sidewalks. We

10  do the jackhammer. We do the chipping. We do all the

11  grinding in the building.

12         Like if a surface has to be ground smooth, we

13  have to do that. We handle the equipment. We do the

14  jackhammer. We can burn used torches. We use air

15  tools. We do all the mixes for the cement for the

16  block masons. We do the mixings of cement for the

17  plasters.

18         We do a lot of grouting. We do a lot of

19  waterproofing. Those are some of the things I can

20  think of.

21      Q.   I know you are not giving me every single

22  thing.

23      A.   That's what I'm telling you. There are just

24  so many.

1     Q.    I understand.  But a carpenter, what kind of

2    tools do carpenters normally bring onto a job?

3     A.    Hammer, tape.  The company will supply the

4    skill saws.  The company supplies some levels.

5     Q.    What about --

6     A.    Squares, like that.

7     Q.    What kind of measuring devices do the

8    carpenters use?

9     A.    Use measuring tapes.

10     Q.    What else?

11     A.    That's about it.  Measuring tape.

12     Q.    Are there some more sophisticated tools

13    besides measuring tapes that a carpenter uses?

14         MR. POLLACK:  Object to the form.  You can

15      answer.

16         THE WITNESS:  To measure with?

17    BY MS. CESARANO:

18     Q.    Right.

19     A.    If you are just taking a measurement, it is a

20    tape.  We can shoot elevations.

21     Q.    How would a carpenter shoot an elevation?

22     A.    We can shoot elevations with a level, and

23    also, laborers do that, too.  We've got laborers that

24    do that, too.

Page 61

1    Q.    What type of things do carpenters do that

2    laborers don't do?

3        A.    Well, if you want to install a door or

4    something, a laborer would help him get the jam in

5    place, get the jam ready, and then he would have to

6    help him hang the door.

7            Laborers help them do all that.

8        Q.    What type of things do carpenters do that

9    laborers don't do?

10       A.    Let's say if you were in this room here, a

11   crown molding, the carpenter would put that up.  He

12   would have to have help, but a carpenter could do

13   that.

14           Put up paneling like what we've got here.

15   Maybe install cabinets.

16       Q.    What kind of instruments would a carpenter

17   have or use that laborers would not normally have or

18   use?

19       A.    A tool a carpenter would use, that's kind of

20   hard to say.  I mean, we use levels.  We use squares.

21       Q.    Are you saying a laborer uses every single

22   kind of tool that a carpenter uses?

23       A.    Not every kind.  I mean, we use drills.  I'm

24   trying to think.  On some jobs they don't particularly

1   want us to use a skill saw.  It is not saying we can't

2   use a skill saw, but on some jobs they won't let you

3   use a skill saw.  They will give it to the carpenter to

4   do, an electrical saw.

5       Q.   That's a tool a carpenter --

6       A.   That is a tool a carpenter probably would --

7   we use them also, but some jobs we don't use them.

8   Some areas we don't use them.

9       Q.   Now, isn't it true both laborers and

10  carpenter have unions that are craft unions, correct?

11      A.   Yes.  Uh-huh.

12      Q.   Isn't it true from time to time there are

13  disputes between unions as to what jobs belong to which

14  craft?

15      A.   Which one can do what, yeah.

16      Q.   That happens from time to time?

17      A.   That's true.  That's true.  That's true.

18      Q.   Isn't it true from time to time most unions,

19  if this were a perfect world, they would like the line

20  to be a real strict line between the crafts so there

21  aren't any arguments?

22          MR. POLLACK:  Object to the form.  You can

23      answer.

24          THE WITNESS:  Well, all unions are like

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

1       that. Yeah, they basically want everything for

2       themselves if they can.

3  BY MS. CESARANO:

4       Q.   Right. And so it would be fair to say there

5  are differences between what carpenters do and what

6  laborers do that make the two unions different?

7       A.   It is somewhat of a difference.

8       Q.   And isn't it also true that carpenters have

9  more occasions to use blueprints and read plans, et

10  cetera, than a laborer would?

11      A.   You are saying carpenters?

12      Q.   Yes. More times when they would be called

13  upon to use blueprints and read plans than a laborer

14  normally would?

15      A.   That varies. That's on some jobs. Some jobs

16  right now, we have guys that does everything that

17  carpenters do.

18      Q.   Let's stick to Whiting-Turner. Wouldn't it

19  be fair to say carpenters working on a Whiting-Turning

20  job have more occasions to read the blueprints, the

21  plans, the site plans than a laborer would?

22      A.   Yes. Yes.

23      Q.   Okay. And, therefore, a carpenter would tend

24  to have a little more familiarity and skills in that

Page 64

1    area.

2              MR. POLLACK: Object to the form. You can

3        answer.

4              THE WITNESS: You mean with Whiting-Turner?

5    BY MS. CESARANO:

6        Q.    Yes, with Whiting-Turner.

7        A.    On that particular job?

8        Q.    With Whiting-Turner.

9        A.    Yes, if that is where the job is, yeah.

10       Q.    Now, Chuck Bender started on the Sawgrass

11   Mills project at a time after you did; is that right?

12       A.    Chuck Bender started in March. I had been

13   there since October.

14       Q.    Could it have been February that Chuck

15   started?

16       A.    I thought it was March.

17       Q.    So you think --

18       A.    I'm saying I thought it was March. Maybe I

19   was a couple of weeks off or something. I thought it

20   was March.

21       Q.    Sometime around March is what you think?

22       A.    I thought it was in March.

23       Q.    This would be '98?

24       A.    '98.

1     Q.   And that's when Chuck started?

2     A.   Yes.

3     Q.   Now, it is true, isn't it that Chuck Bender

4  was a carpenter?

5     A.   He was a carpenter?

6     Q.   Yes, by craft?

7     A.   I think so.

8     Q.   That is to say Chuck Bender as far as you

9  knew was not in the laborer's union, correct?

10     A.   Uh-huh.

11     Q.   That's true?

12     A.   Yes.

13     Q.   Now, is it your position that at the time

14  that you worked with Chuck Bender during that, say,

15  first six-month period that you had the same level of

16  skills as Chuck Bender did?

17     A.   Now, you want me to say yes or no or answer

18  this?

19     Q.   You can answer it any way you want.  My

20  question is would you say you have the same skill level

21  as Chuck Bender during that first six months that you

22  two worked side by side?

23     A.   Yes, and we did the same -- we were doing the

24  same thing.  My buildings were the more advanced

1    buildings because I was there when he came.  I built

2    Building 2, 3.

3           I did the underground on Building 1.  I did

4    all of the sanitary piping before Chuck Bender came.

5    Also, I had built the parking lot, Target parking lot.

6    I was assistant superintendent.  I set up concrete

7    pours.

8           I coordinated all the densities.  I did all

9    this before Chuck Bender came out there.  Also, the

10   sanitary lines underneath these buildings, I

11   coordinated that part of the construction.  Also the

12   demolition, the start of that project I was in charge

13   of demolition.

14          I was in charge of tree transplanting on this

15   project.  So all these things were done before Chuck

16   Bender.

17   Q.    Demolition is typically a laborer's job?

18   A.    That was a superintendent job.  That was my

19   job to get the demolition done.  The demolition

20   includes certain areas -- we took a look at the plan,

21   which also I went to Allstate Construction.

22          I learned how do that reading.  We had to

23   look at the plans and a certain section we would demo,

24   bring the equipment in and demo this section and leave

1    this section.

2          I was there when the fences were being put

3    in.  I was there to detour the buses.  The buses used

4    to run right through the shopping center.  That is my

5    job to detour the buses that morning.

6    Q.    Obviously, at this long project, you did

7    thousands of things?

8    A.    This is what I did before Chuck Bender came.

9    Q.    That doesn't answer my question.  My question

10   was, the first six months you worked side by side --

11   A.    What about the six months before he came, you

12   don't want to hear about that?

13   Q.    I didn't ask you that question.  I only want

14   to know the answers to my questions, not whatever you

15   would like to speak about at the time.

16   A.    Okay.

17   Q.    I'm talking about the first six months when

18   you two were side by side on the same project?

19   A.    Same thing.

20   Q.    You would say that you and Chuck had the same

21   skill level during the first six months?

22   A.    Yeah, that is how I feel.

23   Q.    Okay.  Now, after approximately six months,

24   you are aware that Chuck Bender got some sort of

1    promotion, correct?

2        A.    Yes.

3        Q.    What was that promotion, from what to what?

4        A.    I know he got an increase in salary.

5        Q.    I'm asking you in terms of title.

6        A.    I don't know about his title.

7        Q.    You don't know what his title was when he

8    came?

9        A.    Well, we were assistant superintendents is

10   what I was told.

11       Q.    You have the same title as him?

12       A.    Made the same titles.

13       Q.    You are aware of the fact there were two

14   types of assistant superintendent titles, weren't you?

15       A.    No, I wasn't aware of this.

16       Q.    Were you aware of the fact that you were

17   getting union benefits during the time that you say you

18   were acting superintendent?

19       A.    Uh-huh.

20       Q.    You are aware of that?

21       A.    Yeah.

22       Q.    The company was making contributions to

23   health and welfare for your union?

24       A.    Uh-huh.

1    Q.   In fact, during the entire time you worked at

2  Whiting-Turner, the company at all times made

3  contributions to the union for health and welfare and

4  pension on your behalf, correct?

5    A.   Uh-huh.  Uh-huh.

6    Q.   That never stopped?

7    A.   No.

8    Q.   So let me be clear on the record.  At all

9  times that you were employed by Whiting-Turner until

10  that final day, the company made union pension payments

11  and health and welfare plan contributions?

12    A.   Yes.

13    Q.   On your behalf?

14    A.   Yes.

15    Q.   Correct?

16    A.   Yes.

17    Q.   Now, isn't it true that when you are

18  assistant superintendent and in management with the

19  company that the company stops making union

20  contributions on your behalf?

21       MR. POLLACK:  Object to the form.

22  BY MS. CESARANO:

23    Q.   You can answer.

24    A.   I don't know.  Nobody never explained any of

1    this to me.

2        Q.   Okay.  Did you know if people like Jeff

3    Cooper and Rob Miller --

4        A.   Mitchell.

5        Q.   Mitchell, and Eric Plotke had union

6    contributions to health and welfare and pension made to

7    their union?

8        A.   I can't answer that.  I don't know.

9        Q.   You don't know?

10       A.   No.

11       Q.   Did you understand that during the time that

12   you were working on the Sawgrass Mills project that you

13   were not a member of management?

14            MR. POLLACK:  Objection, asked and answered.

15        You can answer.

16            MS. CESARANO:  It is the whole case, and I

17        can ask him.

18            MR. POLLACK:  You are asking for a legal

19        conclusion and you are asking for knowledge

20        outside of the scope.  I will continue to object.

21            MS. CESARANO:  You can object all you want as

22        long as he answers.

23            MR. POLLACK:  It's asked and answered.  It is

24        the same question.

Page 71

1          MS. CESARANO:  With all due respect, I don't

2     think I have a clear answer yes or no.  Can you

3     read back the question?

4          (The question referred to was read by the

5     reporter as above recorded.)

6          THE WITNESS:  Did I know that?

7  BY MS. CESARANO:

8     Q.   Yes.

9     A.   Nothing was explained to me.  Just go out and

10  do your job.  Nothing was explained.

11     Q.   So we got to nothing was explained, but let's

12  ask a different question.  What did you think?

13     A.   Okay.

14     Q.   Just simple.  Simple.

15     A.   Simple, I will make it very simple.

16     Q.   Were you a member of management?

17          MR. POLLACK:  Object to form.

18          THE WITNESS:  I felt I was a part of

19     management.  I mean being assistant

20     superintendent, I felt that I'm sitting in

21     meetings and everything.  I felt that I was a part

22     of this team.

23  BY MS. CESARANO:

24     Q.   Management, not team.  Team is not the

1    question.

2         A.    Yeah, management.

3         Q.    Management?

4         A.    Uh-huh.

5         Q.    Now, could you hire other people?

6         A.    Yes.

7         Q.    Tell me the other people you hired.

8         A.    I hired the labor foremen.

9         Q.    When was that?

10        A.    We had him at Bloomingdale's.  I hired him at

11   Bloomingdale's.

12        Q.    I'm talking about Sawgrass.

13        A.    I'm trying to explain that to you.  I hired

14   him at Bloomingdale's Alvin Barber and Jacques

15   Marcelin, and I brought him with me.  They made him the

16   labor foreman.

17        Q.    Did they work at Bloomingdale's?

18        A.    Yes, ma'am.

19        Q.    You hired them while you were still at

20   Bloomingdale's?

21        A.    I hired both of them, yes, ma'am.

22        Q.    You were still general foreman at

23   Bloomingdale's when you hired them?

24        A.    Yes, ma'am.

```
 1        Q.   Did you understand that Whiting-Turner had

 2   its own company pension plan? Did you know that?

 3        A.   No, nobody ever explained that to me.

 4        Q.   Were you part of the Whiting-Turner pension

 5   plan at any time?

 6        A.   No.

 7        Q.   Were you part of the Whiting-Turner health

 8   and benefit plan at any time?

 9        A.   No.

10        Q.   But you would agree that managers at

11   Whiting-Turner were part of the pension plan of

12   Whiting-Turner?

13             MR. POLLACK:  Object to the form.

14             THE WITNESS:  I really don't know.

15   BY MS. CESARANO:

16        Q.   You know they had one?

17        A.   I guess.  I guess all companies got them.  I

18   don't know.  Nobody explained nothing like that to me.

19   I can't answer it.  I don't know.  I really don't

20   know.

21        Q.   Did you understand that when you went over to

22   the Sawgrass Mills project that Eric Plotke and other

23   Whiting-Turner managers were going to teach you

24   anything?
```

1      A.    To teach me?

2      Q.    Yes.

3      A.    No, I didn't know that.

4      Q.    You didn't know that?

5      A.    Never ever came to me and told me they were

6   going to teach me anything.

7      Q.    Did in fact Eric Plotke ever train you or

8   teach you on the Sawgrass Mills project about how to

9   read plans and blueprints and do measurements?

10     A.    No, not plans, no.

11     Q.    Did Eric Plotke ever on the Sawgrass project

12   take you out in the field and show you to do surveying?

13     A.    He and Chuck Bender and I, we did that, yeah.

14     Q.    Not asking whether you did it.  My question

15   is, did Eric Plotke ever take you out in the field and

16   train you on how to do surveying?

17     A.    Yes.

18     Q.    Did he do that a few times?

19     A.    I think we did that.  I think it was about

20   three times.  Yeah, probably about three times we did

21   that.

22     Q.    Is this surveying skill something that Eric

23   Plotke knew how to do?

24           MR. POLLACK:  Object to the form.  You can

1        answer.

2              MS. CESARANO:  Let me withdraw it.

3              THE WITNESS:  I will say he had some

4        knowledge in it.  He had some knowledge in it.

5   BY MS. CESARANO:

6        Q.   Would you say Eric Plotke's knowledge was

7   more knowledge than what you had at the time he was

8   training you?

9        A.   I will say he probably had more knowledge

10  than I.

11       Q.   Was there ever a time when Eric Plotke went

12  over certain company plans or documents in an attempt

13  to teach you anything?

14       A.   Not that I know of.  I can't remember that.

15       Q.   So just the surveying?

16       A.   Just the surveying, yes, that is what we

17  did.

18       Q.   Now, again, I'm speaking to the Sawgrass

19  project right now, so all my questions until I tell you

20  otherwise are Sawgrass, in case I forget to say

21  Sawgrass.

22       A.   Okay.

23       Q.   Did there come a time when you did get a wage

24  increase in approximately March of '98?

1      A.   Yes.

2      Q.   That was on the Sawgrass project?

3      A.   Yes.

4      Q.   You had been there at that time about five

5   months or so?

6      A.   Since October, yes.

7      Q.   Tell me how you first became aware that you

8   were getting a raise.  Who spoke to you about it first?

9      A.   Eric Plotke and Jeff Cooper.

10      Q.   Where were you when that conversation

11   occurred?

12      A.   In the office trailer on the job.

13      Q.   What date was that?

14      A.   I don't know exactly what day it was.  I know

15   it was in March.  I just don't know the date.

16      Q.   In terms of time, how much in terms of days

17   or weeks prior to the time you actually saw the raise

18   on your paycheck stub did that conversation take place?

19      A.   I forgot which day it was, but I think that

20   went into effect like that next -- the next pay

21   period.  It was like the next Wednesday.

22      Q.   So approximately a week?

23      A.   Uh-huh.  Something like that.

24      Q.   And what did Eric and/or Jeff tell you in

1   this meeting?

2       A.    Okay.  Now, I'm going to answer like this

3   here:  That's the part I was telling when you asked me

4   a question and I couldn't answer but so much.

5           When they took me in the office and told me

6   these things, Eric Plotke said, We will give you a

7   $4.70 raise, or either $4.60, I forgot, $4.60 or $4.70,

8   and he told me, he said "In six months, you will be

9   reviewed."

10          The six months for that review would have

11  been at the time, I guess, when I would have been in

12  the same status as Chuck Bender.  That is what Eric

13  Plotke told me.

14      Q.    Let's stick to the meeting.

15      A.    I'm trying to answer the meeting for you.

16      Q.    I understand you're telling --

17      A.    That is what the meeting was about.

18      Q.    Right.

19      A.    He told me in six months I would be

20  reviewed.

21      Q.    I want everything that happened at the

22  meeting.  So you told me they told you what your raise

23  was.  They told you in six months you would be

24  reviewed?

1          A.    Six months I would be reviewed, uh-huh.

2          Q.    Did they say why you were getting the raise?

3          A.    Jeff Cooper had made mention to me one time

4    before, and these are his words and I quote, he told me

5    I was grossly underpaid, because I was in the capacity

6    of assistant superintendent, and I was only making

7    $10.60 an hour as labor foreman.

8          Q.    I previously asked you when you learned about

9    the raise.  The first time you learned about the raise

10   you told me was at this meeting with Eric?

11         A.    That morning is the first I heard about it.

12         Q.    Let's finish out the meeting because I want

13   to make sure I got everything that happened.  Did they

14   tell you how they arrived at that amount of money?

15         A.    Eric Plotke told me that is what Doug Howden

16   had got and that is the increase I was getting is what

17   Doug Howden, the guy that was there when I got there

18   was getting.

19         Q.    Was Doug Howden in the same type of status as

20   you were?

21         A.    Doug Howden was assistant superintendent.

22         Q.    What was his age?

23         A.    White.

24         Q.    Do you know how old he was?  Was he older

1    than you or younger?

2        A.   No, he was younger than me.  He was probably

3    say 36, 35, something like that.

4        Q.   And you said Jeff was the one that explained

5    that, or was it Eric?

6        A.   Eric Plotke explained to me how come I was

7    getting that much.

8        Q.   Did Eric say what the raise was for?

9        A.   No.

10           MR. POLLACK:  Objection, asked and answered.

11   BY MS. CESARANO:

12       Q.   Did they tell you that you had a new title?

13       A.   No.

14       Q.   Did he tell you that you were going to be

15   temporary assistant superintendent?

16       A.   No.

17       Q.   Did he tell you that after six months he

18   would review you?

19       A.   I would be reviewed.

20           MR. POLLACK:  Let her finish.

21   BY MS. CESARANO:

22       Q.   Let me finish my question.  He would review

23   you in six months to see if you would stop being

24   temporary but would be permanent assistant

Page 80

```
 1    superintendent?
 2         A.    He didn't tell me like that.
 3         Q.    Did he tell you what the review at the end of
 4    the six months would mean to you?
 5         A.    No.
 6         Q.    Did he tell you why you would be reviewed in
 7    six months?
 8         A.    He just said I would be reviewed.
 9         Q.    Did they tell you that if the review was
10    successful you would be promoted?
11         A.    Yes.  Yes, that is what we talked about.
12         Q.    You got the definite impression if the review
13    went well --
14         A.    Yeah, that is how it went.
15         Q.    -- you would get a promotion, yeah?
16         A.    That is what I thought, yeah.
17         Q.    He didn't tell you what the new title would
18    be?
19         A.    No.
20         Q.    This conversation took place approximately
21    one week or so before you actually saw the raise in
22    your paycheck in March?
23         A.    Yes, ma'am.  Uh-huh.
24         Q.    Anything else said in that conversation?
```

Page 81

```
 1        A.    Eric said this, Eric said that at that time I
 2   would have to make a decision to relinquish my
 3   affiliation with my union.  He said at that time if I
 4   was going to be taken in as a full-time, I guess
 5   superintendent, that I could make that decision, that
 6   would have been up to me because then I would have been
 7   like you were saying a while ago with the
 8   superintendent benefits, or either not.  That is what
 9   he had mentioned to me.
10        Q.    Was that of concern to you?
11        A.    What?
12        Q.    That you would stop receiving union benefits?
13        A.    Well, it would have been a decision I had to
14   make.  See, I was there because he asked me to come
15   with the company there and it would have been a
16   decision I had to make.  Whether I would have left my
17   affiliation with the union or went ahead on with them,
18   which we never got to that, but I'm saying it would
19   have been my decision.
20        Q.    But Eric made it clear to you that some six
21   months down the road when you got an appraisal --
22        A.    Yes, ma'am.
23        Q.    -- you would have to choose whether you
24   wanted to leave the union?
```

1       A.   Yes.

2       Q.   Did they tell you that at that point you

3   would be converted into management?

4       A.   Yeah, that is right.  Yes, ma'am.

5       Q.   Did he tell you that the company had anything

6   that would replace the union benefits you would be

7   losing?

8       A.   Well, I knew -- I had found out the benefits

9   they had because me and Chuck Bender shared an office

10  together and we discussed some of that because Chuck

11  had more knowledge than I did.

12           Nobody ever discussed that with me, but from

13  Chuck, I knew they had a plan they had told him about.

14      Q.   What was that?

15      A.   I didn't -- then I -- I didn't get too much

16  into it.  But Chuck was telling me some of the things

17  they told him about.

18      Q.   What were those things?

19      A.   I can't remember.  I just can't remember.

20      Q.   Did they have to do with pension?

21      A.   Pension, yeah.

22      Q.   Health insurance?

23      A.   I'm trying to remember.  Health insurance,

24  even 401.  Something like 401-K, something like that.

1    I'm trying to remember.

2         It is vague now.  It is two years ago.

3         Q.   So the bottom line was the company had some

4    sort of benefits?

5         A.   Some sort of benefits.

6         Q.   In place?

7         A.   Yes, ma'am.

8         Q.   You would have to choose between the union

9    benefits or the company benefits?

10        A.   Yes, ma'am.

11        Q.   But that was down the road?

12        A.   Yes, ma'am.

13        Q.   Anything else happen at meeting?

14        A.   No.   That was -- no.   That's basically it.

15        Q.   Now, jumping ahead a little.  At some point

16   approximately six months later or so, you became aware

17   that Chuck Bender got a promotion of some sort,

18   correct?

19        A.   Yes.  Uh-huh.  Uh-huh.

20        Q.   In fact he told you; is that right?

21        A.   Yes, he told -- he told me.

22        Q.   So you knew within a day or two of his

23   promotion that he had gotten it?

24        A.   Yes.  Yes, I did.

Multi-Page

Page 84

```
 1        Q.   Did he tell you what his new title was?

 2        A.   Well, he was assistant superintendent.

 3        Q.   He told you that was his title?

 4        A.   Yes.

 5        Q.   What was his title prior to that, if that was

 6   his new title?

 7        A.   We were assistant superintendents.

 8        Q.   But if he said I got promoted to assistant

 9   superintendent, what was his old status?

10        A.   Well, what it is.

11             MR. POLLACK:  Objection to form.

12             THE WITNESS:  He told me that he got a

13        promotion.  I forgot how much money it was and I

14        guess then that puts him into the company, I

15        guess.

16   BY MS. CESARANO:

17        Q.   He has to choose?

18        A.   Yes.  That put him on to the -- I'm trying to

19   think of the name here.  I heard it.

20        Q.   Company benefits?

21        A.   I guess, yeah, company benefits.  He became a

22   company benefit superintendent, but we are still

23   assistant superintendents.

24        Q.   Versus a union benefits assistant
```

1    superintendent?

2         A.    I guess so.

3         Q.    Those were the two titles?

4         A.    I think that is what it is.  I have seen so

5    many titles, I don't want to say for definite.

6         Q.    At this point in time, Chuck had to stop

7    getting his union benefits as a carpenter's union

8    member, correct?

9         A.    Yes, ma'am.  I guess.  Yes.

10             MR. POLLACK:  Object to form.

11   BY MS. CESARANO:

12        Q.    At the time you learned of Chuck's promotion,

13   what, if anything, did you do to go to the company and

14   complain?

15        A.    What did I do?

16        Q.    Uh-huh.

17        A.    Well, what I did was just -- I increased my

18   work.  I volunteered.  I came in on Saturdays when I

19   wasn't supposed to be there.  I went to Eric Plotke and

20   let him know I was going to volunteer.  I came in on

21   Saturdays, weekends off.

22             I did that four times to try to show the

23   company that it was work efforts or whatever it took,

24   this is what I wanted to do, and I have those dates, I

Page 86

1    don't have them with me now, that I volunteered four

2    weekends to come in.

3         I wanted to show this company that I wanted

4    to be a part of this. I felt I deserved it and felt I

5    worked for it, but then --

6         Q.   My question was --

7         A.   I'm just saying.

8         Q.   No, but my question was, what if any things

9    did you do as far as going to Eric Plotke or any other

10   manager and saying, hey, how about my promotion?

11        A.   I went to Eric.

12        Q.   When was that?

13        A.   December.

14        Q.   Of what year?

15        A.   Was it December? I'm trying to remember was

16   it December or January. I went to Eric. We had a

17   conversation.

18        Q.   What year was this in?

19        A.   I'm trying to remember, and I have it in my

20   notes. I just can't remember.

21        Q.   If you started at the Sawgrass job in October

22   of '97, which December? Was it 14 months later?

23        A.   The six months, they went along. That took

24   us down to April, May, June, July, August, September.

Page 87

```
 1        Q.   So this would be December '98?

 2        A.   I can't remember exactly when it was, but it

 3    came up, and then also in January of '99 it came up.

 4        Q.   So let's go to December of '98.

 5        A.   I can't remember exactly what was said.

 6        Q.   But this would have had to be December of

 7    '98, correct?

 8        A.   Yeah, probably December of '98.

 9        Q.   You said you went to Eric?

10        A.   Yes.

11        Q.   What did you say to Eric?

12        A.   I can't remember what I said, but it was

13    something in the course of those days passing in this

14    day I mentioned something about it.  I can't remember

15    what it was.

16        Q.   Then you said you had another conversation in

17    January of '99?

18        A.   Yeah.  January of '99, yeah.

19        Q.   Was this also with Eric Plotke?

20        A.   Eric Plotke, yes.

21        Q.   Where did that occur?

22        A.   That occurred out in the field.

23        Q.   Was anyone else there?

24        A.   Just me and Eric.
```

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

Page 88

1    Q.    What was said?

2    A.    Eric brought the paychecks out, and Eric told

3    me and I quote, he said when I look at the paychecks of

4    the carpenter's foreman and the laborers' foreman, you

5    don't make any money.

6    Q.    Okay.

7    A.    He said I'm thinking about putting you back

8    on hourly.  This is what he said to me.

9    Q.    Was that because the carpenters' and

10    laborers' foreman earned overtime?

11         MR. POLLACK:  Object to the form.  You can

12    answer.

13         THE WITNESS:  That is because we were coming

14    in at 6:30 in the morning to 5:30 every day.  Some

15    days we stayed longer.  So I'm putting ten, 12

16    hours in and I'm only paid for eight hours a day.

17    BY MS. CESARANO:

18    Q.    Let me clarify for the record.  You were on a

19    salary, correct?

20    A.    Yes.  Uh-huh.

21    Q.    So managers work on a salary?  They don't get

22    paid extra for extra time; is that right?

23    A.    You are saying I'm a manager again.

24    Q.    Is that right?

```
 1        A.    But anyway, he looked at the salaries for all
 2   the hours I'm putting in.  He said he was putting me
 3   back in on hourly.  That is all he said.
 4        Q.    If he were to do that, you could earn the
 5   overtime; isn't that correct?
 6        A.    Yes.
 7        Q.    Isn't it true the carpenters' foreman and
 8   laborers' foreman at that time when he was looking at
 9   their checks, they were getting some overtime,
10   correct?
11        A.    Yes.
12             MR. POLLACK:  Object to form.
13             THE WITNESS:  Do you want the other part of
14        that conversation?
15   BY MS. CESARANO:
16        Q.    Yes, I want what you said to him, too.
17        A.    I told Eric, I said these words, "Eric, you
18   do the payroll every week.  You know how much money I
19   make."
20             "You do the payroll every week.  You know
21   how much I make."  That is my answer to him.
22        Q.    What did he say?
23        A.    Blank, I just left it like that.  That is
24   what I told him.
```

Page 90

```
 1        Q.    What did he say to you?

 2        A.    He didn't answer me.

 3        Q.    Did you say anything else to him?

 4        A.    No.  I just let him know it was no accident

 5   that he sees what I'm making, when I have seen it, he

 6   has seen it.  Everybody has seen it.  He knows I'm

 7   making less than anybody in supervision.

 8              I said, "You do the time every week, and you

 9   know what I make."

10        Q.    Now, Chuck Bender was also working some

11   weekends, wasn't he, during the first six months?

12        A.    We all had different weekends to work.  Like

13   if Chuck's weekends came up --

14        Q.    Just think about my question.  Let's think

15   about my question.  My question was, Chuck Bender

16   during the first six months he got there was also

17   working some weekends, correct?

18        A.    I said yes.

19        Q.    He wasn't getting paid extra for working any

20   weekends, correct?

21              MR. POLLACK:  Object to the form.

22              THE WITNESS:  No.

23   BY MS. CESARANO:

24        Q.    So you weren't being treated any differently
```

1    than Chuck Bender at that time, correct?

2         MR. POLLACK:  Object to the form.

3         THE WITNESS:  I will say I was being

4    mistreated because he got a raise and I didn't and

5    he got a review and I didn't.

6  BY MS. CESARANO:

7    Q.    But before that, remember, my question was

8  the first six months that Chuck Bender worked there, he

9  was working extra hours and not getting paid just like

10  you, correct?

11    A.    Yes.

12    Q.    Now he is white, correct?

13    A.    Yes.

14    Q.    He is younger than you, correct?

15    A.    Uh-huh.

16    Q.    So before we get to his promotion six months

17  later, there is no difference in treatment, correct?

18         MR. POLLACK:  Object to the form.

19         THE WITNESS:  There are a lot of things that

20    happened between there, but I don't know how much

21    time we have to do this.  Other things happened in

22    between there, you know.

23         I mean, I'm going by your format, but I don't

24    know.

1    BY MS. CESARANO:

2        Q.    Yes or no, and if you want to explain, that's

3    fine, but I want to know during the first six months

4    were you and Chuck treated the same?

5        A.    No.

6        Q.    Tell me what was different.

7        A.    Robert Mitchell had came out one day and told

8    us he wanted everybody to go to Universal Studios.

9            He came into a meeting and gave us a

10   presentation on it.  He said he wanted everybody to go.

11           All right.  Within a couple of weeks that

12   Chuck Bender was sent, okay, then Chuck Bender went,

13   and Eric Plotke mentioned to me, because I asked him

14   about it, about me going to Universal Studios.

15           Up until this day, I was never told where the

16   hotel was at.  I was never told any arrangements to go

17   to Universal Studios, and I felt that was wrong.

18           I felt that was bad, and I felt the reason I

19   didn't is because I was black, whether they are ashamed

20   of me or what.

21       Q.    Isn't it true during the trip to Universal

22   Studios you were on vacation?

23       A.    No, that is not the truth.

24       Q.    Okay.

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

1          A.    Eric Plotke, I asked him, "Can I take off,"

2     and it is in our book, "Can I go to Alabama?"

3                He said yes.  He said, "When are you coming

4     back?"

5                I said, "Monday."

6                He said, "Okay.  Go to Universal Studios

7     Tuesday."

8          Q.    Right.  So let's go step by step.  I will ask

9     questions to follow up.

10         A.    Okay.

11         Q.    So based on that conversation, Eric was

12    telling you that on the way back from your vacation to

13    go to Universal Studios?

14         A.    No.

15         Q.    That is what he wanted you to do?

16         A.    That is exactly what he didn't do.  That is

17    what I felt he should have did.

18                He told me to come back to work Monday, and

19    then Monday night, get right back up and go right back

20    up to Orlando, which I thought was wrong.

21                I agree with what you said.  If I'm going to

22    go to Alabama and come back, why don't I stop Sunday

23    night in Orlando, go to Universal Studios on Monday,

24    Monday night, come back to Miami.

1          No.  He had me come back to Miami, and at

2    that time, I got all the days on this here.

3        Q.    But --

4        A.    I'm trying to explain it to you.

5        Q.    He wanted you to go to Universal Studios

6    after you got back.

7        A.    He wanted me to work that Monday, that Monday

8    night leave and go back to Universal that very next

9    day.

10          My wife said, "It don't make no sense."

11          How come I couldn't come from Alabama, get up

12    that Monday morning go to the job and then leave the

13    job that afternoon at Universal Studios, drive back to

14    Miami?

15          I was told to come back to Miami after

16    detouring 150 miles during those fires in 1998, and my

17    wife said, "Something is wrong here."  And she said,

18    "You are not going."

19        Q.    You would agree that the fires had nothing to

20    with Whiting-Turner?

21        A.    The fires had nothing to do with me either

22    other than I was taking the time off.

23        Q.    That's fine.

24        A.    You said it.  Shouldn't I be given the

1    courtesy to come back through Orlando?

2        Q.    I'm not trying to argue with you.

3        A.    I'm just telling you.  I'm not trying to

4    argue.  I'm just telling you.  I'm not arguing.

5        Q.    The fact of the matter is, under your

6    proposal, you would have missed work on Monday,

7    correct?

8        A.    Yes.  I would have had to miss a day anyway.

9        Q.    That is not the question.

10       A.    Yeah.

11       Q.    Under your proposal, you would have missed

12   work on Monday, correct?

13       A.    Yeah.

14       Q.    Isn't it true that Eric under his proposal

15   wanted you to work Monday, right?  In fact, you did

16   work Monday, correct?

17       A.    Yes.  Uh-huh.

18       Q.    And isn't it true the company's proposal

19   included the fact they would pay for you to go to

20   Universal?

21       A.    I was never told how this was going to be

22   arranged.  I was never told they were going to pay for

23   it.

24       Q.    Wait a minute.  Wait a minute.

1          A.    You asked me a question.  You don't want

2     me --

3          Q.    Did you really think -- are you telling me

4     Eric Plotke said you are going to go up to Universal on

5     your own dime?

6          A.    I was never told.  Listen to this now.  I

7     think you are missing this.  I'm in rental car coming

8     out of Alabama.  I would have gladly stopped there that

9     night and came on back and drove in the next day.  I

10    would have gladly did that.

11              I never asked them -- I never knew the

12    hotel.  I swear to God under oath.  I never knew the

13    hotel, none of that stuff, but I would have been glad

14    to stop there Sunday night and went Monday morning to

15    the job and came back.  I was in a rental car, but

16    nobody ever told me nothing.

17         Q.    I'm not talking about what is more convenient

18    or not convenient, and your idea and their idea.

19              MR. POLLACK:  I object.

20    BY MS. CESARANO:

21         Q.    My question to you is, if they were going to

22    let you go to Universal Studios anyway, how is that

23    discrimination?

24              MR. POLLACK:  Objection, asked and answered.

1    BY MS. CESARANO:

2         Q.    Go ahead and answer.

3         A.    How was it discrimination?

4         Q.    I know you think you had a better plan, but

5    how was it discrimination?

6         A.    Okay.  I feel this here:  I feel if this

7    company would have wanted me to go, they would have

8    gave me the information.  I didn't know the hotel or no

9    arrangement.

10              Now, Chuck Bender had went, but nobody

11   explained to me the hotel.  Nobody told me no

12   arrangement, so I'm saying I got a rental car, I will

13   go on over there.  I will go and come on back.

14              Nobody ever explained to me about the

15   arrangements.

16        Q.    But isn't it true that you didn't agree to do

17   it their way?

18        A.    I did it their way.  I came back to Miami,

19   but when I told my wife, I said we probably will have

20   to leave and drive back up the next night, she said,

21   "No way.  Why should we be put through this kind of

22   inconvenience?"

23        Q.    And you said no?

24        A.    No.  I agreed not to go.

1  Q. You did not go?

2  A. I did not go.

3  Q. You said --

4  A. Nobody gave me another time to go.

5  Q. You said to Eric Plotke no, I'm not going to

6 go to Universal Studios?

7  A. No, I didn't say that to him. I didn't tell

8 him that.

9  Q. You didn't go?

10  A. I didn't go.

11  Q. But you --

12  A. I could have drove back up there the Monday

13 night, and that wasn't fair to nobody. If Chuck Bender

14 was sitting up there under good conditions, and that's

15 how I wanted to go, was under good conditions, I'm no

16 different than anybody else and I'm --

17  Q. Isn't it true when Chuck Bender was at

18 Universal Studios you were in Alabama on vacation?

19  A. No. No. No. That's not true.

20  Q. Isn't it --

21  A. Chuck Bender went a couple of weeks before I

22 went. I was not in Alabama, and the records will show

23 that. Their records will show that.

24  Q. And isn't it true that this trip that we are

1  talking about to Universal Studios was not for fun and

2  games; isn't that correct?

3          A.    It was supposed to be educational.

4          Q.    Correct.

5          A.    The vice president said do it.

6          Q.    Isn't it true the purpose of the Universal

7  trip was because Whiting-Turning had a project that

8  they were doing in Universal Studios, correct?

9          A.    Right.

10         Q.    Isn't it true that Eric Plotke wanted you to

11 see the project as a means to see what kind of

12 construction was being done at Universal Studios by

13 Whiting-Turner?

14         A.    Right.

15         Q.    This was in fact a business type trip, right?

16         A.    That is what it was going to be, business

17 trip.

18         Q.    Your wife didn't have anything to do with

19 it.

20         A.    She didn't have to go to the job.  She could

21 have stayed in the hotel.

22         Q.    This wasn't for your wife's convenience at

23 all, was it?

24         A.    She wouldn't have to go to the job.  It was

1    me to go to the jobs, not her.

2         Q.    I mean, the purpose of trip wasn't for you

3    and your family to have a wonderful time at Universal

4    Studios, correct?

5         A.    That is not what it would have been.  I would

6    have came there, done what I had to do that day and

7    came back.  She didn't have to stay locked up in the

8    room either.  She could have done what she wanted to

9    do.

10         Q.    Bottom line, it wasn't a pleasure trip?

11         A.    It wasn't going to be a pleasure trip.  I

12    wanted to go like everybody.  I have to go rush back to

13    Miami and take off the same afternoon?  I didn't think

14    it was safe and I don't think it is fair, and my family

15    don't think it is fair.

16         Q.    That was one way you felt the company was

17    simply unfair to you, correct?

18         A.    Yes.

19         Q.    What other --

20         A.    Pardon me.  Can I call my office one minute?

21    They called me twice.

22              MS. CESARANO:    Sure.

23              (Thereupon a brief recess was taken, after

24         which the following proceedings were had:)

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

1    BY MS. CESARANO:

2        Q.    When we left off, I think we were done with

3    Universal Studios.  Were there any other things that

4    happened to you that you believe show race

5    discrimination, that is while you were working at

6    Whiting-Turner?

7        A.    Yes.  I believe that at one time they were

8    getting ready for another job.  They were getting

9    presentations ready and everything for another job.

10   And those potential owners came out of that job and I

11   was told they were going to be there, and we were

12   supposed to be there with Whiting-Turner hats on.

13           They took pictures of everybody in the

14   trailer except me.

15       Q.    Who were these people coming?

16       A.    This is Whiting-Turner.  Well, the people

17   from the Wellington project.

18       Q.    Did these Wellington people come on the job?

19       A.    They came on the job site and we were told

20   they was coming, and you know, we were like supposed to

21   showcase what we do, I guess, and you know, let them

22   see how a Whiting-Turner operation was, and I was a

23   part of that.  But when they get ready to take

24   pictures, I thought there should have been a picture of

H. Allen Benowitz & Associates, A Veritext Company
(305) 373-9997

1    me.

2          I mean, you have a Polaroid there, and you

3    take one more picture of one more guy.  They took a

4    picture of Chuck Bender, Ray McKean, Eric Plotke, Jeff

5    Cooper.

6          Q.   Tell me everybody that they took a picture

7    of.

8          A.   They are the ones I know of.  At that time, I

9    had resumes and everything with the company.  I proved

10   what I could do.  I was with them almost two years and

11   I thought I should have had a picture taken of me.

12          Also, if not for that particular project,

13   maybe for a future project if I'm a part of this

14   company.

15          Q.   Who was taking the pictures?

16          A.   Somebody from Whiting-Turner.  I have seen

17   him before.  I can't recall his name.  They sent him

18   out there to take pictures.

19          Q.   Someone you recognized?

20          A.   I would recognize him if he walked in the

21   door, but I don't know his name.  I know he was with

22   Whiting-Turning.  He came out of the main office.

23          Q.   When was this?

24          A.   This had to be about November.

1       Q.    Of?

2       A.    I think November of '98.  I'm guessing, but I

3   got offended by that.

4       Q.    But again, going back to the date, because I

5   want to make sure I got the date, was this early on in

6   the Sawgrass Mills project, or this was more toward the

7   end?

8       A.    This was toward the end of '98.

9       Q.    '98, I mean, in other words, let me for my

10  purposes work back from the end.  How much was this in

11  terms of months or weeks before you left the Sawgrass

12  job?

13      A.    It had to be four, five months.

14      Q.    Prior to that?

15      A.    Uh-huh.

16      Q.    And.  You resigned in what, March of '99?

17      A.    No, April.

18      Q.    April of '99?

19      A.    Yeah.

20      Q.    So if this was four months before, so like

21  right at the end of year of the prior year?

22      A.    I'm thinking it was November.

23      Q.    End of '98?

24      A.    I thinking November of '98, somewhere around

1    there.

2        Q.    So November of '98, maybe around

3    Thanksgiving, something like that, if you remember?

4        A.    Probably before.  Probably before.

5        Q.    Before Thanksgiving?

6        A.    Yeah.

7        Q.    So somebody from Whiting-Turner was on the

8    job and they were taking pictures of people and they

9    took a picture of Chuck Bender and Ray McKenna?

10       A.    Ray McKean.

11       Q.    What was Ray McKean's job?

12       A.    Engineer.

13       Q.    Project engineer?

14       A.    Project engineer.

15       Q.    Did he work in the office part?

16       A.    We all worked in the same office, yes.

17       Q.    Jeff Cooper?

18       A.    Jeff Cooper is the project manager.

19       Q.    Okay.

20       A.    In fact, they have that job now, the

21   Wellington.  But I was just thinking, I don't know,

22   maybe I'm wrong looking at it this way.  You have

23   Polaroid, and if you're making pictures of three guys

24   or four guys and you have another guy right there, if I

Page 105

```
 1   will be a potential keeper with this company, so you

 2   take a picture of me for future jobs or something

 3   because they always mention the fact one day you will

 4   be on your own.  You know, blowing smoke.

 5           So why not take a picture of me.  That is how

 6   I feel.

 7       Q.   This is after Chuck Bender was promoted?

 8       A.   After that, yeah.

 9       Q.   This is when he was in management, correct?

10       A.   Uh-huh.  Yeah.

11       Q.   What if any other incidents can you remember?

12       A.   I have another one.  Okay.  One day the

13   company -- the company would always send letters out.

14   They would inform you of everything.

15           We received a letter one day and this letter

16   came from Robert Mitchell.  It was mandatory that

17   everybody went to the EEO meeting that was going to be

18   in our trailer.

19       Q.   Okay.  When was that?

20       A.   I think that was in October.

21       Q.   Of?

22       A.   That was either October 18th or somewhere in

23   that range.

24       Q.   '98?
```

1          A.     Ninety-eight.  I think it was October, and

2     then it could have been November.  October or either

3     November, and everybody, they will tell you, nobody

4     misses these meetings.  Nobody.  That is how it comes

5     out.  Nobody.  You have no exceptions.

6          Q.     Okay.

7          A.     When this meeting started at 2:00, I received

8     a call from Eric Plotke.  Eric Plotke told me to go out

9     into the field, go back in the field.

10          Now, I'm in the trailer.  He called me back

11     in the field and he told me to go out there and make

12     sure that they put the orange fencing around the

13     trees.

14          Q.     All right.

15          A.     And I was so offended that I started to get

16     in my car and drive off because the orange fencing you

17     could have taken a girl scout and put the orange

18     fencing around the trees.

19          I felt I was called out of this EEO meeting,

20     and I felt that it is just -- I felt it was prejudiced.

21          Q.     Was the EEO meeting --

22          A.     EEO meeting.

23          Q.     Had it started?

24          A.     Whiting-Turning sets them up.

1     Q.    Had it started?

2     A.    No, it was supposed to start at 2:00.  It was

3     two minutes to 2:00.

4           Chuck Bender said, "I heard them call you.

5     What did you have to do?"

6           They have four people out there with radios

7     that could have done this job, and Eric Plotke called

8     me out of that meeting, and I'm offended by that.

9     Q.    Why do you think he did that for racial

10    reasons?

11    A.    I think it was a put down to me.  Why call

12    me?  We have a carpenters' foreman out there.  We have

13    a laborers' foreman out there.  We have two other

14    foremen with radios.  He could have sent those guys to

15    fix the fencing around the tree.

16    Q.    What was wrong with the fencing?

17    A.    Here is a tree.  Here is the orange fencing.

18    Some places people ran into them.  Stretch it out.

19    Orange fencing it is something either one of you ladies

20    could do, and it is just that light, and he told me to

21    go back out in the field.

22    Q.    I understand what you are saying, and I want

23    to know what was wrong with the orange fencing.  It was

24    fallen down, broken?

1      A.    It's a matter of guys placing it, going back

2   and forth looking to see if one looks down, take a

3   piece of wire and put on it, and I didn't think they

4   should have to call me to go do that.

5      Q.    But you were in charge of the crew?

6      A.    We are in charge of safety.  We are always in

7   charge of safety, so as a safety issue, everybody at

8   Whiting-Turner's trailer was a part of that.

9      Q.    That was a safety issue?

10     A.    To me, if it fell into a tree, it was a

11  safety issue.  He told me to do it and I had to miss

12  the whole EEO meeting, and of all of the white

13  employees through Dade and Broward, I'm the one that is

14  called out.

15     Q.    How many people attended the meeting?

16     A.    Fifteen or 16 people.

17     Q.    Is this something that somebody would want to

18  go to?

19             MR. POLLACK:  Object to form.

20             THE WITNESS:  That not the meaning of it.  I

21        was sent a memo saying we were suppose to go to

22        it.  Also, during the presentation meeting to us,

23        they said it was mandatory, we had to go to give

24        presentations.  It was mandatory and this EEO

Page 109

```
 1          meeting was mandatory, also.
 2     BY MS. CESARANO:
 3          Q.    Were you speaking at it?
 4          A.    No, we are supposed to have been in
 5     attendance.
 6          Q.    How often does the EEO meeting occur?
 7          A.    That was the first one that I knew about.
 8     That was the first one and only one I knew about.
 9          Q.    Well, who was speaking at the meeting?
10          A.    Robert Mitchell was there.  He had other
11     superintendents.  He had other project managers.  Other
12     project engineers.  Everybody that is supposed to be
13     somebody, I guess.
14          Q.    These were all internal Whiting-Turner
15     people?
16          A.    All internal Whiting-Turner people like I
17     was.  I received a memo also.
18          Q.    No speaker was coming in from the outside?
19          A.    They did.  I don't know who the person was
20     from the outside because I didn't make it to the
21     meeting.
22          Q.    But there was a speaker there?
23          A.    Chuck Bender told me there was a speaker
24     there.
```

1  Q. What did Eric say to you?

2  A. He called me.

3   MR. POLLACK: You have to let her finish the

4  question.

5 BY MS. CESARANO:

6  Q. I know what you just told me. Did Eric

7 Plotke say anything to you to indicate to you the

8 reason he called you out of meeting was because you

9 were black?

10   MR. POLLACK: Object to form. You can

11  answer.

12   THE WITNESS: That is what I felt.

13   MS. CESARANO: What is your objection to my

14  form?

15   MR. POLLACK: Can you read it back?

16   It calls for speculation. Actually, that is

17  what it is.

18   MS. CESARANO: No. Did Eric Plotke say

19  anything to you. Why don't you finish the

20  question?

21   (The question referred to was read by the

22  reporter as above recorded.).

23   MR. POLLACK: I think it calls for

24  speculation of what Eric Plotke was thinking, but

1       he can answer the question.

2    BY MS. CESARANO:

3       Q.    Did he say anything to you to indicate that?

4    I know what you thought.

5       A.    I know, this is how I felt because --

6       Q.    I don't want to know how you felt.

7       A.    How do I answer if you don't want to know

8    what I felt?

9       Q.    You have to understand.  One of the reasons

10   your deposition is taking a long time is I don't get

11   the answers to my question, and my question was did

12   Eric Plotke say anything to you --

13      A.    It was --

14            MR. POLLACK:  Let her finish the question,

15        Mr. Bush.

16   BY MS. CESARANO:

17      Q.    -- that indicated that he was calling you you

18   out because you were black?  Did he say anything to

19   you?

20            MR. POLLACK:  I will still raise the same

21        objection.

22            MS. CESARANO:  You can object all you want.

23        The question is crystal clear.

24            MR. POLLACK:  You can answer.

Page 112

1          THE WITNESS: He didn't say that.

2     BY MS. CESARANO:

3     Q.    Now, you indicated there were some other

4     examples of maybe some racial issues. Can you give me

5     any other examples of things that come to mind?

6     A.    No. Okay. We can go to a meeting, another

7     meeting that I had one morning. March 2nnd. I think

8     that's -- March 22nd after doing all this work out

9     there for 22 months with Whiting-Turner.

10    Q.    I want to make sure have it the right year.

11    '98?

12    A.    No, this is '99.

13    Q.    '99?

14    A.    March 22nd, '99. After they wouldn't give me

15    no review, after I hadn't been reviewed on my

16    performance or nothing, and I noticed they were

17    stalling because I mentioned that to Eric in January.

18    Q.    Let's go to what happened on March 22nd.

19    A.    I'm going to tell you what happened on March

20    22nd. When they asked me -- there is another phase we

21    were going to have to do on the kiosk footings, and I

22    told Sergio Tio I didn't think I'm smart enough to do

23    the other part of that work, and I told him that I

24    don't think I'm smart enough.

1        I knew I would get a response, and that was

2    my way of getting their attention to the meeting we

3    had.

4        Q.    When did you tell that to Sergio?

5        A.    About 8:15, 8:25.

6        Q.    A.M.?

7        A.    A.M., March 22nd.

8        Q.    Who was Sergio Tio?

9        A.    That was one of the project engineers.

10       Q.    Tell me --

11       A.    He was over concrete.  I want to let you know

12    what his job is.  He and I worked together.  He did the

13    concrete and he set it up.

14       Q.    He was in charge of making sure it happened?

15       A.    He was the engineer of charge of concrete.

16       Q.    Since we are skipping to earlier, tell me how

17    that conversation with Sergio got started.  What did

18    Sergio say to you and what did you say to him?

19       A.    He told me we were ready to proceed with the

20    kiosk footings.  We had some stuff coming in that had

21    to be done.  It was the last part of the phase on the

22    kiosk footings.

23       Q.    What do you mean footing?

24       A.    A concrete footing.  I poured all the

1    footings on Main Street.  So then the kiosk was a thing

2    that was going to sit on four bolts and hat to be

3    sitting in place and bolted and it had four legs and

4    was going to have grout underneath.

5            And I told Sergio, you know, "I don't think

6    I'm smart enough to finish that project."

7        Q.    What did he say to you?

8        A.    And I told him this, I think you need to tell

9    Mr. Plotke and Mr. Cooper.

10       Q.    What did he say to you?

11       A.    He said okay.  So then he goes back to the

12   trailer and he told those two people what I told him to

13   tell.

14       Q.    What happened next?

15       A.    Then Eric Plotke came out in the field.  He

16   said, "What do you mean you are not smart enough?"

17           I said, "I told Sergio I'm not smart

18   enough."

19           I said, "I am doing the same work, I'm

20   working on the same buildings as Chuck Bender, and for

21   some reason I can't get a review."

22           So it was a brief exchange of words.  Eric

23   told me to come to the office and we would discuss it.

24       Q.    Did you raise your voice?

1     A.   He raised his and I raised mine.  I'm an

2  ordained minister, but I won't let anybody get in my

3  face and talk to me in any kind of way.

4     Q.   Was he talking to you in any kind of way?

5     A.   Hollering, yelling.  He was telling me -- I

6  said I'm doing the same job as Chuck.  He is jumping up

7  and down because he was known to do that.

8     Q.   What did he do?

9     A.   He said a few things because I left him out

10  there hollering and screaming.

11     Q.   What did he say?

12     A.   I blocked him out.  It is best to block him

13  out than get in trouble.

14     Q.   What did you?

15     A.   I said I'm doing the same job as everybody

16  else.  I'm the most underpaid guy on the project.  I

17  make less than everybody and then I walked off.

18     Q.   So you were angry, too?

19     A.   Oh, yeah.  It's been building up since the

20  fact everybody has been reviewed but me.

21     Q.   Okay.  Had you prior to that ever gone to

22  Eric Plotke and asked to be reviewed?

23     A.   I told you I went to him in January and we

24  talked about that in January.

1    Q.    What did you tell him?

2    A.    When we were having the check talk about the

3    check with the carpenters' foremen, the laborers'

4    foreman and everything and I told him that he did the

5    paychecks.

6    Q.    So everybody knew?

7    A.    He knew.  Everybody knew.

8    Q.    The record has to be clear.  When you are

9    referencing this conversation to me --

10    A.    I already brought this to his attention.

11    Q.    This was the December and January

12    conversations we already covered, correct?

13    A.    Yeah.  Uh-huh.

14    Q.    Were there any other times besides those two

15    times that you talked to him about your review?

16    A.    Sort of vaguely it came up one day because he

17    told me that somebody told him I was sort of

18    disgruntled, or something he told me like that and I

19    told him, I said, "Well, anything I have to say, I will

20    say it to Whiting-Turner."

21        Something like that I told him, and we cut it

22    short right there, because he was saying somebody was

23    telling him I was disgruntled because of the review and

24    everything.  I just told him, "What I have to say, I

1   will tell to you."

2       Q.   To who?

3       A.   To Eric.

4       Q.   When you say "you," you mean Eric?

5       A.   Yeah.

6       Q.   Did you say anything else to him?

7       A.   That's all I said.

8       Q.   Now, in the January conversation, that was

9   about being low paid, correct?

10      A.   Because he made mention of it.  He said when

11  I look at the paychecks and I see what everybody is

12  making, he said, you are not making any money.

13      Q.   Right, but that was about your pay, correct?

14      A.   That was about my pay, correct.

15      Q.   It wasn't about race?

16      A.   It wasn't about, correct.

17      Q.   Same thing this January, correct?

18      A.   Uh-huh.  Uh-huh.

19      Q.   So now skipping back to March 22nd.  You go

20  into the room to meet with Eric and Jeff?

21      A.   Yes.

22      Q.   Cooper?

23      A.   Yes.

24      Q.   Just the three of you?

Page 118

1     A.   Uh-huh.

2     Q.   And what was said?  How did the meeting

3  start?

4     A.   Well, it started out by they wanted me to

5  express -- they wanted me to say what was on my mind

6  and I let them know how I felt.  I told them, "You

7  brought me out here.  I did everything you asked me to

8  do."

9        I told them I have built three buildings.  I

10  did Main Street.  I did three structures that cost a

11  million and something dollars.  For some reason, you

12  gave me these structures.  Why did you give them to

13  me?

14        They said they knew I could it.  Right, I did

15  it, but you guys haven't reviewed me.

16        "Eric, you told me in six months I would be

17  reviewed in March."

18        I said, "You never reviewed me.  You never

19  came and reviewed me."

20        They said we couldn't have did it without you

21  and all this stuff, and that aggravated me because they

22  were playing me like a kid.

23     Q.   You have to --

24     A.   They couldn't have done it without me.  You

Page 119

1    were an integral part of this, and meanwhile, I make

2    less than anybody else.

3        Q.    Is this what you said?

4        A.    I gave them both barrels there, yeah.

5        Q.    I want to make sure.

6        A.    They asked me, and I told them, yes, ma'am.

7        Q.    I want the record to be clear, not just what

8    you were thinking, but what you actually said to them.

9        A.    That is what I said.

10       Q.    And what they said to you?

11       A.    Jeff Cooper made a statement that he said,

12   Well -- and I told him.  I said, "Well, just fire me."

13            I said, "Fire me in a day."

14            Jeff said, "We are not going to fire you."

15            I told Eric, "You fire me."

16            Eric said, "I will not fire you."

17            You will not fire me, but you clearly didn't

18   give me no review.

19            Well, we -- Jeff Cooper said, "Well, what I

20   will do, I will get with you and we will monitor

21   things," which was a lie.  He never monitored a thing.

22       Q.    Now you are commenting things.

23       A.    But I told him that.  I told him, I let him

24   know how I felt.

1      Q.    When you say that was a lie --

2      A.    That was a lie, yeah.

3      Q.    To me, that is your personal comment on what

4    he said.  I need you to stick to what was said in the

5    meeting.

6      A.    He said he would monitor things for me to see

7    what we could do, and Eric heard me out.  Like I said,

8    we were sitting there for about an hour and a half

9    talking about this, and they told Robert Mitchell right

10   after.

11     Q.    Stay with me because I want to make sure I

12   cover this meeting before we end it.  Okay.  What all

13   did either Eric or Jeff say to you during this meeting?

14     A.    They didn't say too much except that I did a

15   great job and they couldn't have done it without me and

16   I have did this and I did that because I told them flat

17   out to fire me.

18           "I rather be fired than humiliated."  Those

19   were my words.

20     Q.    How you were being humiliated?

21     A.    I was being humiliated by making less.  The

22   subcontractor was making more money than I was making,

23   and I was checking and I was making less money than any

24   assistant superintendent with Whiting-Turner.

Page 121

| 1 | The other guys up in Orlando, all of them |
| 2 | guys made more than me, and I told them that.  I told |
| 3 | Robert Mitchell that also later. |
| 4 | Q.    Sticking to this meeting. |
| 5 | A.    Sticking to the meeting. |
| 6 | Q.    We have to do the meeting. |
| 7 | A.    I told them, yeah. |
| 8 | Q.    You said this to them at the meeting? |
| 9 | A.    Yes. |
| 10 | Q.    You said I'm making less than everybody? |
| 11 | A.    Making less than everybody?  I don't know. |
| 12 | Q.    You have to -- |
| 13 | A.    I can't remember. |
| 14 | Q.    Well, do your best because this is your -- |
| 15 | A.    Like I said, I was outraged at the fact they |
| 16 | seemed like they didn't realize that I hadn't been |
| 17 | reviewed, and I brought it to their attention. |
| 18 | And then I told them, I said, Well, since you |
| 19 | guys can't negotiate on whether I get a review like |
| 20 | everybody else, I will work here until April 16th. |
| 21 | On that day, I will leave Whiting-Turner, and |
| 22 | that is that letter I think you have in front of you. |
| 23 | Q.    You told them you were resigning? |
| 24 | A.    I told them if I can't get a review come |

Page 122

```
 1   April 16th, we have certain projects to finish as of

 2   April 16th, and that will be my last day.

 3        Q.   Did you mean get reviewed or get promoted?

 4        A.   If I wasn't doing the work, then don't review

 5   me.  If I had been doing the work, promote me.  Just

 6   that simple.

 7        Q.   Well, did you want the promotion in order to

 8   stay?

 9        A.   Yeah.

10        Q.   In order to stay?

11        A.   Yeah.

12             MR. POLLACK:  Objection to form.

13   BY MS. CESARANO:

14        Q.   That is what you were telling them, either

15   you fire me if you don't like me or you promote me if

16   you think I'm doing a good job?

17        A.   Yeah.

18             MR. POLLACK:  Objection to form.

19   BY MS. CESARANO:

20        Q.   Is that fair what you said to them?

21        A.   That is pretty much what I was saying.  The

22   fact everybody has been reviewed -- and something else

23   I would like to add at this time.  I don't know when it

24   is the time to say it.
```

Page 123

1      Q.   Say it and I may want to jump back to the

2  meeting.

3      A.   Also the day Eric and Jeff called me in the

4  office and gave me the $4.70 raise, nobody else was

5  given a raise like that on the job.  Nobody else was

6  reviewed like that.  The vice president reviewed

7  everybody.  He reviewed Chuck Bender.  He reviewed Ray

8  McKean.  He reviewed Jeff Cooper.  He reviewed Eric

9  Plotke.

10     Q.   You mean Robert Mitchell?

11     A.   Robert Mitchell, he reviewed everybody, and

12  I'm offended at the fact he never reviewed me, and I

13  asked him that question, you know, how come he never

14  reviewed me.  He never did.

15     Q.   Isn't it possible that Robert Mitchell only

16  reviews people that are going into Whiting-Turner

17  management?

18     A.   Well --

19     Q.   Is that possible?

20     A.   Well, let me ask you this.

21     Q.   No, just answer my question and then you can

22  add.

23     A.   I don't know.  I don't know.  Can I comment

24  now?

Page 124

1    Q.   Let me ask you another thing.

2    A.   Okay.

3    Q.   Does Robert Mitchell ever sit down and review

4    union members, to your knowledge?

5    A.   I don't know who he reviews, but I know he

6    reviewed everybody in that trailer and everybody --

7    Q.   I know.  I'm asking a different question.

8    A.   I don't know.

9    Q.   Well, let me put it a different way.  Have

10   you ever seen or heard of Robert Mitchell reviewing

11   anybody in the union to give them an appraisal?

12   A.   I don't know.

13   Q.   No.  I mean, have you ever seen him do that?

14   A.   I can't answer that because I'm clearly

15   telling you Robert Mitchell reviews everybody.

16   Q.   Let's go back.  Whether you are union or

17   not.

18   A.   I wasn't the only guy in the union.

19   Q.   You said Robert Mitchell reviewed everybody?

20   A.   He reviews everybody.

21   Q.   Did he ever review a carpenter on the job?

22   A.   No.  I mean, he reviewed everybody that's in

23   supervision.

24   Q.   It is a fact, isn't it, that Robert Mitchell

1  does not review a carpenters' foreman?  Just yes or

2  no.

3      A.   I don't know.  I don't think he reviews the

4  carpenters' foreman.

5      Q.   Isn't it a step further, you know, because

6  again, we want the record to be as clear as what you

7  know.  I mean, you have been in the union 30 years or

8  whatever.  You know what goes on.  Isn't it true that

9  Rob Mitchell as vice president of Whiting-Turner really

10 cannot give appraisals to union members?

11          MR. POLLACK:  Object to form.

12 BY MS. CESARANO:

13     Q.   Isn't that true?

14     A.   That's not true.

15          MR. POLLACK:  Object to form.

16 BY MS. CESARANO:

17     Q.   Will the union accept an appraisal of

18 their --

19     A.   The union --

20          MR. POLLACK:  Let her finish.

21 BY MS. CESARANO:

22     Q.   Let me finish.

23     A.   No.

24     Q.   Tell me a union craft member that ever has a

Page 126

1  written appraisal by Rob Mitchell.  Name me a name.

2       A.   The way you are asking me --

3       Q.   Name me a name.

4       A.   I don't have an answer for it.  I don't know

5  what Rob Mitchell does, but all I'm saying to you is

6  this, and I don't know what it is.

7       Q.   You say you don't know what he does?

8       A.   The way you are asking me the question, I

9  don't know what he does.  All I'm saying is that

10 everybody in that trailer was reviewed by Rob Mitchell

11 except me.

12      Q.   Isn't it true the people in the trailer were

13 people like the project engineer, correct?

14      A.   No.

15      Q.   Is that one person that was in the trailer?

16      A.   He was in the trailer, but there were

17 engineers in the trailer.

18      Q.   One by one.

19      A.   Uh-huh.

20      Q.   The project engineer was in the trailer,

21 correct?

22      A.   Yeah.

23      Q.   He was reviewed by Rob Mitchell, correct?

24      A.   Right.  Uh-huh.

Page 127

```
 1        Q.   How do you know that?

 2        A.   He was reviewed.  I knew they was going -- I

 3   don't remember the dates, but I knew Jeff had to have a

 4   review.  Eric had to have a review.  Omar had to have a

 5   review.

 6        Q.   Isn't it true they're members of the

 7   management of Whiting-Turner; is that correct?

 8             Is that correct, yes or no?

 9             MR. POLLACK:  If you know, say yes or no.

10             THE WITNESS:  Yes.  Yes.

11   BY MS. CESARANO:

12        Q.   Okay.  Isn't it true that at the time we are

13   talking about, your complaint was that you hadn't got a

14   review in order to become part of the management of

15   Whiting-Turner?

16             MR. POLLACK:  Object to the form.

17   BY MS. CESARANO:

18        Q.   Wasn't that your complaint?

19        A.   I never got a review, yes.

20        Q.   If you had gotten a review and it was

21   successful at that point, your understanding was at

22   that point you would become part of the management of

23   Whiting-Turner, isn't that correct?

24             MR. POLLACK:  Object to the form.
```

1          THE WITNESS:  I guess.

2          MS. CESARANO:  What is your objection to

3     form?

4          MR. POLLACK:  You are putting words into the

5     witness's mouth.

6          MS. CESARANO:  No, I'm not.  Really, at this

7     point, you know, I'm ready to go to the judge

8     because you know --

9          MR. POLLACK:  Go to the judge.

10         MS. CESARANO:  You have objected to every

11     question I have asked on form.

12         MR. POLLACK:  I want it on the record.

13         MS. CESARANO:  I have never had a depo in 23

14     years where somebody objected to every question on

15     form.

16         MR. POLLACK:  Please.  So the record is clear

17     in case we go to the judge, I would say that I

18     have objected to a fraction of questions that you

19     have asked.

20         MS. CESARANO:  They are not on form because

21     you don't know what form is.

22         MR. POLLACK:  I believe I do.  I believe when

23     you are mischaracterizing the witness's testimony

24     or you ask him for questions that are completely

Page 129

```
 1     outside the scope --

 2          MS. CESARANO:  Guess what, David?  When you,

 3     as you put it, mischaracterize the witness's

 4     testimony, his answer to me should be no.  Very

 5     simple.

 6          MR. POLLACK:  I'm not controlling his

 7     answers.  I'm controlling my objections.  My

 8     objections --

 9          MS. CESARANO:  Let me start over.

10          MR. POLLACK:  For the record, I want to

11     finish my objection.

12          MS. CESARANO:  Finish, because this will take

13     about 20 hours the way we are going.

14          MR. POLLACK:  I'm not making this

15     adversarial.

16          MS. CESARANO:  Very.

17          MR. POLLACK:  I think I have a legitimate

18     concern when the questions you are asking call for

19     what I deem to be legal conclusions, conclusions

20     about who's management, who's labor based on --

21     that is not -- if he knows it, that's fine.   I

22     think that is way outside the scope.

23          MS. CESARANO:  First of all, you keep telling

24     him what he knows and doesn't know.  He knows what
```

1        he knows.

2               MR. POLLACK:  And he told you.

3               MS. CESARANO:  He can tell me if me doesn't

4        know.

5               MR. POLLACK:  You keep asking him again and

6        again.

7               MS. CESARANO:  They are all different, and if

8        YOU listen more carefully, you would see the

9        questions are different.  If he says no to one

10        question, I ask a different question.

11               MR. POLLACK:  You are free to ask it and I'm

12        free to object.  Is there a question?

13               MS. CESARANO:  I've forgotten what the

14        subject matter is at this point.

15               Do you want to read the last question?

16               (The question referred to was read by the

17        reporter as above recorded.)

18               MS. CESARANO:  That's a question.  I'm asking

19        what his understanding was.  I know what my

20        understanding is right or wrong.  He knows what

21        his understanding is right or wrong.

22               MR. POLLACK:  Mr. Bush, if you understand,

23        answer the question.

24        BY MS. CESARANO:

1          Q.    Do you want her to read it once more?

2          A.    No.

3          Q.    Basically, I think that is what I thought my

4    review would be, increase in salary and a chance to be

5    in management.   Then I would have had to make a

6    decision then whether I would have stopped the benefits

7    with my union.   That's what I thought.

8                UNIDENTIFIED SPEAKER:   Their lunch is here.

9                MS. CESARANO:   Off the record.

10               (Thereupon a brief recess was taken, after

11          which the following proceedings were had:)

12   BY MS. CESARANO:

13         Q.    Just to finish this meeting we are talking

14   about on March 22nd, were there any other complaints

15   that you made to them at that meeting that you haven't

16   already talked about to me?

17         A.    No, that was -- like I said, it was a long

18   extended thing there, and basically I let them knew how

19   I felt.   That I felt, you know, they brought me out

20   there simply to get the work done and they had no

21   intention of reviewing me.   They had no intention of

22   being fair, and that's basically what I told them that

23   day and I put some of this in that letter.

24         Q.    And no intention of promoting you?

1          A.    They had no intention of promoting me even

2    though I had 34 years experience.  I had more

3    experience than anybody on that team and they showed it

4    over and over again.

5          Q.    But again, to the meeting --

6          A.    At the meeting, that is what I told them.

7          Q.    That's what you told them?

8          A.    That's basically what I told them.

9          Q.    Their response to you was please stay?

10         A.    Well, some response was slow and Jeff Cooper

11   told me we couldn't have done it without you.  They

12   wanted me to stay.  They said they was not going to

13   fire me.  That is what they told me.

14         Q.    Did they tell you that they didn't think that

15   you were able to be a superintendent?

16         A.    They didn't tell me that.

17         Q.    Did they tell you anything else during that

18   meeting, any criticisms?

19         A.    No, and I asked them was it anything I did

20   wrong or something I didn't perform that well and they

21   said no, they had no problem with my work.

22         Q.    Did they try talking you into staying?

23         A.    They made some statements about, you know,

24   about going further up to the next job.

Page 133

1      Q.    Did they say what the next job was?

2      A.    The next job was going to be City Place and

3   the Wellington job.

4      Q.    Are those big jobs?

5      A.    Big jobs, yeah.  Probably $200 and something

6   million between the two of them.  Over $200 and

7   something million.

8            (The document referred to was thereupon

9   marked "Defendant's Exhibit No. 1 for Identi-

10    fication," a copy of which is attached hereto.)

11  BY MS. CESARANO:

12     Q.    Okay.  I marked something for

13  identification.  This is Exhibit 1.  Is that your

14  signature at the bottom of that document?

15     A.    Yes, it is.

16     Q.    You wrote that letter?

17     A.    Uh-huh.

18     Q.    It says, "To whom it may concern."  It is

19  dated April 13th, 1999, correct?

20     A.    Uh-huh.

21     Q.    Who did you give the letter to, if anyone?

22     A.    I gave one to Mr. Mitchell, one to Mr. Plotke

23  and one to Mr. Cooper.

24     Q.    Did you give it to them on the same date as

Page 134

1    the letter?

2        A.    I think it was the same date, yes, ma'am.

3        Q.    Was it or --

4        A.    Same date.

5        Q.    You are pretty sure it was the same day?

6        A.    Yes, ma'am.

7        Q.    Did you type this letter yourself?

8        A.    No, I had it typed.

9        Q.    Who typed it?

10        A.    I'm trying to see who typed it now.  I think

11    I had another secretary that I can't recall the first

12    part of her name.  I had a secretary to type it.

13        Q.    At Whiting-Turner?

14        A.    No.  No.  She did it at her home on her own

15    computer or something.

16        Q.    But it was an employee of Whiting-Turner?

17        A.    No.

18        Q.    Just some secretary, a friend of yours?

19        A.    Well, I know a lot of people, yeah.

20        Q.    But I mean, she typed it the same day you

21    handed it in?

22        A.    No, I started on this letter -- I started on

23    this letter before that.

24        Q.    How much before?

1        A.    I don't know.  Probably like a week or so I

2    started putting that letter together.

3        Q.    You handwrote it?

4        A.    Yes.

5        Q.    Then somebody else typed it?

6        A.    Uh-huh.

7        Q.    About a week later?

8        A.    I don't know.  It could have been more than

9    that.

10       Q.    And you turned this in to Robert Mitchell?

11       A.    Mr. Rob Mitchell.

12       Q.    Did you turn it in to Jeff Cooper and Eric?

13       A.    Jeff Cooper, Eric Plotke.  I have them a copy

14   here.

15       Q.    Did anybody else get a copy of the letter at

16   the time you wrote it?

17       A.    No.

18       Q.    Did you turn it in personally to Rob

19   Mitchell?

20       A.    I gave it personally to Rob Mitchell.

21       Q.    Did Rob Mitchell read it at the time you gave

22   it to him?

23       A.    He discussed the resignation with letter with

24   me and he asked me to stay on with the company.  He

1   mentioned something about the other projects coming up

2   at the time.

3       Q.   This is on April 13th he talked to you?

4       A.   I think it was -- it could not have been the

5   13th.  The 14th, one of those days.

6       Q.   Within a few days of getting the letter?

7       A.   Yeah, because when he came out and I gave him

8   his letter in his hand, he and I talked.  Mr. Mitchell

9   and I, we must have talked, I don't know, I think we

10  talked about an hour maybe.

11      Q.   Where did you talk?

12      A.   Out in the field.

13      Q.   He read the letter as he stood there?

14      A.   I don't know when he read the letter because

15  I gave it to him, but I know we talked about an hour.

16      Q.   An hour?

17      A.   Yeah.

18      Q.   He talked to you the same date he got the

19  letter?

20      A.   I think this same date he got the letter,

21  yeah.

22      Q.   He tried to encourage you to stay with the

23  company.

24      A.   Yeah, he made mention the fact what they had

Page 137

1   coming up and everything, you know.

2       Q.    Did he say that he wanted you to stay as the

3   laborers' foreman?

4       A.    No, he didn't tell me.

5       Q.    Did he tell you IN what capacity?

6       A.    In what capacity, he didn't say.

7       Q.    Did he say anything else during that hour?

8   That was a long conversation.  What else was said by

9   either you or him?

10      A.    Basically, I was telling him was he aware of

11  what I did out there in my job, my work performance.  I

12  basically asked him that.

13      Q.    What did he say?

14      A.    I can't remember.  He said yeah, he was aware

15  of the work that I did.

16      Q.    Was there anything else said at all in the

17  conversation?

18      A.    No.  No, not really.  Not that I can think

19  of.

20      Q.    Would it be fair to say he was trying to talk

21  you into staying?

22      A.    I think he probably talked to the other ones

23  and knew I probably wasn't going to stay.

24      Q.    Right, but that is not the question.  Was he

1    trying to talk you into staying?

2              MR. POLLACK:  Object to the form.

3              THE WITNESS:  I can't say whether he was or

4         not really.

5    BY MS. CESARANO:

6         Q.   Did he ask you to stay?

7         A.   He was trying to tell everybody what he was

8    going to do as far as transportation to the other job

9    and stuff.  That is a way I guess of asking me to stay

10   on.

11        Q.   Did he tell you that you could stay on if you

12   wanted to?

13        A.   No, because when I told him, I had already

14   let him know I wasn't going to stay.

15        Q.   You made it clear?

16        A.   Yeah.  I took enough.  I had took enough of

17   the humiliation of it, and I reminded him that I was

18   the lowest paid assistant superintendent with

19   Whiting-Turner and I could prove it.  I did tell him

20   that.

21        Q.   Did he say anything in response to that?

22        A.   He told me that I wasn't, but I told him I

23   knew I clearly was.  I already had some people to look

24   into it.

1        Q.    Well, isn't it true the raise you did get in

2    approximately March of '98 was at least a 45 percent

3    raise over what you were making?  How much were you

4    making at the time?

5        A.    $11.10.

6        Q.    You were raised to $15 and what?

7        A.    $15.70.

8        Q.    $15.70?

9        A.    Uh-huh.

10       Q.    It would be fair to say that was a fairly

11   significant raise; isn't that correct?

12       A.    No.

13       Q.    It is not a 45 percent raise?

14       A.    It is not a fair raise when you're doing what

15   I'm doing.

16       Q.    I didn't say the word "fair."  I said

17   "significant."  That's not the same as it was fair.

18       A.    I didn't think it was significant at the

19   time.

20       Q.    Doesn't the percentage work out to be a 45

21   percent raise?

22       A.    I don't know the percent, but was it

23   significant?  I don't think it was significant at the

24   time.  Compared to what I was doing, it was not

1    significant.

2         Q.    You would agree you were making $7 and how

3    much an hour?

4         A.    Huh?

5         Q.    You would agree as a laborers' foreman you

6    were making $7 and what an hour?

7         A.    $11.10 an hour.

8         Q.    $11.10 an hour?

9         A.    Uh-huh.

10        Q.    You got an extra dollar because you were

11   foreman; is that right?

12        A.    Yeah.

13        Q.    Extra dollar per hour?

14        A.    Yeah.

15        Q.    All foremen get an extra dollar per hour; is

16   that correct?

17        A.    That is up to X amount of people.  You get X

18   amount of people, you get a dollar.  Like the general

19   foremen may get a dollar and quarter, $3, $5.

20             They can pay you just what they want.  They

21   can pay you what they want.

22        Q.    But the foreman gets extra money?

23        A.    Extra money, yes.  Oh, yes.  Uh-huh.

24        Q.    And that is again pursuant to the union

Page 141

```
 1   contract they get extra money, correct?

 2       A.    And I would say yes to a part of it, but then

 3   it is up to the discretion of the superintendent.

 4       Q.    Right.  Well --

 5       A.    He could pay you the $1 or he could pay you

 6   $6.

 7       Q.    Or he could pay you $1 million if he wanted

 8   to?

 9       A.    We have guys making $6 over scale.

10       Q.    It is a minimum, correct, under the union

11   contract?

12       A.    You have to pay that minimum, uh-huh.  That

13   is right.

14             MS. CESARANO:  Off the record.

15             (Informal discussion off the record.)

16   BY MS. CESARANO:

17       Q.    I know in your EEOC charge you state you were

18   promised a promotion and never got it, correct?

19       A.    Yes.

20       Q.    Who precisely is the person who promised you

21   the promotion?

22       A.    That would be Eric Plotke.

23       Q.    And he?

24       A.    He didn't like just say, well, it's going to
```

Page 142

1    be, I promise you this, but he told me I would be

2    assistant superintendent. This is how he introduced me

3    to the inspectors with Sunrise. That is how he

4    introduced me to all the subcontractors.

5            He introduced me to everybody as assistant

6    superintendent. I cared about that and worked proudly,

7    and this is what I felt I was.

8        Q.    In terms of the person, if you were to name

9    the name?

10       A.    Eric Plotke.

11       Q.    If you were to name the name?

12       A.    Eric Plotke.

13       Q.    No one else?

14       A.    No. Eric Plotke.

15       Q.    Now, did Chuck Bender ever come to you during

16   the time that you and he shared an office or at any

17   other time and say, you know, Look, James, if you think

18   you deserve to get an appraisal and be promoted, you

19   need to go talk to them at Whiting-Turner, talk to the

20   management? Did he ever tell you that?

21       A.    I can't remember him saying that. I remember

22   him telling me he went to Eric one day and he asked him

23   how come I hadn't got my review. I remember he told

24   me.

1          Q.    When you say that sentence, I want to make

2     clear who the "I" is?

3          A.    I think Chuck said that.  I'm trying to

4     remember.  I think it was Chuck.

5          Q.    Did you hear him say that?

6          A.    No, he told me he had mentioned to them about

7     how come I wasn't reviewed.

8          Q.    How come I, Chuck, wasn't reviewed?

9          A.    How come James wasn't reviewed.

10         Q.    I wasn't clear who the "I" was.

11         A.    Me.

12         Q.    Who did he tell that to?

13         A.    He told that to Eric.

14         Q.    What did Eric say?

15         A.    I don't know.  I don't know what the answer

16    was.

17         Q.    I know you weren't there so you are getting a

18    hearsay conversation from Chuck, but did Chuck tell you

19    what Eric said?

20         A.    No, it was never said what.

21         Q.    Did Chuck ever tell you that Chuck had to go

22    to management to ask for his appraisal?

23         A.    I don't know if he did or not.  I really

24    can't answer that.

1          Q.    Don't you remember him saying to you, look, I

2     had to go to them, they didn't come to me?

3          A.    I don't remember that.  All I know is what

4     Eric told me.  That is all.  He told me I would be

5     reviewed in six months.

6          Q.    You knew Chuck Bender was anxious to get

7     promoted, too?

8          A.    We all was.

9          Q.    You knew Chuck wanted to get promoted,

10    correct, and you shared an office with Chuck, correct?

11         A.    Yeah.

12         Q.    In fact, a lot of these complaints you have

13    voiced to Chuck, correct?

14         A.    We talked about a lot of things.

15         Q.    But Chuck knew you were disgruntled about

16    things, correct?

17         A.    A lot of people on the whole job knew it.  It

18    wasn't no secret.  They would see me volunteering, the

19    workers, and they at no time understood why.  Everybody

20    knew it.

21         Q.    It would be fair to say the last, you know,

22    maybe six months you were very unhappy on the job,

23    correct?

24         A.    Yeah.

1    Q.    And people saw it?

2    A.    They knew it.    From me being a person

3    outgoing and everything, everybody knew it and

4    everybody knew the reason why.    Everybody knew that.

5    Q.    But your attitude was not the best during the

6    last six months, correct?

7    A.    No, I didn't change my attitude or my work

8    habits.    Like I said, I volunteered to work Saturday

9    and Sunday when I shouldn't have been there.

10    Q.    It isn't true during the last six or so

11    months of your employment you could hardly make

12    yourself look at Eric Plotke?

13    A.    That is not true.

14    Q.    Isn't it true you wouldn't say hello to him?

15    A.    That is crap.    I even talked to Eric about

16    going to church.    He and his wife, when his wife and

17    kids came on the job, we shared all these things.

18        Eric invited me fishing.    Football,

19    basketball games he would bring me tickets.    It wasn't

20    like that.    I didn't blame Eric.    It was just the

21    situation there.    I don't blame him today.

22    Q.    So you are not saying Eric is a racist?

23    A.    No.    No.    I don't think --

24        MR. POLLACK:    Object to form.

Page 146

| 1 | THE WITNESS: I wouldn't say he is a racist. |

1    THE WITNESS: I wouldn't say he is a racist.

2    I've seen a lot of incidents out there that

3    happened.

4    Guys of color, let's say guys of color, my

5    Latin friends, I seen some things happen to them.

6    BY MS. CESARANO:

7    Q.    We are talking about you.

8    A.    I wouldn't say personally that he is a

9    racist. I wouldn't say personally he is a racist, no.

10    Q.    All right. So you wouldn't say that Eric

11    Plotke did this to you because of your race?

12    A.    Well --

13    MR. POLLACK: Object to the form.

14    THE WITNESS: I believe this and I think I've

15    got that in some of my letters that I wrote. I

16    believe this here, and I concur with this. I

17    believe that if I was a white American with 34

18    years of experience, started his own company, got

19    the schooling behind me, did all the things I did,

20    plus this company trusts me with three big major

21    features that cost over a million and something

22    dollars, one mistake on my part, if I had one foot

23    over this way or one foot over this way, it could

24    have cost Whiting-Turner a fortune. They trusted

Page 147

```
1     me with this stuff.

2           Now, what else would I have had to do in

3     order to get a review?  If I had been a white

4     American, no problem.  I think I would have been

5     stepped right up there with Chuck and we would've

6     gotten reviews together.

7           And Chuck felt the same way sometimes because

8     here it is I'm doing everything I could, and why

9     didn't they give the structures to Chuck.  You

10    know, that is how I felt.

11   BY MS. CESARANO:

12    Q.    Isn't it true, though, that Eric Plotke

13   didn't do or say anything to you that was racist?

14         MR. POLLACK:  Object to form.

15         THE WITNESS:  He didn't say anything to me

16    that was racist.  He didn't say anything to me.

17   BY MS. CESARANO:

18    Q.    Did he do anything to you that was racist?

19    A.    Not to me.

20    Q.    When you say not me, who else are you talking

21   about?  It is like you are referring to somebody else

22   he did do something racist to.

23    A.    I have seen in some of my Latin friends that

24   has had some things done to them.
```

```
 1        Q.    But that's a different kind of

 2   discrimination.  That is what, just so you know, is

 3   Hispanic or national origin.  I'm talking about your

 4   claim is for race discrimination, so aside from your

 5   Hispanic friends, anything else that Eric Plotke did

 6   that was racial in terms of black?

 7        A.    Well, like I said, if I went -- if I had been

 8   white --

 9        Q.    We are talking about Eric Plotke.

10        A.    He didn't do anything to me.

11        Q.    Not Whiting-Turner, not the whole company.

12   We have to go one at a time.

13        A.    Uh-huh.

14        Q.    It is fair to say Eric Plotke didn't say or

15   do anything to you that was adversely directed to you

16   because you were black?

17        A.    I think the way the situation was handled was

18   because I was black.

19        Q.    What did he say or what did he do?  What did

20   he say?  You already said he didn't say anything.

21        A.    I'm talking about the way things was handled.

22        Q.    Right.

23        A.    No review.  Tells me something in October of

24   '97.  He really don't follow through with that, and he
```

1    didn't do what he said he would do, and I did my part.

2         Q.   I understand, and there were things that were

3    supposed to be done and didn't happen and you have told

4    me.

5         My question is much different.  Did he say

6    anything to you that was racist?

7         A.   No, he didn't say anything.

8         Q.   Did he specifically do anything to you such

9    as, you know, I mean, an example, some action that he

10   took?

11                 MR. POLLACK:  No.

12                 MS. CESARANO:  Can I finish my question?

13                 MR. POLLACK:  Yes.  Yes.

14                 MS. CESARANO:  It is the most standard

15        question in all discrimination depos.

16                 MR. POLLACK:  Action is different from

17        inaction.  Maybe he deems -- he described a number

18        of actions that he considers to be an inaction.

19                 MS. CESARANO:  Inaction is my sitting doing

20        nothing.  Action is picking up my pen.

21                 MR. POLLACK:  When somebody doesn't review

22        him for six months, is that an action?

23                 MS. CESARANO:  And we've covered that.

24                 MR. POLLACK:  Is your question other than

Page 150

1     what he testified to?

2           MS. CESARANO:  That is what I said.

3           MR. POLLACK:  That is legitimate.

4           MS. CESARANO:  I said we have covered that.

5     I just said that to him, that I understand.  We

6     have covered that, and then I went to statements,

7     and now I'm going to affirmative things that he

8     did to him.  Those are the three categories.

9           MR. POLLACK:  Other than what he testified

10    to?

11          MS. CESARANO:  Yes.  I said that if you were

12    listening.

13          MR. POLLACK:  See, let's not --

14          MS. CESARANO:  We are already here to a

15    quarter of 2:00, and I'm not a third done with

16    this thing.

17          MR. POLLACK:  You don't need to -- I want the

18    record to be as clear as you want the record for

19    your client.

20          MS. CESARANO:  I want it organized.  I want

21    it categorized so I am clear we are covering every

22    conceivable kind of discrimination.

23          MR. POLLACK:  I'm not concerned about that,

24    but I'm concerned that the record be clear when

1    you say --

2         MS. CESARANO:  You made your point.

3    Inaction, we covered inaction.  We just covered

4    that for probably two hours.

5         MR. POLLACK:  With all due respect, I think

6    he covered action.  That is my objection.  Other

7    than what he testified to?

8    BY MS. CESARANO:

9    Q.    I want to be clear.  You have told me some

10   things about not getting a promotion, not getting an

11   appraisal.  I'm categorizing those as things that

12   happened to you because somebody didn't take an action

13   affirmatively to do something for you.

14        I don't want you to repeat those again

15   because we will be here for two hours.  I have asked

16   you about statements and you told me about that.  My

17   third category is, did Eric Plotke do something to you

18   like hit you over the head, do something to you that

19   you can recall and say, yes, that's racist?  That's my

20   question.

21   A.    No, I mean, he didn't hit me or nothing like

22   that.

23   Q.    An example, when I say do something to you --

24   A.    No, he didn't hit me.

Page 152

1    Q.    Other than what you have covered, you covered

2    all the inaction, I want something new.  I want to hear

3    something new I haven't heard before.  Is there

4    anything new you would like to tell me that you haven't

5    already covered?  Again, only to Eric Plotke.  We can

6    only go one person at a time.

7        A.    I can't think of anything really.

8        Q.    If you think of something later on, tell me.

9    That's fine.

10       A.    I will.

11       Q.    But nothing occurred to you today?

12       A.    No.   Huh-uh.

13       Q.    Obviously, there are other people at

14   Whiting-Turner besides Eric Plotke.  So let's go to

15   Jeff Cooper?

16       A.    Uh-huh.

17       Q.    Tell me what if any statements Jeff Cooper

18   made to you that were racist.

19       A.    He never made a statement to me, but he made

20   a remark one night.

21       Q.    Okay.

22       A.    We had a water problem at the theatre.

23       Q.    Which theatre?

24       A.    At the theatre, at the Regal Theatre at the

Page 153

1    job out there, Sawgrass.

2        Q.    Okay.

3        A.    The only way to fix this project -- this

4    problem we had with all this water and people trying to

5    get to the theatre, and the thing was flooded, was to

6    have a trench dug.

7            So with my experience, I could operate heavy

8    equipment also.  I jumped on to a front end loader and

9    I began running this front end loader.  To alleviate

10   this problem, I cut trenches in the parking lot to let

11   the water run out of the parking lot so the people

12   could walk by, and I thought for this I should have

13   been celebrated.

14           I thought for this I should have got pats on

15   the back.  Instead, I was teasing Jeff and another

16   engineer and Chuck Bender.  I said, "You know, man,

17   this is good.  We need a picture of this for Rob."

18           Rob Mitchell, you though, that is our vice

19   president.

20           We were out there late that night working for

21   free and I made that statement, and Jeff Cooper got

22   vehemently I mean out of his mind.  He said I don't

23   like people poking fun at me, and even Chuck Bender

24   made a statement to me.

Page 154

1          "What is wrong with that?"

2          He said, "I don't know."

3          I just ran a front end loader for 45 minutes

4     helping with a problem that nobody else could run a

5     front end loader and did this to help my company, and

6     Jeff Cooper said, "I don't like the fact somebody is

7     making fun of me."

8          I wasn't making fun of him.  I said he needed

9     to make a picture of this to give it to Rob Mitchell

10    because at 8:30 on a Friday night we were out there

11    working.

12         He snapped on me like that.

13    Q.   How is that racist?

14    A.   I felt if a white American had just ran a

15    front end loader, something that was not his job to do

16    to help to relieve a problem to not have lawsuits, I

17    think they should have -- I think he should have said

18    something better than don't pick fun at me.

19         He is getting mad at me and I was the only

20    black guy there, and you can't tell me not to be

21    offended by that.

22    Q.   You can be offended by anything you want to

23    be offended by.

24    A.   I just took my own time and energy and what I

1  have learned through the years and I saved them a lot

2  of money.  I relieved all of this water out of the

3  parking lot by digging a series of trenches and he got

4  mad and put his finger out.  I can't understand that.

5      Q.   Let me be clear about that.  His words were,

6  "Don't make fun of me"?

7      A.   Yeah.

8      Q.   He felt somehow you were making fun of him?

9      A.   He wanted me to be offended, and Chuck Bender

10 looked at me and said, "What's wrong with him?"

11      I mean, he came unglued and said a whole lot

12 of stuff.  I can't remember what he said, but, man, I

13 just did a super duty here.

14      Q.   So I'm clear, Jeff Cooper was acting like he

15 was offended, correct, and you couldn't understand why?

16      A.   Well, he was acting like he was mad, and I

17 couldn't understand what would make him mad.  Nobody

18 could figure out why he was mad.

19      Q.   He felt he was being mocked; is that right?

20      A.   I don't know what he felt though.  But I

21 don't think if I had been a white American he would

22 have said that.

23      Q.   Did he say he felt you were making fun of

24 him?

1      A.   No.

2      Q.   What were his words?

3      A.   I'm saying he snapped up, exploded.  I don't

4  like people making fun at me, or something like that.

5  He said something like that.

6      Q.   So his words were he felt you were making fun

7  of him, correct?

8      A.   I guess so.

9      Q.   What else having to do with Jeff Cooper,

10  anything else?

11      A.   That is all I can think of.

12      Q.   That's the only thing?

13      A.   Uh-huh.

14      Q.   Let's go to any other managers on the job.

15      A.   We had a problem with Ivan.

16      Q.   Who is Ivan?

17      A.   I don't know his real name.  He was a

18  superintendent.

19      Q.   Which project?

20      A.   Car Max.

21      Q.   Okay.  What happened there?

22      A.   They sent me over there.  They told me to

23  leave Sawgrass, and Rob Mitchell told me to go help

24  them get that job finished.  I went over to get the job

Page 157

1    finished like they told me.

2        Q.    What were you doing?

3        A.    I was going over there as assistant

4    superintendent to get things finished, the job finished

5    that they wanted to put me on.

6            When I got over there, a carpenters' foreman

7    named Jerry said, "Let me introduce you to Ivan."

8        Q.    Do you know what Ivan's last name was?

9        A.    I don't know his last name.  So when he

10    introduced me to Ivan, Ivan, this is James, Ivan, this

11    is James Bush, they sent him over to give me a hand,

12    this is Ivan's words:  "If you can't find nothing for

13    him to do, then fire him."

14        Q.    His words were, if you can't find something

15    for him to do?

16        A.    That is what he told Jerry.

17        Q.    Then fire him?

18        A.    Fire him.

19        Q.    Did he say anything else?

20        A.    He said that, and when he told me that, I

21    told him these words:  "Mister, you don't have to fire

22    me.  I have the keys to my car," and I went ahead and

23    walked out to my car and I took the cellular phone that

24    Whiting-Turner gave me and I called Eric Plotke.

1           Eric Plotke said this guy has a problem.  Go

2    back over to the Sawgrass job.  That is what I did.

3        Q.   So this was the only --

4        A.   That is not all of it.

5        Q.   But at this time?

6        A.   That happened right then because I left.  I'm

7    a peace-loving person.

8        Q.   Let's --

9        A.   I walked away.

10        Q.   Let's not comment about what you are or

11   aren't.  I want to know what happened.

12        A.   Okay, but that's what happened.

13        Q.   You left?

14        A.   Walked away.

15        Q.   And do you know from either Jerry or Ivan

16   being there for that brief time what it was about not

17   having any work?

18        A.   No.

19        Q.   What was that about, you have no idea?

20        A.   Rob Mitchell sent me over there to help these

21   guys get the job finished.

22        Q.   Rob thought there was something to do?

23        A.   The job was only three quarters finished and

24   he sent me over there to work with him and Ivan.

Page 159

```
 1          Ivan told Jerry, "If you can't find nothing

 2   for this guy to do, fire him."

 3          MR. POLLACK:  Eat your lunch.

 4          THE WITNESS:  I will get it later.  I rather

 5      get this done.

 6   BY MS. CESARANO:

 7      Q.   Anything else with respect to that?

 8      A.   Then I left.  A week later, they sent me back

 9   over there.  I said, "Eric, remember the problem I had

10   with this guy?"

11          Eric said, "Don't worry about it.  Don't

12   worry about going back over there.  We will take care

13   of it."

14          I went over there.  They had me pouring

15   concrete, working a big crew of guys, getting my work

16   done.  So then we were standing up there waiting on the

17   concrete truck, and you could see it down the road

18   there, but I'm waiting on it to pour the concrete.

19          Ivan came up behind me, him and Dennis Clem.

20   Dennis Clem is a project manager with --

21      Q.   C L E M?

22      A.   C L E M.  So Ivan pulled up beside me, "What

23   is going on?"

24          I said, "Not much."
```

Page 160

1        He said, "Let me tell you something," and he

2   tore right into me. "On my jobs, we don't take a

3   45-minute lunch break."

4        I said, "I'm not taking a 45 minute lunch

5   break.  I'm waiting on that concrete truck to pour your

6   concrete."

7        He said, "Who is running the show out here?"

8        I said, "I don't know.  You have two

9   assistant superintendents and two carpenters' foremen

10   and a laborers' foreman.  I don't know who is running

11   the show."

12        He told me, "Well, let me tell you

13   something."

14        I'm telling you what he said.

15        He said, "I don't know you from Adam," and he

16   pointed his finger at me, and I mean, he took off.  I

17   could've tried to attack him.

18        Q.   You mean physically?

19        A.   If I could have.  He embarrassed me in front

20   of 15 men plus three other subs, and that's one time in

21   construction out of 35 years if I could have got to

22   this guy, because that was the second time he did

23   something like this to me, and he was very racially

24   motivated, but later on, he had a couple of incidents

1  that were racially motivated with somebody else, but if

2  he did that to me, and if I could've got my hands on

3  him, that is how I felt.

4       Q.   Who is somebody else?

5       A.   Several other black guys who had a problem

6  with the same guy.

7       Q.   Who?

8       A.   Some electrician and somebody else.

9       Q.   Who?

10       A.   I don't know who, but I know they had a

11  problem with him.

12       Q.   I need you to go through this.

13       A.   I don't know.  I'm not going to waste your

14  time telling you because I don't know.

15       Q.   I mean, did you see it?

16       A.   No, word.  Somebody told us about it.

17       Q.   Were they Whiting-Turner?

18       A.   They were black guys with other companies.

19       Q.   Subcontractors?

20       A.   Yeah, subcontractors.

21       Q.   So you --

22       A.   I think one was with an electrical company.

23       Q.   So nobody you or I could track down today?

24       A.   No, we couldn't track them today.

1          Q.    So going back to this, what happened next?

2          A.    So on that day, I got in my car and I left.

3     We were getting ready to pour concrete and I got in my

4     car and left.

5               Dennis Clem, the project manager, he called

6     Rob Mitchell and told Rob Mitchell what he just seen

7     was uncalled for.  He said, "This man was clearly out

8     there doing his work," and Dennis Clem called Rob

9     Mitchell and complained about the treatment I got from

10    Ivan.

11         Q.    But isn't it true that Ivan was known to have

12    a terrible temper?

13         A.    That is not my problem.  I was sent out there

14    to work with him.

15         Q.    I know, but I'm asking.

16         A.    If he had a terrible temper, I don't know

17    even his last name.  I don't know nothing about him.

18         Q.    Isn't it true Dennis Clem told you the guy

19    has a bad temper?

20         A.    He never told me that.

21         Q.    He never told you that?

22         A.    He didn't tell me he had a nasty temper when

23    this happened.  Later on, he told me that, but that was

24    no consolation to me.

Page 163

```
 1        Q.   Later on Dennis Clem told you that?
 2        A.   We talked about it later on, Dennis Clem and
 3   I.
 4        Q.   He told you that?
 5        A.   That was too late.
 6        Q.   But let's get the facts down.  Dennis Clem
 7   later told you?
 8        A.   Yeah, he mentioned something to me about this
 9   guy probably a month later when I saw him.
10        Q.   Being bad to everybody, correct?
11        A.   I don't know about being bad to everybody,
12   but Dennis was in a sense apologizing for what happened
13   that day.
14        Q.   Didn't Dennis Clem tell you it wasn't just
15   you, he had a bad temper with a lot of people.  Did he
16   tell you that?
17        A.   He didn't say that in that many words, but
18   like I told you --
19        Q.   Did he tell you that in any words?
20        A.   If he did, I can't remember the last.
21        Q.   If Dennis Clem testified under oath --
22        A.   Dennis Clem mentioned something, but that was
23   three weeks later or a month later.
24        Q.   And the mention about this guy was --
```

Page 164

1    A.    We did talk about Ivan.

2    Q.    -- he had a bad temper with a lot of people,

3    correct?

4    A.    I can't say that was the words he used.

5    Q.    You tell me what you remember.

6    A.    I can't remember what words he used, but I

7    remember we did talk about Ivan.

8    Q.    What did he tell you?

9    A.    He was telling me about he was sorry about

10    what happened over there that day and something like in

11    that order.

12    Q.    What did he tell you about Ivan?

13    A.    That is what we were talking about, Ivan.

14    Q.    I know he said he was sorry.    What else did

15    he tell you about Ivan?

16    A.    I can't remember the rest of it.    I know we

17    talked about it.

18    Q.    But you don't know what else was said?

19    A.    But I know I told Eric, and I thought -- I

20    felt offended that nobody with Whiting-Turner either,

21    Eric Plotke, Jeff Cooper or Rob Mitchell would take any

22    actions in my defenses and get me and this guy together

23    and tell this guy, look, this guy works for the same

24    company you do.

Page 165

1          Nobody did it and I'm still offended right

2     now because they never took the time and fixed it on

3     account of me.

4          Q.   Again, Ivan sees you and you are not working,

5     correct?

6          A.   No, he didn't see me not working.  I was

7     introduced.  He seen me waiting there.  It is

8     lunchtime, but I'm standing there out of the sun.

9          Q.   Let's do this slowly.

10         A.   Yeah.

11         Q.   He sees you standing there and he doesn't

12    know what you are doing?

13         A.   Uh-huh.

14         Q.   You have to answer for the court reporter.

15         A.   Yes.

16         Q.   He apparently assumes that you are doing

17    nothing, correct?

18         A.   He could have assumed that.  He told me to

19    pour concrete.  So all he had to do -- in construction,

20    I don't know how it is in legal stuff.

21         Q.   We will get too long an answer.

22              MR. POLLACK:  You have to answer her

23         questions.

24              THE WITNESS:  I don't know how to answer it.

Page 166

```
 1        I don't know how to explain it to her.  You know,

 2        if it was something else or construction, his job

 3        was to ask me what was going on, what was I

 4        doing.

 5   BY MS. CESARANO:

 6        Q.   That would be nice if he was a nice, real

 7   sweet person, but obviously he is not?

 8        A.   I didn't know that.

 9        Q.   Apparently, he says to you words to the

10   effect he thinks you are doing nothing and taking a

11   long lunch break, right?

12        A.   I guess.

13        Q.   He is wrong, right?

14        A.   Dead wrong.

15             MS. CESARANO:  Okay.  How are we doing on

16        time?  It is almost 2:00.

17             MR. POLLACK:  What time?

18             THE WITNESS:  I may be wrong.  I have 1:47.

19             MS. CESARANO:  I will try to pick a place to

20        stop.

21             THE WITNESS:  Go as far as you want to.

22             MS. CESARANO:  I'm trying to find a good

23        place to stop.

24   BY MS. CESARANO:
```

Page 167

```
 1         Q.   Any other incidents involving racial, you

 2   know, type incidents or words or events that you can

 3   think of while you were at Whiting-Turner?

 4         A.   Not right now.

 5         Q.   Nothing else comes to mind?

 6         A.   Not right now.

 7              MS. CESARANO:   Then why don't we take a take

 8         break now.

 9              MR. POLLACK:   It is a good time?

10              MS. CESARANO:   Might as well, there is no use

11         pressing the last 15 minutes.

12              (Informal discussion off the record.)

13              (Thereupon the taking of the deposition was

14         concluded.)

15

16
                            JAMES BUSH
17

18            Sworn to and subscribed before me this

19         9th day of June 2000.

20

21
                            Notary Public
22

23

24
```

Page 168

```
 1                    CERTIFICATE OF OATH

 2

     STATE OF FLORIDA
 3   COUNTY OF MIAMI-DADE

 4

          I, the undersigned authority, certify that JAMES
 5   BUSH personally appeared before me and was duly sworn.
          WITNESS my hand and official seal this 9th day of
 6   June 2000.

 7

 8                    AMY MASSENGALE
                      Notary Public - State of Florida
 9                    My Commission No. CC543978
                      Expires: March 31, 2004
10

11
                    REPORTER'S DEPOSITION CERTIFICATE
12

13   STATE OF FLORIDA
     COUNTY OF MIAMI-DADE
14

15          I, AMY MASSENGALE, Registered Professional
     Reporter, certify that I was authorized and did
16   stenographically report the deposition of JAMES BUSH;
     that a review of the transcript was requested; and that
17   the transcript is a true and complete record of my
     stenographic notes.
18
            I further certify that I am not a relative,
19   employee, attorney, or counsel of any of the parties,
     nor am I a relative or employee of any of the parties'
20   attorney or counsel connected with the action, nor am I
     financially interested in the action.
21
            DATED this 9th day of June 2000.
22

23
                    AMY MASSENGALE
24
```

April 13, 1999

To whom it may concern:

I James T. Bush Sr. feel at this time, I can no longer work for Whiting-Turner, due to a number of things that have happened. I feel I wasn't treated fairly. I committed myself to Whiting-Turner coming 61 miles per day to work, giving my all even after a meeting with Jeff Cooper, Project Manager and Eric Plotke, General Superintendent, my feelings are the same. The meeting only just fused my complaints even more. I feel there's a double standard with Whiting-Turner. A company that has been in business since 1909 should have a better policy concerning all employees regardless of race, creed, national origin or age. My complaints are real obvious. I haven't at no time, since September 1964 has these problems with no company in 34 1/2 years. I have read the literature from Whiting-Turner, but it doesn't address the companys policy on these matters. I feel from the Vice President to all supervisory people in the field they should be taught and more aware of situations that may arise by having a monthly meeting when there are different ethnic races on the job site. It's not something to take lightly, because some of us are sensitive to certain issues that might not affect others. In October 1997 when I came to Sawgrass Mall, I came to see this project completed. On April 15 is completion date. I agreed on March 22, 1999 to stay until April 16, 1999. My decision is based on the fact; this venture has become a bad turn for the past year for me and my wife. After 6 months and no review, not even a meeting, my wife concluded that Whiting-Turner had no plans for me. The part that offends us so much is that I turned down several general foreman jobs in the past 6 months. But I'm not a quitter, so it cause a lost of suffering to my marriage and I've apologized to my wife for my bad decision to stay with Whiting-Turner. Truly its put a serious damper on an illustrious career. I'm sorry I didn't fit in, its not because I didn't try. My belief in God, being ordained in 1978, I would like to hope it showed in the way I treated all office personnel, engineers, field operators, my superintendent, my project manager and all officials from the Mills, City of Sunrise Personnel, all sub-contractors, carpenters and laborers. I'm sorry we couldn't make it work for all of us.

With Respect Always

*James T. Bush*

James T. Bush

cc:    Robert Mitchell, Vice President
       Jeff Cooper, Project Manager
       Eric Plotke, General Superintendent

DEPOSITION
EXHIBIT

Am 6.8.00

Plaintiff/Bush 362

1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2
               FORT LAUDERDALE DIVISION
3              CASE NO. 00-6224-CIV-DIMITROULEAS

4    JAMES BUSH,

5                   Plaintiff,
                                        **ORIGINAL**
6        v.

7    THE WHITING-TURNER
     CONTRACTING CO., a Maryland
8    corporation,

9                   Defendant.

10   - - - - - - - - - - - - - - - - - - x

11

12                      1500 Miami Center
                        201 South Biscayne Boulevard
13                      Miami, Florida
                        June 15, 2000
14                      2:10 p.m. - 4:05 p.m.

15

16

17

18                 DEPOSITION OF JAMES BUSH

19                      VOLUME II

20

21        Taken before Amy Massengale, Registered

22   Professional Reporter and Notary Public for the State

23   of Florida at Large, pursuant to Notice of Taking

24   Deposition filed in the above cause.

```
                                                              2
```

| | |
|---|---|
| 1 | APPEARANCES |
| 2 | |
| 3 | DAVID H. POLLACK, ESQ., of the firm of |
| | David H. Pollack, on behalf of the |
| 4 | Plaintiff. |
| 5 | SHEILA CESARANO, ESQ., of the firm of |
| | Shutts and Bowen on behalf of the |
| 6 | Defendant. |

```
1                      APPEARANCES

2

3           DAVID H. POLLACK, ESQ., of the firm of
            David H. Pollack, on behalf of the
4           Plaintiff.

5           SHEILA CESARANO, ESQ., of the firm of
            Shutts and Bowen on behalf of the
6           Defendant.

7

8

9

10

11

12                    I N D E X

13   Witness            Direct    Cross      Redirect

14

15   JAMES BUSH            3        108        116

16

17                   E X H I B I T S

18     Dft.                     For Ident.

19   2................................................ 3

20   3................................................ 5

21

22

23

24
```

```
 1            (The document referred to was thereupon
 2   marked "Defendant's Exhibit No. 2 for Identi-
 3    fication," a copy of which is attached hereto.)
 4            Thereupon--
 5                    JAMES BUSH
 6   was recalled as a witness by the Defendant and,
 7   having been first duly sworn, testified as follows:
 8                  DIRECT EXAMINATION
 9   BY MS. CESARANO:
10       Q.   Mr. Bush, we will continue your deposition
11   from last time.  I had a document marked as Exhibit
12   No. 2 that I would like you to look at.
13       A.   Uh-huh.
14       Q.   Well, first of all, is that your
15   handwriting?
16       A.   Yes, it is.
17       Q.   And when did you prepare this document?  If
18   it was over a time period, that's fine.  You can tell
19   me that.
20       A.   I remember I started working on them I would
21   say it was in the month of April probably.  I'm just
22   trying to guess.
23       Q.   Of '99?
24       A.   I think it is six or seven of them.  I
```

1    forget now.

2        Q.    Of 1999?

3        A.    Of '99, yes, ma'am.

4        Q.    This would have been very shortly after your

5    termination?

6        A.    Yes.

7        Q.    Or I should say your resignation.

8        A.    Yes.

9        Q.    And did you give these handwritten notes to

10    the EEOC, the Equal Employment Opportunity

11    Commission?

12        A.    I'm trying to remember. I gave them a bunch

13    of stuff. This could have been a part of it. I'm

14    trying to remember. I know I gave it to my attorney

15    when he asked, you know, for all the stuff I had. I

16    don't know if he gave it to them or not. I'm trying

17    to remember. I can't remember.

18        Q.    Okay.

19        A.    But I know I gave one to my attorney when he

20    requested stuff like this.

21        Q.    You can probably see from the markings at

22    the bottom, it says No. EEOC Bush 105, which is a

23    special number. I mean, I'm only seeing if that

24    refreshes your memory. I believe this came out of

5

1   the EEOC's file.

2       A.    Could be.  Could be.

3       Q.    You're not positive, but that sounds like it

4   could be?

5       A.    If it came out of their file, I took it up

6   there.

7       Q.    Approximately over what time period did it

8   take to complete these notes?

9       A.    To complete them, probably over a week, a

10  week and a half, something like that.  Because I

11  think I sat down and wrote them rough, and then I

12  came back and wrote them more legible.

13            (A document was thereupon marked

14  "Defendant's Exhibit No. 3 for Identification," a

15  copy of which is attached hereto.)

16  BY MS. CESARANO:

17      Q.    Mr. Bush, I would like you to look at a

18  document marked Exhibit 3.  Do you recognize that

19  document?

20      A.    Yes.

21      Q.    Is that your charge of discrimination?

22      A.    Yes, it is.

23      Q.    Is that your signature on the document?

24      A.    Yes.

6

1    Q.    You signed that document about April 2nd,

2    1999?

3    A.    Yes.

4    Q.    Now, you were still working at the company

5    on that date; is that correct?

6    A.    Yes.

7    Q.    Do you remember if on the date that you

8    signed your EEOC charge, that is on April 2nd, 1999,

9    had you started preparing Exhibit No. 2?

10    A.    No.

11    Q.    Which is this one?

12    A.    No, I hadn't started that yet.

13    Q.    Okay.  Now, I think part of Exhibit No. 2

14    talks about your visiting your doctor?

15    A.    Yes.

16    Q.    Dr. Dennis?

17    A.    Yes.

18    Q.    I think we covered most of that already last

19    time, but I just wanted to ask you if you recollect

20    over what time period you saw Dr. Dennis?

21    A.    You mean up until today?

22    Q.    Yes.  Yes.

23    A.    One time, I was going every two weeks.

24    Q.    When would that have been?

7

1    A.    That was when I was with Whiting-Turner.
2    When I started going to the doctor, yeah, I was going
3    every two weeks.

4    Q.    Would that have been on or around late
5    February 1999?

6    A.    I would get -- the first visit there, that
7    should be in my doctor's file, but I forget the first
8    visit.

9    Q.    Do you still go to that doctor?

10    A.    Yes, I am.

11    Q.    How often do you go now?

12    A.    I was there last Friday.  No, I was there
13    Monday.  I'm sorry.  I was there Monday and I will be
14    back in two weeks.

15    Q.    What are you going for currently?

16    A.    High blood and also I take insulin.

17    Q.    How long have you taken insulin?

18    A.    I started taking insulin about two months
19    ago.

20    Q.    Had you been diagnosed with diabetes prior
21    to that time?

22    A.    No.

23    Q.    Okay.

24    A.    I was told that my sugar level was up maybe

8

| | |
|---|---|
| 1 | three -- two or three years ago, but I wasn't -- I |
| 2 | just found out that I needed insulin from my doctor. |
| 3 | I didn't know it was that bad.  I did a series of |
| 4 | blood tests and urinalysis and all that, and that is |
| 5 | when it was determined that I needed to go on |
| 6 | insulin. |
| 7 | Q.    That was pretty recently? |
| 8 | A.    I would think within two months. |
| 9 | Q.    Of today? |
| 10 | A.    Yeah, I think about two months ago I went on |
| 11 | insulin. |
| 12 | Q.    The high blood pressure problem, when did |
| 13 | you first become aware of that? |
| 14 | A.    I have probably had periods with high blood |
| 15 | throughout my life, because I used to be 257 pounds. |
| 16 | Q.    Oh. |
| 17 | A.    I come from a big family, but my blood |
| 18 | pressure would come up and I would lose weight and it |
| 19 | would come back down.  As long as I kept my weight |
| 20 | down, I had no problem with it.  As long as I kept my |
| 21 | weight down. |
| 22 | Q.    Now, skipping back to Exhibit 2? |
| 23 | A.    Yes, ma'am. |
| 24 | Q.    Your notes. |

| | |
|---|---|
| 1 | A.    Uh-huh. |
| 2 | Q.    Are those notes true and correct to the best |
| 3 | of your ability? |
| 4 | A.    Best of my ability, yes, ma'am. |
| 5 | Q.    That way, I won't have to go over each and |
| 6 | every word with you. |
| 7 | A.    Yes, ma'am. |
| 8 | MR. POLLACK:  Can I clarify for the record? |
| 9 | There are some pages in here that are not his |
| 10 | notes that are part of that exhibit. |
| 11 | BY MS. CESARANO: |
| 12 | Q.    Okay.  Just to clarify, when I talk about |
| 13 | your notes, you are talking about what is your |
| 14 | handwriting? |
| 15 | A.    What I wrote, yes, ma'am. |
| 16 | Q.    Then you included some other documents that |
| 17 | you thought were relevant; is that right? |
| 18 | A.    Yes, ma'am. |
| 19 | Q.    I wanted to talk to you about just certain |
| 20 | things that I understand occurred on the job and get |
| 21 | your comments about them. |
| 22 | A.    Yes, ma'am. |
| 23 | Q.    Now, apparently there was a problem with |
| 24 | building a pad, something about a Building 1 pad. |

1   Does that ring a bell, that the building needed

2   certification?

3       A.   Yes.

4       Q.   Do you recall what that was about?

5       A.   Yes.

6       Q.   Tell me what you know about that.

7       A.   Okay.  When we were building that pad, the

8   surveyors came out and gave us points.  When they

9   came out and gave us points, we built a pad according

10  to that.  We knew the elevations that it was going to

11  be.

12          Nine five was going to be the elevation of

13  it, and when they came out and when we got the pad

14  ready to be certified, I did all the work and did all

15  the density slabs and brought it up.

16          One surveyor came out told us we had it,

17  meaning that the building was where it was supposed

18  to be.

19      Q.   Do you remember who did that survey?

20      A.   I don't remember his name.  He was with

21  Craven Thompson, but then another surveyor -- because

22  me and Eric talked about this and said we missed a

23  corner, like we missed like five foot.  So when he

24  said we missed that, we had the company to come back

1   and bring that five feet field out and they didn't
2   think they should have to do it, but one surveyor
3   said it was right and one surveyor said it was
4   wrong.  So Whiting-Turner made the guy come back and
5   made the slab.
6         Everybody was aware of it, Eric, Jeff
7   Cooper.
8         Q.   Were there any measurements connected with
9   that whole issue of building the pad?
10        A.   Yes, it was measurements with it.
11        Q.   Now, were you responsible for the
12  measurements?
13        A.   The people that did the initial surveying,
14  they are surveyors, they came out and surveyed.  We
15  built the pad according to their survey.  We had the
16  measurements.
17        Q.   You are saying Whiting-Turner was not
18  responsible for any measurements for the company?
19        A.   Yes, just build the measurements off that
20  the surveyors gave us.  That is where -- they just
21  gave me a little drawing like this, and that little
22  drawing showed us where it should be.
23        Q.   Did you take any measurements yourself to
24  check the work that the Craven Thompson did against

12

1  the blueprints?

2      A.    Yeah, we took measurements, but what
3  happened by not building the last five foot, the five
4  foot was supposed to be the offset.  When you have
5  building points, you have an offset.  So what we
6  didn't have was just the offset.  We measured the
7  building, but we didn't have nothing offset.

8      Q.    But you are saying the building measurement
9  was five?

10     A.    The offset was another five foot, but we had
11 it for the building, but like I said, we got together
12 and determined maybe he lost some marks we put mark
13 in the dirt.  These are marks in the dirt, not where
14 you see them, but like in the dirt.

15         But between Eric and I, we assumed maybe
16 those guys disturbed the point and we missed the
17 point and that is what caused us when we had that
18 problem on the slab, but it was not like my fault,
19 no.

20     Q.    You are saying like the marks may have been
21 moved?

22     A.    We think that maybe the dozer came along and
23 hit some marks, and if you hit the marks, we lose the
24 mark.

1    Q.    What came?

2    A.    The dozer, the bulldozer.

3    Q.    Oh, okay.  The bulldozer?

4    A.    Yes, ma'am.

5    Q.    Okay.  The second question I was going to

6    ask you has to do with Building 3.

7    A.    Uh-huh.

8    Q.    Some layouts.  Was there any issue with the

9    bolts being wrong on three of the columns by Neiman

10   Marcus, an anchor bolt?

11   A.    Anchor bolts, the anchor bolts, if there was

12   a problem with them, Camco, the subcontractor was

13   responsible for setting the anchor bolts.  We weren't

14   responsible for setting them.

15        We came back in and we did a QT, which is

16   quality control.  We came back and checked them.

17   Eric and I, we worked together on this, and it is one

18   corner down by Neiman Marcus, one corner down there,

19   the block masons, I think that is what he is talking

20   about maybe.  I'm trying to remember.

21        The anchor bolts were set by Camco.  That is

22   one of our subcontractors.

23   Q.    Were they set wrong?

24   A.    No, the bolts wasn't set wrong.  His -- when

1  the block masons came in, the block masons, they were

2  given a point to start. Eric told them to start with

3  the block, but in reality, it was seven foot this

4  way.

5       It should have gone to the corner and it

6  didn't go to the corner.

7       Q.   You mentioned a QA form?

8       A.   QT, we call it quality control.

9       Q.   QC then?

10      A.   QC, yeah.

11      Q.   Is it your job or was it your job to fill

12  those out?

13      A.   We fill out reports on that.

14      Q.   When you say "we," did you yourself fill out

15  the QC form?

16      A.   I fill out some, yes.

17      Q.   Did you fill out the one for that footing we

18  are talking about by Neiman Marcus?

19      A.   That was the first footing we did.  I don't

20  think I did one for this.  I'm trying to remember.  I

21  don't think I did one.  For one, I know we had the

22  layout, but Camco, they were responsible for the

23  bolts and footers.

24      Q.   But there was some mistake made by that

15

1  company?

2     A.    It was a discrepancy on that corner at

3  first, yes.  Then it was fixed.

4     Q.    Now, was it your job to double-check with

5  what that company did?

6     A.    On that building, that was the first

7  building we started.  Eric, Chuck Bender and myself,

8  we all got together and checked those.

9     Q.    Who was responsible for Building 3 to check

10 it though?

11    A.    Building 3?

12    Q.    Yes.

13    A.    Well, I did most of the work on Building 3.

14    Q.    Okay.

15    A.    So it wasn't my sole responsibility.

16    Q.    Another question about Building 3.

17    A.    Uh-huh.

18    Q.    Was there some rebar for a masonry wall that

19 was placed improperly so the segment of a wall was

20 missing?

21    A.    That is what I just mentioned to you.  That

22 is what I thought you were talking about.

23    Q.    That is what you were talking about for --

24    A.    It wasn't like it wasn't there.  We had to

1  come over a few more feet and put the wall up.

2     Q.   Did you have any responsibility for checking

3  that?

4     A.   For checking that?  We caught it.  We caught

5  that later when we were doing our initial layout, and

6  in fact, the man that was doing the iron deck, he

7  brought it to our attention.  He mentioned it to

8  Eric.

9     Q.   Who brought it to Eric's attention?

10    A.   Jeff, I think Jeff Justice.  I think his

11  name was Jeff Justice.

12    Q.   He worked for whom?

13    A.   He worked for -- I can't recall the name of

14  the company.  Oh, man, I just can't call it now.  I

15  may can call it before we leave today.

16    Q.   What type of work did the company do?

17    A.   Iron columns.  He did the iron deck.

18    Q.   Was he an iron worker then?

19    A.   Yes, he was an iron worker.

20    Q.   Now, were there any QC forms that you had to

21  fill out with respect to that?

22    A.   We did forms on the bolts, and I did forms

23  when they poured the concrete and the blocks.  I did

24  those forms.

1    Q.    Okay.   Now, when you do those forms, are you
2    supposed to double-check the work of the
3    subcontractor?
4    A.    Well, everything is a process where we
5    check, yeah.
6    Q.    Now, was there ever an issue where the
7    layout of store fronts and the edge of the slab forms
8    were wrong?   Do you remember anything about that?
9    A.    On my building?
10    Q.    Yeah.
11    A.    I know at one point we had to take a grinder
12    and grind the lip down, the lip of the slab.   We had
13    to grind that down.   We had an area there about ten
14    feet, maybe 15 feet, something like that.
15    Q.    What was the problem there?
16    A.    The guy with the form, the guys held the
17    concrete high because the concrete was up.   We shot
18    the elevation along there, but when he came along and
19    poured the concrete, in some places it was a little
20    high so it had to be ground down.
21    Q.    Now, did you supervise that?
22    A.    Did I supervise it?
23    Q.    Yes, for Whiting-Turner?
24    A.    Again, the company shot the elevations in

1   there. The company that did the concrete slabs, they
2   shot the elevations, and what we did, when we came
3   along and checked, we had a stick and we put one of
4   our guys, a carpenter, and his only job was to check
5   that.

6           It is like you cut a ten-foot stake and that
7   stake goes from here down to the top of the slab and
8   our guy missed it. He missed about ten, 15 feet or
9   something like that that it was high, so we had to
10  take a grinder and grind it off.

11      Q.   The carpenter for Whiting-Turner?

12      A.   Carpenter with us, yes.

13      Q.   -- made that mistake?

14      A.   Yes.

15      Q.   He reported to you?

16      A.   He reported to me, but when he reported to
17  me -- no, he didn't report it to me. We found it
18  when we came in to check for the window openings.
19  That is when I found out because we were weren't just
20  going one building at a time.

21          I was doing Building 3, 2, 1 and the tree
22  transplants.

23      Q.   So anyway, would you say you didn't have
24  any, what, responsibility for correcting that error?

1    A.    Well, any time you are doing anything in

2    these buildings -- Eric mentioned it to me, because

3    like I said, you know, we were pouring the concrete.

4    We did have a man on it.  We had story pole, we

5    called it, and our man said he missed that particular

6    section.

7    Q.    Do you remember any issue having to do with

8    the water lying behind Building 2 that was a fire

9    line?

10    A.    Building 2 that was a fire line?  I just

11    can't recall right now.

12    Q.    Let me give you a few more facts and see if

13    this jars your recollection.

14    A.    Okay.

15    Q.    Was there ever an issue about the fire

16    inspector giving an option to the company to correct

17    a problem, and the option was either to chip the

18    footing and backfill the line because it didn't pass

19    inspection on this fire line?

20    A.    Yeah, that had to with our contractor.  I

21    forget the name.  F & R, something like that.  Farmer

22    Irvin.

23    Q.    They made an error?

24    A.    They were one the contract subs.  They

20

1  made an error. We got it passed. We had an

2  inspector come look at it and we got it passed.

3      Q.   What was the error with respect to this fire

4  line?

5      A.   I'm trying to remember. I can't remember

6  now, but I know it was resolved. I just can't

7  remember now. It was resolved and we continued.

8      Q.   Do you remember how long it took to resolve

9  it?

10     A.   It was up to the city of -- it was up to the

11 City of Sunrise inspectors also. Farmer Irvin didn't

12 do the necessary paperwork on it to get it resolved.

13 It took them, I don't know, a couple of weeks, as far

14 as I can remember.

15     Q.   Okay. If they had done it, fixed the

16 problem, probably how long should it have taken them,

17 the subcontractor?

18         MR. POLLACK: Object to the form. You can

19     answer that.

20         THE WITNESS: I can't say that because that

21     line was hit more than once. People would hit it

22     with backhoes. It was a big problem.

23         People come in digging and they would have

24     to fix it again and again and again, so I can't

1       say how long it took to do it from the

2       beginning.

3   BY MS. CESARANO:

4       Q.    What was actually done to fix the problem?

5       A.    I think when the inspectors came -- I'm

6   trying to remember what we did on that.  It was

7   something, some kind of detail that they would

8   approve it and we did it.  Something they gave us to

9   improve.

10      Q.    Do you remember if the line had to be

11  backfilled?

12      A.    All the lines had to be backfilled.  All the

13  lines in the ground had to be backfilled and

14  compacted.

15      Q.    Would it be fair to say that the

16  subcontractor took more time than it should have to

17  fix the problem?

18      A.    Well, the company at that time, yeah, they

19  took more time than they should have.  The company

20  was shaky at that time.  They couldn't get the right

21  permit.

22          Everybody at Whiting-Turner was aware of

23  that.  We wrote them letters and we tried to get them

24  to fix it, and for a long time, they didn't come back

22

1   and fix it.  They took off of the job at one time and
2   they hadn't fixed it and that was a great problem.
3        They even talked about bringing in another
4   contractor to finish because this company started
5   doing flaky stuff, but that was Whiting-Turner's sub.
6        Q.   What was the name of company?
7        A.   Farmer Irvin.
8        Q.   Farmer I R V I N?
9        A.   Farmer, I don't know.  Farmer Irvin.
10       Q.   Do you remember there being any problem with
11  some conduit on a screen wall that was wrongly
12  installed such as it was in view of the public?
13       A.   I remember that.  That was Whiting-Turner's
14  sub, All Bright Electric.  They took and they ran
15  some conduit too high on a wall.
16       When they went through the inspection, it
17  was told to Eric Plotke and myself that the pipe was
18  too high and should have been lower.  It was running
19  through a flower bed.
20       Q.   Now, was it your job to take care of and fix
21  this problem?
22       A.   No.
23       Q.   Or to assign somebody to fix it?
24       A.   No.  We had an engineer.  The engineer's job

1   was to work also along with me and work with the
2   electrical contractor, and when they took and ran it
3   this way, I even questioned the guy how come they
4   were running it that way, and the guy said they had
5   no choice to run it that way because of the footer or
6   something like that, but I don't know because Eric
7   Plotke was in on that, and I don't know what to say.
8        Then I left before it was fixed.  Before it
9   was corrected for the final inspection, I was gone.
10       Q.   So this would have been mid April?
11       A.   I guess, yeah, because I was gone.  I
12  remember when it came up that I was gone, yeah.
13       Q.   I thought you stayed until the end of the
14  project?
15       A.   No.  No.  No.  No.  I stayed -- on April
16  16th was a part of the project that was going to be
17  completed.  That is when I left.  I didn't stay there
18  for the continuation of it.
19       Q.   So at mid April, this conduit sticking up on
20  the screen wall still was not fixed?
21       A.   When I left -- when I left, it wasn't fixed,
22  yes, ma'am.
23            MR. POLLACK:  Let her finish the question.
24  BY MS. CESARANO:

1       Q.     Yeah, because she can't get us both.

2       A.     I'm sorry.

3       Q.     The project engineer you mentioned, was that

4    Ray McKean?

5       A.     Ray McKean.

6       Q.     What was his involvement?

7       A.     Ray McKean, his job was to handle the

8    electric and the plumbing.  That was his phase.  He

9    handled all the electric and plumbing in the

10   buildings.

11            All phases of electric, street lights,

12   lighting in the building, the conduits, the meter

13   rooms, any light on top of the building, light on the

14   main street.  Generally, all electric and plumbing.

15      Q.     What did Mr. McKean have to do with this

16   particular problem with the conduit?

17      A.     He wrote -- I think he wrote letters.  I am

18   quite sure he did, wrote letters to All Bright to

19   make them fix it.

20      Q.     Okay.  Now, what were your job duties, if

21   any, as far as fixing a problem like this wrongfully

22   installed conduit?  What were you supposed to do?

23      A.     Well, when we addressed it, when we

24   addressed -- like I said, I left before it was fixed,

1   but we addressed it, and I don't know what they did
2   on it, because like I said, April 16th, I was gone.
3            But that was just -- these are just minor
4   things here.  So I mean, so many things happened.  It
5   would be brought to our attention and we would write
6   letters to the company and make sure the company came
7   out and we fixed it, because if not, they don't get
8   no money.
9       Q.   How much time before you left did this
10  conduit problem first arise?
11      A.   I don't know.  I know one day it was shown
12  to me and Eric.  I can't remember when that was.
13      Q.   Was it more than --
14      A.   Maybe a few weeks.  Maybe a couple of
15  weeks.  I don't know.
16      Q.   Just a couple of weeks before you left?
17      A.   I'm trying to remember.  Maybe it was a
18  couple of weeks maybe.  Maybe it was a couple of
19  weeks that it was identified, I would say.  Maybe a
20  couple of weeks, as far as I can remember.
21      Q.   Again, I know you said "we this" and "we
22  that," but what I want to ask you is, what, if any,
23  duty did you have to take care of fixing this conduit
24  issue from the beginning?  I mean when you discovered

1 | it.

2 |     A.   Like I said, we brought it to the

3 | contractor's attention.  I got with the general

4 | superintendent with All Bright and we told them about

5 | the problem and he took the problem to Ray McKean.

6 |     See, it was out of my hand.  He took it to

7 | Ray McKean because Ray McKean is who it would have

8 | had to go to.

9 |     Q.   You didn't have anything to do with it?

10 |     A.   No, I didn't have anything to do with the

11 | fix on it.

12 |     Q.   Okay.  Do you remember a time when there was

13 | a concrete pour for some foundations and footing

14 | between Buildings 2 and 3 and the footings were two

15 | inches too high?  Do you remember anything about

16 | that?

17 |     A.   Footings were two inches too high?

18 |     Q.   Yes.

19 |     A.   I can't recall that.

20 |     Q.   Do you remember Jeff Cooper getting upset

21 | about that and talking to you about these footings?

22 | I think it was at the entry.

23 |     A.   Okay.  When Jeff Cooper made that statement,

24 | he had come to find out -- I will make sure this is

```
 1   in the records: I wasn't wrong. The curb was wrong.
 2       Q.   Okay.
 3       A.   We had an elevation there. I went by the
 4   elevation we had on my plans.
 5       Q.   On what?
 6       A.   Of that entry feature. Come to find out, we
 7   were right. The curb out was wrong. They had to
 8   take the curb out and pour the curb at another
 9   elevation. We were right. The foundation today is
10   just like we left it.
11       Q.   So you are saying the footings were not
12   poured two inches too high?
13       A.   No. No.
14       Q.   Now, again, if this is the same issue we are
15   both talking about, did there come a time when some
16   poured footings had been discovered by Jeff Cooper
17   and he saw it first and then he took care of fixing
18   it before the concrete dried? Do you remember a time
19   involving some footings where that happened?
20       A.   I don't remember that.
21       Q.   Doesn't ring a bell?
22       A.   Huh-uh. No. No. I'm sorry.
23       Q.   Do you remember any occasion where there was
24   some, I guess, wet concrete and it needed to be
```

 1 | changed involving footings?

 2 | A.    That probably would be that same entry

 3 | feature.

 4 | Q.    You don't remember it being changed?

 5 | A.    I can't -- well, after he had said make it

 6 | lower, after he said make it lower, but when I

 7 | checked the elevation on the drawings, it showed we

 8 | were right.

 9 | Q.    You are saying it wasn't changed?

10 | A.    We dug some of the concrete out a little bit

11 | because Jeff Cooper wanted to make sure we were low

12 | enough.    That is what his thing was, but when we

13 | looked at the plans, we weren't wrong.    The curb out

14 | back was too high.

15 | Q.    Did Jeff Cooper agree with the fact you were

16 | not wrong?

17 | A.    After I showed him the drawing.    Whether he

18 | agreed or not, the drawing is what we go by.

19 | Q.    Were you orally reprimanded by Jeff Cooper

20 | about that?

21 | A.    No.    No.

22 |        MR. POLLACK:    Let her finish.

23 |        THE WITNESS:    No.

24 | BY MS. CESARANO:

H. Allen Benowitz & Associates, A Veritext Company
(305)373-9997

1    Q.    Do you remember on a different occasion

2    sometime in about June of '98 where Eric Plotke

3    reprimanded you regarding Building 2 about a whole

4    line of footings that were a foot too low?

5    A.    He didn't reprimand me.  It was about 14 or

6    15 of us that missed the elevation on the footers.

7    We all interpreted the same thing on those plans.

8    Q.    Who were the 14 or 15 people?

9    A.    Eric, Jeff, everybody with Camco.  Everybody

10   interpreted it to be different.  They interpreted

11   those feet to be at another elevation, but what we

12   did for the fix is we came back and added a foot to

13   them.

14         It wasn't my fault.  I asked Eric about

15   that.  It wasn't my fault.

16   Q.    Was this a major --

17   A.    No.

18   Q.    -- redo?

19         MR. POLLACK:  Wait.  Let her finish the

20        question.

21   BY MS. CESARANO:

22   Q.    Was this eventually a major problem causing

23   the redo?

24   A.    It wasn't --

1          MR. POLLACK:   Object to form.

2          THE WITNESS:   No, it wasn't a major

3      problem.

4   BY MS. CESARANO:

5      Q.   Did it involve a whole line of footings?

6      A.   Fourteen by 14 footers.   I think about 14.

7   I'm just guessing.   I think about 14.

8      Q.   Did it involve a particular sub that was

9   doing the concrete work?

10     A.   Yes.

11     Q.   Do you know the name of the sub?

12     A.   Camco.

13     Q.   Were some of the footings designed to be

14   deeper than others?

15     A.   Yes.

16     Q.   You don't remember Eric being upset at you

17   about that?

18     A.   I went to Eric and Eric discussed that with

19   me because in the meeting we had with he and Jeff

20   Cooper, I asked him is that one of the reasons I

21   wasn't reviewed, and he told me no, that wasn't one

22   of the reasons I wasn't reviewed, on that same

23   particular issue right there.

24     Q.   Again, this may be related to the conduit

1    question I already asked you about, but do you
2    remember that some conduit on a retaining wall in
3    Building 3 took three months to get fixed?
4         A.    I don't know.  I don't know about that.
5         Q.    Do you remember Eric speaking to you about
6    some QC reports on Building 2 where one of the beams
7    was off center and eight columns were a foot too low?
8         A.    No, I don't remember that.  I don't.
9         Q.    Do you ever remember there being a field
10   inspection by Eric Plotke where 19 columns were found
11   to be wrong?
12        A.    No.
13        Q.    Do you remember anything about 19 columns
14   having to be redesigned by the structural engineer?
15        A.    That would be the same ones we just talked
16   about.
17        Q.    Just the last incident we were discussing?
18        A.    Yes, ma'am.
19        Q.    Was there any problem involving Tu Tu Tango?
20        A.    I can't recall.  I can't recall.
21        Q.    Do you ever remember there being a concrete
22   pour that ran 30 percent over budget and that Greg
23   Bridges, the carpenter, did the layout?
24        A.    I can't remember a concrete pour being -- I

1   don't know.  I don't remember that.

2       Q.    Do you remember anything about a concrete

3   pour involving Camco, a concrete company?

4       A.    They did the concrete for Buildings 2 and

5   3.

6       Q.    But you don't remember any problems with

7   them?

8       A.    I don't remember nothing going over budget.

9   Nobody told me that.

10      Q.    Do you remember any issues arising under

11  your supervision or with your crews involving

12  landscaping and some palm trees that had to be moved?

13      A.    Palm trees that had to be moved?

14      Q.    Yes.

15      A.    No.

16      Q.    Six palm trees?

17      A.    No, they didn't move six palm trees.

18      Q.    Do you remember anything to do with palm

19  trees?

20      A.    They said the company that was installing

21  them, they said one tree was leaning and they was

22  going to make them come back and do some

23  straightening.

24      Q.    You say "they" a lot, so I need to know who

1    you are talking about.  When you say "they," do you
2    mean Whiting-Turner?

3        A.    Dixie.  Dixie Landscape, they are the ones
4    that installed the tree.

5        Q.    You are saying only one was wrong?

6        A.    I think they moved -- I'm trying to remember
7    if they moved two down by the Cheesecake Factory.  It
8    wasn't my fault.  It was a fault with when the layout
9    was given to these people.  People didn't put the
10   trees exactly center.  I wasn't there that weekend.

11       Q.    Did Dixie Landscaping make a mistake?

12       A.    Yeah.

13       Q.    And they had to correct it?

14       A.    Had to correct it.

15       Q.    You weren't supervising the crew at the time
16   Dixie Landscaping was putting in the trees?

17       A.    I wasn't there when they put in the trees.
18   I think that happened on a Saturday or something like
19   that.

20       Q.    Did it just take one day to put in these
21   palm trees?

22       A.    As far as I can remember.  Then the other
23   trees died.  We had a couple down by the theatre that
24   died.  I know they moved them.

1    Q.    Did that involve royal palms, if you know?

2    A.    No, it wasn't royal palms.  That is the

3  other kind of palms, but the royal palms -- I can't

4  think of the two.

5    Q.    Do you know about anything to do with, any

6  issue with royal palms where they were too high?

7    A.    I think somebody came and complained about

8  the bulb on the tree.  You have a big bulb on the

9  trees.  They took a machete and covered the bulb.

10    Q.    The root balls were too high?

11    A.    Yes.

12    Q.    Was that done under your supervision?

13    A.    No.  No.

14        MR. POLLACK:  Root balls?

15        MS. CESARANO:  Yes.

16        THE WITNESS:  Root balls, sometimes a tree

17    has a three-foot root ball, about three foot

18    high.

19  BY MS. CESARANO:

20    Q.    Do you remember any problems with the

21  concrete pour being too high near the Cheesecake

22  Factory?

23    A.    Huh-uh.  No, I don't.  Not a concrete pour,

24  no.

1    Q.   Do you remember there being a problem with
2  an irrigation system near the theatre complex where
3  the line had to be relocated?

4    A.   With an irrigation line?

5    Q.   Yes.

6    A.   No, I don't.

7    Q.   Do you remember Eric Plotke discussing with
8  you the fact that the zones on the irrigation system
9  were wrong and were never fixed?

10    A.   I had nothing to do with fixing zones on
11  irrigation.  I mean, these things that are mentioned
12  in here, this is not just like my project by myself.

13    Q.   No, I know.

14    A.   All these things he is mentioning there,
15  that is not my problem.  We had an engineer to
16  take -- Sergio Tio.  We had a company to come in and
17  do the irrigation, but it wasn't my mistake if they
18  did a zone wrong or something.

19    Q.   Well, isn't it your job if the subcontractor
20  makes a mistake to take whatever steps are necessary
21  to get the subcontractor to fix the mistake?

22    A.   And we did, yes.

23    Q.   But that is your job?

24    A.   If anything came up like that, we would take

1   care of it, yeah.

2   Q. Isn't it part of your job during this time
3   to try to double-check with the contractors to make
4   sure they don't make mistakes?

5   A. You can do that to a point. You just can't
6   catch all the mistakes.

7   Q. Now, when the subcontractor does make a
8   mistake, is it part of your duty to make sure the
9   contractor fixes it as promptly as possible?

10   A. Yeah. Yeah. Well, we make the call to the
11   company and try to get them back out. Sometimes with
12   the irrigation guy, in order help the situation, I
13   went around and I made sure he showed us where we cut
14   these things off.

15       These were hit by the backhoe, all this
16   one. It was here, over here, and we had to make the
17   connection, and Whiting-Turner will admit they had a
18   problem with the company doing the irrigations.

19   Q. What company was that?

20   A. Woody and Ray. I think the company changed
21   hands one time while they were there and they
22   couldn't get the people. The foreman quit and walked
23   off the job.

24       It was a big problem for Whiting-Turner.

1      Q.    What, if anything, were you to do to assist
2   in correcting that problem?

3      A.    Not much I could do once they give it to a
4   contractor, you know, to help.  All I could do is
5   call them when we had problems.

6         I call to make sure they got their work, but
7   you have to remember, you can't be in every spot at
8   one time.  You are trying to build three buildings.
9   You had 1,000 -- I had the only two-story building on
10   the job.

11         I had my inspections and everything, so a
12   lot of time out there working we couldn't be right
13   there with them doing, and we would come back later
14   when we found a problem and we would make them
15   correct it.

16      Q.    Do you remember Eric Plotke having any
17   trouble with you or issues with you about monitoring
18   the dumpsters every day?

19      A.    No.

20      Q.    Do you remember Eric Plotke speaking with
21   you or having any issues about a grease trap that had
22   to be redug and lowered?

23      A.    I'm trying to remember.  I think that was on
24   Building 3.  The subcontractor that they hired came

1  in with the information that I think Whiting-Turner

2  had gave him and he put them in according to what he

3  had.

4        Later on, he found out it wouldn't work like

5  that and they had to lower it.  That wasn't my job.

6  That was Whiting-Turner's problem.

7     Q.   Is it part of the duties of an assistant

8  superintendent to identify any problems on the job?

9     A.   Oh, yeah.

10    Q.   Is it also a duty to solve the problem if

11 possible?

12    A.   If we couldn't solve the problem, then I

13 would always go to Eric.  I kept Eric aware of what

14 happened on the job at all times.  Because if I

15 couldn't handle it, I had to go to him.  He is my

16 boss.

17    Q.   How often did you have occasion to do that?

18    A.   Daily, because I had Eric's cell number plus

19 I had his home number, and then I had -- you know, I

20 could always reach him through the day.  We stayed in

21 communication.

22    Q.   Was there ever a problem going back to these

23 19 columns about them being one month behind

24 schedule?

1       A.    No, they was not one month behind schedule.

2       Q.    Was it behind schedule at all?

3       A.    No, those columns was mixed.  I think it

4   took those guys three days to fix those columns,

5   three to four days because all they had to do is

6   build a one foot box on top and pour the concrete

7   in.

8       Q.    Now, it was part of your job to fill out QC

9   reports?

10      A.    Yes.

11      Q.    Tell me how that works.

12      A.    This is like if they got ready to pour

13  concrete and there was a pad -- let's say this pad

14  was eight foot by six foot.  I go out and take the

15  measurement on the pad to make sure this pad was

16  right.  I would check the layout to make sure these

17  bolts were in the right place.  Also, I would take my

18  tape and I would measure the depth to make sure they

19  are deep enough.

20          When we are doing that, we are doing a

21  design, that is a design footed.  I looked at width,

22  length and depth to make sure it was right and I

23  would take the strings on there and find a center.

24          The string would be in the center.  I could

1   measure the bolts this way and this way, and I'm
2   saying that is where they are supposed to be.
3       Q.    So you wrote all those measurements on the
4   QC?
5       A.    It was already on some of the QC reports,
6   but we had to write in the final number.
7       Q.    Let me see if I get this straight.  You get
8   a QC report.  Where did you get those initially?
9       A.    We get those from the office,
10  Whiting-Turner.
11      Q.    Who prepares them?
12      A.    Whiting-Turner had a bunch prepared from
13  different jobs, so we pick the one out he had
14  prepared on that job.
15      Q.    Are they blank?
16      A.    No, there's some number on them.  We have
17  the right the number in there.  You have a column, 14
18  columns this way, 14 here, 14.  We pick what column
19  is this, Column A, Column 6, Column B, Column 4.  I
20  write all this.
21          And also, for the record, I received a
22  second quarter award from Whiting-Turner for my
23  ability to use these better than anybody on that job
24  site.  I gave that to my attorney and he has those in

41

1  writing.

2      Q.  QC reports?

3      A.  QC, they gave me $125 for my ability to use
4  those QC reports.

5      Q.  The QC reports, are they done at the time
6  right on the job?

7      A.  Yes.  If I don't do them right then, I do
8  them that day.  When I'm standing there looking at
9  it, that is the time to do it.

10         Also, I would take a note pad with me, and
11  if I see anything wrong, I would bring it to the
12  attention of the subcontractor before we pour the
13  concrete.

14     Q.  Is one of the purposes in the quality
15  control report for you when you take these
16  measurements, if you see something wrong, you right
17  away bring it --

18     A.  If we see it then, we bring it.

19     Q.  You bring it to the attention of the
20  subcontractor?

21     A.  Yes.  Uh-huh.  Yes.

22     Q.  Now, did Eric Plotke ever -- well, did you
23  give these QC reports to Eric Plotke?

24     A.  Eric Plotke, yes, ma'am.

1    Q.    He was the next person in line --

2    A.    Eric.

3    Q.    -- to receive the report?

4    A.    He was my boss.  Before we did, we had a
5    file.  We had a file that they had on that job, and
6    all QCs, even when they are pouring the blocks, even
7    when they are pouring the grout, all those things I
8    have records.  I gave records to Whiting-Turner on
9    all of that.

10    Q.    Did Eric Plotke ever speak with you about
11    these QC reports in any critical way?

12    A.    No.  Just the importance that we need to do
13    them.  That is -- you know, just the importance we
14    need to have these just in case something went
15    wrong.

16          We found one spot in there where it was all
17    muck and we couldn't build a building on the muck.
18    So the engineers designed something for us where we
19    could dig the footer much deeper and put in drain
20    rocks and then bring it up to the elevation with the
21    drain rocks and pour concrete.

22          A lot of these cases we had to do in that
23    building because that building is so far out in the
24    Glades at Sawgrass, and we had those problems and I

43

1  would identify these problems, and me and the
2  engineer from -- oh, man, I can't recall the name of
3  them from the engineering company.  I will call it
4  after a while.
5        When we made the determination it had been
6  hit -- on the job every day, this guy would be on the
7  job.  He would make the call on the ones we added the
8  rocks to make sure we had fixed the problem.
9     Q.   Do you remember a time when Eric Plotke got
10 very angry at you around say March or so of 1998?  Do
11 you remember that you two had a falling out?
12    A.   No.
13    Q.   You don't remember that?
14    A.   No, I don't remember that.
15    Q.   You don't remember Eric being very upset
16 about some columns being behind schedule and the QC
17 reports being wrong?
18    A.   No.
19    Q.   It doesn't ring a bell?
20    A.   No, I don't remember that.
21         MR. POLLACK:  Can we go off the record?
22         (Informal discussion off the record.)
23 BY MS. CESARANO:
24    Q.   Now, are there any employees at

44

| | |
|---|---|
| 1 | Whiting-Turner that you believe are comparable to you |
| 2 | but that were treated differently than you? |
| 3 | MR. POLLACK: I will object to the form, but |
| 4 | you can answer the question. |
| 5 | BY MS. CESARANO: |
| 6 | Q. Do you understand my question? |
| 7 | A. Charles Bender. |
| 8 | Q. Okay. Why don't you give me the list of the |
| 9 | names before we forget them, and I will ask you about |
| 10 | each one, if there are any others. |
| 11 | A. No. |
| 12 | Q. Really just Charles Bender? |
| 13 | A. We were the only ones that did the same job. |
| 14 | Q. He goes by Chuck, right? |
| 15 | A. Yeah, Chuck. Yeah. |
| 16 | Q. He is really the person that you believe is |
| 17 | someone that if we looked at the comparison between |
| 18 | you and him, you are saying there was discrimination, |
| 19 | correct? |
| 20 | A. That is right. |
| 21 | Q. And so tell me in what way there was |
| 22 | discrimination? |
| 23 | MR. POLLACK: Asked and answered, but you |
| 24 | can answer the question. |

1          THE WITNESS:  Okay.  This is how I feel it
2     was discrimination.  I was told by Eric Plotke
3     that I would be brought over there as assistant
4     superintendent.
5          Before Charles Bender came, I had done all
6     the underground on that project.  I had built the
7     pads for Building 1, 2 and 3.
8          I also helped them do all the tree removal.
9     I was there when demolition was done.  I was
10    there early one Saturday morning to reroute the
11    buses and help coordinate the job.
12         Eric helped me to do some scheduling.  I did
13    the scheduling he asked me to do.  Also, we had
14    built the Target parking lot.  I was the
15    assistant superintendent there.  It was only me,
16    one engineer.  That was Sergio Tio.
17         Eric Plotke was still finishing the job at
18    Bloomingdale's and I was there as the only
19    superintendent on the job.  I did my job.  We
20    didn't cost Whiting-Turner no money.  We made
21    money.  We finished on time on that job, and I
22    felt that -- I felt that I was being
23    discriminated against.
24         When Chuck Bender came, Eric Plotke told

1    Cluck Bender, I want you guys to work together,

2    James has pretty much adapted into concrete

3    pouring and that area, I know you did a lot of

4    interior, I want you guys to help and work with

5    each other.

6         So on that statement, I felt that we were

7    equal.  I felt I should have been treated the

8    same as he was.  He came in.  When he wanted the

9    review, he got his review.  I was promised a

10   review in six months.  I never got it.

11   BY MS. CESARANO:

12   Q.   If I can interrupt you, he asked to get his

13   review?

14   A.   Well, I don't know if he asked to get it or

15   not, but I know this:  I know if a person tells you

16   in six months you will be reviewed and you don't get

17   your review, then you wait and you are patient enough

18   to wait for another year, I waited a whole year to be

19   reviewed, now, that is patience and that is a person

20   still believing in a company, believing a company

21   will be fair.

22   Q.   Now, who promised you that you would be

23   reviewed in six months?

24   A.   Eric Plotke told me out of his mouth I would

H. Allen Benowitz & Associates, A Veritext Company
(305)373-9997

 1   be reviewed in six months.  He said it in the

 2   presence of Jeff Cooper, the project manager.

 3       Q.   When did that happen?

 4       A.   That happened on the day they gave me the $4

 5   and something raise.

 6       Q.   Where were you when he said that?

 7       A.   I was in Eric's office, me and Jeff.

 8       Q.   He said it would be exactly in six months?

 9       A.   He said in six months I would be reviewed.

10   He said at that time I could relinquish my

11   association with my union.

12       Q.   Did he say that was the minimum time period?

13       A.   He said six months.

14       Q.   For review?

15       A.   He just said six months.

16       Q.   He didn't tell you six months was the

17   minimum time period; it could be longer?

18            MR. POLLACK:  Objection.

19   BY MS. CESARANO:

20       Q.   You can answer.

21       A.   Well, he said in six months I would be

22   reviewed and that is what I went on.  When Charles

23   Bender came and me and Charles Bender talked about

24   that and Charles Bender told me, well, at six months,

1  you know, I will get my review, and that's what time
2  he got his review I think, too.  Six months and I
3  think one week.

4         Also, Eric Plotke came back later and told
5  me that he told Jeff Cooper and Robert Mitchell that
6  I should have been reviewed.  That is Eric's words to
7  me, that I should have been reviewed.

8     Q.   Who said that again?

9     A.   Eric Plotke.

10    Q.   When did he say it?

11    A.   We had the meeting on the 22nd of March,
12 '99.  Eric came back, because my office he had to
13 come by my office to walk into his.

14         He said, "I told Robert Mitchell and Jeff
15 Cooper you should have been reviewed."

16    Q.   Is this shortly before your resignation?

17    A.   This is on the meeting on the 22nd shortly
18 before my resignation.  That is what Eric Plotke told
19 me.

20    Q.   Wasn't it up to him to review you?

21    A.   It is like I told you before.  It was up to
22 Robert Mitchell.  Robert Mitchell reviewed everybody
23 that is anybody in the supervision.  There is nobody
24 in Whiting-Turner that is there right now that has

1  not been reviewed by Rob Mitchell.

2        And the day I had a meeting with

3  Mr. Mitchell, I told him he was a racist.  I told him

4  I was the only black superintendent assistant in

5  Florida at Whiting-Turner, because at the job in

6  Orlando, they were all white, and I told him when he

7  reviewed the young guys from the University of

8  Florida, that since I had been there, I had never

9  seen a young black guy on that job and I called him a

10  racist.

11        I said, "You have a problem with black

12  people."

13        I told him that and he got very mad and I

14  didn't care.

15    Q.    What did he say to you?

16    A.    He told me he was not a racist and I told

17  him again, "You are a racist."

18    Q.    Did he name other black managers that

19  Whiting-Turner employed?

20    A.    I said assistant superintendents, and he

21  couldn't name none.

22    Q.    So he didn't give you any names?

23    A.    He couldn't give me no names in Florida

24  because I already checked it out.  I was the only

H. Allen Benowitz & Associates, A Veritext Company
(305)373-9997

1    black assistant superintendent in Florida, and I told

2    him I could prove it, and I told him also I was the

3    lowest paid and he couldn't answer me.

4        Q.    Did he give you the name of other people

5    that were paid the same?

6        A.    He didn't give the name of nobody else paid

7    like I was paid.  He didn't give me none of that.  He

8    didn't give me no names.

9        Q.    What else was said in that conversation?

10       A.    It is a lot of things that was said because

11   I told him I never got the 14 days.  I was supposed

12   to have got two weeks, and I told him I didn't get

13   travel time.

14            I told him I heard the guys talking about

15   travel time.  I told him I traveled 31 miles each way

16   and nobody ever mentioned travel time to me.  I

17   didn't get the 14 days.  I mentioned to him about the

18   fact I was the only person on the job that wasn't

19   invited to his Christmas party.

20       Q.    Let's go one at a time.

21       A.    You asked me.

22       Q.    Go ahead, and I will ask you about each

23   one.

24       A.    I told him, I said, "I don't know what kind

1   of policy you've got."

2        I told him his policy was no good.  On

3   paper -- it was only good on paper.  It was no good.

4   I told him it was double standards with the company.

5   I told him I had been out here and given to you what

6   I could do.  I told him about the Car Max job that I

7   went to over there and did what they asked me to do.

8        I had been out here 18 months.  You clearly

9   overlooked me.  You reviewed everybody but me.  You

10  reviewed young guys from the University of Florida.

11  You brought them out.

12       Some of these guys would sleep through the

13  meeting.  He brought them into the company, and I

14  could prove this.  Also, I told him at Car Max when

15  Ivan came to me on two occasions and came to me and

16  just did what he did to me telling me he don't know

17  me from Adam, and that is the day I tried to attack,

18  and I will say at it the feet of my Lord.  That is

19  the only time in construction I have been mad enough

20  to attack anybody.

21       When he told me he didn't know me from Adam,

22  that experience, and spit rocks in my face, and I

23  told Rob Mitchell, you being the vice president was

24  told this because Eric Plotke told you of these

 1  incidents with this guy.  I don't care what problems
 2  this guy had with anybody else in the world.
 3        I work for Whiting-Turner.  He should've
 4  found out what his problem was with a black man or me
 5  as a superintendent or whatever, and I told Rob
 6  Mitchell, you didn't do that.  Then you took and
 7  brought this guy to the job with me.
 8        And I told my wife, I said --
 9  Q.    Which guy did the job?
10  A.    Ivan.  They brought Ivan to the same job
11  that I was on, and I told Eric, I said, "Eric, this
12  will be a problem."
13  Q.    Which job?
14  A.    Sawgrass.  Eric told me, he said, Look,
15  don't pay him any attention, act like he is not
16  here.  I think that is the worst way in the world for
17  any company to tell an employee, ignore this guy, act
18  like he is not here.
19  Q.    Was the Car Max job over?
20  A.    It was finished and Ivan was with us.  He
21  said he will not be in your way, but he will be doing
22  this.
23        But nobody ever sat us at the table and
24  said, let's work this out, we work for the same team,

1    guys.

2             There's one conversation, Ivan and I.  He
3    managed to come back to my desk, and I wasn't paying
4    no attention because I didn't want to hear nothing he
5    said unless he could apologize.

6             But I am a human being and I have been here
7    almost 54 years, and these guys, between Rob Mitchell
8    and Ivan, he made me think of the Jim Crowe days in
9    Selma, Alabama when people thought I was trash, when
10   people could tell me I have to get off the sidewalk
11   and let a white family -- when we can't come into the
12   city.

13            After 20 years, they put me back in the Jim
14   Crowe days.  I told my wife that, and this is the
15   first time in construction I went back to Jim Crowe
16   days in 1999.

17            If my skills -- and I told Rob Mitchell.  My
18   skills have showed you guys what I have done.  I am
19   listening to all these things I have been accused of
20   today.  They can accuse me of it, but they can't
21   prove none of this stuff.  And the thing that
22   aggravates me, being in this town all these years as
23   a solid citizen, and then I was treated like this by
24   this company.

54

```
 1         That is the reason -- all my organizations
 2   that I'm a president of, I have told every one of
 3   them.  I told every one of my organizations that I'm
 4   a part of.  I'm a part of a lot of organizations.
 5   All my church communities, I told them of this
 6   situation because I thought it was dead wrong.
 7         It is wrong today.  It was wrong then.  The
 8   only thing he had to do or say, here, we will give
 9   you a $1 raise.  If they had given me a $1 raise, I
10   still would have been with Whiting-Turner if I
11   elected to.  But the thing I'm saying, they didn't
12   offer me nothing.  They didn't offer me a dime.
13   Q.    When you say the $1 raise, if you had gotten
14   $1, what do you mean?
15   A.    If I got $1 raise, at least they showed me
16   they were encouraging me, not discouraging me.
17   Q.    Didn't they give you like a $5 raise?
18   A.    $4.70, but if you are paying me $4.70 and
19   you are paying me $15.70 and another guy $19.50 and
20   we are sharing the same desk, doing the same
21   things --
22   Q.    The other guy is Chuck Bender?
23   A.    -- something is wrong with this picture.
24   This is a double standard if you don't think you
```

1   ought to pay me what this guy is making.  You ought

2   to get rid of me.  If I'm not capable, get rid of me,

3   bring in another guy.

4       Q.   When you compared the $19 or whatever for

5   Chuck, how do you know what he made?

6       A.   We shared the same desk.  I have seen his

7   check.  We were friends.  I seen his check.

8       Q.   Was that after he got promoted after the six

9   months?  Is that what you are comparing it to?

10      A.   Yeah, because I never got a raise.  And here

11  is another thing --

12      Q.   Let's go more slowly because, see, I get to

13  ask questions and you are telling me a story, and you

14  know, I'm letting --

15      A.   I'm the only one sworn in.

16      Q.   I understand, and I'm letting you do it, but

17  I can't do it for too long and I can't get my

18  questions in and your attorney will be here until

19  8:00.

20          MR. POLLACK:  You will, too.

21  BY MS. CESARANO:

22      Q.   You mentioned Ivan at Car Max.  Is that the

23  story you told me last time?

24      A.   Yes, ma'am.  Yes, ma'am.

56

```
 1      Q.    He was very rude, et cetera?

 2      A.    People at Whiting-Turner admit that.

 3      Q.    You mentioned something about you saw him

 4   again at the Sawgrass job?

 5      A.    They brought him to the Sawgrass job to work

 6   in the same trailer with me.

 7      Q.    Now, did he say or do anything to you at

 8   Sawgrass?

 9      A.    He avoided me like a plague and that was

10   best.

11      Q.    You didn't have any conversations?

12      A.    No, and I just told you, we had one day he

13   came down to my desk and he was telling me about some

14   problem he had and how he treated him and he came

15   from New York and I heard him talking, but that

16   didn't have nothing to do with me.

17      Q.    Was he in your office?

18      A.    Well, yeah.  Our office is like at the end

19   of a hallway.  Then when you turn here, Eric's office

20   was right here in the back.

21      Q.    Was he trying to talk to you?

22      A.    I guess.  I seen him wondering around

23   through there because my desk is right here looking

24   at a big window, so I heard him in there.  I heard
```

1  him talking and just me and him was in there, but I

2  didn't want to hear nothing.

3      Q.    So you ignored him?

4      A.    Yeah.

5      Q.    You mentioned something else about Ivan

6  where he said I don't know you or --

7      A.    He told me these words, that day when I told

8  you that he said to me, "What are you guys doing

9  taking a 45-minute lunch," he is talking to me.  My

10  guys is sitting down.

11          I said, "I'm waiting on the concrete in that

12  truck to pour your concrete."

13          He said, "Who is running the ranch?"

14          I said, "I don't know.  I'm doing what they

15  told me to do.  You have two superintendents.  You

16  have a carpenter's foreman, and I'm doing what I'm

17  told."

18          He said, "Who are you?  I don't know you

19  from Adam," and that is the same thing as saying the

20  "N" word to me.  You don't know me from Adam?  The

21  company sent me over here and you don't know me from

22  Adam.

23      Q.    Let me stop you and ask you a question.  Had

24  you ever worked with him on the job before?

58

1    A.    Yes.

2    Q.    Where?

3    A.    I worked on the same job when the guy

4    introduced me to him and he told him to fire me.

5    Q.    How many days had you worked with Ivan prior

6    to the time he said "I don't know you from Adam"?

7    A.    Probably about a week.

8    Q.    A total of about a week?

9    A.    Yes.

10   Q.    On these jobs there are at least 30 other

11   guys, right?

12   A.    Thirty other guys doing what?

13   Q.    Thirty guys on the job?

14   A.    Not with Whiting-Turner.  Not 30 guys with

15   Whiting-Turner, no.

16   Q.    When you worked with Ivan before, you said

17   you worked with him once before, how many guys were

18   on the job then at that job when you worked with

19   Ivan?

20   A.    You mean how many people total?

21   Q.    People total?

22   A.    Oh, I don't know.  I don't know how many

23   people total.

24   Q.    Give me an estimate.

| | |
|---|---|
| 1 | A. I would say maybe 50 people. |
| 2 | Q. Okay. The Christmas party. I know you have |
| 3 | complained you weren't invited to the Christmas |
| 4 | party. Isn't it a fact the Christmas party was for |
| 5 | management of Whiting-Turner? |
| 6 | A. I will say this here -- |
| 7 | Q. No. No. First yes or no. |
| 8 | A. I don't know. |
| 9 | Q. Or I don't know? |
| 10 | A. I don't know. |
| 11 | Q. Fine. |
| 12 | A. I don't know. |
| 13 | Q. When you complained about not being invited |
| 14 | to the Christmas party, isn't it true you first |
| 15 | brought that up around the time you resigned? |
| 16 | A. No. |
| 17 | Q. When did you first bring that up? |
| 18 | A. It was brought up to me by Charles Bender. |
| 19 | Q. To you? |
| 20 | A. Charles Bender asked me how come I didn't |
| 21 | come to the party. That was his interpretation. He |
| 22 | thought I was supposed to have been there. |
| 23 | Q. Did you complain to anybody in management |
| 24 | about not being invited to the Christmas party? |

60

1    A.    I didn't know anything about it.    Nobody
2    said anything to me about a Christmas party.
3    Q.    At some point, you did learn there was a
4    Christmas party?
5    A.    I found out from Charles Bender.
6    Q.    When was that?
7    A.    I don't know.    It had to be right after the
8    holidays when he asked me -- he said when he got
9    there he was looking for me.
10        I said I didn't know anything about a
11    Christmas party.
12    Q.    So one or two weeks after the Christmas
13    party you learned about it?
14    A.    It was a week and a half or two, something
15    like that.
16    Q.    After you learned about it from Chuck
17    Bender, did you go to management and complain about
18    not being invited?
19    A.    No, I didn't go to management to complain
20    right then, no.    I brought it up later to Eric.
21    Q.    When was that?
22    A.    I don't know, but one day it came up and I
23    mentioned it.
24    Q.    Isn't this around the time of your

61

1 | resignation?

2 | A.   I think a little bit before that.  I know --

3 | because I think Eric or somebody said they didn't go

4 | or something like that, but I thought, you know I'm

5 | there.

6 | Q.   And what did Eric say to you about your not

7 | being invited to the Christmas party?

8 | A.   I think he said he didn't go, and I think

9 | Jeff Cooper didn't go.  They didn't tell me the

10 | reason I didn't go.

11 | Q.   You are saying that no one, not Eric, not

12 | Jeff, not Rob Mitchell?

13 | A.   Robert Mitchell said it -- that was the day

14 | I was leaving on the 16th of April.

15 | Q.   Rob Mitchell told you it was for

16 | management.

17 | A.   He told me it was for salaried people, and I

18 | told him, "Sir, what have I been on for the past year

19 | if I'm not on salary?  I make the same amount whether

20 | I work 60 hours or 90 hours.  I'm on salary, too."

21 | Q.   But isn't it true that Rob Mitchell told you

22 | that you weren't in the management group, however he

23 | defined who got the invitations?

24 |       MR. POLLACK:  Objection, asked and

| | |
|---|---|
| 1 | answered.  You can answer the question. |
| 2 | THE WITNESS:  He didn't explain it like |
| 3 | that.  I forgot now his explanation. |
| 4 | BY MS. CESARANO: |
| 5 | Q.   Okay.  But he linked -- |
| 6 | A.   It was a heated conversation and I don't |
| 7 | know how exactly he explained it. |
| 8 | Q.   But isn't it true he linked it to the method |
| 9 | by which you were paid? |
| 10 | A.   No.  No.  I think it was -- I told him it |
| 11 | was his method.  I told him it was his policy, which |
| 12 | was one-sided.  You have a double standard.  That is |
| 13 | what I told him, so I said it over and over again so |
| 14 | he could get my point. |
| 15 | Q.   Did he tell you it wasn't because you were |
| 16 | black? |
| 17 | A.   No, he didn't tell me that. |
| 18 | Q.   Did he tell you it was for some objective |
| 19 | reason, such as being salaried? |
| 20 | A.   He didn't make it clear.  That is the reason |
| 21 | why I took it by the fact me being black.  That is |
| 22 | how I feel. |
| 23 | Q.   Did he give you an explanation? |
| 24 | A.   No, I don't remember the explanation he |

1   tried to give.

2        Q.   All right.  This is a conversation you had

3   on or about April of '98 when you resigned?

4        A.   '99.

5        Q.   Excuse me, '99?

6        A.   Yes.  Uh-huh.

7        Q.   In other words, this was at the very end of

8   your employment when you talked with Rob Mitchell?

9        A.   Uh-huh.  Yes.

10       Q.   This is the same conversation you just told

11  me about where you called him a racist; is that

12  right?

13       A.   Yes, ma'am, that is right.

14       Q.   Was anything else said in that conversation,

15  any other topics discussed, and I think you mentioned

16  some other issues, but what, if anything, did he say

17  to you in this conversation?

18       A.   I asked him something about my job.  He said

19  I did my job.  And I told him that -- I said I have

20  been with you 22 months with Whiting-Turner, and I

21  said on three occasions is all you found to speak to

22  me.

23            I made sure he knew that, and like I said,

24  he went on --

1    Q.   Well --

2    A.   He said something about another job or

3    something he was starting.

4    Q.   And he wanted you to go there?

5    A.   He didn't tell me he wanted me to go there.

6    I guess he wanted me to ask, and I wanted to ask --

7    Q.   Isn't it true that Rob Mitchell as vice

8    president of the company is not in the field doing

9    construction work?

10   A.   Rob Mitchell is not in the field doing

11   construction work, but he is the boss.  He is in

12   charge of -- Rob Mitchell knows everybody in

13   supervision.  He knows who is doing what.

14   Q.   So he has every project in Florida under

15   him?

16   A.   He runs the Florida team, Rob Mitchell.  He

17   is here in Florida, and he has other guys in Virginia

18   also, and I have worked with them out of Virginia

19   also, but Rob Mitchell is the man.  He is the man.

20   Q.   Would it be fair to say he is fairly busy?

21   A.   Fairly busy?  I don't think so.  I have seen

22   him come on the job and spend two or three hours on

23   the job for some days, and for some reason it seemed

24   like he avoided me.  On one occasion he spoke to me

1    at Sawgrass. One occasion he came to me and talked
2    to me like I was part of the company.

3         Even I had a young man ask me, "Is that the
4    guy you work for?"

5         I said, "That is the guy I work for,"
6    because he walked around. I am walking around with a
7    big Whiting-Turner hat. Like I said, three
8    conversations in 22 months. That is how he treated
9    me.

10    Q.   Do you have any factual knowledge that he
11    talked to other employees any more than that?

12    A.   Oh, yeah, he talked to Chuck Bender more
13    than that.

14    Q.   Were you there all the time?

15    A.   I have seen it. I have seen it.

16    Q.   With Chuck Bender, just answer me, were you
17    at all times there when he talked to Chuck Bender?

18    A.   I wasn't there all the time, but my vision
19    ain't that bad where I can't stand on the job and see
20    him talking to him. I even talked to him in the
21    trailer.

22    Q.   You think if he didn't talk to you as much
23    as he talked to Chuck Bender that is race
24    discrimination?

```
 1          MR. POLLACK:  Object to form.  You can
 2      answer.
 3   BY MS. CESARANO:
 4      Q.   Is that right?
 5          MR. POLLACK:  Withdrawn.  You can answer.
 6          THE WITNESS:  I think somewhere along the
 7      line, if I had my company, I got to know
 8      everybody.
 9   BY MS. CESARANO:
10      Q.   Before you make comments, answer the
11   question.
12      A.   He should have at least spoke to me.
13      Q.   That isn't my question.
14      A.   What is the question?
15      Q.   If Rob Mitchell spoke to Chuck Bender more
16   than he spoke to you, you think that is race
17   discrimination?
18          MR. POLLACK:  I will object to the form, but
19      you can answer.
20          THE WITNESS:  I don't know how to answer
21      that.
22   BY MS. CESARANO:
23      Q.   Well, yes or no or I don't know.
24      A.   Yes.  Yes.  Yes.  Yes.  Yes.  Yeah.  I'm
```

67

1  highly upset about it, because I'm out there, too.

2  I'm trying to make him money and I think he should

3  talk to me also.

4      Q.   It says in your EEOC charge you were denied

5  mileage on weekends.  Tell me about that.  Who denied

6  it to you?

7      A.   Nobody never mentioned it to me.

8      Q.   Who denied it to you?

9      A.   The company.  The company.  The company

10 never offered me a dime of mileage while I was up

11 there, and I heard from one of the employees.  I

12 can't remember who that told me I was supposed to get

13 mileage.

14     Q.   Did you submit for mileage to get paid for

15 it?

16     A.   Nobody never told me the procedure.  I

17 didn't know the procedure.

18     Q.   Did you ask Eric Plotke or any other manager

19 how you could go about getting compensated for

20 mileage on the weekends?

21     A.   No.  I brought it up in the meeting on the

22 22nd.

23     Q.   Of what?

24     A.   22nd of March.

68

1   Q.   At the end of your employment?

2   A.   At 22nd of March, no, I was there until

3   April 16th.

4   Q.   But shortly before the end of your

5   employment?

6   A.   Uh-huh.   Uh-huh.   Uh-huh.

7   Q.   What did you say and to whom?

8   A.   Because I didn't find this out.

9   Q.   What did you say?

10  A.   I'm trying to tell you now.   When I found

11  this out, I heard some of the guys talking about

12  mileage.

13  Q.   That is not my question.   My question is

14  what did you say and to whom did you say it?

15  A.   I just said it to Eric and Jeff.

16  Q.   And where were you?

17  A.   In the meeting on the 22nd.

18  Q.   What did you tell them?

19  A.   I just told them how come I didn't get

20  mileage.

21  Q.   What did they say to you?

22  A.   I don't know the answer.   I can't remember

23  the answer.

24  Q.   Now, you are saying that in your charge that

69

1    Chuck Bender received mileage, correct?

2        A.    I'm trying to see if --

3        Q.    You can look at the charge.  It is right in

4    front of you.

5            MR. POLLACK:  In the charge, she is saying

6        you say that.

7    BY MS. CESARANO:

8        Q.    At the middle.  It states "A white assistant

9    superintendent, Chuck Bender, age 29, was hired in

10   February of 1998 who received mileage and vacation."

11       A.    Oh, vacation, I mean he received his whole

12   14 days.

13       Q.    But before we go to vacation, I asked you,

14   how do you know Chuck Bender received mileage?

15       A.    I think I heard that come up.  I happened to

16   hear part of a conversation.  I was using part of

17   what I heard, part of a conversation.

18       Q.    Do you know for a fact --

19       A.    I don't know for a fact.

20       Q.    -- that Chuck Bender received mileage?

21       A.    I don't know for a fact.  I heard Chuck and

22   somebody talking about the mileage, but I don't know

23   for a fact.

24       Q.    And why do you think you were denied

70

1  vacation?

2     A.   I was supposed to have got 14 days.  I only

3  received nine.  I have proof of that.  I received

4  nine days and I should have got my five days, and I

5  should have never -- I never got the last five days.

6     Q.   Did you ask for the last five days?  Did you

7  tell anybody you were missing five days vacation pay?

8     A.   When I mentioned this to Eric, Eric said in

9  your stuff there I received 14 days, and I have proof

10 saying I didn't receive 14 days.

11    Q.   If the company provides proof you received

12 14 days, would you agree that is all you were

13 entitled to?

14    A.   I can show you proof I didn't receive it.

15    Q.   No, that is not my question.  If the company

16 shows you that you were paid for 14 days, then you

17 would agree that 14 days was the amount you were

18 entitled to?

19    A.   If they could prove it.

20    Q.   But it is 14 days that you believe you were

21 entitled?

22    A.   Fourteen days for a year.

23    Q.   And that is the same as Chuck Bender?

24    A.   Uh-huh.

1    Q.    Fourteen days?

2    A.    Yes.

3    Q.    Now, you also say that Chuck Bender did not

4  have any experience.  I think you say in Paragraph 11

5  of the complaint that he was a white male with little

6  or no experience in construction?

7    A.    Where is that at?

8    Q.    Paragraph 11 of the complaint.

9    A.    I didn't write that.

10    Q.    Okay.  Well then, would you agree Chuck

11  Bender had experience in the construction industry?

12    A.    Chuck Bender, I said he was interior.  He

13  was an interior worker.  He did a lot of interior

14  work.

15    Q.    He was experienced in the construction

16  industry?

17    A.    Interior, yeah, he was experienced.

18        MR. POLLACK:  Before we go to the complaint,

19      can we take literally a 30-second break?  My

20      secretary leaves at 3:30.

21        (Thereupon a brief recess was taken, after

22      which the following proceedings were had:)

23  BY MS. CESARANO:

24    Q.    I now want to go down and ask you a couple

72

1  of questions about things in the complaint maybe we
2  haven't covered.

3      A.    Okay.

4      Q.    In Paragraph 14 of the complaint, you talk
5  about being excluded from various social and
6  professional gatherings, and I know you have
7  mentioned the Christmas party. What other social and
8  professional gatherings were you excluded from?

9      A.    Social gatherings?

10     Q.    Social and professional gatherings, any
11 others you can think of besides the Christmas party?

12     A.    I'm trying to think. I'm trying to think.
13 I can't think right now.

14     Q.    Now, who are the individuals at
15 Whiting-Turner that you believe were the people who
16 discriminated against you based on race?

17     A.    Rob Mitchell.

18     Q.    Anyone else?

19     A.    Eric Plotke.

20     Q.    Anyone else?

21     A.    Ivan.

22     Q.    Well, I know Ivan you certainly talked
23 about, but did Ivan have the supervisory power to do
24 anything to you?

73

1     A.     Well, he was a superintendent.

2             MR. POLLACK:   Well, object to form.

3     BY MS. CESARANO:

4     Q.     Okay.

5     A.     He was the superintendent with the same

6     power as Eric.

7     Q.     Did he in fact do anything to affect your

8     employment?

9     A.     To affect my employment?

10    Q.     Right.   Ivan, only speaking about Ivan now.

11    A.     Well, he affected my employment on the two

12    occasions he did these shenanigans that he did.   I

13    left the job both times.

14    Q.     You mean he was rude?

15    A.     Yes.

16    Q.     Besides that, did he give you a disciplinary

17    warning, for example?

18    A.     No.

19    Q.     Did he lower your pay?

20    A.     No, he didn't give it to me, but I left my

21    post on account of him.   I left my post.   I got in my

22    car and left on two occasions on account of him

23    because I figured it was the best way for me to stay

24    out of trouble.

1    Q.    Did that have an adverse effect on the job

2    you were supposed to be supervising when you

3    abandoned your job?

4    A.    I had 14 or 15 jobs under my supervision, so

5    to keep from this guy, from me going to jail or

6    something else, I got in my car.  I told my guys what

7    was happening when the concrete was coming, to

8    continue on, and I left.

9    Q.    Anything else involving Ivan that you

10   haven't already told me about?

11   A.    Just the fact when they sent him to the job

12   with me, I thought that was an insult to injury.  I

13   thought they should've never sent a guy there unless

14   they sent a guy like I told you, sit this guy down

15   and let's find out what's the problem.  Maybe he

16   didn't like black people.  Maybe he didn't like me.

17          I thought between Robert Mitchell and Eric

18   Plotke, we should shake hands and work it out.

19   Q.    This guy meaning Ivan?

20   A.    That is what I felt, Ivan, right.

21   Q.    Did Ivan do anything else to you that you

22   haven't already told me about?

23   A.    No.

24   Q.    Or say anything else to you?

75

1     A.    No.

2     Q.    Let's focus on Rob Mitchell.

3     A.    Uh-huh.

4     Q.    Just without repeating the whole event, just
5   maybe make me a list of the things that you felt that
6   he did to you that in your view was racial
7   discrimination.

8     A.    He didn't review me as he did whites.

9     Q.    Okay.

10     A.    Their policy, I mean, I don't think he did
11   that.  Their policy says they would review minorities
12   and encourage minorities into supervision with
13   Whiting-Turner.

14     Q.    Review, so we have the same terminology,
15   that would also include appraisals?

16     A.    Right, to assess what I have done, whether
17   I'm worthy of a raise or promotion.  Their policy,
18   they are supposed to encourage minorities into
19   supervision.

20          I worked for 18 months for the same job.
21   You don't give me a review, you act like I have a
22   plague, like you are ashamed of me or something.  You
23   should at least come by, and it is a matter -- we
24   call it "kicking it" in construction, kick it with me

1   or something, make me feel a part of this.  Don't

2   avoid me like the plague.

3       Q.   Anything else?

4       A.   I think with my skill when I first went to

5   Whiting-Turner, I mean, by what they gave me surely

6   showed my background, what I had done.  Between some

7   kind of way between Robert Mitchell and Eric, they

8   should've looked at this, this is not right, and call

9   and verified what I could do.  These contractors are

10  still in town I used to work for.

11      Q.   Isn't it true they gave you a chance to be

12  an assistant superintendent that was a step up from

13  being a foreman, correct?

14      A.   They gave me a chance, but the chance they

15  gave me didn't come with the rewards everybody else

16  got.  I got no review.  That is why I said it was a

17  double standard.

18      Q.   I want a list.  So what else did Rob

19  Mitchell do to you?

20      A.   Okay.  He denied me a promotion by not

21  reviewing me.

22      Q.   Okay.

23      A.   And I think the way he handled the situation

24  between me and Ivan was deplorable.  I don't think a

1  | man in leadership would handle something like that
2  | where it is a potential -- where this guy mistreats
3  | me twice in front of people and talked to me any kind
4  | of way in front of people, and I think Robert
5  | Mitchell missed that and should have handled it
6  | different.

7  |     Q.   Okay.  What else?

8  |     A.   Also, if like I said, if the policy was
9  | right and you encouraged the employment of blacks and
10 | put them into supervision and all this kind of stuff,
11 | he didn't do what the policy says.

12 |     Q.   Put blacks in supervision?

13 |     A.   Well, you have a black there you encouraged
14 | to be in supervision.  You have to support him
15 | along.  If I wasn't doing the right thing, he should
16 | have taken me out of supervision.  I would have went
17 | somewhere else.

18 |     Q.   Anything else?  This is Rob Mitchell.

19 |     A.   And then relating back to why I called him a
20 | racist, because in my time there, I never seen him
21 | review a young black man from the University of
22 | Florida.  That is where they get all their people
23 | from.  I never seen a black man reviewed.

24 |     Q.   What do you mean?

1    A.    They had young men on the job, let them walk
2    around the job and they would be considered for these
3    jobs for employment with Whiting-Turner.

4         For example, Andy Haberman, Andy Haberman
5    was a college graduate, University of Florida.    They
6    sent him out to work with me and Andy Haberman worked
7    with me.

8         I was showing him things, because this is a
9    young man just out of school and he made a few
10   blunders but we were trying to help.

11   Q.    He was black, right?

12   A.    White.    When he told me he had a chance to
13   be there, he said he didn't want to be with
14   Whiting-Turner and he thanked me for the things I
15   taught him.

16   Q.    This is a white kid, this Andy Haberman?

17   A.    Yes, Andy Haberman, but there never was a
18   young black man they sent out there.    I never seen a
19   young black man they were going to offer a position
20   in supervision.

21   Q.    When you say "university," of what?

22   A.    University of Florida.    That is where all
23   the people in Florida, in the Florida team, that is
24   where Rob Mitchell recruits them out of the

79

1    engineering school of the University of Florida.

2        Q.    Are these people that Whiting-Turner

3    actually hires right out of the university, or are

4    these people they are looking at?

5        A.    They bring them out, they look at them.

6    They gave Jeff Slade and Andy Haberman an opportunity

7    to come out and work out in the field with us the

8    summer of '98.

9        Q.    Two people?

10       A.    Two people at the time.  He put some others

11   on other jobs.  Andy Haberman was accepted and so was

12   Jeff Slade.

13           Jeff Slade stayed with the company.  Andy

14   Haberman told me he wasn't going to stay.

15       Q.    Jeff Slade is white?

16       A.    He was a white, but Andy wanted to be a

17   superintendent.

18       Q.    Was Andy an engineering major?

19       A.    They all come out of the engineering school,

20   but some chose to be engineers.  Some chose to be

21   superintendents, and that's how they did it, yes.

22       Q.    So these recruits from the University of

23   Florida, there were only two during the summer of

24   '98?

80

| | |
|---|---|
| 1 | A. They had only two with us, yes, ma'am. |
| 2 | Q. You are saying there were no blacks? |
| 3 | A. I never seen a young black recruit. |
| 4 | Q. During your tenure with Whiting-Turner, you |
| 5 | never saw one? |
| 6 | A. Not in 22 months with them. |
| 7 | Q. Are these recruits only during the summer? |
| 8 | A. According to how the guys' credits are or |
| 9 | whatever, you could do it at any time. I never seen |
| 10 | a black guy, and that is what I was telling |
| 11 | Mr. Mitchell. |
| 12 | Q. These recruits, did you usually just see |
| 13 | them in the summer? |
| 14 | A. That is the only time I seen them on that |
| 15 | particular job was that summer. I don't know if they |
| 16 | did it any other time, but that is the particular |
| 17 | time I'm talking about. |
| 18 | Q. So summer of '98, April, May? |
| 19 | A. Somewhere in that range. |
| 20 | Q. That is the only summer they worked on that |
| 21 | particular job? |
| 22 | A. Yes, ma'am. Yes, ma'am. |
| 23 | Q. With Whiting-Turner? |
| 24 | A. Yes, ma'am. |

1    Q.    Anything else Rob Mitchell did that you feel
2    was constituted racial discrimination?

3    A.    And the fact that I was the only one that I
4    know of that Eric Plotke and Jeff Cooper when they
5    came and talked to me -- okay.  They didn't review
6    nobody else but me.  Rob Mitchell reviewed everybody
7    else.

8         When they came and gave me the $4.70, I'm
9    saying how come -- and I asked Rob Mitchell.  I said,
10   "How come you didn't review me?"

11   Q.    What did he say?

12   A.    As always, he couldn't answer me.  He didn't
13   answer me.

14   Q.    Anything else with Rob Mitchell?

15   A.    I fought him -- I think between him and Eric
16   Plotke I fought both of them because Eric Plotke
17   asked me to walk out of the EEOC meeting, and Rob
18   Mitchell was there.  I think Rob Mitchell should have
19   asked, why wasn't James Bush at this meeting, and it
20   was mandatory we be there and he should have asked
21   the question how come I wasn't there.  It is hard to
22   miss me.

23   Q.    Back to the EEOC meeting, I think we covered
24   that last time?

82

1   A.   Yes, ma'am.

2   Q.   Tell me again.   You were pulled out

3   because --

4   A.   Yes, ma'am.

5   Q.   Because?

6   A.   Eric Plotke called me out of the meeting and

7   told me to go out and put orange fencing around

8   trees.

9   Q.   Okay.

10  A.   I felt that we had four other people out

11  there with radios that could have easily did that.

12       I mean, I don't know why I had to be the one

13  called out of a meeting.   I get discriminated on.

14  Q.   Where were the trees?

15  A.   Out there in the field.

16  Q.   Where?   What do you mean by the field?

17  A.   Three blocks, three blocks away from the

18  trailer.

19  Q.   In front of any particular store or --

20  A.   No.

21  Q.   Theatre?

22  A.   No, straight down Main Street.   The trees

23  out there in Main Street, that is the area where the

24  pavers and stuff like that were, and that is the area

1    he called me back out to.

2        Q.    Now, isn't it true that those trees had to

3    be moved that were put in wrong?

4        A.    No, that is not those trees.

5        Q.    That is not those trees?

6        A.    We had different palm trees.  These were

7    sable palms.  These were different palms.

8        Q.    You are saying nothing whatsoever was

9    wrong --

10       A.    No.

11       Q.    -- as to where the trees were put?

12       A.    No, these trees were going to stay there.

13   Yes, ma'am, we had to put the fencing around.

14       Q.    Let me keep asking the questions.

15       A.    Uh-huh.

16       Q.    Isn't it true one of these trees was falling

17   down?

18       A.    No, not that day.

19       Q.    Not that day?

20       A.    Not that day.  I don't know nothing about no

21   falling down tree on that particular day.

22       Q.    Was that EEOC meeting around early December

23   of '98?

24       A.    It could have been.  I thought it was

1   November, but it could have been December.  I'm not
2   sure.
3       Q.    It was the only EEOC meeting that was ever
4   held your during tenure at Whiting-Turner?
5       A.    That I know of, yes, ma'am.  Yes, ma'am.
6       Q.    Anything else, again involving Rob Mitchell,
7   so I can kind of complete my list?
8       A.    I can't think of anything right now.
9       Q.    Then what about Eric Plotke?
10      A.    With Eric Plotke, Eric Plotke told me one
11  day and Chuck Bender that Whiting-Turner was going to
12  hire 500 superintendents within the next two years.
13  Things like that always worked real good on me, and I
14  guess it was intended because I'm thinking then,
15  well, if that is the case they are going to hire that
16  many guys, I'm here doing the work, doing the work
17  they asked me to do, like baiting me on, telling you
18  all kind of things, dangling carrots in your face,
19  that is how I felt.
20      Q.    How was what he said to you race
21  discrimination?
22      A.    Well, you tell me you will hire 500
23  superintendents and you won't review me, won't give
24  me an appraisal, won't tell me what kind of job I'm

1   doing, won't tell me nothing, you guys don't come out
2   and tell me what the company policy is.

3           I had to find out the company policy on my
4   own.  I had to find out on my own.  Nobody told me
5   nothing.

6       Q.    What evidence do you have that the company
7   managers withheld the information from you because of
8   your race or age?

9       A.    Well, this stuff was never told to me.

10      Q.    Well, I know that.  Let's assume that's
11  true.  My question is, what evidence do you have to
12  base your opinion that the reason you never found out
13  about this and you weren't told was because of your
14  race or age?

15      A.    I believe it is my race.  I was the only
16  black one there as an assistant superintendent.

17          You had Omar Sweeney that had been with the
18  company for years.  He was there, but these things
19  are part of the table.  These things are part of what
20  this company has to offer.  Then somewhere along the
21  line, somebody should have told me.  I had no idea.
22  I just happened to hear things from other people.

23      Q.    Isn't it true the benefits you were talking
24  about was if you became part of management with

1   Whiting-Turner and left the union?

2       A.   No.

3       Q.   Okay.  Those aren't the benefits you are

4   talking about?

5       A.   No, because if you check back, if they were

6   going to give me 14 days and they said they gave me

7   14 days, why give me 14 days if I'm not on benefits?

8       Q.   Don't you get vacation as a union member?

9       A.   No.  We do not have vacation with union

10  members.  You take your own vacations with our

11  union.

12           I don't know about other unions.  With our

13  union, you don't get vacations.

14      Q.   You don't get paid?

15      A.   No.

16      Q.   Going back to this, to finish up my question

17  again, I know about your beliefs.

18      A.   Yes.

19      Q.   But I'm asking you what was either said or

20  done by management that underlies your belief that it

21  was race or age discrimination as the reason why they

22  didn't tell you about the benefits?

23      A.   Yes, I believe it was age and I believe that

24  they had a youth movement, and with the youth

1   movement, they should have told me they had a youth
2   movement because I could have went on.
3       Q.   So what either fact, conduct or things they
4   said that underlies your belief that the reason they
5   withheld this information was because of your age or
6   your race?
7       A.   Yes.
8       Q.   What did they say to you or what did they do
9   to you?
10      A.   They showed this in so many ways by not
11  telling me about these benefits here that was there
12  for me.
13      Q.   Why don't you think that they forgot, for
14  example?
15      A.   They didn't forget.
16      Q.   Okay.  Is it possible that the benefits
17  didn't apply to you?
18      A.   Well, here is the thing:  If the benefits
19  didn't apply to me, all they had to do is simply say
20  these don't apply to you and you are not eligible,
21  you are not at this point or this stage to proceed on
22  further.
23           But the thing I'm saying, like when they
24  took the picture, I figured it was race

88

1   discrimination -- I mean age discrimination.  I am
2   older than anybody there.  I'm sitting right here,
3   here is a guy here, a guy here, a Polaroid, bap, bap,
4   bap.  You can pop ten pictures.  You can come on a
5   job and pop four pictures and leave.  You could have
6   told me in advance.  I would bring in a white shirt
7   and tie.
8           I could have done the same thing.  You could
9   have walked out of the door and threw it away.
10  Meanwhile, I'm part of this thing, and take a picture
11  of me for future reference and future jobs if I'm
12  going to be there, and I feel that is age
13  discrimination.
14      Q.   You feel it was age discrimination?
15      A.   Sure.
16      Q.   What do you base that feeling on?
17      A.   I base that feeling on that is my gut
18  feeling.  I believe it is just age and race because
19  --
20      Q.   Okay.  Okay.
21      A.   Well, you want me to explain it.
22      Q.   Well, in bits.  When you tell me a story
23  that is five paragraphs long, it gets confusing.  I'm
24  trying to break it up.

89

1    A.    Uh-huh.

2    Q.    You say it was because of age.  Did anybody

3    say anything to you about your age, anybody in

4    management?

5    A.    Did they just come out and say anything

6    about my age?

7    Q.    Right.  Right.

8    A.    I don't remember them saying anything, but I

9    always let them know how many years I had been in

10   this.

11   Q.    But did anybody say anything to you about

12   your age?

13   A.    No.

14   Q.    Did anybody write anything to you about your

15   age?

16   A.    What do you mean "write"?

17   Q.    Well, write you a memo saying you don't get

18   this benefit because you are too old or you are not

19   getting this job because you are too old?  Did they

20   write anything to you?

21   A.    Well, that is the reason I think it clearly

22   showed, because you know, you have a guy doing the

23   work for you and you have him on your payroll for 22

24   months and you don't review him, don't appraise him,

90

1 | that is how I feel.

2 | Q. I know how you feel, but my question was,

3 | did anybody write anything to you?

4 | A. No, I didn't get that in writing.

5 | Q. About age?

6 | A. No.

7 | Q. As far as the age discrimination charge

8 | goes, which managers do you feel are the ones who

9 | discriminated against you based on age? We have

10 | talked about race, but what about age?

11 | A. Rob Mitchell.

12 | Q. Anybody else?

13 | A. Mostly Rob Mitchell.

14 | Q. Tell me about Rob Mitchell. I mean, again

15 | you don't have to repeat the whole thing again. You

16 | can make a list about the things you told me about.

17 | A. Same thing I just told you, no review.

18 | Q. Okay.

19 | A. He didn't treat me as others. He never came

20 | to me and asked me what is going on, what is

21 | happening with you, is this okay with you, how come

22 | this or how come that. He never did that.

23 | I seen him with others and stuff, and that

24 | is the reason I felt there was a problem there.

| | |
|---|---|
| 1 | Q. What did he say or do that is evidence that |
| 2 | the reason he didn't give you a review or didn't |
| 3 | appraise you or didn't promote you is because of age? |
| 4 | A. Because he didn't. |
| 5 | Q. Okay. |
| 6 | A. And that is how I felt, and like I said, |
| 7 | with the University of Florida is where they get |
| 8 | practically all their people in supervision, but you |
| 9 | have to keep in mind, I wasn't -- I was brought |
| 10 | there. I was brought there because of my experience |
| 11 | and I worked with those young guys. |
| 12 | I worked with Jeff Slade. I worked with |
| 13 | Andy Haberman. These guys never seen some of the |
| 14 | things they seen in real life. I helped them the |
| 15 | best that I could. |
| 16 | Q. In fact, Eric Plotke asked you to go from |
| 17 | the Bloomingdale's job to go to Sawgrass? |
| 18 | A. He wanted me. |
| 19 | Q. He wanted you to go there? |
| 20 | A. He wanted me, yeah. |
| 21 | Q. Okay. How old were you when you first |
| 22 | started working for Whiting-Turner? |
| 23 | A. '97, 50 going on 51, I think. |
| 24 | Q. Fifty-one. Again, what is your date of |

1   birth?

2        A.    12/17/46.

3        Q.    I'm not very good at the math.

4        A.    I think I was going on 51.  I think I was

5   51.  I think I was 51 in December, I think it was.

6        Q.    When Whiting-Turner hired you?

7        A.    Yes.

8        Q.    I want to ask you also, one of the parts of

9   your complaint covered an unpaid wage claim.  What is

10  that in reference to?

11       A.    Unpaid wage claim?

12       Q.    Yes.

13       A.    Since I wasn't reviewed and I had a

14  collective bargaining agreement with Whiting-Turner,

15  so since they didn't review me, for all those hours

16  and stuff that I worked, those Saturdays and Sundays,

17  those days that I volunteered, all of those days

18  should have been premium time on the weekend and I

19  was working from 6:30 -- I worked from 6:30 to 5:30.

20  I should be paid all of that money and time because I

21  was still a member of the union since they didn't

22  review me.  If they wanted to review me at the same

23  time as Charles Bender and say, look, you can

24  relinquish your union card, or else, relinquish it

1   and then you can go into management, but they never

2   did that, so I'm looking to be paid for all that

3   time.

4        Q.   As back pay?

5        A.   That is right.  Over a whole year.

6        Q.   That is triggered by the fact they didn't

7   review you?

8        A.   That is right.  That is right.  So then I

9   was still a union member.

10        Q.   Okay.

11        A.   That's what I'm saying.

12        Q.   So going back, when you started at the

13   Sawgrass job, at that point, is that when you went on

14   the salaried position and became assistant

15   superintendent?

16        A.   I was told I was going to be assistant

17   superintendent.  I was acknowledged as an assistant

18   superintendent, but until March is when I got an

19   increase in salary.  I was being paid as a labor

20   foreman up until March.

21        Q.   Up until March?

22        A.   Yes, ma'am.

23        Q.   Then starting in March of '98, that is when

24   your paycheck stub changed, correct?

1    A.    Yes.

2    Q.    Is that when you went salaried for 40 hours

3  a week?

4    A.    Yes.

5    Q.    That was a flat rate no matter how many

6  hours you worked?

7    A.    No matter how many hours you worked, it

8  stayed the same thing.

9    Q.    If you worked Saturdays, you didn't get paid

10  extra, correct?

11    A.    That is right.

12    Q.    Was that the same as for Chuck Bender?

13    A.    Same thing.

14    Q.    Versus before as a foreman if you worked a

15  Saturday?

16    A.    I would have got paid for all of it.

17    Q.    You would have gotten extra?

18    A.    Yes, ma'am.

19    Q.    So if I understand correctly, you are saying

20  that starting in March when you became salaried until

21  let's just say six months later in September '98, if

22  you had gotten reviewed and you had been promoted or

23  whatever and got appraised and reviewed, then you

24  would not have made this claim for unpaid wages?

95

| | |
|---|---|
| 1 | MR. POLLACK: Object to the form. The |
| 2 | document speaks for itself. |
| 3 | BY MS. CESARANO: |
| 4 | Q. You can still answer the question. |
| 5 | A. Would I still have made that if I would have |
| 6 | got reviewed and went on to be an assistant |
| 7 | superintendent on paper? |
| 8 | Q. Right. |
| 9 | A. No. No, because then it would have been in |
| 10 | accordance with what we talked about, the fact, you |
| 11 | know, I'm paid here now at this and I would be |
| 12 | changed into this here. |
| 13 | Q. So you are saying if that had happened, |
| 14 | which it didn't, but if it had, you wouldn't have |
| 15 | this claim for unpaid wages? |
| 16 | A. No. |
| 17 | MR. POLLACK: Same objection. |
| 18 | THE WITNESS: Now, you asked me something. |
| 19 | Can I just make sure I'm clear on something? |
| 20 | BY MS. CESARANO: |
| 21 | Q. Yes. |
| 22 | A. You asked me something about my checks. |
| 23 | Q. In March. |
| 24 | A. In March, you mean? |

96

| 1  | Q. Of '98. |
| 2  | A. Did it change to assistant superintendent on |
| 3  | my check? |
| 4  | Q. Well, I didn't ask that, but did it? |
| 5  | A. No. |
| 6  | Q. But in March is when Eric talked to you and |
| 7  | said -- |
| 8  | A. Yes. |
| 9  | Q. -- you are going to go on salary? |
| 10 | A. I would be in six months, yes. |
| 11 | Q. And you would get a raise? |
| 12 | A. Yes, ma'am. |
| 13 | Q. At that time in March? |
| 14 | A. Uh-huh. |
| 15 | Q. You got more money in March? |
| 16 | A. Yes, ma'am. |
| 17 | Q. In fact, it went from -- |
| 18 | A. It went from $11.10 to $15.70. |
| 19 | Q. Right, at a rate of that per hour; is that |
| 20 | what happened? |
| 21 | A. Yeah. I went to $15.70. Yeah, $15.70 an |
| 22 | hour. |
| 23 | Q. And then you got a flat 40 hours a week? |
| 24 | A. Flat 40 hours. |

1     Q.    No matter how many hours you worked, no

2   matter if you worked 90 hours, and Eric told you this

3   would be your new salary in March of '98?

4     A.    Yes.

5     Q.    That is reflected in the paycheck?

6     A.    Uh-huh.   Uh-huh.

7     Q.    Okay.   Again, did he tell you that you were

8   an assistant superintendent with union benefits in

9   March of '98?

10         MR. POLLACK:   Objection, asked and

11      answered.   You can answer.

12         THE WITNESS:   Yes, in March of '98, I was

13      still a union member.   I was still a

14      superintendent with union benefits.

15         Also, to add to that, Whiting-Turner has a

16      superintendent that is a union superintendent.

17      They never have relinquished their cards and that

18      is in the Whiting-Turner policy.

19         They have superintendents that are union

20      superintendents, and in my case, I would have

21      been a union superintendent.   I would have never

22      had to relinquish my card, not after 35 years.

23      They have union superintendents.

24         I could have said, look, I want to -- I

98

1      could say I want to be a union superintendent,

2      but I still could have gotten a review.

3   BY MS. CESARANO:

4      Q.   Those union benefit superintendents that you

5   are talking about, they would still not get overtime

6   or anything, they would still be on a salary?

7      A.   They would be union benefits.  I don't know

8   how that would work, but still get union benefits and

9   maybe still get their overtime.  I don't know.

10     Q.   You don't know, right?

11     A.   No, but I know --

12     Q.   Would they be on a salary?

13     A.   And I don't know how it would work, I really

14  don't, but at Whiting-Turner they do have union

15  superintendents.

16     Q.   You don't know what that pay structure is?

17     A.   No, ma'am, I don't know.

18          MR. POLLACK:  We will be here to 8:00 if you

19     don't answer her questions.

20          THE WITNESS:  Yeah.  Yeah.

21  BY MS. CESARANO:

22     Q.   Okay.  I think we covered the claims to the

23  complaint.  Can you give me the name of anyone who

24  would in your view have information or facts relevant

99

1  to this case, know something about this case and
2  about your claim for discrimination?
3         MR. POLLACK:  Just to speed -- well, okay.
4      Other than those that we have on the
5      interrogatories and --
6         MS. CESARANO:  If he knows.  I mean, I don't
7      know if he remembers the interrogatories.  I can
8      try to get them.
9         THE WITNESS:  Not right now.
10  BY MS. CESARANO:
11     Q.  Do you have them with you?
12        MR. POLLACK:  I didn't bring my file.
13        THE WITNESS:  I can't remember.  You mean
14     that would know all the particulars about it?
15  BY MS. CESARANO:
16     Q.  Well, let me back up.  You have told me
17  about a lot of things that have happened and you told
18  me who was there.  You told me the names of people
19  involved, so I have gotten some of these names, but
20  what I want to really know is which persons do you
21  feel can give you support or know facts that would
22  support the fact that you were discriminated against,
23  you know, what names leap to your head?
24     A.  That is hard to do.  That is hard to do.  I

1    mean, I have discussed this with a lot of people that

2    wasn't on the job.

3        Q.    No, I don't mean who you have discussed it

4    with.

5        A.    I can't answer.

6        Q.    Because they weren't there.  I'm looking for

7    people who saw things or heard things that would

8    support your claim for race or age discrimination or

9    the pay issue.

10        A.    I couldn't answer.

11            MR. POLLACK:  If you show him, I mean, we

12        went -- I'm just trying to expedite things.

13            MS. CESARANO:  Let's take a break.

14            (Thereupon a brief recess was taken, after

15        which the following proceedings were had:)

16    BY MS. CESARANO:

17        Q.    Mr. Bush, while I was off the record, I

18    found your answers to interrogatories, so I will ask

19    you about some of the names in there.

20        A.    All right.

21        Q.    You have obviously got yourself and we have

22    discussed Eric Plotke, Rob Mitchell, Jeff Cooper and

23    Charles Bender.  Doug Raines is mentioned, City of

24    Sunrise inspector.  What, if any, information might

1  Doug Raines have to shed light on this case?

2      A.    I told him what was happening, the reason

3  why I was going to leave.  I told him I wasn't being

4  treated fair, and he knew the work I was doing.  He

5  knew I was doing all of my reports.  I would call the

6  City of Sunrise, set up inspections.  And you know,

7  the inspections, your QCs, that goes from the ground

8  to the roof, and the guy saw the job I was doing.

9          I explained to him, I told him what was

10  happening.  I told him they had a double standard

11  which I didn't think to be fair.  That's all.

12      Q.    Did he have any firsthand knowledge?

13      A.    Well, I got to deal with him everyday.

14      Q.    So he would say you are a very good employee

15  and knew a lot, right?

16      A.    Yes.

17      Q.    In terms of discrimination, would he be able

18  to testify if he saw or heard anything that

19  management at Whiting-Turner did that he himself saw

20  or heard?

21          MR. POLLACK:  Object to the form.  Calls for

22      speculation.

23          THE WITNESS:  I don't know that.

24  BY MS. CESARANO:

102

1    Q.    You have listed him.  I mean, I'm only
2    asking you what you know.

3    A.    Yeah.  I really don't know.

4    Q.    Did he ever tell you he had seen or heard
5    anything?

6    A.    No.

7    Q.    Bob Needham, City of Sunrise inspector,
8    again, same question.

9    A.    No, I explained to him that I was going to
10   leave and I wasn't going to be there, that I didn't
11   think the company was fair.

12   Q.    Did Bob Needham as far as you know hear
13   anything or see anything done by managers at
14   Whiting-Turner?

15   A.    I really don't know.

16   Q.    But that you know of?

17   A.    Not that I know.

18   Q.    James Patterson, inspector of construction,
19   same question.  What is your understanding about his
20   knowledge of the case?

21   A.    I spoke with Jim concerning this problem
22   because I worked for him before.  I have known him
23   since 1984.  I explained that to him and told him how
24   I was being treated by the company and we talked

1 | about it several times because he was on the job at

2 | the time.  He was a subcontractor.  We talked about

3 | that.

4 | Q.   Same question, as far as you know, did he

5 | see or hear anything said or done by Whiting-Turner

6 | managers?

7 | A.   I don't know what he heard.  No, I couldn't

8 | answer that.

9 | Q.   Was he physically on the job at

10 | Whiting-Turner?

11 | A.   Yes.

12 | Q.   On the Sawgrass project?

13 | A.   Yes.

14 | Q.   Did he tell you that he had seen something

15 | that indicated discrimination?

16 | A.   No, he didn't tell me that in so many words,

17 | no.

18 | Q.   Okay.  So you don't have any specifics as to

19 | anything he might know about discrimination at

20 | Whiting-Turner?

21 | A.   I don't know what he would say.  I don't

22 | know what he might say.

23 | Q.   What about John Jones, general project

24 | manager?

1    A.   John Jones, he was a senior project manager
2   with the Mills Corporation, and I put him down
3   because I was introduced to him also as a
4   superintendent by Eric, and I just knew he would have
5   some knowledge of the fact that I was introduced to
6   him at the beginning of the project and he would have
7   knowledge that I was there, did do my job, built
8   three buildings.

9        I did Main Street, and from time to time, he
10  would talk to me concerning my work, you know, what
11  my job was, my duty, and I know he would know that if
12  he was put on the stand.

13   Q.   When were you introduced to him?

14   A.   I was introduced to him I think maybe -- I
15  don't know if he got there in November of '98, but
16  when he got there, I was introduced to him, and Eric
17  took me to his office and I was introduced to John
18  Jones in his office as assistant superintendent.

19   Q.   And you are saying that Eric introduced you
20  as assistant superintendent?

21   A.   Assistant superintendent, yes, ma'am.

22   Q.   Any other information that John Jones has,
23  as far as you know?

24   A.   The fact he knows I was there throughout the

1    project, assistant superintendent.  He sat in on some
2    meetings with us.  He knew the responsibilities that
3    I had.
4       Q.    What kind of meetings?
5       A.    We had job meetings in the beginning.  John
6    Jones had meetings with us.  Later, we had
7    coordinating meetings and then scheduling meetings
8    with the other trailer, all the people from both
9    companies.
10      Q.    Did you go both to --
11      A.    Just the scheduling meetings.
12      Q.    Who went to the other meetings?
13      A.    Jeff Cooper went to the other meetings.
14      Q.    Did --
15      A.    The project manager.
16      Q.    Did Eric Plotke?
17      A.    Sometimes Eric went, too.  Yeah, Eric went.
18      Q.    Did Chuck Bender ever go?
19      A.    Not that I know of.
20      Q.    Doug Howden, assistant superintendent,
21   carpenter's union?
22      A.    Yeah, Doug Howden, he worked for
23   Whiting-Turner for about three or four years.  And
24   Doug Howden was at the Bloomingdale's job and they

1   fired Doug at the end of the Bloomingdale's job, and

2   at that time they fired him, they hired me.

3       Q.    Was he white?

4       A.    He was white.

5       Q.    Was he young?

6       A.    Yes.

7       Q.    How old do you think he was?

8       A.    Probably -- I would say Doug was probably

9   about 35 if he was that old.  Maybe 33, something

10  like that.

11      Q.    Anything else that Doug Howden knows about

12  as far as you know?

13      A.    I don't know how much he knew about it, but

14  because I replaced him, I don't know how much he knew

15  about it, but I put his name down there because he

16  and I had some talks before he left.  I know he was

17  very disgruntled when he left, so I don't know what

18  all he would know about it, but we did talk about it.

19      Q.    But he was fired, right?

20      A.    Yes.

21      Q.    Do you have any idea what for or why?

22      A.    No, I don't.  I don't know the particulars.

23      Q.    Now, I think in your answers to

24  interrogatories you list religious and spiritual

1   leaders.  Again, firsthand knowledge they would have

2   about the case, would they have any firsthand

3   knowledge as far as being at the Whiting-Turner

4   turning project and seeing or hearing anything?

5       A.   No.

6           MR. POLLACK:   Just the reason that they are

7       listed I think is as to damages.  I don't want

8       you to think --

9           MS. CESARANO:   I'm just scanning this.

10      That's fine.

11          MR. POLLACK:   Okay.

12  BY MS. CESARANO:

13      Q.   I think you said that there weren't any

14  other black assistant superintendents or

15  superintendents working for Whiting-Turner in

16  Florida.  Wasn't there one in Orlando?

17      A.   (Shakes head in the negative.)

18      Q.   No?

19      A.   When I asked Rob Mitchell, he couldn't

20  answer me.  I said I found out I'm the only black

21  assistant superintendent in Florida.  That is what he

22  talked about.

23      Q.   He didn't say anything to correct you?

24      A.   He didn't tell me yes or no.

108

1    Q.    Okay.    Now, do you have a contingency fee

2    agreement with your attorney?

3        MR. POLLACK:    I will instruct the witness

4        not to answer.    I think that is privileged.

5        MS. CESARANO:    It is not privileged.    That

6        is not.

7        MR. POLLACK:    Whether --

8        MS. CESARANO:    The contract is not

9        privileged.    I can get that.

10        MR. POLLACK:    I can tell you my contract,

11        but the terms of the contract, there is a

12        contractual --

13        MS. CESARANO:    I mean, I can get it in

14        discovery and I certainly can ask whether it is a

15        contingency fee arrangement or whether he is

16        paying you by the hour.    That is a common

17        question.

18        MR. POLLACK:    But the terms of it?

19        MS. CESARANO:    We will talk about the actual

20        terms later I will limit my question.

21    BY MS. CESARANO:

22    Q.    My question to you is, are you paying your

23    attorney by the hour or on what is called a

24    contingency basis?

109

| | | |
|---|---|---|
| 1 | A. | I think it is contingency. |
| 2 | Q. | Okay. Have you ever made any prior |

3  complaints of discrimination against any other

4  persons or employers?

| 5 | A. | No. |
| 6 | Q. | Filed any other EEOC charges? |
| 7 | A. | Never. |
| 8 | Q. | Any other complaints or civil cases? |
| 9 | A. | No. |
| 10 | Q. | Have you ever been arrested? |
| 11 | A. | Never. |
| 12 | Q. | Obviously not convicted of a felony, right? |
| 13 | A. | No. |
| 14 | Q. | Final question I just wanted to ask you, you |

15  know, obviously there is this lengthy document which

16  we have labeled Exhibit 2 that you wrote?

17    A.   Yes.

18    Q.   Describing some of your concerns with your

19  employment at Whiting-Turner?

20    A.   Uh-huh.

21    Q.   Is there anything else that you have written

22  down, either notes or memos or other documents that

23  you have in your possession or that you have given to

24  your attorney that relate to what happened to you at

| | |
|---|---|
| 1 | Whiting-Turner during your employment? |
| 2 | A. You are saying is there any other notes? |
| 3 | Q. Yes, any other documents. |
| 4 | MR. POLLACK: Other than what you have given |
| 5 | me? |
| 6 | THE WITNESS: As of right now, I don't think |
| 7 | so. But like I told my attorney, if I run across |
| 8 | this stuff, I told him I would gladly bring it to |
| 9 | him, because right now I'm a note taker. I do it |
| 10 | all the time. |
| 11 | I do little tidbits, but if it is -- I told |
| 12 | my attorney I would bring it to him if I had |
| 13 | something. |
| 14 | BY MS. CESARANO: |
| 15 | Q. Whatever you have, you gave it to your |
| 16 | attorney? |
| 17 | A. Yes, ma'am, he will tell you I brought a |
| 18 | suitcase to him. Whatever I had. |
| 19 | Q. Notes? |
| 20 | A. Yes, ma'am. |
| 21 | Q. Memos? |
| 22 | A. Notes, memos, times, dates. |
| 23 | Q. Do you have any tape recordings? |
| 24 | A. No tape recordings, no. |

1    Q.   Any videos?

2    A.   No, I don't have no videos.

3        MS. CESARANO:  Okay.  So I will ask your

4    attorney for all that.  I have no further

5    questions.

6        MR. POLLACK:  Okay.  I have just a few.

7        MS. CESARANO:  Sorry.  He gets to prolong

8    this.

9        MR. POLLACK:  I just have a little bit.

10                   CROSS-EXAMINATION

11  BY MR. POLLACK:

12    Q.   Mr. Bush, before you came to Whiting-Turner,

13  on direct examination, Ms. Cesarano asked you about

14  surveying work.  Had you ever done surveying work

15  before you came to Whiting-Turner?

16    A.   Yes.  Off and on through the years, you

17  know, if it called for it.  If it didn't call for it,

18  I didn't have to fool with it.  In fact, I have a

19  letter where I did the layout, layout and surveying

20  with Witters Construction down at Baptist Hospital.

21    Q.   Had you ever done blueprint reading before

22  you came to Whiting-Turner?

23    A.   Yes, sir.  I took a class in blueprint

24  reading in 1978 and I stuck with it all through the

112

1   years.

2       Q.    At the time you worked for Whiting-Turner,

3   did you have a general contractor's license?

4       A.    At the time with Whiting-Turner, I had --

5   they call it a specialty license.  I was a licensed

6   contractor.  My job was concrete placing, finishing,

7   doing tie beams.  I could do residential houses, tie

8   beams and stuff.

9       Q.    Did Whiting-Turner, to your knowledge, know

10  that you had that license?

11      A.    Yes.  I even told Eric Plotke, and the one

12  time Eric Plotke and me, the time I was supposed to

13  go to a continuing education class, he asked me if I

14  would want to go together, me and Eric.

15          MR. POLLACK:  Did you mark this as an

16      exhibit?

17          MS. CESARANO:  No, because it is a

18      pleading.

19  BY MR. POLLACK:

20      Q.    Mr. Bush, I will show you what has been

21  marked -- it is not marked.  I'm sorry.  I will show

22  you what I will represent is the complaint and demand

23  for jury trial in this case.  Do you see that

24  document?

1       A.    Yes, sir.

2       Q.    Did you personally actually draft this

3    document?  Did you write it?

4       A.    No, I didn't.

5       Q.    Okay.  Ms. Cesarano asked you some questions

6    about Count 3, the count for unpaid wages?

7       A.    Yes, ma'am.  Yes, sir.

8       Q.    I'm sorry.  Count 5.

9       A.    Okay.

10       Q.    Now, let me ask you something.  You

11    testified that you did not get paid the same amount

12    of money as Chuck Bender; is that correct?

13       A.    Chuck, uh-huh.

14       Q.    You also testified that you believe he

15    performed the same work, same job as Chuck Bender,

16    correct?

17       A.    Yes.  Yes, I did.

18       Q.    You had the same title as assistant

19    superintendent, correct?

20       A.    Yes.

21       Q.    Is that part of what you are seeking in this

22    lawsuit?

23            MS. CESARANO:  I will object.  It is not

24       supposed to be leading.  You are supposed to ask

114

1    him for his opinion.

2            MR. POLLACK:  Let me rephrase the question.

3            THE WITNESS:  Okay.

4    BY MR. POLLACK:

5        Q.  Did you, to your knowledge, get paid the

6    same amount of money as Chuck Bender?

7        A.  No, I didn't.

8        Q.  Either when you were assistant

9    superintendent -- at any time during the time that

10   you were assistant superintendent?

11       A.  No.

12       Q.  Do you know legally what the term "unpaid

13   wages" in the law means?

14           MS. CESARANO:  I will object to form.  It

15       obviously calls for a legal conclusion.

16   BY MR. POLLACK:

17       Q.  Do you feel that you're entitled to be paid

18   the same amount of money as Chuck Bender for the job

19   of assistant superintendent?

20       A.  Yes, I feel that.

21       Q.  Is that part of why you brought this

22   lawsuit?

23       A.  Yes, it is.

24       Q.  Did Eric Plotke lead you to believe that you

1   were an assistant superintendent -- well, let me

2   rephrase the question. When in time did Eric Plotke

3   first lead you to believe that you were an assistant

4   superintendent?

5       A.   In October '97.

6       Q.   Okay. Now, Ms. Cesarano asked you about

7   ways in which you had been discriminated by people at

8   Whiting-Turner. You testified just a moment ago that

9   you were paid a different amount of money than Chuck

10  Bender.

11      A.   Yes.

12      Q.   Do you consider that to have been a form of

13  discrimination?

14      A.   Yes.

15      Q.   She also asked you about some people listed

16  on the answers to interrogatories. Doug Raines, do

17  you recall Mr. Raines?

18      A.   Yes, I remember him.

19      Q.   Were you ever introduced to Mr. Raines as an

20  assistant superintendent?

21      A.   Yes, I was.

22      Q.   Do you recall when that was in time?

23      A.   I think that was like the last part of

24  October when Mr. Raines and Mr. Nehlan, Robert

1   Nehlan, both of them came by the job and we were in
2   front of the office trailer and Eric Plotke
3   introduced me to both of them as assistant
4   superintendent.
5           That is October of '97.  I think October of
6   '97 or the first part of November or somewhere in
7   this range.
8       Q.   He is an inspector for the City of Sunrise?
9       A.   Yes, that.
10      Q.   That also would be Mr. Needham?
11      A.   Yes, Robert.
12      Q.   For the record, were you also introduced to
13   Mr. Needham as assistant superintendent?
14      A.   Yes, I was.  It's N E H L A N or something
15   like that.  I have seen his name.  Something like
16   that, Nehlan.
17      Q.   You testified that you believed that you
18   were entitled to 14 days of vacation pay, correct?
19      A.   Yes, sir.
20      Q.   And you also testified that you do not
21   believe that you received those 14 days; is that
22   correct?
23      A.   That is true.
24      Q.   Is that one of the things you are seeking in

1    this lawsuit?

2        A.    Yes.

3        Q.    You also talked about reimbursement for

4    travel time that you thought you were entitled to; is

5    that correct?

6        A.    Yes.

7        Q.    It is your belief that you are entitled to

8    reimbursement for travel time?

9        A.    Yes.  I just say yes.  Yes.

10       Q.    Is that one of the things you are also

11   seeking in this lawsuit?

12       A.    Yes.

13       Q.    Ms. Cesarano asked you about the fee

14   agreement in this case.

15       A.    Uh-huh.

16       Q.    Do you know how many fee agreements there

17   were in this case between you and myself?

18       A.    I think it was two.

19       Q.    Do you know, initially when you first came

20   to see me, were you paying me money to represent you

21   or was it a contingency agreement?

22       A.    We made an arrangement.

23       Q.    Well, was the arrangement that you would pay

24   me for work that I did?

118

1     A.    Yes.  Yes.  Yes, it was.

2     Q.    Do you recall the reason -- did we have any

3   discussions about why I would be charging you for the

4   work that I did?

5     A.    Yes.

6     Q.    Do you recall what I told you?

7     A.    I have got it.  I mean, I just can't recall

8   the numbers, but I have got it.  I have got an

9   agreement and everything.

10     Q.    In fact, didn't I tell you that the reason

11   that I was charging you initially was I wanted to

12   make sure you were committed to this lawsuit and you

13   believed in it?

14     A.    Yes, sir.

15     Q.    Isn't that true?

16     A.    Yes, sir.

17     Q.    In fact, didn't there come a point where you

18   did pay me money for doing work for representing you;

19   isn't that correct?

20     A.    Yes, sir.

21     Q.    Did there come a point in time where I

22   didn't believe you would be able to continue paying

23   me to represent you on an hourly basis?

24     A.    Yes, sir, you said that.

```
 1      Q.   In fact, didn't we have a conversation where
 2   I said because you appear to believe that sincerely
 3   in your lawsuit I would change the nature of our
 4   agreement?
 5      A.   Yes, sir.  Yes, sir.
 6      Q.   At that point, the agreement then changed;
 7   isn't that correct?
 8      A.   Yes, it did.
 9           MS. CESARANO:  By the way, when was that?
10           MR. POLLACK:  I can get you the dates.
11   BY MR. POLLACK:
12      Q.   In fact, Mr. Bush, who is paying for the
13   out-of-pocket costs in this lawsuit?
14      A.   I am.
15      Q.   I bill you for them?
16      A.   Yes, sir.
17      Q.   You pay me?
18      A.   You bill me, pay that amount, yes, sir.
19           MR. POLLACK:  I have nothing further.
20                     REDIRECT EXAMINATION
21   BY MS. CESARANO:
22      Q.   I just have a couple of follow-up
23   questions.
24      A.   Okay.
```

120

1    Q.   When you initially started working at

2   Sawgrass, you were paid $10.82 an hour; is that

3   right?

4    A.   Yes.

5    Q.   Then you got paid for overtime, et cetera?

6    A.   Yes, ma'am.

7    Q.   That stayed the same way as far as how you

8   were paid, correct, until March 15th or so of '98?

9    A.   Somewhere like that, yes, ma'am.

10    Q.   That is when you began to get $15.70 an

11   hour?

12    A.   Yes, ma'am.

13    Q.   That is when you went on 40 hours a week

14   flat rate no matter how many hours you worked?

15    A.   Yes, ma'am.

16    Q.   And when you talked to Eric Plotke in March

17   of '98 and he discussed this change in the pay

18   structure with you, did he tell you that you would be

19   put on a salary and not get paid for the extra time?

20   Did he tell you that?

21    A.   In March of '98?

22    Q.   In March of '98, yes.

23    A.   At first, and I guess I misunderstood him,

24   at first I thought I was going to get paid for

1  overtime making the $15.70, but then after I

2  mentioned it to him, he said, no, $15.70, that would

3  be salary.

4      Q.   Okay.  Was that the same as for Chuck at

5  that point?  I don't mean the same rate of pay.  What

6  I mean, he didn't get paid for the weekends either,

7  right, at that time in March of '98?

8      A.   Yes, I think that is the way it worked.  I

9  think you are right.

10     Q.   The same?

11     A.   I think so.

12     Q.   And during the time you worked for

13  Whiting-Turner, you were paid what they told you they

14  would pay you?

15     A.   That is right.

16     Q.   Is that correct?

17     A.   Uh-huh.

18     Q.   Even though I understand your claim, you

19  were paid less than Chuck Bender, correct?

20     A.   Uh-huh.

21     Q.   They paid you what they promised to pay you?

22     A.   Yes.

23     Q.   I only had I think one question about you

24  mentioned a continuing education class, something

122

1  | about going with Eric Plotke?

2  | A.  Yes, ma'am.

3  | Q.  What is that about?

4  | A.  Okay.  Any contractor in Dade County, every
5  | two years, you have to go for continuing education.
6  | That is just to bring you up on the latest or
7  | whatever.  It is like when they had the hurricane
8  | code in '92, they changed it June of '93, and those
9  | things have to be brought to our attention.

10 |     If I was going to build a house for
11 | somebody, which I'm licensed to do that, I would have
12 | to know that because if I started doing footers and
13 | walls, I have to know where those columns should
14 | appear.

15 |     Eric and I were talking about renewing our
16 | license and Eric suggested to me maybe we can go
17 | together.

18 | Q.  Do you remember when that was about?

19 | A.  I brought it over to my attorney showing you
20 | that I did go take it.  I went by myself.  I got all
21 | my continuing education stuff.

22 | Q.  Do you remember what year it was?

23 | A.  '98.  Sometime in '98.  I forgot exactly
24 | when, but they set it aside on a weekend for you to

1   be able to go.  I went that weekend.  I think I paid
2   $129 to Gold Coast.

3        Q.    Saturday and Sunday, both days?

4        A.    Yes, ma'am.

5        Q.    Eric didn't end up going?

6        A.    He didn't go with me, but he had to go
7   somewhere because you have to do this to keep your
8   license alive.

9        Q.    Did he do that on a different weekend?

10       A.    He could go to any school he wanted to.  He
11   didn't go to the same school.

12       Q.    Do you know why he didn't end up going with
13   you?

14       A.    I don't know.  It was his suggestion.

15       Q.    That he go with you?

16       A.    He said maybe we will ride together.  That
17   is what he said.

18       Q.    At that class, you get updated on all the
19   changes and the codes and everything?

20       A.    Yes, ma'am.  Yes, ma'am.  You are updated
21   and given a synopsis of different municipalities.
22   You answer some questions and get a lot of new stuff
23   from the State of Florida.  That is what it is about.

24       Q.    Let me ask you, I have some tools to ask you

```
 1   about, a list of tools.  Are you knowledgeable in

 2   using a plane?

 3        A.   A plane, yes.

 4        Q.   How about a sander?

 5        A.   Sander, yes.

 6        Q.   Grinders?

 7        A.   Yes.

 8        Q.   If I'm reading this, choppers?

 9        A.   Chop saw?

10        Q.   C H O P P E R maybe?

11        A.   Yes, ma'am.

12        Q.   Chisel?

13        A.   Yes, ma'am.

14        Q.   Squares?

15        A.   Yes, ma'am.

16        Q.   Protractor?

17        A.   Yes, ma'am.

18        Q.   Survey chains?

19        A.   Yes, ma'am, survey chains.  We use all that.

20        Q.   And were you knowledgeable on how to use a

21   survey chain, for example, in March of '98?

22        A.   Yes.

23        Q.   And same thing with the plumb bob?

24        A.   Yes.
```

125

```
 1      Q.   And the level?

 2      A.   Yes.

 3      Q.   And same time period for a lever level?

 4      A.   Laser.

 5      Q.   Laser level?

 6      A.   Yeah.   That is an instrument setup.   It has

 7   a laser eye.  You set it up on the tripod.  It spins

 8   around and you set your elevation.  Yes, ma'am.

 9           In fact, I owned one until somebody stole

10   it.

11      Q.   You knew how to use that when you started

12   work at the Sawgrass project?

13      A.   Yes.

14      Q.   Builders level?

15      A.   Yes, ma'am.

16      Q.   Digital transit?

17      A.   You've got so many different kinds of

18   transits.  The kind that Whiting-Turner had I wasn't

19   familiar with as much as other ones, but they are

20   basically the same thing.

21      Q.   Did Eric show you how to use a digital

22   transit?

23      A.   Yes.  Me and Chuck Bender, we worked on --

24   we pushed buttons and it is a newfangled thing and it
```

126

1   sets itself.

2          MS. CESARANO:  Okay.  That's it.  That's all

3      I have.

4          (Thereupon the taking of the deposition was

5      concluded.)

6

7
                        JAMES BUSH
8

9          Sworn to and subscribed before me this

10              day of                    2000.

11

12
                     Notary Public
13

14

15

16

17

18

19

20

21

22

23

24

127

1                              CERTIFICATE OF OATH

2

    STATE OF FLORIDA
3     COUNTY OF MIAMI-DADE

4

           I, the undersigned authority, certify that
5     JAMES BUSH personally appeared before me and was duly
    sworn.
6                       WITNESS my hand and official seal this 6th
    day of July 2000.
7

8
                    AMY MASSENGALE
9                          Notary Public - State of Florida
                    My Commission No. CC543978
10                         Expires: March 31, 2004

11

12                    REPORTER'S DEPOSITION CERTIFICATE

13

    STATE OF FLORIDA
14    COUNTY OF MIAMI-DADE

15

           I, AMY MASSENGALE, Registered Professional
16    Reporter, certify that I was authorized and did
    stenographically report the deposition of JAMES BUSH;
17    that a review of the transcript was requested; and
    that the transcript is a true and complete record of
18    my stenographic notes.

19            I further certify that I am not a relative,
    employee, attorney, or counsel of any of the parties,
20    nor am I a relative or employee of any of the
    parties' attorney or counsel connected with the
21    action, nor am I financially interested in the
    action.
22
           DATED this 6th day of July 2000.
23
24
                AMY MASSENGALE

SMC COPY

DEPOSITION
EXHIBIT
2
6.15.00 PM

①      RACIAL DISCRIMINATION    NO REVIEW

ON MARCH 22, 1999 I TALKED WITH MR. JEFF COOPER (PROJECT-MANAGER) AND MR. ERIC PLOTKE (GEN SUPT.). MR COOPER TOLD ME, HE WANTED TO TALK TO ME WEEKLY. THAT WAS ONLY SMOKE IN THE TUNNEL, WE HAD NO CONVERSATION CONCERNING ME STAYING, GETTING A REVIEW FOR PROMOTION, NOTHING. I DID GET, YOU DID A GOOD JOB, COULDN'T DID IT WITHOUT YOU, YOU'RE A HARDWORKER. ONE POSITIVE THING MR COOPER SAID I QUOTE (YOU SHOULD'VE BEEN REVIEWED). 26 DAYS LATER AS 17 MONTHS BEFORE I JUST WANTED EQUAL TREATMENT, BUT I NEVER WAS REVIEWED. THIS AGAIN OFFENDED ME, HOW LONG CAN YOU BE HUMILIATED. MR JEFF COOPER TOLD ME IN NOVEMBER 1997 THAT I WAS GROSSLY UNDER PAID A + $1.10 PER HOUR ASST. SUPT. NO WHERE IS THERE AN ASST. SUPT WITH WHITING-TURNER, I CHALLENGED MR. ROB MITCHELL APRIL 16, 1999 BECAUSE I KNOW I'M RIGHT. THE ONLY COMPANY I'VE WORKED FOR WHERE, EXPERIENCE, DEDICATION, ENERGY GETS YOU NOTHING. MR. ERIC PLOTKE (GEN SUPT) TOLD ME THAT WHITING-TURNER WOULD HIRE 500 SUPERINTENDENTS IN 3 YEARS. I FELT THEY NEEDED 499, BECAUSE I COUNTED MYSELF AS ONE OF THE NEW SUPERINTENDENTS, I THOUGHT 31 YEARS IN SUPERVISION WOULD HELP ME, BUT WHAT HURT IS WHAT YOU CAN'T CHANGE, MY COLOR, MY AGE. MAYBE I'M WRONG, A COMPANY INVEST 22 MONTHS IN AN EMPLOYEE AND DON'T TRY TO NEGOTIATE TO KEEP HIM IS STRANGE. MY WIFE SAID IT WAS CLEAR I WASN'T NEEDED, BUT REJECTED, AND SHE FELT THAT AN EXPLANATION SHOULD'VE BEEN GIVEN. THIS WHY I REMINDED EVERYONE THAT I WAS NOT A ROOKIE, BUT OVER 34 YEARS IN THE INDUSTRY. I JUST HAD NOTHING TO INTEREST WHITING-TURNER MANAGEMENT. BUT SINCE 1964 THIS HAS BEEN MY ONLY SOURCE OF EMPLOYMENT

         WITH RESPECT ALWAYS

         JAMES T. BUSH SR.

②        AGE DISCRIMINATION

MY WIFE TOLD THREE OF OUR SONS, WHO ARE IN CON-
STRUCTION, ABOUT MY SITUATION WITH WHITING-TURNER. OUR SONS
WORKING IN THE CONSTRUCTION INDUSTRY ① A CARPENTER, ② PLUMBERS
THEY COULDN'T BELIEVE THAT, THIS WAS HAPPENING. SHE TOLD THEM
ABOUT NO CONSIDERATION FOR ADVANCEMENT. NO ONE TOLD ME OF
PLANS TO GO TO THE NEXT JOB. MY WIFE AND I THOUGHT THEY
WHITING-TURNER WOULD WAIT UNTIL THE JOB AT SAWGRASS WAS
ABOUT FINISHED, THEN THEY WOULD RELEASE ME. OUR SONS
FELT COLLECTIVELY THAT IT WAS AN AGE ISSUE, AND
NOT AN ISSUE OF EXPERIENCE, RESPECT FOR MY SUPERIORS,
HARD WORKING, DEDICATION TO MY DUTIES. I PREPARED MY
SONS FOR THEIR EMPLOYMENT, HOW TO KEEP A JOB BY RE-
SPECTING AUTHORITY, DO YOUR JOB, GO TO WORK ON TIME, AND
LEARN FAST. MY WIFE AND MY FAMILY AGREE THAT IF WHITING-
TURNER HAS A YOUTH MOVEMENT, THEY SHOULD'VE EXPLAINED MY
OPTIONS TO ME, TO FIND OTHER EMPLOYMENT, SINCE I WAS
NEVER REVIEWED BY THE VICE-PRESIDENT MR. ROB MITCHELL.
BY LEAVING, THE COMPANY I DID WHAT THEY COULDN'T DO.
WHAT IS THE POLICY, DEALING WITH PEOPLE OF COLOR. FORGET
ABOUT THE 34½ YEARS, THEY (I) HAVE STRUGGLED TO STAY IN
THIS INDUSTRY, THE COUNTLESS TIMES I WAS IDENTIFIED AS
AN ASST. SUPT. I PAID MY DUES TO BE TREATED LIKE EVERY-
BODY ELSE. IN 1964 THESE ACTIONS WERE TOLERABLE. THANKS TO
WHITING-TURNER MANAGEMENT FOR THE WAY YOU CARE ABOUT
YOUR MINORITY EMPLOYEE AND HIS FAMILY. BUT NO THANKS
FOR THE HURT WHITING-TURNER HAS DONE.

                     WITH RESPECT ALWAYS

# THE WHITING–TURNER CONTRACTING COMPANY
## Equal Employment Opportunity Statement
### and
### Affirmative Action Program

1.   It is the policy and employment practice of The Whiting–Turner Contracting Company not to discriminate against any qualified applicant for employment, or any qualified employee because of race, color, religion, age, sex, citizenship, national origin, or a disability, particularly with regard to employment, upgrading, demotion, transfer, recruitment and recruitment advertising, lay–off and termination, compensation, apprenticeship and training, and work conditions.

2.   It is the policy of The Whiting–Turner Contracting Company to participate in an Affirmative Action Program set forth in Executive Order 11246 with specific attention to minority or female recruitment, training, upgrading and promotion.

3.   It is the policy of The Whiting–Turner Contracting Company not to discriminate against any employee or applicant for employment because he or she is a disabled Veteran or Veteran of the Vietnam Era, or because of physical or mental handicap in regard to any position for which the employee or applicant is qualified.

4.   Whiting–Turner seeks the inclusion of qualified employees on a non–discriminatory basis in any apprenticeship, on the job, night school, or supervisory programs in which the company participates to assist in locating, qualifying and increasing the skills of its employees. All female and minority employees are encouraged to refer other qualified persons for possible employment.

5.   Any employee who is desirous of participating in any of the training programs, or of advancing in a particular skill or trade, or of being considered for supervisory capacity is encouraged to contact his or her job superintendent for information. In the event that the superintendent is unable to supply the information or he or she desires additional information, the Company EEO Officer, Robert J. Kimmons, can be contacted at the Main Office, 410–821–1100.

6.   Any complaint of discrimination should be reported immediately to the project EEO Officer or if he or she is not readily available, contact the company EEO Officer, Robert J. Kimmons, should be contacted at the Main Office, 410–821–1100. Investigation and resolution will be made promptly upon receipt of the complaint and within the time frames established by the respective agencies.



Robert J. Kimmons
Vice President and EEO Officer

12.3

ON OCTOBER (10 997 Approx) I WAS INTRODUCED TO A SUPERINTENDENT
AT CARMAX PROJECT ON 595 IN BROWARD COUNTY. THE NAME GIVEN
ME OF THE SUPT., WAS, IVAN. THE CARPENTER FOREMAN TOLD HIM MY
NAME (JAMES BUSH). JERRY THE CARPENTER FOREMAN ASKED THE
SUPT.(IVAN) WHAT HE WANTED ME TO WORK ON. IVAN SUPT. TOLD
JERRY (FOREMAN) I QUOTE (IF YOU CAN'T FIND SOMETHING FOR HIM (JAMES)
TO DO, THEN FIRE HIM. 35 YEARS AGO THIS WAS NORMAL TO DO TO
WORKERS, RACIAL TONES, WE EXPERIENCED ALL THE TIME, I HAD BEEN
ON THE RECEIVING END A LOT BUT NOT IN 1997. I WOULD LIKE TO
THINK WE ADVANCED FROM THIS LEVEL THEN I TOLD IVAN (SUPT) THAT
I QUOTE (YOU DON'T HAVE TO FIRE ME, I HAVE THE KEYS TO MY CAR
I COULD LEAVE) AND THATS WHAT I DID. I CALLED ERIC PLOTLE (GEN
SUPT) HE TOLD ME TO GO BACK TO SAWGRASS PROJECT, AND THEN
WHAT I DID. FOUR DAYS I WAS TOLD BY ERIC PLETKE (GEN-SUPT)
TO GO BACK TO CARMAX PROJECT AND HE WOULD BE THERE. WHEN
MR PLETKE CAME, HE GAVE ME, MY SCOPE OF WORK, HE NEEDED ME
TO PERFORM. AFTER A COUPLE OF DAYS, AGAIN IVAN (SUPT.) DROVE UP
IN HIS TRUCK, ALONG WITH HIM WAS, THE (PROJECT ENGINEER) DENIS CLEM.
IVAN SUPT GETS OUT OF HIS TRUCK, BEGAN YELLING AT ME, ACCUSING
ME OF LETTING OUR CREW MEN, TAKE TO LONG FOR LUNCH. ALL THE
LABORERS WERE STANDING UP EXCEPT 4, WE WERE WAITING ON THE
CONCRETE TRUCK TO POUR WHITING-TURNERS CONCRETE. IVAN (SUPT)
ASKED ME I QUOTE (WHO'S IN CHARGE) I TOLD HIM I QUOTE (YOU GOT
AN ASST SUPT, 3 FOREMANS, CARPENTERS, AND LABORERS I'M DOING
WHAT I'VE BEEN TOLD). AT THAT TIME IVAN (SUPT) REMARKS WERE
I QUOTE (I DON'T KNOW YOU FROM ADAM) AT THAT TIME WITH
HIS TONES, I FELT DISRESPECTED IN FRONT OF MY CREW, WHICH
WERE ALL BLACK. THE LANDSCAPERS, THE STRIPERS, INSTALLED PEOPLE

THE CONCRETE, XX DRIVER. WHEN THIS HAPPENED I FELT
AS I DID, BACK IN THE EARLY 60's, WHEN THESE SORT OF ACTIONS
WERE ACCEPTED. I WAS APPALLED AT THIS, WE CLEARLY WORKING FOR
THE SAME COMPANY, SO AS BEFORE I LEFT THE JOB. BEFORE I
LEFT, A BLACK ELECTRICIAN TOLD ME, HE IVAN (SUPT) HAS HAD
PROBLEMS WITH A LOT OF BLACK WORKERS. THE NEXT DAY I TOLD
MR PLOTKE (GEN SUPT) WHAT HAD TRANSPIRED WITH IVAN (SUPT).
MR CLEM (PROJECT ENGINEER) ALSO TOLD MR RO.B. MITCHELL VICE-
PRESIDENT. A COUPLE OF MONTHS LATER I WAS TOLD THAT, IVAN (SUPT)
WAS GOING TO COME TO SAWGRASS PROJECT. MR ERIK PLOTKE TOLD ME
NOT TO PAY HIM ANY ATTENTION, AVOID HIM. I FELT THAT THE (VICE-
PRESIDENT) ROB MITCHELL, ERIK PLOTKE (GEN SUPT.) SHOULD BE TREATED
THIS DIFFERENT A RACIAL INCIDENT THAT HAPPENED OUT HERE SHOULDVE
BEEN BROUGHT TO THE TABLE, DISCUSSED, TO PREVENT RACIAL HARDSHIP.
ON THAT DAY WHEN THE SECOND INCIDENT HAPPEN I WAS MAD ENOUGH
TO PROBABLY FIGHT IVAN (SUPT) BECAUSE OF THE RACIAL OVERTONES. FOR
ME IT'S NOT OVER, IT WAS NEVER RESOLVED. I MADE SURE ENOUGH
PEOPLE WITH WHITING-TURNER KNEW ABOUT IT. MAYBE THE MANAGE-
MENT OF WHITING TURNER FEEL THAT TIME WILL HEAL ALL WOUNDS.
BUT FOR ME AND MY FAMILY, MY RACE, ALL MY CHILDREN,
25 GRANDCHILDREN, FOR US THE WOUND SHOULDN'T HAVE HAPPEN.
MAYBE WHITING-TURNER HAVE THE ANSWER TO THIS MATTER,
MAYBE MY WIFE IS RIGHT, THIS WAS RACIAL AND WHITING-
TURNER MANAGEMENT LET IVAN (SUPT) GET AWAY WITH IT.
IT DON'T SURPRISE ME AND MY WIFE, IT JUST OFFENDS US.

                        WITH RESPECT
                        JAMES T. BUSH SR.

ON MARCH 22, 1999 IN A MEETING WITH MR JEFF COOPER (PROJECT MANAGER), MR ERIC PLOTKE (GEN SUPT) I MENTIONED TO THEM ABOUT MY TITLE ON MY CHECK. WHEN I CAME TO WHITING-TURNER I CAME TO WORK AS A FOREMAN (LABORER) IN JUNE 1997 (APPROX 5). IN OCTOBER, AFTER MY PERFORMANCE, MY SKILLS, MY ENERGY AS A FOREMAN AT THE BLOOMINGDALE PROJECT, I WAS TOLD I WOULD BE AN ASST. SUPERINTENDENT. FOR 5 MONTHS AFTER BEING MADE ASST. SUPT., I STILL WAS PAID AS A LABOREL FOREMAN. AND THATS HOW MY CHECK READ. ON JANUARY 13, 1999 ERIC PLOTKE (GEN SUPT) BROUGHT ME MY CHECK IN THE FIELD. AT THAT TIME ERK PLOTKE (GEN SUPT) MADE A COMPARISON WITH MY CHECK, THE CARPENTER FOREMAN, LABORER FOREMAN CHECK, AND HE ACKNOWLED THAT MY PAY WAS LOW. MR PLOTKE SAID THAT MAYBE HE WOULD PUT ME BACK HOURLY, I TOLD HIM (MR PLOTKE) THAT YOU DO THE PAYROLL. ON THE 27 OF JANUARY 1999 I RECEILED A CHECK, SAME AMOUNT, BUT WHAT CAUGHT MY EYE WAS MY TITLE CHANGE, WHICH SAYS (UBER SUPT). I'M VERY OFFENDED, WHITING-TURNER COULD CHANGE MY STATUS, BUT NOT REVIEW ME AND GIVE ME A RAISE, AS OTHERS. I TALKED TO MR ROB MITCHELL (VICE-PRESIDENT) HE TOLD ME I QUOTE (PAYROLL IN BALTIMORE HAD MADE THIS ON MY CHECK). IT MIGHT NOT MEAN MUCH, BUT I WAS WORKED IN THE CAPICITY OF A ASST. SUPT, 15 MONTHS LATER I'M STILL NOT CLASSIFIED AS AN ASST. SUPT. I DON'T FEEL PAYROLL SHALL CLASSIFY ME, BUT THE MANAGEMENT PEOPLE ON MY PROJECT. THIS IS HIGHLY DISCRIMINATORY AND IT WASN'T CORRECTED. MY LAST CHECK READ THE SAME WAY. MAYBE I WAS NEVER AN ASST SUPT, JUST WORKING IN THAT CAPICITY. SOMETHING IS WRONG

Is THIS A DOUBLE STANDARD PRACTICE, BIG COMPANIES CAN DO WHAT THEY WANT, THEY CAN GIVE OR TAKE, WHAT EVER THE CASE MIGHT BE, MY FAMILY NEED TO KNOW. THIS IS VERY ALARMING, ESPECIALLY AFTER A INDUSTRY HAVE BEEN SO GOOD TO ME AND MY FAMILY. MAYBE IF PAYROLL DEMOTED SOME OTHERS, THEY MIGHT FEEL LIKE I DO, IF PAYROLL HAVE TO DO THE REVIEWING ON AN EMPLOYEE. ITS REAL BAD AND IT HURTS, NO ONE COULD SEE NOTHING YOU'VE DONE IN 15 MONTHS ON A PROJECT. I'M REAL HAPPY FOR THE ONES WITH WHITING-TURNER THAT CAN GET PROMOTIONS. REVIEWS, TITLE CHANGES, BUT NOT WHAT HAS HAPPENED TO ME. SOME WHERE IN YOUR 90 YEAR COMPANY, THERE SHOULD BE A POLICY. BUT WHITING-TURNER DON'T HAVE TO APOLIGIZE, TO THE MANAGEMENT THEY FEEL NO HARM DONE, TELL ME ITS AN ERROR, THAT HAS HAPPENED SINCE JANUARY. TELL ME IT HAPPEN ALL THE TIME, COMMON OCCURENCE. WHEN WE GET BACK TO REALITY, I DON'T THINK SO. AGAIN I'M OFFENDED BY THIS, AND WHITING-TURNER WAY OF CORRECTING THIS MATTER, HAS WENT UNDONE. LET'S SAY IF THIS WAS ONLY 1949 OR 1959, WITH MY FATHER WORKING, IT WOULD BE BUSINESS AS USUAL, BUT 1997-1999 ON MY FAMILY WANT ANSWERS, THEY MIGHT BELIEVE WHITING-TURNER MANAGEMENT

WITH RESPECT

JAMES T. BUSH SR.

| CO. | DIV. | EMPLOYEE | | TRADE | | PERIOD END DATE | DEPT./LAST JOB | CHECK NO. |
|-----|------|----------|--|-------|--|-----------------|----------------|-----------|
| 01 | 000 | 00 21868 JAMES T BUSH | | LABOR SUPT | | 04/11/1999 | 7580 | 044993 |

| EARNINGS | | | | DEDUCTIONS/BENEFITS | | | |
|----------|--|--|--|---------------------|--|--|--|
| DESCRIPTION | HOURS | RATE | AMOUNT | DESCRIPTION | AMOUNT | Y.T.D AMOUNT | |
| REGULAR | 40.00 | 15.700 | 628.00 | DUES | 18.85 | 282.75 | |

PLEASE CHECK YOUR ADDRESS AND SOCIAL SECURITY NUMBER

| | | | | | | | |
|--|--|--|--|--|--|--|--|
| CURRENT | 628.00 | 70.69 | 48.05 | | | 118.74 | NET PAY |
| Y.T.D | 9,420.00 | 1,061.56 | 720.75 | | | 18.85 | |
| | GROSS EARNINGS | FEDERAL WITH. TAX | F.I.C.A | STATE TAXES | LOCAL TAXES | TOTAL TAXES/DED. | *****490.41 |

EEOC/BUSH 112

ON APRIL 16, 1999, MY LAST DAY WITH WHITING-TURNER I was
ASKED BY MR. JEFF COOPER TO ATTEND A PICTURE TAKING SESSION
AND LUNCH WITH SAWGRASS MILLS. MY WIFE AND I DISCUSSED
IT AND WE THOUGHT IT BEST I DIDN'T ATTEND. FOR ME AND MY
WIFE, OUR STRUGGLE CONTINUES, FOR EQUALITY. SO THE
16 APRIL 1999 WAS THE DAY I BECAME UNEMPLOYED., THAT'S NOT
A TIME OF RIVALRY, OR TO REFLECT BACK OVER 18 MONTHS,
THAT I FEEL I WAS TREATED UNFAIRLY. THE TIMES I WOULD
AS EVERYBODY, JUMP THRU THE HOOP, FOR THE MILLS CORP.
IF THINGS WOULD'VE BEEN DIFFERENT FOR ME I WOULD'VE HAVE MIND, BUT I
WAS CLEARLY OVERLOOKED. MY COLOR REALLY HURT ME,
NOT MY EXPERIENCE OR MY DEDICATION TO MY JOB, THANKS
FOR THE OFFER TO TAKE A PART, BUT I NEEDED AN OFFER TO
BE REVIEWED, TREATED AS EVERYBODY US. IN 18 MONTHS I TURNED
DOWN FOOTBALL, BASEBALL, HOCKEY, AND BASKETBALL TICKETS
SINCE I CAME TO SAWGRASS, NOT GOING TO ANYTHING. ALL I WANTED
WAS MY SHARE OF THE CHAIN. A PLATE OF FOOD AND A PICTURE
IS FAR SHORT OF WHAT, I BELIEVE I SHOULD'VE HAD AND AGAIN
MY WIFE AND I ARE OFFERED. ACCORDING TO MR. JEFF COOPER
(PROJECT MANAGER) AND MR. ERIC PLOTKE (GEN SUPT) I CLEARLY
DID MY JOB, WHAT I WAS HIRED TO DO. I WOULD'VE NEVER
LEFT WHITING-TURNER AS LONG AS THEY WORK FOR ME TO, BUT
I GAVE WHITING-TURNER 17 MONTHS AND 25 DAYS TO OFFER
ME A REVIEW FOR PROMOTION. EVEN AFTER 2 CONVERSATIONS WITH
MR. ROB MITCHELL (VICE-PRESIDENT) THE FOOD AND THE
PICTURES WAS NOT FOR MY 18 MONTHS ON THE SAWGRASS
PHASE III PROJECT.                               THANKS
                                        JAMES T. BUSH SR.

EEOC/BUSH 113

IN OCTOBER WHEN WHITING-TURNER WAS BIDDING ON A SHOPPING CENTER IN WEST PALM (WELLINGTON). CERTAIN PERSONELL WAS PICKED TO TAKE PICTURES, PRESENT RESUMES FOR THE PRESENTATION TO OWNERS OF WELLINGTON. I WAS OFFENDED, I WASN'T ASKED TO TAKE A PICTURE OR TO BRING IN A RESUME. SOMEONE SHOULD'VE EXPLAINED TO ME, THAT I WASN'T NEEDED FOR THE JOB, MY CREDENTIALS WERENT GOOD ENOUGH. MY RESUME SHOWING 31 YEARS IN SUPERVISION, OR MY COLOR MIGHT, JUST MIGHT HAVE HURT THEIR CHANCES FOR THE JOB, I GUESS WE'LL NEVER KNOW. WHEN I TOLD MY WIFE, SHE WAS HIGHLY OFFENDED. I THINK 34½ YEARS IS IMPRESSIVE IN ANY CAREER, IT ALSO HELPS WHEN YOU'RE 31 IN SUPERVISION. I FELT ME BEING INCLUDED, WOULDN'T HAVE HURT THIS COMPANYS ENDEAVORS TO GAIN THIS JOB. BUT WHITING-TURNER COULDN'T CHANCE HAVING A BLACK 52 YEAR OLD MAN HURT THEIR PRESENTATION. I TALKED TO MR ROB MITCHELL VICE-PRESIDENT DID WE (WHITING-TURNER) RUN OUT OF FILM, OR WAS IT BY DESIGN, THAT I BE SNUBBED, LOOKED OVER, NO INCLUDED I'M NOT AS SMART, MAYBE BUT IF A CAMERA ON THE JOB TO TAKE PICTURES OF THIS SORT, I WOULD'VE TAKEN PICTURES OF ALL SUPERVISION AND USED PICTURES FOR ANOTHER JOB, OR TELL THE BLACK MAN, THE PICTURES WILL BE USED FOR ANOTHER JOB ANYWAY, TO MAKE THE BLACK SUPERVISOR THINK WHITING-TURNER IS BEING FAIR.

WITH RESPECT ALWAYS

James P. Bush

EEOC/BUSH 114

IN OCTOBER 19,8 WHITING-TURNER HAD A SCHEDULED EEO MEETING TO BE HELD IN OUR OFFICE TRAILER. ALL SUPTS, ASST SUPT, PROJECT ENGINEERS, PROJECT MANAGERS WERE TO ATTEND. A FEW MINUTES BEFORE THE MEETING STARTED, ERIC PLOTKE (GEN SUPT.) ASKED ME I quote (TO MAKE SURE WE HAVE ORANGE FENCING AROUND ALL TREES ON MAINSTREET, BECAUSE MR. BOB JONES (MILLS CORP) WANTED IT DONE. SO I LEFT THE TRAILER TO MAKE THIS HAPPEN, BY DOING THIS I MISSED THE EEO MEETING. MY WIFE ASKED ME HOW MANY PEOPLE WE HAD IN THE FIELD WITH RADIO'S. I TOLD HER WE HAD 4 CARPENTER FOREMAN Hugo SUSA, A LABOR FOREMAN ALVIN BARBER, A CARPENTER JOHN GORDY AND ANOTHER CARPENTER ROBERT BRIDGES, WHO WERE ABLE TO GET THIS DONE. BUT THIS WASN'T MY CALL, I DID WHAT I WAS TOLD. NO ONE SEEM TO MISS ME AT THE MEETING, A FEW WEEKS LATER THE SECRETARY FOR WHITING-TURNER ASKED ME DID I ATTEND THE MEETING, I SAID NO, I DIDN'T ATTEND. I'M OFFENDED BECAUSE EVEN IF I WAS SENT IN THE FIELD TO GET A PROJECT DONE, WHERE 4 OTHER PEOPLE SHOULD BE BEEN ABLE TO DO, I STILL SHOULD'VE RECEIVED A EEO BOOKLET, SO I WOULDN'T BE IN THE DARK CONCERNING SOME OF THE SAME ISSUES WE'RE WRITING ABOUT NOW. ON MARCH 22, 1999 10:18AM I ASKED ERIC PLOTKE (GEN-SUPT.) AND MR JEFF COOPER (PROJECT MANAGER) I quote WHO IS THE EEO OFFICER ON THIS PROJECT AND HOW COME INFORMATION CONCERNING THE EEO ISSUE IS NOT POSTED. IN 17½ MONTHS I DIDN'T SEE NO POSTING. AGAIN THIS IS CLEARLY NOT MY FAULT. WITH WHITING-TURNER POLICY SAYING THAT THIS INFORMATION SHOULD'VE BEEN THERE THROUGHOUT JOB.                    THANKS AND RESPECT,

I JAMES T. BUSH SR. CAME ON THE SAWGRASS PHASE III
PROJECT OCTOBER 1997 (APPROX THE 12). I WAS THE FIRST
WHITING-TURNER EMPLOYEE ON THE JOB. I WAS TOLD MY TITLE
WAS ASST. SUPERINTENDENT, THIS IS HOW I WAS INTRODUCED TO
CITY OF SUNRISE DEPARTMENTAL INSPECTORS, THE MILLS CORPORATION,
ALL SUB-CONTRACTORS, WHITING-TURNER PERSONELL. A MONTH OR
SO LATER AFTER THE PROJECT WAS PROGRESSING, WHITING-TURNER
BEGAN A SAWGRASS PHASE III DIRECTORY. THIS DIRECTORY LISTED
ALL SUB-CONTRACTORS, ENGINEERING, ARCHITECTS ETC. SEE ATTACHED
COPY OF DIRECTORY. ABOUT 12 MONTHS OF THIS DIRECTORY BEING
DISTRIBUTED, AT NO TIME WHERE WHITING-TURNER ON SITE CONT-
RACTOR APPEARED WAS JAMES BUSH INCLUDED. I'M OFFENDED
HIGHLY, HOW CAN YOU, FOR A YEAR NOT INCLUDE A MEMBER OF
THE COMPANY, AN EMPLOYEE, A PERSON IN SUPERVISION, A FLORIDA
TEAM MEMBER, SAME UNIFORM PLAYER, TEAM MATE, ETC. ONE
SUB-CONTRACTOR ASKED ME I QUOTE (JAMES HOW COME YOU DIDN'T
MAKE THE DIRECTORY) I SAID I QUOTE (JAMES IS STILL IN A STRUGGLE
TO EXIST WITH WHITING-TURNER) ITS A HURTING, SINKING FEELING
TO BE SNUBBED. LOOKED OVER, TREATED LIKE A BLACK SHEEP, AND
STILL SHOW LOYALTY, AND PUSH, SHOVE TO GET YOUR WORK DONE.
I WORKED SATURDAYS AND SUNDAYS FEELING, THAT IN CASE SOMETHING
WOULD'VE HAPPENED, I WOULD'VE HAD TO CALL SOMEONE IN
AUTHORITY. I WASN'T TRUSTED TO MAKE A DECISION, THAT'S WHY
I DIDN'T MAKE THE DIRECTORY LIST. MY WIFE AND I WERE JUST
DEVASTATED, TO THINK THIS, BUT WE HAD NO OTHER EXPLANATION.
MY WIFE AND MYSELF, OUR SYNOPSIS IS THAT, THIS WAS NO
OVERSIGHT, THIS WAS INTENDED TO FURTHER HUMILIATE ME.

I THOUGHT & T OF ALL THE DIRECTORYS, I SHOULD VE ADDRESSED
ATLEAST ONCE. No ONE WITH WHITING-TURLER ON SITE HAS
WEATHERED MORE STRUGGLES IN THIS INDUSTRY THAN ME.
NONE OF THE WHITING-TURNER PERSONEL ON THIS PROJECT COME
CLOSE TO MY 34½ YEARS. IM HIGHLY OFFENDED THAT WHITING-
TURNER DIDN'T THINK I RATED ENOUGH AFTER 22 MONTHS TO
BE LISTED AS A PERSON OF AUTHORITY, IN OTHER WORDS, A GO
TO PERSON. I FEEL THAT IF ONLY I WAS OF ANOTHER RACE, WITH
34½ YEARS, THEN I COULD'VE BEEN TREATED FAIRLY, BUT MY
WIFE AND I AGAIN ATTRIBUTE THIS TO COLOR AND MY AGE.
BUT I WANT WHITING-TURNER TO KNOW THAT I'M NOT ASHAMED
OF MY YEARS IN THIS INDUSTRY, RAISING 9 CHILDREN, AND FOR
DEFINITE I'M NOT ASHAMED OF MY COLOR. AFTER 90 YEARS
IN BUSINESS, REGARDLESS OF LOCALE, ACROSS THIS NATION, AGAIN
WE SHOULD BE BEYOND, COLOR BEING A BARRIER, A HURDLE, A FENCE
TO STOP LIMITATIONS OF OTHERS. THERE'S LOTS OF WAYS TO BE
FAIR, WHITING-TURNER, SHOULD SEEK TO FIND THEM. FOR ME
AND MY WIFE, SOMETHING AS THE DIRECTORY, COULD'VE BEEN
EASILY MENDED, JUST THE LISTING OF MY NAME, 9 LETTERS,
COULD'VE MADE ALOT OTHER MATTERS GO AWAY.

WITH RESPECT ALWAYS
JAMES T. BUSH SR.

EEOC/BUSH 121

**EGAL COUNSEL:**

| | | | |
|---|---|---|---|
| Aastriana & Christiansen | Ron Mastriana | Phone (954) | 566-1234 |
| 750 N. Federal Highway | Steve Hoffman | FAX   (954) | 564-0222 |
| ort Lauderdale, FL 33306 | | | |

**GENERAL CONTRACTOR - OFFICE:**

| | | | |
|---|---|---|---|
| he Whiting-Turner Contracting Co. | Rob Mitchell | Phone (954) | 776-0800 |
| 000 Corporate Drive, Suite 290 | | FAX   (954) | 776-0797 |
| ort Lauderdale, FL 33334 | | | |

**GENERAL CONTRACTOR - ON SITE:**

| | | | |
|---|---|---|---|
| awgrass Mills Jobsite | Kit Fawthrop | Phone (410) | 821-1100 |
| 2801 W. Sunrise Blvd. | Jeff Cooper | Pgr   (954) | 528-5199 |
| unrise, FL 33323 | Sergio Tio | Cell   (954) | 614-0591 |
| | | Pgr   (954) | 409-5156 |
| | Eric Plotke | Cell   (305) | 606-0850 |
| | | Pgr   (954) | 528-4967 |
| | Chuck Bender | Cell   (954) | 648-2145 |
| | Omar Sweeney | Phone (954) | 858-9991 |
| | Ray MacKeen | Phone (954) | 858-9991 |
| | Noreen Niamath | Phone (954) | 858-9991 |
| | Shamia Blanchett | Phone (954) | 858-9991 |
| | | FAX   (954) | 858-1406 |

**UTILITY LOCATOR SERVICE:**

| | | | |
|---|---|---|---|
| ≈ Dig | David Coover | Phone (954) | 476-0813 |
| .51 N. Oakland Forest Drive | | FAX   (954) | 486-4361 |
| .land Park, FL 33309 | | Pgr   (888) | 779-2930 |
| 9 S. Bolmer Street | Jim Sweat | Phone (800) | 545-1531 |
| ). Box 39 | | Phone (610) | 696-9220 |
| est Chester, PA 19381 | | FAX   (610) | 344-7519 |

**TEWORK -- 02A:**

| | | | |
|---|---|---|---|
| .. Hardy, Inc. | Jack Hardy, President | Phone (954) | 583-8945 |
| 25 S.W. 67th Terrace STE #101 | *JACK PORTER* | FAX   (954) | 581-7392 |
| vie, FL 33314 | Jen Hilley, PM | Cell   (954) | 610-8526 |
| | *LUYI* | | |

**NDSCAPE / IRRIGATION -- 02B:**     **EEOC/BUSH 122**

| | | | |
|---|---|---|---|
| .ie Landscape Co., Inc. | Jeff Reamer | Phone (305) | 884-5700 |
| 50 N.W. 113th Court | Mike Glynn, PM | FAX   (305) | 884-8843 |
| .ni, FL 33178 | *LENO* | | |
| | *DAVIO* | | |
| | *JAVIER* | | |

RACIAL DISCRIMINATION    (TOKEN)

⑨

I JAMES T. BUSH AND MY WIFE, FEEL THAT MY EMPLOYEMENT
AT WHITING-TURNERS SAWGRASS MILLS PROJECT, WAS NEVER
SUPPOSE TO WORK FOR US. MY WIFE OF 31 YEARS TOLD ME
I QUOTE (WHITING-TURNER HAVE NO PLANS FOR YOU FOR ADVANCEMENT,
YOU'RE JUST THERE TO FULFILL A QUOTA. WHEN THE JOB IS FINISHED
YOU WILL BE LAYED OFF OR FIRED. AND THEY WILL NOT OFFER YOU
ANOTHER DIME TO STAY. THEIR AIM WAS TO HAVE A MINERITY
PERSON, SHOWCASED TO THE MILLS CORP. I BELIEVE WITH MY
WHOLE HEART I'M RIGHT.) END OF QUOTE. ON APRIL 16, 1999 AT 9:47AM
I MENTIONED THIS ISSUE TO MR ROB MITCHELL VICE PRESIDENT AND HE
DENIED IT. ALSO I MENTIONED THIS TO MR. ERK PISTKE ABOUT THIS
ISSUE, HE BEING THE GEN. SUPT ON THE PROJECT, HE ALSO DENIED IT.
BUT I HAVE TO RESPECT MY WIFE VIEWS, WHATEVER AFFECT ME,
AFFECTS MY WIFE. ON AUGUST 20, 1998 IS WHEN SHE TOLD ME
THIS. FROM THE TIME SHE TOLD ME, 239 DAYS AGO, JUST A LITTLE
SHY OF 18 MONTHS ON THIS PROJECT, 2 BIRTHDAYS HAVE CAME, THREE
MORE GRAND CHILDREN BORN, I COULD GO ON. SOME WHERE IN WHITING-
TURNERS POLICYS, IT SHOULD ADDRESS, THE EFFORTS, EXPERIENCE,
DEMEANOR, CHARACTER, ATTITUDE, ECT, OF THE EMPLOYEES. I
SUPPORT MY WIFE VIEWS, BECAUSE WE'RE IN THIS TOGETHER.
EVERYTHING WE HAVE, SHE WAS THERE, SHE MAKES MY FAMILY
COMPLETE, HER IMPUT IN THIS PECULIAR SITUATION FOR US. I HAVE
NO OFFER FOR REVIEW, I HAD NO OTHER JOB OFFER WITH
WHITING-TURNER UNTIL APRIL 16, 1999, BY MR ROB MITCHELL VICE PRES.
WE FILL WITH 35 YEARS IN THE INDUSTRY, COME SEPT 17, 1999, I SHOULD
HAVE BEEN TREATED FAIRLY, INSTEAD FOR ALL THESE MONTHS WERE
BEING OFFENDED AGAIN.                    THANKS WHITING-TURNER
                                          JAMES T. BUSH SR.

EEOC/BUSH 123

(10)                    DI RACIAL DISCRIMINATION    (POLICY)

I JAMES T. BUSH SR. FOUND THAT, BY ME NOT HAVING A
REVIEW, I DIDN'T RECEIVE A SUPERINTENDANT'S MANUAL, NO EEO
INFORMATION. I'M OFFENDED BECAUSE BEING AN MINORITY
EMPLOYEE, I SHOULD'VE RECEIVED THE INFORMATION PROVIDED BY
FEDERAL GOVERNMENT AND WHITING TURNER MANAGEMENT. NO
ONE AT NO TIME MADE ME AWARE OF THESE DOCUMENTS. I
DON'T THINK THIS INFORMATION SHOULD'VE BEEN KEPT AWAY
FROM ME FOR 22 MONTHS. THIS IS CLEARLY A BAD POLICY,
ONE LOOK AND YOU COULD REALIZE, I'M A MINORITY EMPLOYEE.
WHITING-TURNER EEO POLICY AND AFFIMATIVE ACTION PROGRAM
I BELIEVE, WAS PUT TOGETHER FOR EMPLOYEES THAT FIT MY DISCRAP-
TION. WHITING-TURNER SHOULD SPECIFY WHICH MINORITIES, WHO
APPLY, WHOSE INCLUDED, WHO THIS POLICY REPRESENTS, UNLESS
THIS POLICY DON'T EXIST. IF THIS IS THE CASE, THE FEDERAL
GOVERNMENT SHOULD KNOW, THAT THIS POLICY EXISTS ON
PAPER ONLY, SEE ATTACHED COPIES. I'M OFFENDED, MY WIFE
ALSO, THE FEDERAL CIVIL RIGHT ACT OF 1964, I CAN'T FORGET.
THAT'S THE YEAR I CAME INTO THE CONSTRUCTION INDUSTRY
HELPING BUILD A MISSILE BASE IN KEY LARGO, DURING THE CUBAN
CRISIS. FROM THAT TIME ON, I'VE FELT THAT, EVERYTHING I'VE
HELPED BUILD, IS BUILDING OUR NATION, BUILDING OUR FUTURE.
I REMEMBER WHEN THE CIVIL RIGHT ACT WAS IMPLEMENTED, I KNEW
IT WOULD HELP ME AS A YOUNG BLACK MAN OF 17 YEARS OLD.
NOW I'M ALMOST 53 YEARS OLD. AND I FEEL THAT'S THE LAW.
IF I MIGHT MAKE A CONCLUSION, I WOULD SAY TO WHITING-
TURNER MANAGEMENT, ADVERTISE THE POLICY, IF IT'S IN EFFECT,
DON'T SEND A SMOKE SCREEN.              THANKS
                        JAMES T. BUSH SR

EEOC/BUSH 124

THE WHITING-TURNER CONTRACTING CO.

January 1, 1993

## EQUAL EMPLOYMENT OPPORTUNITY POLICY
## AND
## AFFIRMATIVE ACTION PROGRAM

1.    It is the policy and employment practice of The Whiting–Turner Contracting Company not to discriminate against any qualified applicant for employment or any qualified employee, because of race, color, religion, age, sex, citizenship, national origin, or disability, with regard to employment, upgrading, demotion, transfer, recruitment and recruitment advertising, layoff and termination, compensation, apprenticeship and training, and working conditions.

The Contractor submits this plan and has instituted the steps necessary, as set forth in the plan, to assure compliance with the Civil Rights Act of 1964, Executive Order 11246 and any additional lawful orders and rules that pertain to this act and to reaffirm its continued commitment to a program of equal employment opportunity and merit employment policies.

2.    The Contractor's Equal Employment Opportunity Officer shall be Robert J. Kimmons, Vice President, 300 East Joppa Road, Baltimore, Maryland 21286. The EEO Officer is to coordinate and administer the Contractor's Affirmative Action Program and to investigate any compliant of discrimination, and if he finds such to be true, institute all necessary procedures to correct such discrimination. He is to periodically review the Contractor's AAP and initiate and establish as necessary any changes required to assure that the program does fulfill the company's obligation.

3.    The company's EEO Officer shall from time to time, as necessary to carry out this policy and employment practice, designate such Assistants and Project EEO Officers as may be required, and delegate certain responsibilities to other officers and supervisory personnel as may be in the best interest of this plan.



4.    The Contractor's EEO Officer shall inform and instruct new supervisory employees of the Contractor's policy of Equal Employment Opportunity in regard to hiring, promotion, demotion and termination of employees. The EEO Officer shall obtain the supervisory

12.4

EEOC/BUSH 125

⑪   RACIAL DISCRIMINATION   (OVERTIME PAY)

I James T. Bush Sr. in 1964 I joined the Laborers
Union Local #478 Miami Fla. I've been associated
since, never leaving the union. I came to Whiting-Turner
by referral as a union foreman, to the Bloomingdale
store Aventura, Fla. Whiting Turner has a collective bargaining
agreement with this union nationally. For 4 months June 1997-
Oct 1997 I was an laborer foreman, in October 1997 I was
appointed Asst. Supt. From Oct 1997 until March 1998 I was
paid as a labor-foreman, 13 months As a Asst. Supt. From
March 1998. Whiting-Turner hired another employee as
Asst. Supt, which was reviewed in 6 months. I feel that August
1998 I should've been reviewed also, for my abilities,
my work, my skill, instead no review for promotion.
I feel after 6 months no review, no raise, the company
should have to pay me for my overtime, according to
the agreement with the union from August 1998 until
April 16, 1999. Me still being union I shouldn't be
denied my overtime work on Saturdays and Sundays and
other days late, in which I performed my job. No one
discussed anything about promotion, a raise, someone should
have at least discussed this issue. I asked the question about
overtime in March, I thought I supposed to had received overtime
pay until, I was promoted thru my review. I'm offended and
hurt that the labor foreman, laborers all made more than
me, when Whiting-Turner offered this position, it was clearly
a demotion this should me investigated and it will.

                              Thanks   James T. Bush

EEOC/BUSH 126

A weekly salary shall be established prior to starting work in this capacity.

Employee receives normal benefits of salary, but is not to be paid overtime or vacation pay.

Temporary assignment is to be for a specific project only - new approval is required if assignment is to continue to another project.

Employee should be advised that if we mutually decide to continue his or her employment as a Superintendent (or Assistant Superintendent) on a permanent basis, it would be in accordance with our standard benefit plans. Union benefits would then cease.

 We will continue to pay union benefits for union employees on temporary superintendent assignments.

Temporary salaries should be arranged through the General Superintendent.

 All temporary and permanent Superintendent and Assistant Superintendent assignments and salaries are to be approved by the Executive Vice President.

<u>Local Union Agreements</u>

We are signatory to a limited number of local agreements; the duration and terms of which are constantly changing. Check the Project Managers Manual for the current status.

<u>Work Assignments</u>

<u>General Contract - Union Jobs</u>

Before starting construction on any job where there is Whiting-Turner "direct hire" work and there is doubt or question as to work assignments between the various trades, arrange a meeting with the union Business Agents involved to make the appropriate work assignments. Work assignments are only to be made by Project Managers or a Vice President. Refer to the "Impartial Jurisdiction Disputed Board Booklets", dated June 1, 1973 for procedures for assigning work.

If a jurisdictional problem arises, arrange a meeting between the union Business Agents involved and request they furnish to you all printed material available relative to the problem at hand. Let the Business Agents settle the dispute between themselves, if possible; if not, the Project Manager should make the assignment, using his/her best judgment.

A file of union contract and jurisdictional decisions is maintained by the Company.

Check with a Vice President on the states with Right-To-Work-Laws.

<u>Construction Management/General Contract Mixed - Union and Merit Shop</u>

Before awarding subcontracts:
Request the union subcontractors to obtain assurances (preferably in writing) from the unions they use that their members will work in harmony with Merit-Shop contractors.

Have a plan to set up two gates, one for the union subcontractors and the other for the non-union subcontractors. If a gate is needed, place signs listing the contractors that are to use

We will not release your paycheck to anyone other than you except with your written authorization. Remember also that we are required by law to make deductions from your paycheck for federal and state withholding taxes, and for social security taxes (FICA).

You may voluntarily authorize, in writing, additional deductions from your paycheck for items permitted by our Firm. It is your responsibility to be certain such deductions are correct.

### 3.6 ON CALL SERVICE

Providing service to our clients frequently goes beyond the limits of eight (8) hour work days and forty (40) hour work weeks. In order to meet customer demands during off-hours in an efficient manner, we follow a system of rotating some of our employees for weekly "on-call" status.

### 3.7 SUPERINTENDENTS

Overtime Payment



In general, Superintendents are paid on a weekly salary basis and do not receive extra compensation for overtime hours. For situations requiring continuous overtime, exceptionally long working hours or other special cases, obtain Executive Vice President approval before any exceptions are made.

Working Hour Requirements

The Superintendent should remain on the jobsite 100% of normal working hours.

If subcontractors are working on the jobsite after normal working hours, a Whiting-Turner Superintendent or a responsible representative must be present.

Field Records

Superintendents are required to keep a diary on all jobs, recording daily job conditions, progress, safety meetings, important verbal decisions and conversations with the Owner. The diary must be filed with the permanent job records upon completion of the work.

Superintendent's Manual

Consult the Superintendent's Manual for a complete description of duties, responsibilities and procedures concerning Superintendents and other field supervisory personnel.

### 3.8 FIELD LABOR/UNION

Labor

Union tradespeople are not to be paid at higher than prevailing rates; foremen and general foremen rates should not be more than required by the trade agreements.



Union employees are not to be utilized in supervisory management and/or administrative positions (other than as required by prevailing union agreements as foremen) without Senior Vice President approval. In the event such employees are to be considered for temporary assignments as Superintendents or Assistant Superintendents, the following shall apply:



1/99

(i)                    ON MARRIAGE

I JAMES T. BUSH SR, WRITING THIS LETTER, CONCERNING MY
MARITAL STATUS. WHILE EMPLOYED FOR WHITING-TURNER, LEADING UP
TO THE MONTH OF AUGUST 1998, THAT'S WHEN I THOUGHT I WOULD GET
A PROMOTION (RAISE). MY WIFE OF 31 YEARS RECOGNIZE THAT, FOR
THE FIRST TIME IN MY CAREER, THIS JOB WASN'T A FAIR WORKPLACE
FOR US. I CONSTANTLY TOLD ME WIFE ABOUT, MY REVIEW FOR A RAISE,
I TOLD HER IN 6 MONTH'S, SHE WOULD SEE THE DIFFERENCE IN MY
PAY CHECK. SHE BEGAN TO MONITOR MY MOODS, THE WAY I RESPONDED
TO HER, I BEGAN SPENDING A LOT OF TIME IN MY OFFICE AT HOME.
IN AUGUST ANOTHER EMPLOYEE, SAME POSITION AS MYSELF WAS
REVIEWED, WEEKLY SHE WOULD ASK ME TO THE POINT, WE BEGAN
TO CLASH, ARGUE OVER THIS SITUATION WITH WHITING-TURNER.
SHE ASKED ME I QUOTE (HOW CAN YOU HAVE LOYALTY TO WHITING-TURNER,
AND IT'S CLEAR, YOU'RE NOT APPRECIATED FOR WHAT YOU DO, AND THE
PROBLEMS IN OUR HOUSE ARE CAUSED BY WHITING-TURNER). I TOLD
MY WIFE I'M A PROFESSIONAL WORKER AND I HAVE AN OBLIGATION
TO WHITING-TURNER, TO DELIVER MY PART OF THE WORK, THAT I WAS
HIRED TO DO. OUR WEDDING ANNIVERSARY IS ON JUNE 12, I PROMISED
TO BUY NEW WEDDING RINGS, RENEW OUR WEDDING VOWS. I TOLD
HER TO WAIT UNTIL I'M REVIEWED. ON MOTHER'S DAY I PROMISED
NEW CARPET IN OUR BEDROOM, AGAIN THE REVIEW WAS MY
ANSWER. AFTER IT WAS APPARENT THAT, WHITING-TURNER
WAS NOT GOING TO REVIEW ME, THIS ESCALATED MY PROBLEMS
AT HOME. HER CAR WAS IN OUR YARD UNREPAIRED, SO SHE
WAS CATCHING BUSES TO TAKE CARE OF OUR AFFAIRS, WHILE
I USED THE OTHER CAR TO DRIVE 60 MILES A DAY TO MY
PLACE OF EMPLOYMENT. FROM OCT 1997 - JAN 1999. IN A
MEETING WITH MR PLOTKE (GEN SUPT) AND MR. JEFF COOPER.

EEOC/BUSH 129

MARRIAGE

① (PROJECT MANAGER) AND LATER WITH MR. ROB MITCHELL (VICE-PRESIDENT) OF WHITING-TURNER. I ASKED THEM (QUOTE WOULD YOU LET YOUR WIFE CATCH BUSES, AND HOW WOULD YOU LIKE IT). MY MARITAL STATUS REACHED AN ALL TIME LOW, WE WENT TO A COUPLE OF OUR FRIENDS, WHO ARE BOTH IN THE CLERGY, AND I ASKED THEM TO PRAY FOR ME AND MY WIFE, THAT OUR MARRIAGE PROBLEMS MIGHT IMPROVE. MY BELIEF IN GOD IS STRONG, BEING ORDAINED IN 1978 AS A DEACON, IN 1993 I WAS INSTALLED AS AN ELDER IN THE SAME CHURCH. BUT CLEARLY THE PROBLEM WASN'T OUR FAITH IN GOD, BUT MY WORK PLACE. MY WIFE MADE THE ULTIMATE SACRIFICE FOR ME TO, TAKE THE BEST TRANSPORTATION, TO MY JOB, WHILE I'M BEING HUMILIATED, MAKING LESS THAN EVERYBODY IN SUPERVISION. MY WIFE REMINDED ME WEEKLY, I QUOTE (YOU'VE GOT FRIENDS IN THE CONSTRUCTION INDUSTRY, YOU CAN EASILY GET A JOB). THAT'S THE FIRST TIME SHE'S EVER TOOK THIS APPROACH TO MY WORK. EVERY WEDNESDAY SHE BROUGHT THESE SAME ISSUES UP, ABOUT OUR FINANCIAL SITUATION, AND CONTINUALLY OUR PROBLEM IN OUR MARRIAGE. SHE TOLD SOME OF OUR CHILDREN, THAT WE WERE HAVING ARGUMENTS OVER THIS PROBLEM AT WHITING-TURNER. MY WIFE AND I HAVE RAISED ⑨ CHILDREN OVER 31½ YEARS, OUR STRUGGLES, OUR CONCERN, OUR HIGHS AND LOWS WE'VE SHARED. NOW NO FAIRNESS IN MY WORK-PLACE, HAVE CAUSED A LOT OF DAMAGE TO A 31½ YEAR RELATIONSHIP. MY WIFE IS MY BEST FRIEND, MY PARTNER, BEST MOTHER IN THE WORLD, MY CONFIDENT, MY SECRET KEEPER, SOMEONE WHO'S IN MY CORNER, MY PRAYER PARTNER, MY GROW OLD PERSON. I ALMOST LET (WHITING-TURNER WITH, THEIR UNFAIR TREATMENT, DOUBLE STANDARD, CAUSE THESE ILL FEELINGS, BETWEEN US. IT'S A SHAME, WE BEGAN TO ARGUE FREQUENTLY OVER, MY JOB, IT BECAME OUR MAIN TOPIC, LIKE AN OBSESSION.

EEOC/BUSH 130

MARRIAGE

③ OUR MAIN TOPIC USED TO BE, OUR 24 GRANDCHILDREN, BUT THE WHITING-TURNER ISSUE WOULD BECOME PARAMOUNT. LAST YEAR A MONTH BEFORE, HURRICANE GEORGES, WE DISCOVERED A ROOF LEAK ABOVE OUR BEDROOM, MY WIFE GOT A PRICE FROM OUR NEIGHBOR, WHOSE A ROOFER. I TOLD HER I WOULD PATCH THE LEAK FOR NOW, BECAUSE WE COULDN'T AFFORD IT. IT RAINED IN OUR BEDROOM, MY WIFE BECAME VERY BITTER, THEN SHE TOLD ME I QUOTE (YOU NEED TO QUIT THIS JOB IF WE'LL HAVE ANY CHANCE TO RESTORE OUR HOME, LIFESTYLE, FOR OUR MARITAL STATUS TO IMPROVE OR HEAL). I HAD NEVER SEEN MY WIFE AT THIS STAGE ABOUT ANYTHING OR ANYBODY. SHE BLAMED WHITING-TURNER AND SHE BLAMED ME FOR STAYING WITH WHITING-TURNER. IN OUR BEDROOM, THE PROBLEM WAS OF A GREAT MAGNATUDE, YOU CAN'T ARGUE AND BE PASSIONATE, THE TWO DON'T CORRELATE. IF SOMEONE WOULD HAVE SCALED ME ON SKILLS, PERFORMANCE, INSTEAD OF WHATEVER STANDARDS THEY USED, THIS WOULD BE NEVER HAPPENED. FAIRNESS COMES EASY. ON MARCH 22, 1999 IS WHEN I HEARD ACCOLADES, ABOUT THE JOB I'VE DONE, COULDN'T HAVE DONE IT WITHOUT YOU. THAT'S NO RELIEF FOR THE DAMAGE DONE TO ME AND MY WIFE OF 31 YEARS, THANKS ANYWAY. WHITING-TURNER IS NOT MY EMPLOYER, I QUIT AS MY WIFE HAD ASKED. BUT WHITING-TURNER HAS LEFT A LASTING GRIP ON MY WIFE AND MYSELF. HURTFUL SITUATIONS DON'T JUST VANISH, THEY HAVE TO GO AWAY WITH TIME. WHITING-TURNER IS GONE, NEVER WILL WE GO THAT WAY, BUT OUR STRUGGLE TO REDIRECT OUR LIVES IS STILL HERE.

FOR UNFAIRNESS

MR & MRS JAMES T. BUSH SR.

EEOC/BUSH 131

①      LIST OF JOB DUTIES

STUDY PLANS TO GET ACQUAINTED WITH PROJECT, GET WITH
SURVEYORS FOR FOOTPRINT OF BUILDINGS HELP SET UP SUB-
CONTRACTORS MEETINGS TO DISCUSS SCHEDULING, OF PROJECT.
MONITOR SUBS DAILY, WHITING-TURNER MANPOWER, KEEPING
A DAILY LOG. SET UP NECESSARY INSPECTIONS SUCH AS DENSITIES,
STURCTURAL STEEL, CONCRETE BLOCK GROUTING, METAL STUDS,
DRYWALL INSPECTION, CONCRETE CYLINDER TESTS, ROOF DECKS, ROOF
MEMBRANE, ROOF COPING. MONITOR STUCCO WORK, PAINTING, WALL-
DECKING, SUCH AS DENS GLAS, WIRELATH, STOREFRONT FRAMES, GLASS
PANELS, THRESHOLDS, CAULKING. MAKING SURE ALL INSPECTIONS ARE
LOGGED FROM FOUNDATIONS TO BUILDING FINALS FOR PERMANENT RECORD.
MONITORING ALSO ELECTRIC, PLUMBING, FIRE SPRINKLER, AIR CONDITIONING,
INSTALLATION OF DOOR FRAMES, DOORS AND HARDWARE. MONITORED
LAYOUT OF CANOPY FOOTINGS, ENTRY FEATURES, UMBRELLA FSBOTINGS,
COOL SPOTS, SOME TREES. SET UP REINFORCING (STEEL) PLACEMENT
INSPECTIONS, SET UP ALL CONCRETE FOR STRUCTURES (ENTRY FEATURES)
THAT COST OVER 1 MILLION DOLLARS, EXCAVATING, FORMWORK, POURING
A AVERAGE OF 57 YARDS AT EACH ENTRY FEATURE. INSPECTION OF
ALL THREE ENTRYS, STRUCTURAL FRAMES, CANVAS INSPECTION. EVERY
WEDNESDAY, ATTENDING SUB-CONTRACTORS MEETING AT 10:30 AM,
AT 9:30 AM, I CONDUCTED SAFETY MEETINGS FOR THE COMPANY.
I DID ALL BUT 3 MEETINGS (SAFETY) ON THIS PROJECT, I WOULD
SAY 99% OF THE SAFETY MEETINGS. I MONITORED THE PAVERS
ON MAINSTREET AND PAVER BANDS POURED AT 4 BUILDINGS. I
ASSISTED IN WORKING WHITING-TURNER EMPLOYEES, CARPENTERS,
LABORERS, AND RENTAL EQUIPMENT PERSONEL. AT TARGET
PARKING LOT AT SAWGRASS, I ASSISTED PROJECT ENGINEER
MR SERGIO TIO. FROM START TO FINISH. DOING UNDERGROUND

EEOC/BUSH 132

DUTIES

② At BUILDING #1, SETTING UP INSPECTION'S FOR UNDERGROUND PIPING, SANITARY, WATER LINES, SETTING UP DENSITY ON SOIL, TO BUILD SITE PAD FOR BUILDING, SECURING FOR CERTIFICATION FOR PAD, FOR BUILDING. I ASSISTED SERGIO TIO (PROJECT ENGINEER) WITH LANDSCAPING + IRRIGATION FROM START OF PROJECT MARCH 1998- APRIL 1999. I COORDINATED WITH TERRY WOLFORD (MILLS CORP) ON COMPLAINTS CONCERNING IRRIGATION TO PLANTS, ZONES OF WATERING, MAXICOM CABLE, DEAD PLANTS, DERUSTING OF TREES, TRANSPLANTING, BREAKS IN IRRIGATION PIPING. WORKING WITH WARREN'S CONCRETE ON SIDEWALKS AT BLDG #3, #2, #1 REGAL CINEMA, RED SNAPPER ENTRANCE, PEDESTRIAN WALKS (3) MY JOB INCLUDED MONITORING DUMPSTERS DAILY FOR ENTIRE PROJECT. MONITORING ALL SAFETY ISSUES DAILY, TO KEEP JOB SAFE.

JAMES T. BUSH

EEOC/BUSH 133

(1)                          SELF ESTEEM

COMING INTO THE CONSTRUCTION INDUSTRY, 34½ YEARS AGO, I HAVE
NEVER BACKED OFF FROM A CHALLENGE. I'VE WORKED HTOTAL 12 YEARS
AT HOSPITALS. I'VE WORKED HIGH RISES, SHIPPING CENTERS, SEWER PLANTS, CONDOS,
APTS, RESIDENTIAL HOMES, AND A POST OFFICE, TO NAME A
FEW. I'VE ALWAYS WENT TO WORK PREPARED TO DO MY JOB, DEDICATED,
AND I BRING MY SKILLS, I'VE LEARNED THROUGH THE YEARS WITH ME.
I CAME TO WHITING-TURNER THE SAME WAY, WITH VIGOR TO ACCEPT
MY DUTIES. A FEW MONTHS AFTER I STARTED MR. ERIK. PLOTKE
(GEN SUPT) TOLD ME, HE WANTED ME TO GO TO SAWGRASS MILLS SHIPPING
CENTER JOB. MR. PLOTKE TOLD ME I WOULD BE AN ASSISTANT
SUPT. ON THE PROJECT. I LOOKED FORWARD TO THE NEW POSITION.
TWO WEEKS LATER MR. PLOTKE SENT ME TO SAWGRASS ALONE,
TO START PROJECT, BY CONSTRUCTING A NEW PARKING LOT. IN OCT.
1997, AS OUR SUB-CONTRACTORS CAME ON THE JOB, I WAS INTRO-
DUCED AS ASSISTANT SUPT TO THEM. MY ESTEEM, MY DESIRES
TO DO GOOD, TO ESTABLISH A GOOD REPORT WITH WHITING-TURNER,
SHOW WHAT I COULD DO, NOT TO LET MR. PLOTKE (GEN.SUPT.) DOWN
MY MOTOR WAS IN OVERTIME, LIKE A KID AT THE CARNIVAL FOR THE
FIRST TIME. ALONG WITH MR. SERGIO TIO (PROJECT ENGINEER), WE
FINISHED THE PARKING LOT ON TIME, I FELT GOOD. AFTER THIS WE,
STARTED PHASE II, I STARTED WITH SAME VIGOR, AS ALWAYS. MR.
PLOTKE TOLD ME I QUOTE (YOU WANT HAVE TO LOOK FOR ANOTHER JOB
YOU CAN FINISH YOUR CAREER WITH WHITING-TURNER.) NOW 16
MONTHS LATER I FEEL, FOR THE FIRST TIME, THAT THIS VENTURE,
HAS PUT ME AT AN ALL TIME LOW, EMOTIONALLY. THE FIRE THAT
I CAME TO WHITING-TURNER HAS COME TO A FLICKER, BECAUSE
OF UNFAIR TREATMENT. IT'S CLEAR SOMETHINGS WERE MISSED.

EEOC/BUSH 136

SELF ESTEEM

② ON MARCH 22, 1999, MR TIO ASKED ME ABOUT THE KIOSK FOOTING, HE SAID WE COULD START THE WORK. I TOLD MR SERGIO TIO (PROJECT ENGINEER) IQUOTE (THAT IM THE DUMMY IM NOT SMART ENOUGH TELL MR PLOTKE (GEN SUPT) AND MR JEFF COOPER (PROJECT MANAGER) WHAT I SAID.) AFTER 30 MINUTES MR PLOTKE ASKED ME TO COME TO THE OFFICE. IN THE MEETING WITH MR. PLOTKE AND MR COOPER, I TOLD THEM TO FIRE ME, THEY SAID THEY WOULDN'T FIRE ME, THAT'S WHEN I TOLD THEM, I WOULD STAY UNTIL APRIL 16, 1999, BECAUSE THIS JOB WOULD BE FINISHED, THAT PHASE OF WORK. ON APRIL 16, 1999 I GAVE THEM MY RESIGNATION LETTER, THAT'S MY FIRST RESIGNATION LETTER IN MY CAREER. I WOULD RATHER GIVE UP MY EMPLOYMENT, INSTEAD OF WORKING ANOTHER WEEK WITH WHITING-TURNER. I FELT DEMORALIZED, NOT WELCOME, AN OUTCAST, NO FUTURE, BLACK SHEEP, OUT OF PLACE, NO FUTURE THERE, NO ONE CARED IF YOU WALKED OUT, OR WAS CARRIED OUT, JUST A SINKING FEELING. THIS IS WHERE I WAS AT AFTER 22 MONTHS WITH WHITING-TURNER. NO RAISE, NO PROMOTION, NO SIGN OF ADVANCEMENT FOR ME. THEN AFTER THE MEETING, NO ONE KNEW, WHO WAS SUPPOSED TO REVIEW ME. IN MY RESIGNATION LETTER I STATED SOME OF THE WRONG DOINGS TO ME, ON JAN. 13, 1999 MR PLOTKE BROUGHT ME MY CHECK IN THE FIELD, I QUOTE (YOU DON'T MAKE MUCH WHEN I COMPARE YOUR CHECK TO HUGO SOSA (CARPENTER FOREMAN) AND ALVIN BARBER (LABORER FOREMAN). I TOLD MR PLOTKE, THAT I COMPARED EVERYONE SALARY TO MINE, AND I TOLD HIM, YOU DO THE PAYROLL. MR PLOTKE SAID HE WOULD CONSIDER, PUTTING ME BACK HOURLY, HE SUGGESTED IT, BUT NOTHING MATERIALIZED FROM THAT CONVERSATION AS USUAL. FROM JAN 13, 1999 TO MARCH 22, 1999, AN ADJUSTMENT OR REVIEW FOR PROMOTION, WOULD'VE HELPED MY SITUATION

EEOC/BUSH 137

③                                              SELF ESTEEM

ON MARCH 22, 1999, my MEETING WITH MR JEFF COOPER AND
MR ERIC PLOTKE, THEY BOTH TOLD I SHOULD'VE CAME IN AND
ASKED OR MADE MENTION OF MY REVEEW. MR ROB MITCHELL (VICE
PRESIDENT) TOLD ME ALSO, ON APRIL 16, 1999, THAT I SHOULD'VE
CAME IN AND DISCUSSED. WHY SHOULD I CAME IN, THERE SHOULD
BE A POLICY FOR THIS, NOT TO HUMILIATE TO GET A PROMOTION. OTHER
EMPLOYEES DIDN'T BEG FOR THEIRS, I SHOULDN'T HAVE TO BE THE LEAST
ON THE PAYROLL. THE OTHER HAVE THEIR JOBS, I'M UNEMPLOYED. THE
MORAL OF THE STORY, IT'S LIKE SAYING, DO ALL YOU CAN, AS HARD AS
YOU CAN, KEEP UP THE GOOD WORK JAMES, AND WE MIGHT LOOK IN
YOUR DIRECTION, OR COME IN AND BEG AROUND OUR DESK. I'VE
NEVER HAD TO BEG, STOOP DOWN LOW, BRING UP THE REAR, BE THE
LEAST, BEG FOR MY RIGHTFUL SHARE IN ALMOST 35 YEARS. ON
MY KNEES I ONLY PRAY TO GOD. A FORMER WHITING-TURNER
EMPLOYEE TWO YEARS AGO TOLD ME, THAT WHITING-TURNER WILL
GIVE YOU A JOB, HUMILIATE YOU, AND DON'T GIVE YOU NO RAISE,
NO ADVANCEMENT, NO PROMOTION. HE TOLD ME I WOULD PROBABLY
WIND UP QUITTING, GOING SOMEWHERE ELSE TO WORK. HE SAID
THERE ARE STILL SOME COMPANYS THAT TREAT THEIR EMPLOYEES
FAIR, REGARDLESS OF AGE OR ETNIC BACKGROUND. THESE ACTIONS
RIGHT NOW, MAKE THIS FORMER EMPLOYEE A PROPHET. IT
TOOK A SUPER EFFORT ON WHITING-TURNER'S PART TO STRIP
ME OF MY ESTEEM, MY RESPECT IN THIS INDUSTRY, REGARDING
FAIRNESS TO A PERSON, FORGETTING MY RACE, MY AGE, BUT
REMEMBERING ME. AS A CAREER CONSTRUCTION MAN, STRUGGLING
TO EARN A LIVING.                          WITH REGRET
                                    JAMES F. BUSH SR.

EEOC/BUSH 138

CHARGE OF DISCRIMINATION

| | | CHARGE NUMBER |
|---|---|---|
| ☐ FEPA | | |
| ☒ EEOC | | 150992329 |

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

Florida Comm. on Human Relations
*State or local Agency, if any* _____ and EEOC

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Mr. James T. Bush | (305) 633-9993 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 3824 N.W. 15th Avenue, Miami, FL 33142 | - | 12/17/1946 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Whiting Turner Contracting | Cat D (501 +) | (954) 776-0800 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1000 N. Corporate Drive, Fort Lauderdale, FL 33334 | | 011 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☒ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☒ AGE ☐ DISABILITY ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 03/22/1999 | 03/22/1999 |
| ☒ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I.  On March 22, 1999 I finally got my first performance review with Eric Plotke, Superintendent and Jeff Cooper, Project Manager. I was hired as a Labor Foreman in June 1997. In October 1997 I was promised a promotion to Asst. Superintendent, but never got the promotion. I performed the duties of an Asst. Supt. from the day I was hired in October 1997. During the period of my employment I was subjected to different terms and conditions of employment. I was denied mileage on the weekends. I was denied two weeks of paid vacation. A White Asst. Supt., Chuck Bender, age 29, was hired in February 1998 who received mileage and vacation. Mr. Bender was reviewed six months after his hire. I was not. I was denied a trip to Universal Studios that other non-Black employees went on. I was not invited to the Vice President's xmas party in 1998, that other non-Black managers and supervisors attended. To my knowledge I am the lowest paid supervisor in the company. I have three years experience as an Asst. Supt. and approximately 31 years of General Foreman experience in Dade County.

II. No significant action was taken to address my complaints by my employer. No reason was provided for the disparate treatment.

*(left margin, rotated:)* DEPOSITION EXHIBIT 6/15.00 am

☑ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I declare under penalty of perjury that the foregoing is true and correct.

*(signature)* James C. Bush L.

Date 4-2-99   Charging Party *(Signature)*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)

EEOC FORM 5 (Rev. 08/92)

EEOC/BUSH 103

# ORIGINAL

1                 UNITED STATES DISTRICT COURT --
                 SOUTHERN DISTRICT of FLORIDA
2                  FT. LAUDERDALE DIVISION

3
               CASE NO. 00-6224-CIV-DIMITROULEAS

4
   JAMES BUSH,                       )
5                               )
                               )
6           Plaintiff,           )
                               )
7   vs.                         )
                               )
8   THE WHITING-TURNER CONTRACTING    )
   CO., a Maryland corporation,     )
9                               )
           Defendant.           )
10                               )
   _____)
11

12                  First Union Center--Suite 2000
                  200 East Broward Boulevard
13                  Ft. Lauderdale, Florida
                  Friday, June 16, 2000
14                  1:00 p.m. - 3:45 p.m.

15

16

17            Deposition of Eric Plotke
            ------------------------
18

19        Taken before Maria Isabel Fernandez,

20  Notary Public in and for the State of Florida at

21  Large, pursuant to Notice of Taking Deposition

22  filed in the above cause.

23            - - - - - - - -

24

25

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1        APPEARANCES:
          _____
 2
            ON BEHALF of THE PLAINTIFF:
 3
               David H. Pollack, P.A.
 4             25 Southeast 2nd Avenue
               Suite 1020
 5             Miami, Florida 33131
               BY:  David H. Pollack, Esq.
 6
            ON BEHALF of THE DEFENDANT:
 7
               Shutts & Bowen, LLP
 8             1500 Miami Center
               201 South Biscayne Boulevard
 9             Miami, Florida 33131
               BY:  Sheila M. Cesarano, Esq.
10

11                   _ _ _ _ _ _ _

12                     I N D E X
                       _____
13
      Witness          Direct  Cross  Redirect  Recross
14    -------          ------  -----  --------  -------
      Eric Plotke        3      101     109       115
15
                 Exhibits for Identification
16               _____

17                      None
                        ----
18

19

20

21

22

23

24

25

      FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868
```

```
 1    Thereupon:
 2                    ERIC PLOTKE
 3    was called as a witness by the Plaintiff,
 4    and after being first duly sworn, was examined
 5    and testified as follows:
 6                    DIRECT EXAMINATION
 7    BY MR. POLLACK:
 8         Q.    Good afternoon, Mr. Plotke.  My name
 9    is David Pollack, and I'm representing James
10    Bush in a lawsuit that he's filed against
11    Whiting-Turner.
12               Before we start, let me ask you if
13    you've ever had your deposition taken before?
14         A.    Yes.
15         Q.    Can you tell me the context?
16         A.    It was an accident investigation.
17         Q.    Were you a witness or a party?
18         A.    Witness or -- I don't understand the
19    question.
20         Q.    Have you ever been a party to a
21    lawsuit --
22         A.    No.
23         Q.    -- either been sued or sued somebody
24    else?
25         A.    No.
```

1      Q.   Just briefly to refresh you, I'm
2   going to ask you a series of questions about the
3   lawsuit, things related to the lawsuit.  You are
4   under oath.  You've been sworn in as if you were
5   in court.  So you're required to answer as
6   truthfully and accurately as you can.
7          If you don't understand something
8   that I ask, please ask me to rephrase it or
9   repeat it.  I'll try and do that.  From time to
10  time, your attorney is going to raise objections
11  to questions that I ask.  It's not an
12  instruction to you not to answer the question,
13  but it's simply to make a record for the court
14  reporter, unless she tells you not to answer the
15  question.  That's about it.
16         Can you please spell your full name
17  for the record?
18      A.   E-r-i-c, P-l-o-t-k-e.
19      Q.   Can you tell me what is your current
20  address?
21      A.   18056 50th Street North Loxahatchee,
22  Florida 33470.
23      Q.   And your current phone number?
24      A.   (561) 753-6162.
25      Q.   And your Social Security Number?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1          A.    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.
 2          Q.    Your current employer is
 3     Whiting-Turner?
 4          A.    Yes.
 5          Q.    How long have you been employed with
 6     them?
 7          A.    12 and a-half years.
 8          Q.    Same location for those 12 and a-half
 9     years?
10          A.    No.
11          Q.    Can you tell me where you started
12     out?
13          A.    I started out working at Florida
14     Power and Light Turkey Point Nuclear Power
15     Plant.
16          Q.    When was that?
17          A.    September of 1988.
18          Q.    At that time, what was your job?
19          A.    I was a carpenter.
20          Q.    Can you kind of just quickly walk me
21     through the progression at Whiting-Turner for
22     you, where you went, what your job was and for
23     how long?
24          A.    Yes.   My first position at
25     Whiting-Turner, I was hired as a Union
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    carpenter.  I worked in that capacity for
2    approximately eight months and at that time, I
3    approached my supervisor to inquire about the
4    possibility of my becoming a full-time salaried
5    employee, an assistant superintendent, and at
6    that time, he sent me to interview with a
7    project manager and a vice president and I was
8    placed on a salary with the company paying my
9    Union benefits.  I still retained my Union
10   affiliation and I remained in that roll for
11   probably a year and a-half; probably a year and
12   a-half.
13        Q.    So that takes us up to about what
14   period of time?
15        A.    Close to 1990.
16        Q.    And then what happened?
17        A.    Then at that time, I was brought into
18   the full Whiting-Turner benefits salary program
19   and I relinquished my Union benefit plan.
20        Q.    So you were an assistant
21   superintendent prior to that time?
22        A.    Yes.
23        Q.    How long were you an assistant
24   superintendent while you had Union benefits?
25        A.    As I said, it was approximately a

```
 1   year and a-half.
 2        Q.   Then you relinquished your Union
 3   benefits.  Did your job description or what you
 4   were doing on a day-to-day basis change at that
 5   point?
 6        A.   Not at all.
 7        Q.   That would have been around 1990,
 8   correct?
 9        A.   Yes.
10        Q.   Okay.  How long did you remain in
11   that position as assistant superintendent?
12        A.   Probably another year and a-half, two
13   years.
14        Q.   And at that time, you got promoted?
15        A.   Yes.
16        Q.   To what position?
17        A.   Superintendent.
18        Q.   That would have been around 1993,
19   give or take?
20        A.   Give or take.
21        Q.   That was with Union benefits or
22   without?
23        A.   No, sir.  I had had -- at the time,
24   as I stated earlier, I relinquished my Union
25   benefits.
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1          Q.   Right.  But when you became
 2     superintendent, you continued to get
 3     Whiting-Turner benefits?
 4          A.   Yes, sir.
 5          Q.   Can you tell me when you first met
 6     James Bush?
 7          A.   I first met James while I was
 8     building a Bloomingdale's project at Aventura
 9     Mall in Miami.
10          Q.   That was, just a time, roughly for
11     the record?
12          A.   Roughly June of 1997.
13          Q.   And at that time, you were the
14     superintendent of the project?
15          A.   Yes, sir.
16          Q.   Who was Mr. Bush working for, if you
17     know, at that time?
18          A.   Whiting-Turner.
19          Q.   He was employed by Whiting-Turner?
20          A.   We hired -- I hired him.
21          Q.   So you hired him.  I'm just looking
22     for his date of hire.
23          A.   That would have been the date that I
24     met him.
25          Q.   When you hired him?
```

```
 1         A.    Yes, sir.
 2         Q.    Do you know before you hired him who
 3   he was working with or for?
 4         A.    No.   I do know that he had worked on
 5   the North Western High School project and
 6   Whiting-Turner played a role, I believe, as a
 7   subcontractor to a company named Gaston Thacker
 8   and I do know that James -- I found out after I
 9   hired James that he had worked on that project,
10   but I did not know him or know of him.
11         Q.    How did he come to you or you to him,
12   I guess is the question?
13         A.    I employed a Union labor foreman for
14   several years and he retired and I called the
15   Laborer's Union and I requested -- I stated that
16   I needed a labor foreman and I was looking for a
17   good man and they sent James out to interview
18   for the job.
19         Q.    Did anybody else, other than you,
20   interview him?
21         A.    Actually, I didn't interview James.
22   Somebody else interviewed him.
23         Q.    Do you know who?
24         A.    I don't recall.
25         Q.    Before he actually got hired, he
```

```
 1   wasn't working on the Bloomingdale's project?
 2        A.   No, sir.
 3        Q.   He came out, he was interviewed by
 4   somebody else?
 5        A.   Correct.
 6        Q.   Did you meet him before he was hired?
 7        A.   I believe I did.  I believe I hired
 8   him.  Somebody else interviewed him and, again,
 9   I don't recall who that was, and they said that
10   the interview went well.  As I recall, it was
11   one of my, I think, one of my carpenter foremen,
12   may have met him and told me that he thought the
13   guy could, the guy being James, was well suited
14   for the job; and James came out and met me and I
15   hired him.
16        Q.   He was hired as a labor foreman?
17        A.   Yes, sir.
18        Q.   Did you have any discussions with him
19   about his job prospects with Whiting-Turner?
20        A.   No.
21        Q.   What, if anything, did you talk about
22   with him at that time?
23        A.   The duties that I expected him to
24   perform on that job.
25        Q.   Is there a time period for which that
```

1    job was supposed to last?

2        A.    Yes.

3        Q.    What was that time period?

4        A.    I believe the store opened -- I don't

5    recall the opening date of Bloomingdale's, but

6    every project that we build has a completion

7    date and the anticipated opening date of the

8    store was obviously the time that the

9    construction workers were to be gone.

10        Q.    Do you remember how long he worked on

11    that project?

12        A.    I recall approximately four months or

13    five months.

14        Q.    After that project finished, what

15    happened?

16        A.    I was assigned to start a new job at

17    the Sawgrass Mills Mall in Sunrise and I needed

18    some men to go over to that project and I asked

19    James if he would be willing to go to Sawgrass

20    Mills Mall.

21        Q.    As a labor foreman?

22        A.    Yes.

23        Q.    And he obviously said yes?

24        A.    Yes.

25        Q.    Can you tell me, would that have been

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1   around October?
 2        A.    Yes, of 1997.  It may have even been
 3   September.  It may have been a little sooner.
 4        Q.    What did you tell him he would be
 5   doing at that project?
 6        A.    It was a multi-phase expansion to an
 7   existing mall.  The very first phase was for us
 8   to construct the parking lot and that was the
 9   first thing that I had asked James to become
10   involved with.  We had a project engineer who
11   was assigned to manage.  It was a small phase of
12   work.  It didn't require a large staff.  There
13   was a project engineer who was assigned to
14   supervise the parking lot and I asked James to
15   keep an eye on it since the parking engineer was
16   a young guy.
17        Q.    Who was that?
18        A.    His name is Sergio Tio.
19        Q.    So did you ask him to come over for
20   that particular phase or was he going to work on
21   the whole project?
22        A.    I assumed that he would work on the
23   entire project.
24        Q.    He wasn't just there for the parking
25   lot?
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1          A.    No, sir.
 2          Q.    How long did it take to finish the
 3   parking lot phase?
 4          A.    Parking lot had to be done by
 5   Thanksgiving.
 6          Q.    And after that phase of the project,
 7   then what did Mr. Bush do?
 8          A.    Basically nothing until we received a
 9   permit.  James and two other laborers, Alvin
10   Barber and Jack Marcelin, I retained them on
11   payroll; basically, they had very little to do
12   throughout Christmas.  And I believe we got our
13   permit to begin the work -- it was in the middle
14   to end of January, as I recall.  I wouldn't
15   swear to that, but I believe that was the time
16   we got our permit.
17          Q.    Did you know at the time that you
18   began the project in October when you would get
19   the permit?
20          A.    We had scheduled -- yeah, there was
21   an anticipated time.  I think the anticipated
22   time was the first of the year, but the permit,
23   it just wasn't issued by the municipality.  It
24   was late.
25          Q.    Based on your anticipated time, there
```

1    was a gap between Thanksgiving and the first of

2    the year?

3         A.   Yes.

4         Q.   Once that permit was issued, then

5    what was the next phase of the construction?

6         A.   The next phase was to demolish part

7    of the parking lot.  We were to construct

8    buildings on top of an existing parking lot, so

9    there were underground utilities that had to be

10   relocated in order to facilitate the

11   installation of foundations for the new

12   buildings.

13        Q.   Was the permit that you got around

14   mid to the end of January a permit for both

15   demolition and construction?

16        A.   It was a permit for the utility

17   relocation, initially, and the building pad

18   preparation.

19        Q.   What is the building pad?  Somebody

20   referred to that before.  Is that like the base?

21        A.   In South Florida, because of the

22   flood plain criteria, any structure that's going

23   to be occupied needs to be elevated above a

24   certain elevation to prevent flooding, so there

25   is dirt or a structural fill that has to be

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  placed and compacted to get the building above
2  that flood criteria.
3       Q.    That needs to be done before you
4  begin construction or is that contemporaneous
5  with construction of the buildings?
6       A.    It has to be done before
7  construction.  It is construction.  It's the
8  first phase.
9       Q.    Got it.  Who was responsible for the
10  building pad construction?
11       A.    I was.
12       Q.    You were the superintendent on the
13  job?
14       A.    Yes, sir.
15       Q.    Actually, at that time, was there
16  another assistant superintendent?
17       A.    No.
18       Q.    You hesitated.
19       A.    I hesitated.
20       Q.    Why did you hesitate?
21       A.    Because I had begun conversations
22  with James about whether or not he would be
23  interested in accepting a role or if he thought
24  he was capable of fulfilling the role of an
25  assistant superintendent.

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

16

1    Q.    What did you think?

2    A.    I wasn't sure.

3    Q.    You weren't sure of?

4    A.    Of both, whether or not he would be

5    interested and I was not sure whether or not he

6    was able to fulfill the requirements.

7    Q.    At some point, did he get hired as an

8    assistant superintendent?

9    A.    Yes.

10   Q.    Who hired him?

11   A.    I promoted him.  He was already

12   hired.

13   Q.    You promoted him to assistant

14   superintendent?

15   A.    Yes.

16   Q.    At that point, presumably you became

17   more certain that he was able to perform the

18   role of an assistant superintendent, correct?

19   A.    At that point, he and I agreed that

20   he was interested and presumably capable and at

21   that point, I began indoctrinating him, showing

22   him the role, converting him from being a labor

23   foreman into being an assistant superintendent.

24   And ---

25   Q.    When you say -- sorry.  Go ahead.  I

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  cut you off.

2        A.    Go ahead.

3        Q.    When you say "presumably capable",

4  whose presumption was that?

5        A.    Mine and James.

6        Q.    But you obviously felt certain enough

7  about it to extend him the offer for the job,

8  correct?

9        A.    Yes.

10        Q.    What did you base that certainty on?

11        A.    I based it on his performance for me

12  in the past as a labor foreman.  He did an

13  outstanding job as a labor foreman, outstanding,

14  and it was through conversations with him and my

15  observations of his ability as a labor foreman

16  that I made the decision to give him the

17  opportunity to be an assistant superintendent.

18        Q.    What was it that he did, what things

19  did he do that you base your statement on that

20  he did an outstanding job as a labor foreman?

21        A.    Any task he was given, he

22  successfully completed as a labor foreman.  He

23  had the ability to take initiative, to identify

24  areas in his -- within his control without being

25  told to get an area cleaned up.  I would go out

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  in the building and James would already be
2  cleaning it up. He would see that it was work
3  that had to be done and without being told, he
4  would do it. He was thinking. A concept
5  unbeknownst to some construction workers.
6        Q.    Anything else or is that it?
7        A.    That is what I based my opinion on.
8        Q.    Prior to promoting him to the
9  position of assistant superintendent, did you
10 have occasion to speak with him about the work
11 that he had done before starting to work at
12 Whiting-Turner?
13       A.    Yes, I did.
14       Q.    What did he tell you?
15       A.    He informed me of all of the projects
16 that he had done in the past and what capacity
17 he held on those projects. You know, clearly
18 all of his experience was as a labor foreman,
19 but he had performed well on large projects. He
20 had the ability to manage large amount of crew
21 size, a lot of men and he carried himself well.
22       Q.    When was that point, by the way, when
23 you promoted him to assistant superintendent?
24       A.    We had several discussions about it
25 from the time that he was working on the parking

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    lot, the initial phase, which was approximately
2    mid-October or early November, as I recall, the
3    parking lot finished.  It had to be finished by
4    Thanksgiving, and I began conversations with him
5    at that time and those conversations continued
6    until March.
7         Q.   How many conversations were there?
8         A.   I don't know.  Several.
9         Q.   Can you give me -- I mean, were they
10   sort of on a regular basis, once a week?
11        A.   They were random.  There was no --
12   they were not scheduled conversations.  They
13   were -- no, I can't tell you how many.  I don't
14   know.
15        Q.   Fewer than ten?
16        A.   No.  I'm sure that we had ten or
17   more.
18        Q.   Anybody else, other than you and he,
19   party to those conversations?
20        A.   The conversations that we had were
21   always standing in the field while the work was
22   ongoing.  They were not closed door
23   conversations nor were they open forum for
24   anybody to walk up.
25        Q.   I understand.

1          A.    People may have walked up through any

2     period of time that we had conversations and

3     overheard what we were talking about.  It wasn't

4     a secret.  I wasn't trying to hide what I was

5     trying to do for James.  We never had the

6     conversations in the presence of a Union

7     representative or a Whiting-Turner manager,

8     either, for that matter.

9          Q.    Prior to March of '98, did you have

10    occasion to meet with inspectors from the City

11    of Sunrise in connection with the Sawgrass

12    project?

13         A.    Of course.

14         Q.    Was Mr. Bush present in any of those

15    meetings prior to that time?

16         A.    Yes, he was.

17         Q.    Do you recall if whether or not at

18    any of those meetings he was introduced to those

19    inspectors as the assistant superintendent of

20    the project?

21         A.    Yes, he was.

22         Q.    Would those meetings have occurred

23    prior to March of '98?

24         A.    Yes.

25         Q.    Other than the City of Sunrise

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    inspectors, were there any other people that --
2    and just for the record, when I asked you if he
3    was introduced at those meetings, since you were
4    there, the assumption was that you introduced
5    him that way, is that correct?
6              MS. CESARANO:  Objection to form.
7         Q.   (By Mr. Pollack) Did you introduce
8    him to the inspectors of the City of Sunrise as
9    the assistant superintendent of the project?
10             You can answer.
11             MS. CESARANO:  I'm only objecting.
12             THE WITNESS:  Yes, I did.
13        Q.   (By Mr. Pollack) Other than those
14   inspectors, prior to March of 1998, did you
15   introduce Mr. Bush or refer to him in the
16   presence of anybody else as the assistant
17   superintendent of the project?
18        A.   Yes, I did.
19        Q.   Who else did you introduce him to or
20   referred -- you know what I'm asking?
21        A.   I understand your question.
22        Q.   Who else did you introduce him as
23   that to?
24        A.   I had made a decision on or around
25   January that James was to be the man I chose to

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  be the assistant superintendent to run a portion

2  of the work. I introduced James to everybody,

3  anybody involved in the job, whether it was a

4  subcontractor, a city official, an owner's

5  representative, whomever was party to that

6  project around January. That's the way I began

7  to introduce James.

8     Q.   You say "around January", do you

9  remember earlier in the month, later in the

10 month, was it around the New Year?

11    A.   It was on or around the time that the

12 work was to commence.

13    Q.   Fair enough. Again, for

14 clarification, you said you introduced him to

15 everybody. Can you identify for me the people

16 who you recall around that time prior to March

17 of '98, you introduced him to as assistant

18 superintendent?

19    A.   Are you asking me to name names?

20    Q.   Yes. With the caveat, since we are

21 trying to be somewhat time conscious, if it was

22 everybody on the job site, you can tell me

23 everybody on the job site. If there were other

24 people who were subcontractors, I would like

25 their specific names.

23

1       A.   At the time frame that we're

2   discussing on or around January through March?

3       Q.   Correct.

4       A.   There was two subcontractors -- no,

5   there were three subcontractors that I recall

6   that were on site.  There was a utility

7   contractor.  There was a site work contractor

8   and there was a concrete foreman contractor.

9       Q.   Do you recall the names of any of

10   them or not?

11       A.   Camco was the concrete foreman

12   company.  Jack Hardy, Incorporated, was the site

13   work contractor and the utility contractor.

14   There was also a demolition contractor that was

15   a sub, I believe, to Jack Hardy, and I don't

16   recall the name of that company.

17       Q.   Do you know -- and if you don't know,

18   you don't know -- do you know whether Mr. Bush

19   understood or it was his understanding that

20   January, '98, when you made that decision,

21   whether it was his understanding that he was at

22   that time an assistant superintendent?

23          MS. CESARANO:  Objection to form.

24   Calls for speculation.

25       Q.   (By Mr. Pollack) If you know.

1           A.    I don't understand your question
2     exactly.  Would you rephrase that?
3           Q.    Yes.  Did Mr. Bush ever tell you in
4     that time period between January and March of
5     '98, that he understood that he was the
6     assistant superintendent of that project during
7     that time period?
8           A.    Did he ever tell me that he was the
9     assistant superintendent?
10          Q.    Correct.  Did he ever refer to
11    himself that way during that time period?
12          A.    Yes.
13          Q.    Did he ever represent to other
14    people, that you heard, during that time period
15    that he was the assistant superintendent of the
16    project?
17          A.    I've already stated that I
18    represented him in that manner, as well.
19          Q.    I understand that.
20          A.    Okay.  I don't understand the
21    question.
22          Q.    My question is slightly different.
23          A.    Okay.
24          Q.    My question is:  Whether he then,
25    having heard you say that, said it to other

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    people?

2            MS. CESARANO:    Objection to form.    Go

3    ahead and answer.

4            THE WITNESS:    Yes.

5        Q.    (By Mr. Pollack) Other than the work

6    on the building pad, what work was done on the

7    Sawgrass project between January and March of

8    1998?

9        A.    We received a permit and we began

10   foundation work on the first building we

11   constructed.

12       Q.    There came a point in time where you

13   hired another assistant superintendent for that

14   project in addition to Mr. Bush, correct?

15       A.    Correct.

16       Q.    Am I accurate that it was around

17   February of that year?

18       A.    Yes.

19       Q.    Okay.    And that was Mr. Bender?

20       A.    Yes.

21       Q.    You met Mr. Bender on the

22   Bloomingdale's project?

23       A.    Yes.

24       Q.    Just tell me briefly what occurred

25   between the time that you approached Mr. Bender

1  at the Bloomingdale's project and the time that

2  he was hired as the assistant superintendent.

3  Walk me through the steps that it took to get

4  him there.

5      A.    Sure.  Mr. Bender was working for a

6  subcontractor to Whiting-Turner in the capacity

7  of a general foreman.  It was a carpentry based

8  and drywall contractor.  Chuck was intimately

9  involved with me personally on the

10  Bloomingdale's project.  There were -- it was a

11  very difficult interior layout project, very

12  intricate.  Chuck did all the layout on the job

13  for his company, Lotspeich of Florida.  There

14  was a tremendous amount of detail oriented

15  problems that were inherent to the project that

16  Chuck became completely in charge of by his

17  company.  The interaction between the architect

18  and the resolution of those problems was all

19  performed by Chuck.

20      I was very impressed by Chuck's

21  performance on the job.  And towards the end of

22  the project, I approached him.  He had, on a

23  couple of occasions, expressed to me being

24  somewhat unhappy working for his current

25  employer and I, because I was very impressed by

1   his performance, I asked him if he would be
2   interested in coming to work with Whiting-Turner
3   as an assistant superintendent.
4          Q.    Were you the one that interviewed
5   him?  Was there a formal interview, if you know?
6          A.    I don't recall.
7          Q.    Were you the one who hired him?
8          A.    No.
9          Q.    Do you know who hired him?
10         A.    Rob Mitchell.
11         Q.    Do you know what Mr. Bender's
12  starting salary was?
13         A.    No.
14         Q.    Do you know whether Mr. Bender's
15  starting salary as an assistant superintendent
16  was the same salary that Mr. Bush started at as
17  an assistant superintendent?
18         A.    Can you ask the question again?
19         Q.    Yes.  Do you know whether Mr.
20  Bender's starting salary as an assistant
21  superintendent was the same salary that Mr. Bush
22  had when he got promoted to assistant
23  superintendent?
24         A.    Yes, I do know.
25         Q.    And were they the same?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1        A.    No.
 2        Q.    Do you know what the difference in
 3   salary was?
 4        A.    To the penny, no.
 5        Q.    Do you recall kind of a range of what
 6   you think it is?  I don't want you to guess, but
 7   if you have an idea.
 8        A.    My guess, my idea is that it was
 9   about two dollars an hour different.
10        Q.    And who determined the salaries of
11   Mr. Bender and Mr. Bush?
12        A.    Rob Mitchell.
13        Q.    Did you have any input or say in that
14   determination?
15        A.    Very little.  Some, but ---
16        Q.    Were you asked by Mr. Mitchell your
17   opinion?
18        A.    Yes.
19        Q.    Can you tell me what Mr. Mitchell
20   asked you about that and what you told him?
21        A.    Are you asking me to give you the
22   basis for the difference in salaries?
23        Q.    I'm asking a twofold question.  You
24   said that you had a minimal amount of input.
25        A.    Yes.
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1        Q.   So I guess there would be two
 2   questions.  One, what your input was and if that
 3   basis was something other than what you decided,
 4   but you know what it was, then I'd like to know
 5   that, as well.
 6             MS. CESARANO:  Object to form.
 7        Q.   (By Mr. Pollack) Did you understand
 8   what I'm asking?
 9        A.   I think I do, but can you clarify it
10   again?  I don't want to misanswer.
11        Q.   Do you know what the basis for the
12   difference in salaries between Mr. Bender and
13   Mr. Bush was?
14        A.   Yes.
15        Q.   Tell me what that was?
16        A.   The basis for the difference was
17   established from my knowledge of prior
18   experience, and if you would like me to clarify
19   that, I'd be happy to.
20        Q.   I would, but before you do, you say
21   "from my knowledge."  What do you mean by your
22   knowledge?  Somebody told you that that was the
23   basis?
24        A.   No.  The conversations that I had
25   with Mr. Mitchell.  Anytime there is a new hire --
```

1    you're looking for a secretary right now, you're

2    going to obtain as much information about that

3    secretary as you can.

4         Q.    Correct.

5         A.    And based on what you observe in an

6    interview and a resume, you set a basis for a

7    pay.  Our business is no different than that.

8              My observations of James' experience

9    at Bloomingdale's and his entire background as

10   he described it to me through all of the

11   conversations that I have offered to you before

12   in this that we have had, all of his experience

13   was as a labor foreman or a general labor

14   foreman in concrete work, in clean up, in

15   managing laborers.

16             My personal knowledge of Chuck's

17   ability to do work with all of the layout

18   equipment, transits, levels, integrate layout

19   that I observed him successfully doing, I had

20   personal experience witnessing his layout

21   abilities.  I had personal experience witnessing

22   his interaction with architects and engineers.

23   I had personal experience witnessing Chuck's

24   ability to resolve, to identify, to track down

25   an answer to a problem and to resolve it in an

1   efficient manner.  I had personal knowledge and
2   personal experience witnessing Chuck's ability
3   to do that.
4         The experience that I had with James,
5   he performed in an excellent manner in the
6   capacity of a labor foreman, but I had never
7   personally witnessed James or never had asked
8   James, for that matter, to perform layout, to
9   identify a problem on a drawing before something
10  is constructed and to resolve it through means
11  of architects and engineers and coordinating, so --
12  and because my knowledge that James had never
13  done that was the basis for the difference in
14  the two pay scales and the conversations that I
15  had with Mr. Mitchell.
16        Q.   When you gave James the promotion,
17  there was a meeting between you and him?
18        A.   Yes.
19        Q.   Was anybody else there at that
20  meeting?
21        A.   You say that there was a meeting.  It
22  wasn't a ---
23        Q.   It wasn't a formal thing?
24        A.   No.  I walked out and I told James, I
25  just got you a raise, congratulations, welcome

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    to the team. And I told him what his new pay
2    scale was to be.
3         Q.   What did he say?
4         A.   Honestly I was very surprised at his
5    reaction. His pay rate was $11.00 an hour at
6    the time that he was working as a general
7    foreman and in this interim role that I placed
8    him in as an assistant superintendent, and as I
9    recall, his pay rate went up to 15.70 an hour.
10   Because of the percentage of increase, I
11   expected James to be very happy and, in fact, he
12   was rather unemotional. He just said okay.
13        Q.   Did you ever ask him why he didn't
14   seem as happy as you thought he would be?
15        A.   No.
16        Q.   Do you know why he was unhappy?
17        A.   No.
18        Q.   Do you know whether it had anything
19   to do with the fact that he thought perhaps he
20   had been acting as the assistant superintendent
21   for several months before that?
22             MS. CESARANO:  Objection to form.
23   Calls for speculation.
24        Q.   (By Mr. Pollack) If you know.
25        A.   I have no way of knowing because

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1   James never verbalized any displeasure to me.

2        Q.   When you hired Chuck Bender, was it

3   your intention that he and James would have

4   responsibility for different sections of the

5   project?

6        A.   Yes.

7        Q.   And was it your intention that they

8   would be performing the same job?

9        A.   Yes.

10       Q.   And the tasks that they were each

11  assigned, were those essentially the same tasks?

12       A.   There were some tasks that I assigned

13  to Chuck later on in the project that I would

14  say were -- required much more responsibility.

15       Q.   When did you start assigning those in

16  relation to when James Bush left Whiting-Turner,

17  or simply do you remember when?  You say later

18  in the project.  Do you remember when that

19  occurred, what time period?

20       A.   Part of my responsibilities as a

21  general superintendent is to identify -- it's to

22  delegate work.  That's part of my role.  I

23  delegate work to individuals who I think can

24  handle the work.  The ultimate goal is

25  successful completion of the job.  And when I

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    see that somebody has become overburdened with
2    what I already have assigned them to and if
3    additional work comes up, I have to evaluate who
4    isn't overwhelmed and then evaluate whether or
5    not they had the ability to accept more
6    responsibility and then assign it to them.

7        Q.    Was it your impression that Mr. Bush
8    was overwhelmed with the responsibility at some
9    point?

10        A.    Yes.

11        Q.    When did you have that impression
12    first?

13        A.    The foundation work started in
14    building three.  Again, that was early on in the
15    project.  Probably February, January, February.
16    The building was not rectangular.  It had some
17    geometric angles in it.  And part of the
18    responsibility of an assistant superintendent is
19    prior to placement of concrete, there's anchor
20    bolts that support structural steel that get
21    cast into the concrete.  You know, as you're
22    building a structure, the placement of those
23    bolts is critical to the success of the
24    building.  I had asked James to verify anchor
25    bolt locations and we had some columns that were

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  cast with concrete that the bolts were
2  misplaced.  That was the first thing that I
3  caught.

4            I think to answer your question the
5  second building -- we started with building
6  three.  The second building we constructed was
7  building two.  One of the ways I verify that the
8  guys are doing their quality control and
9  verifying the locations of types of things like
10 anchor bolts is through forms.  We have
11 inspection reports.  James had filled out and
12 turned in inspection reports on column pads of
13 building two.  And in review of his inspection
14 reports, they checked out to be in compliance
15 with plans and specifications.

16           In fact, when the steel erector began
17 installing the steel, which is the framework of
18 the building, it was discovered that 19 of the
19 columns that James had checked and found
20 apparently in compliance, they were, in fact, a
21 foot too low and this caused the steel erector
22 to dismantle a week's worth of work.  It was a
23 substantial schedule impact, and I think that is
24 when I really became concerned about James'
25 abilities to keep up with stuff.  That was

1    really a turning point, I think.

2         Q.    After that happened, did you speak

3    with him about this problem?

4         A.    Yes, I did.

5         Q.    What did you tell him?

6         A.    Well, I asked him -- I first asked

7    him what happened. I went back and I read his

8    quality control reports. He verified them that

9    they were in compliance. I told him I couldn't

10   understand how, if he had done his job properly

11   and documented this as thoroughly as it appeared

12   that he had done, that the problem would have

13   been caught. James was very elusive in his

14   answer. He never actually answered my

15   questions. He was very elusive.

16        Q.    Did you consider this to be a serious

17   problem?

18        A.    Yes.

19        Q.    How serious?

20        A.    In terms of?

21        Q.    In terms of the construction of the

22   building.

23        A.    Well, as I said, it was approximately

24   a three-week schedule delay. It was a serious

25   problem. Yeah. We had to implement a plan to

```
 1   recover.  I had to personally get involved in
 2   the structural repair, which required -- you
 3   know, I shouldn't have gotten involved in that.
 4   I would have expected an assistant
 5   superintendent would be able to -- there's a
 6   form that we have called an RFI, request for
 7   information form.  I had to do the coordination
 8   between the architect and the structural
 9   engineer to effect a repair in order to get the
10   column pads back into the proper elevation, so
11   that the steel would fit.
12        Q.   Did you express concern to anybody
13   else about this problem other than Mr. Bush?
14        A.   Yes.
15        Q.   Who did you express concern to?
16        A.   To the project manager.
17        Q.   Which was?
18        A.   Jeff Cooper.
19        Q.   What did you tell him?
20        A.   Well, I told him that we have a
21   problem with the steel and that we're going to
22   fix it.
23        Q.   Did you express concern at that point
24   about Mr. Bush being able to be an assistant
25   superintendent?
```

1          A.    I expressed concern that Mr. Bush had
2      performed an inspection, that he had documented
3      it improperly, that he hadn't caught the problem
4      prior to, number one, the concrete being placed,
5      number two, the steel being erected.
6              But with James' background, as a
7      general labor foreman, not an assistant
8      superintendent, I chalked it up to experience.
9      No, I wouldn't say that I made a decision at
10     that time that James would never ever be able to
11     be an assistant superintendent.  Had I made a
12     decision like that, I would have asked James to
13     step down from his position, but he made a
14     mistake.  Everybody makes mistakes, and I was
15     willing to, you know, continue to give him an
16     opportunity to do well.
17         Q.    Did Mr. Bender make any mistakes
18     during the time that he was an assistant
19     superintendent?
20         A.    Yes.  I make mistakes.
21         Q.    At the time that you told Mr. Bush
22     that he was getting a promotion and a pay raise,
23     was there any discussion about his being
24     reviewed or receiving a performance review?
25         A.    Yes.

1          Q.   Can you tell me what the two of you
2     discussed concerning that issue?
3          A.   Yes.  When -- when I got James his
4     raise and at that point in time, he went from
5     being an hourly employee of $11.00 and change an
6     hour to a salaried employee of 15.70 or whatever
7     it was.  I explained to him that there is still
8     an interim period of time that he is going to
9     continue to work in the same capacity, but he'll
10    be paid salary, but the benefits that the
11    company will pay will remain in his Union, and
12    at some point in time, there will be a
13    performance review.  If it's favorable, then the
14    company at that time may or may not ask him to
15    relinquish his Union benefits and to become a
16    full-time salaried employee, meaning that he
17    would at that time received company benefits
18    rather than Union benefits.
19         Q.   Now, when he got the raise to 15.70,
20    he was flat salary as opposed to hourly?
21         A.   Yes.
22         Q.   So he didn't get paid for overtime or
23    things like that?
24         A.   No, sir.  And he understood that.  We
25    did have conversations regarding that.  He

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    accepted the salary under those conditions.

2        Q.   So the only difference if he got this

3    performance review and it was favorable, the

4    only difference between his, I guess, job status

5    would be getting benefits from Whiting-Turner as

6    opposed to the Union; is that correct?

7        A.   That's correct.

8        Q.   Okay.  And are the Whiting-Turner

9    benefits, is that a better benefits package?

10       A.   I don't know what the Union laborers

11   get.  I don't know.

12       Q.   Well, what is the reason why

13   initially Chuck and James Bush retained their

14   Union benefits as opposed to getting

15   Whiting-Turner benefits?

16       A.   It's basically an interim period of

17   time.  There is a difference between the way

18   James was hired with the company and the way

19   Chuck was hired with the company.  Chuck was

20   hired to be an assistant superintendent, but he

21   was still -- he still went through an interim

22   period of time where the company paid his Union

23   benefits.  Chuck was looking for a career with

24   Whiting-Turner and he was very anxious to obtain

25   that status.  James was hired, again, as a labor

```
 1    foreman and he was promoted, I guess, he went
 2    through two promotions, where Chuck was just
 3    hired in a capacity.
 4         Q.   So is it your understanding that Mr.
 5    Bush was not looking for a long-term career with
 6    Whiting-Turner?
 7         A.   No, I think he was.
 8         Q.   Did he ever express that to you?
 9         A.   Yes.
10         Q.   Tell me what he told you in
11    connection with that and when he told it to you?
12         A.   Actually, I think it was the other
13    way around.  In conversations that I had with
14    James, I told James that Whiting-Turner could be
15    a career job for him.  I think the words were,
16    this could be the last job you ever look for, as
17    a matter of fact.
18         Q.   And did he seem to be interested in
19    that?
20         A.   Yes, sir.
21              MR. POLLACK:  Can we take a
22    two-minute break?
23              (Thereupon, a recess was taken in the
24         deposition, after which the deposition
25         continued as follows:)
```

1        Q.    (By Mr. Pollack) The RFI reports, are

2    those the same things as the QC reports?

3        A.    No, sir.

4        Q.    Tell me what the difference is.

5        A.    An RFI stands for request for

6    information.  Quality control inspection is

7    something totally different.

8        Q.    Actually, maybe I can shortcut this.

9    Quality control is like you're signing off that

10   something is done correctly?

11       A.    Yes.

12       Q.    An RFI is you need information and so

13   you're making a request for it; is that correct?

14       A.    Correct.

15       Q.    The RFI and quality control reports,

16   are those kept on the job site?

17       A.    Yes.

18       Q.    Are they kept in binders of some

19   kind?

20       A.    Typically, yes.

21       Q.    When the job is finished, where do

22   those go?

23       A.    Into a file, into a job legal box,

24   they get boxed up and sent to a warehouse and

25   storaged.

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1        Q.   Here in town?

2        A.   Yes.

3        Q.   The Sawgrass job, I assume, is over?

4        A.   Yes.

5        Q.   The records, meaning the QC reports

6    and the RFI reports, if we wanted to get ahold

7    of those -- to do it a different way.  The QC

8    and the RFI reports in connection with the

9    Sawgrass job, those are in storage, boxed up

10   somewhere here in town?

11       A.   Yes.

12       Q.   Do you know where?

13       A.   Yes.

14       Q.   Can you tell me where?

15       A.   In Fort Lauderdale in our

16   Whiting-Turner, we have the little storage

17   warehouse.  I don't know the address.

18       Q.   Okay.  And they are labeled by

19   projects?  If someone wanted to go and get them

20   out of the warehouse, they can do that?

21       A.   Correct.

22       Q.   About how many boxes are we talking

23   about for purposes of this project during the

24   time that James Bush was employed?

25       A.   A dozen.

1        Q.   A dozen boxes?

2        A.   Yes.  That's an estimate.  I don't

3   know specifically, but I would assume that

4   there's a dozen.

5        Q.   Okay.  Are they separated by, for

6   instance, does Mr. Bush have his own box?

7        A.   No.  When Mr. Bush left the project,

8   his paperwork was in such a state of disarray

9   that I don't know that it ever got straightened

10   out.

11        Q.   Was it kept in a particular box or

12   location?

13        A.   No.  His stuff was all stuffed in the

14   drawer.  The day he left the job, I had the

15   dubious honor of cleaning out his desk.

16        Q.   Where did all those papers go?

17        A.   I discarded some of them, but I think

18   that some of them we saved.

19        Q.   Okay.  And would they be in a

20   discrete binder or were they mixed in with other

21   sorts of papers?

22        A.   If you're asking me if we can put our

23   hands on James' documentation --

24        Q.   Right.

25        A.   -- it would be quite an effort, but

1  I'm sure that we can produce some of James'
2  paperwork, yes.
3          Q.   That's what I was asking.
4          A.   Yes, sir, we can find some of it.
5               Again, a lot of it was incomplete.  A
6  lot of it was -- a lot of it, you couldn't make
7  heads or tails of it, and I threw a lot of that
8  stuff out.  A lot of the dimensional
9  verification that I had asked him to do, it was
10 on just blank pieces of paper rather than taking
11 a photo copy of the blueprint and then -- a lot
12 of it, you just couldn't understand what it was,
13 so the stuff that I determined meaningless at
14 the end of the project, I just discarded.  I
15 didn't know that I would be sitting here across
16 the table from you two years later.
17         Q.   The paperwork that he did do, when he
18 left, was that the first time that you had seen
19 that paperwork?
20         A.   No.  No, the quality control reports
21 would come to me regularly.  I really started to
22 keep an eye on his quality control reports after
23 the issue in building two happened, which I
24 already described to you as 19 columns being
25 constructed improperly.

1           Q.    When you say you started to keep an
2    eye on it, what does that mean?
3           A.    I did some self-verification.  I
4    wouldn't take James' report at face value.  I
5    would go out and spot check, myself.
6           Q.    When you spot checked these reports,
7    was there a problem with them?
8           A.    On some occasions.  But I think after
9    that occurrence, I think that James did a better
10   job verifying.  He didn't produce as many as he
11   started to in the beginning.  I think that James
12   became pretty frustrated.
13          Q.    When you say "he didn't produce as
14   many", and I guess I'm trying to move things
15   along --
16          A.    Okay.
17          Q.    -- but in the previous deposition --
18   when you say, "he didn't produce as many", I
19   understand that, from the way you're saying it,
20   to be that it was almost like his decision, I
21   want to produce some and I don't want to produce
22   some, as opposed to they need to be produced for
23   this reason and that reason on this occasion and
24   that occasion.  Am I misunderstanding?
25          A.    He would not produce them on every

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  occasion that I asked him to do so.

2          Q.    The reason you needed them produced

3  was for what, to verify?

4          MS. CESARANO:  Why don't you let him

5  answer?

6          THE WITNESS:  Our quality control

7  program is a -- it's self-verification that our

8  subcontractors are in compliance with plans and

9  specifications.

10          Q.    (By Mr. Pollack) What happens if

11  those reports aren't produced?

12          A.    If the reports aren't produced and

13  something is deemed not to be in compliance,

14  then -- the purpose of the reports is to catch

15  something immediately rather than to find out

16  after five other trades have covered up an

17  element of the construction and the sixth trade

18  that comes in recognizes that I can't install my

19  pipe or my ductworth because something that

20  should have been caught six phases earlier was

21  installed improperly.  Then the reason for doing

22  the quality control inspection is to alleviate

23  the possibility of dismantling and disassembling

24  five tiers of trade work in order to correct the

25  problem so that the sixth element -- and these

```
 1   numbers I'm throwing at you are completely
 2   arbitrary.
 3        Q.   So each phase of the project, there
 4   should be a QC report; is that correct?
 5        A.   That is a correct assessment.
 6        Q.   And the assistant superintendent is
 7   the person who does that or are there other
 8   people on the project that also do those
 9   reports?
10        A.   Anybody on the project who works for
11   Whiting-Turner can do that.
12        Q.   You say "can" ---
13        A.   I do them.
14        Q.   Does somebody have the responsibility
15   of producing a QC report?  Whose responsibility
16   is that?
17        A.   On that particular project, I did not
18   deem that to anybody as being primarily their
19   responsibility.
20        Q.   So that if they got produced or not
21   produced that was sort of a discretionary
22   decision on the part of the people on the
23   project?
24        A.   Not completely, but we did not -- the
25   truth is, we did not produce as many quality
```

1    control inspection reports as my boss would
2    probably like to see me produce.

3       Q.    Is it your position, as we sit here
4    today, that Mr. Bush was deficient in his job
5    for not producing quality control reports as he
6    should have?

7       A.    To some degree.  To a greater degree,
8    as stated earlier, the quality control reports
9    that he did perform were inaccurate, which is a
10   much larger problem than not producing one at
11   all.  Because when you produce a report that is
12   interpreted as being in compliance and an iron
13   worker comes on board and he stands up eight
14   columns and he goes down a line and he goes to
15   connect the corners and the beam that he
16   connects is a foot out of level and then you go
17   and -- I would rather have the quality control
18   reports not done than to have them done
19   correctly and to pursue additional work.

20      Q.    Other than the quality control report
21   that you identified with these 19 footings, were
22   there other quality control reports that Mr.
23   Bush produced that you believe to be inaccurate?

24      A.    I don't recall specifically.

25      Q.    So you don't know one way or the

1    other?

2              MS. CESARANO:  Was there more than

3    one, is what he's asking?

4              THE WITNESS:  There were 19 columns

5    that were poured.

6         Q.   (By Mr. Pollack) I understand.

7         A.   But he filled out a report.  Yes,

8    there was more than one.

9         Q.   Leaving aside that circumstance with

10   the 19 columns, I mean, there should have been

11   19 different reports?

12        A.   There was an entry feature footing

13   between building two and three that James was

14   responsible for the entire construction of and

15   it was formed up, the concrete was poured, and I

16   happened to come out while the concrete was

17   still wet.  It was three inches too high, so I

18   had to, myself and Jeff Cooper, the project

19   manager, along with a whole flood of laborers

20   went up there and raked the wet concrete up

21   before it hardened to get it back to grade.

22             James did several quality control

23   reports on brick pavers and landscaping.  There

24   were trees that were installed under his

25   supervision in an improper location that caused

1    them to be relocated.  And the elevation of them
2    was wrong so the brick pavers, rather than
3    coming in flat to the tree, the brick pavers
4    sloped up dramatically.  By the time the brick
5    pavers went in, there was so much other work
6    that had been put in place around the trees and
7    it was so close to the grand opening of the
8    mall, that it was unrealistic to try to pull the
9    trees out and lower them.

10        Q.   Anything else, as far as quality
11   control reports that were not correct?

12        A.   No.  There's a lot more quality
13   issues, but as far as reporting goes, no.

14        Q.   Just the reports.

15        A.   Not to my recollection.  I would ask
16   that I reserve the right to go through the
17   documents to see if there's any additional ones.
18   I presume I can come up with some more issues,
19   yes.  But I don't know any offhand ---

20        Q.   Based on your memory of the reports
21   that you reviewed?

22        A.   Yes.

23        Q.   In terms of other employees, people
24   at the job site who did quality control reports,
25   was the number of what you are indicating are

52

```
 1   mistakes or errors on these reports, was Mr.
 2   Bush's disproportionate --
 3        A.   Yes.
 4        Q.   You have to let me finish.
 5        A.   I'm sorry.
 6        Q.   -- disproportionate to other people's
 7   quality control reports?
 8        A.   Yes.
 9        Q.   Do you consider that to be an
10   important part of the job?
11        A.   Yes.
12        Q.   When did it become apparent to you
13   that his quality control reports, the problems
14   with them, were disproportionate to other
15   people, say, Mr. Bender, for instance?
16        A.   I would say that -- I wouldn't
17   suggest that there was a day that I said, oh, my
18   God, this is disproportionate.
19        Q.   When in time?  Give me a period in
20   time.
21        A.   I think there was -- there were
22   issues.  Are you referring specifically to
23   quality control reports again?
24        Q.   Just for right now, yes.  When, in
25   relation to when he left, six months before, two
```

1 | months before, a year before?

2 | A. I think when -- I think that the day

3 | it hit me over the head was the day I cleaned

4 | his desk out, and I don't make it a habit of

5 | going through other people's files. I don't

6 | want anybody going through mine. When I -- the

7 | day that James left, I think the day after James

8 | left, I started cleaning his desk out and it hit

9 | me like a ton of bricks that there were -- in a

10 | file drawer in a desk rather than file folders

11 | being placed and paperwork being inserted in a

12 | file folder or a Pentiflex, they were stacked.

13 | It was just all stacked on both sides of the

14 | drawers and in every one of the smaller drawers

15 | paperwork was stacked.

16 | Q. So after he left and you cleaned out

17 | the desk, that's when it became apparent to you

18 | there was a problem?

19 | A. No. It was apparent to me that there

20 | was a problem. The magnitude of the problem did

21 | not become apparent to me until he left.

22 | Q. When did it become apparent to you

23 | that there was a problem with the quality

24 | control reports?

25 | A. The day that I discovered that the 19

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  footings were poured wrong.

2        Q.    Thereafter you monitored his quality

3  control reports, correct?

4        A.    To some degree.

5        Q.    Because you were concerned about it,

6  you monitored them?

7        A.    Yes, to some degree.

8        Q.    Thereafter, there continued to be

9  problems with the reports, correct?

10       A.    To some degree.  Not a hundred

11  percent, no.

12       Q.    But problems that you just testified

13  to were disproportionate to those of other

14  people who did those reports, correct?

15       A.    Yes.

16       Q.    And those problems caused you

17  concern?

18       A.    Yes.

19       Q.    Did you voice that concern to Mr.

20  Bush?

21       A.    Yes.

22       Q.    When did you voice that concern to

23  Mr. Bush?

24       A.    Repeatedly.

25       Q.    Tell me ----

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1         A.    Again ---
 2         Q.    Tell me when.
 3         A.    If I reviewed.  If I took one of
 4    James' QC reports and went out and spot checked
 5    it and found it to be okay, in compliance, it
 6    was fine.  If I found one that wasn't
 7    dramatically wrong, but slightly wrong, I would
 8    offer him some advice on how he could better do
 9    it.
10         Q.    So your expectation was that if it
11    wasn't dramatically wrong, that was a good
12    thing?
13         A.    It was better than being totally
14    wrong.
15         Q.    That was your expectation for him,
16    correct?
17         A.    No.  My expectation -- my expectation
18    was that he would learn and develop and grow
19    into somebody who the company could in turn,
20    after the completion of the Sawgrass Mills Mall
21    or after the completion of another job or
22    another job, to hand a set of drawings and a set
23    of specifications to him and for him to go build
24    his own project.  Those were my expectations.
25         Q.    How long did you think it would take
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  for him to reach that point?

2       A.    It takes different people a different

3  amount of time.

4       Q.    Well, when you became concerned in

5  May of 1998 after the 19 footings, how long did

6  you think it would take for him to reach that

7  point?

8       A.    I can't speculate.  There's not a

9  date you can put on something like that.  I

10  would -- at a point in time where I felt

11  comfortable that somebody is capable of handling

12  that responsibility, then I would recommend it

13  to Rob Mitchell.  I wouldn't say that in March

14  of 1998 or April of 1999, that I could have made

15  a recommendation that James Bush go out and

16  build a project on his own.

17       Q.    It sounds like from what you're

18  testifying to that you couldn't make a

19  recommendation that he do much of anything?

20       A.    He's a great labor foreman.

21       Q.    But that wasn't the role that he was

22  hired in in March, according to you, in March of

23  1998, correct?

24       A.    That's correct.

25       Q.    The assistant superintendent is the

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1   person directly underneath you, correct?
 2        A.   Correct.
 3        Q.   They are the one who is sort of your
 4   right hand; is that a fair statement?
 5        A.   Yes.
 6        Q.   They are the one that's supposed to
 7   be trouble shooting, correct?
 8        A.   Yes.
 9        Q.   They are the person, to some degree,
10   that takes work and responsibility off of your
11   back, correct?
12        A.   Yes.
13        Q.   And that's what you are looking for
14   in that person, correct?
15        A.   Yes.  Yes.
16        Q.   Tell me what other problems there
17   were with Mr. Bush, other than the QC reports?
18        A.   There were numerous issues that
19   arose.
20        Q.   Actually before you tell me what they
21   were specifically, were the problems
22   disproportionate in number to the problems with
23   other people on the job site?
24        A.   Yes.
25        Q.   Were the problems disproportionate in
```

 1    severity and magnitude to other people on the

 2    job site?

 3         A.    Yes.

 4         Q.    And these problems commenced around

 5    May of '98, correct?

 6         A.    The biggest problem, yes.

 7         Q.    Did they commence earlier?

 8         A.    Well, I described to you in the first

 9    building already.  I already testified that in

10    building three, which was the first building we

11    began to construct, that there were anchor bolts

12    placed improperly and they had to be --

13    fortunately, these were caught before steel was

14    erected and these problems were corrected before

15    they became a huge problem, but, yeah, I mean,

16    right out of the shute and primarily inherently

17    I think that most of these problems stemmed from

18    James' inability to do layout and his lack of --

19    I mean, I brought him out in the field several

20    times, set the transit, the equipment up, and

21    tried to show him.  I did show him how to use

22    it.  I brought Chuck Bender and James Bush, both

23    at the same time, in the very early on stages of

24    the job, showed them how to use the equipment.

25    Chuck would step right up to it and jump right

1   in there and James would stand there and go
2   uh-huh, I see, uh-huh.  I encouraged him to use
3   it.  I encouraged him several times to take the
4   equipment out even if you're doing verification.
5   And, in fact, had he used the equipment or been
6   able to use it, this issue back with the 19
7   columns would have been caught.

8       Q.   Was that consistent, the standing
9   there and saying uh-huh, was that consistent
10  with Mr. Bush, your experience with Mr. Bush at
11  the prior project at Bloomingdale's?

12      A.   No.

13      Q.   Did it seem inconsistent?

14      A.   It was a different role.  James, in
15  the capacity of a general foreman for laborers,
16  wouldn't need to be told what to do because he
17  had a tremendous amount of experience in that
18  role.  As an assistant superintendent, this was
19  clearly his first opportunity to act in that
20  capacity and I understood that.  I was the one
21  who promoted him from the general foreman into
22  that capacity and I also understood that James
23  would probably need more training because of his
24  prior work experience.

25          It was frustrating that I would --

1  you would ask him if he understood how to use
2  the equipment and he would tell you yes, I do,
3  but then he'd never use it.  Every time I told
4  James to go out and do some layouts, he'd grab
5  the equipment and go out in the field and a half
6  an hour or so later in my travels throughout the
7  job, and I was out there every day, James would
8  have a carpenter using the equipment.  James was
9  supposed to be doing the verification.

10         I asked him about that one day in my
11  office.  Why do you refuse to use this
12  equipment?  And he said, Eric, I just want it to
13  be right.  And I said, are you telling me that
14  you can't use the equipment?  Is that why you
15  have the carpenters doing it?  He said, Eric, I
16  just want it to be right.  James was very
17  elusive in answering a direct question like
18  that.  I think he was very proud.  My personal
19  opinion is that James couldn't use a transit if
20  he had to.
21         Q.   Is that a complicated piece of
22  machinery?
23         A.   Everything is relative.  It's not
24  complicated if you know how to use it.  Is that
25  a complicated piece of machinery?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1            Q.    Well, "that", let the record reflect,

2        is the transcription machine for the court

3        reporter that you need training to use.

4            A.    Right.

5            Q.    I guess my question is:   Is it

6        something you can use with fairly little to no

7        training to use the equipment?

8            A.    I offered the training.   I had James

9        and Chuck out in the field several times in the

10        early stages of the job because at that point in

11        time, time permitted the training and James was

12        exposed to the same training as Chuck Bender

13        was.

14            Q.    Was the use of that transit, that

15        piece of equipment, important to being able to

16        do the work that the assistant superintendent

17        had to do?

18            A.    Yes.

19            Q.    Was is it necessary?

20            A.    Yes.

21            Q.    It wasn't optional?

22            A.    No.

23            Q.    Did there come a point when you

24        realized that James Bush couldn't use that

25        equipment?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1        A.    Yes.
 2        Q.    When was that point?
 3        A.    Are you asking me a time?
 4        Q.    Yes, I am.
 5        A.    I would say that it became completely
 6   obvious to me that he couldn't use that
 7   equipment when we put James in charge of another
 8   phase of the job, which was called Main Street.
 9   James was in charge of the construction of two
10   buildings.  Well, let me stop.
11        Q.    Can you tell me when that was?
12        A.    Time frame?
13        Q.    Yes.
14        A.    A date?
15        Q.    Yes.
16        A.    I'd be guessing.
17        Q.    To the best of your recollection.
18        A.    We said that the columns in building
19   two was in May, correct?
20        Q.    That's correct.
21        A.    I would guess we're talking August or
22   September because at that point in time, we
23   started a new phase called Main Street, and we
24   didn't have a subcontractor on board to perform
25   some foundation work so we estimated the work
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  one of the engineers did, and we asked James to,
2  since building three and building two were --
3  they were erected and they were under control at
4  that point, we asked James to step into this new
5  phase.
6          Again, at that point in time, I made
7  an assessment that James was not overwhelmed on
8  his first assignment.  It had been far enough
9  along in a completion phase that I thought that
10 he should be able to roll over and accept some
11 additional responsibilities.
12     Q.    Despite the problem with the 19
13 footings?
14     A.    Correct.
15     Q.    I'm sorry, go ahead.
16     A.    And, again, getting back to the
17 layout issue, I would consistently see
18 carpenters using this equipment, not James.  And
19 when I questioned him about it, his response
20 was, I just want to get it right, so he, you
21 know, he did not verbally refuse to use the
22 equipment.  He just wouldn't put his hands on
23 it.
24     Q.    What other problems did you have with
25 Mr. Bush?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1          A.    I think one of the other inherent
2     problems that we had was James -- James would
3     identify problems in the field, but he didn't
4     have -- he didn't have the ability to resolve
5     them.  I think despite conversations that he and
6     I had, I think that James thought that his
7     responsibility started and ended in identifying
8     a problem and bringing it to somebody's
9     attention.

10               A superintendent has to be someone
11    who not only can identify a problem and tell you
12    that there is a problem, but has to be somebody
13    who pursues the repair or the fix, whether it be
14    through a subcontractor, an architect, a
15    structural engineer, a civil engineer, an owner
16    or whomever, to track the problem down, track
17    down the resolution and implement a repair or
18    the resolution to a problem with the minimal
19    schedule and minimal cost impact.

20               James repeatedly would bring
21    something to somebody's attention, and I would
22    be aware of some of the issues.  Three days
23    later, I would ask James whatever happened with
24    that and he would say, well, I told so and so or
25    I told Sergio.  He felt that his responsibility

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    ended by identification of a problem and that's
2    not the role of a superintendent.

3                An example, there was a conduit that
4    was installed and it was a seemingly
5    insignificant issue that went on for three
6    months, and we had an owner's representative
7    screaming at us in our office. An electrician
8    installed an exterior conduit along a masonry
9    wall by a loading dock. The owner's
10   representative in a monthly walk-through pointed
11   it out and we had asked -- it was in James'
12   realm of supervision. It was in one of the
13   areas that he had been delegated. We had asked
14   him to get the conduit lowered. It had to be
15   lowered six inches into the dirt so that it
16   wasn't visible to the public.

17               It took three months and I finally
18   had to get the electrician over there and showed
19   it to him. He fixed it the next day. That's
20   one example.

21        Q.    When in time, roughly, did that occur
22   in relation to when he left, Mr. Bush left?

23        A.    This was near the end. James, I
24   think left in April of '99. Is that right? I
25   would say that this was in, I don't know,

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    December, '98, January, '99, and it finally got
2    resolved probably in March.
3         Q.    Did other people complain to you
4    about Mr. Bush's work?
5         A.    Other people complained to me about
6    this specific issue, yes.
7         Q.    This specific issue being the
8    conduit?
9         A.    Yes.
10         Q.    Other than the conduit, were there
11    any other complaints of Mr. Bush's work from
12    people on the job site?
13         A.    Yes.
14         Q.    Tell me what those were.
15         A.    One of the pavers.   The
16    superintendent for the brick paver would
17    complain that areas were not ready when he was
18    told to get in there.   That was, again, on Main
19    Street.
20              Jeff Cooper complained to me a lot
21    about James in his inability to resolve issues
22    and inability to hold to some scheduled dates.
23              Again, we put James in charge of, I
24    testified a little earlier, about some
25    foundations on Main Street that we had asked

1   James to do.  We had asked James to do that
2   because he had told me that in his prior
3   experience that he even had his own concrete
4   company and, you know, he was a concrete
5   subcontractor.  I thought, here's an opportunity
6   for the guy to shine, if he had a business,
7   owned a company, and he did concrete work, here
8   is something that we can get him in there doing
9   that's going to give him an opportunity to look
10  good.  It wasn't a very complicated job.  There
11  was a lot of footing.  They supported canopies
12  in buildings three and four.  There were kiosk
13  footings.  It seemed to take forever, for this
14  stuff to get done.  I know that it went
15  tremendously over budget.  I know that it
16  required more people.  We had to hire people to
17  put on it just to keep ahead of subcontractors
18  because it just wasn't getting done on time.  It
19  just seemed to drag on forever.  And my project
20  manager was irate that it went over budget when
21  it shouldn't have.  It took too much time.
22      Q.   Let me ask you just to shift gears
23  for a moment.  Were you present when Mr. Bush
24  announced that he was leaving Whiting-Turner?
25      A.   Yes.

```
 1         Q.    Was that a formal or an informal
 2    meeting?
 3         A.    I would say that -- I would say that
 4    was as formal a meeting as we had ever had.
 5         Q.    Did that take place in the trailer?
 6         A.    Yes.
 7         Q.    Tell me who else was present for that
 8    meeting?
 9         A.    Jeff Cooper and James Bush.
10         Q.    Not Robert Mitchell?
11         A.    No.
12         Q.    Was Robert Mitchell present at any
13    meeting in which James Bush talked about leaving
14    the company?
15              MS. CESARANO:  You mean with him,
16    present with him?
17              MR. POLLACK:  That he knows of.
18              THE WITNESS:  No.  Rob Mitchell is
19    the vice president, regional vice president, for
20    Whiting-Turner.  He works out of our Fort
21    Lauderdale office.  He makes site visits
22    occasionally.  He doesn't have an itinerary of
23    time frames when he comes out onto these
24    projects.  Rob was there many times.  I couldn't
25    begin to tell you when.  I don't document when
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    Rob comes on site.

2         Q.    (By Mr. Pollack) There wasn't a

3    meeting that you know of where Mr. Bush met with

4    Robert Mitchell about leaving the company?    If

5    you don't know about it ---

6         A.    I don't know.

7         Q.    The meeting that you were present at

8    with Jeff Cooper, tell me when that occurred and

9    what transpired at that meeting?

10        A.    Can I tell you how the meeting came

11   about?

12        Q.    You certainly can.

13        A.    We had -- we received direction from

14   the owner to proceed with another element of

15   concrete work in Main Street.    It was to

16   construct some foundations for a kiosk.    It was

17   an exterior sales booth, if you will.    And since

18   James had been in charge of Main Street and

19   since James had been doing the foundations on

20   Main Street, it was just natural to give that --

21   to ask him to do that.

22             One of the project engineers, Sergio

23   Tio, went out to say to James, we got released

24   from the owner to do these.    We all knew of them

25   and we had drawings.    It was just an area that

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1   was on hold while the other work transpired. So
2   Sergio went out and asked James, you know, we
3   got released. We need you to go ahead and get
4   started on those footings. Sergio later came
5   into my office or in passing through the trailer
6   and said, what's up with James? And I said,
7   what do you mean? And he said, you know James
8   just went off on me in the field. And, you
9   know, I said what happened? He explained to me
10   that he had gone out and asked James to get
11   started on this element of work and that James
12   said something to the effect of, I'm not smart
13   enough to do concrete work. I'm not going to do
14   it. Get somebody else. And that's not a quote,
15   but that was the gist of the conversation. And,
16   you know, I knew that James' attitude had
17   changed for some time, but he had never
18   exhibited that type of behavior.
19         So I immediately went out there and I
20   approached him and I asked him what's the
21   matter, and for the first time in the entire
22   time that I employed that guy, he was clearly
23   upset, said how unhappy he was, how he felt that
24   we didn't treat him right. Told me he wasn't
25   going to pour any more concrete, to find

1  somebody else.  And it got loud and I asked him
2  to come over.  I said okay.  I didn't want to
3  stand there and argue.  It wasn't professional
4  to stand there and argue.

5            I went back to the trailer.  I spoke
6  to Jeff Cooper, the project manager, and I said,
7  we need to ask James to come over to the
8  trailer.  He's upset.  Here's what I heard.
9  Here's what Sergio heard.  We need to sit down.
10 And it was at that time that I called James on
11 the radio, asked him to come over to the
12 trailer.  About a half an hour later, he came
13 over.  We sat down in Jeff's office.  We closed
14 the door.  And it was at that time that James --
15 he went on for two hours about all his prior
16 experience in construction, which is extensive.
17 Clearly the guy has got some 30-some years in
18 the construction industry.  And he talked a lot
19 about all of the accommodations he had received
20 as a general labor foreman, all of his success
21 as a general labor foreman.  He described all
22 the companies that he had ever worked for.  He
23 described the great relationship that he had had
24 with all the people throughout the years.  And
25 he said that this was the worst job he had ever

1    had.

2            The disappointment at that point in

3    time that I had was that this man, this grown

4    man, had never come to me and expressed any of

5    these feelings.  Never.  You know, if my

6    employees are unhappy with anything, I have an

7    open door policy.

8            Several of my employees will come

9    into my office and we'll close the door and

10   they'll voice their opinion.  James never

11   offered that.  Never one time expressed any

12   displeasure verbally.  He walked around like

13   there was a big gray cloud over his head a lot,

14   and I had asked him about that a couple of times

15   and I said, you know, we have to work on your

16   attitude.  I don't have a bad attitude.

17   Clearly, he did.  But he would not elaborate.

18           The meeting in Jeff's office went on

19   for an hour and a-half, maybe two hours, and at

20   the end of the meeting -- as I recall, it was

21   March 22nd.

22           MS. CESARANO:  '99?

23           THE WITNESS:  Yes.  At the end of the

24   meeting, he expressed to Jeff and I that he had

25   made a decision that on April 16th -- our grand

1    opening date for the mall was April 15th, '99 --
2    and he expressed to us that he was going to stay
3    through, that he had made a commitment to work
4    on that job. He was going to stay there until
5    the job was done, but on April 16th, he was
6    going to resign from Whiting-Turner.

7         Q.    (By Mr. Pollack) What did you and/or
8    Jeff Cooper say?

9         A.    Well, as I recall, you know, I told
10   James that he didn't have to resign. If he was
11   unhappy working in the capacity that he was that --
12   you know, and I think we had a conversation
13   about this prior to this meeting, too, once; I
14   don't know the date -- about the possibility of
15   him -- and, again, it was in '99, it was as the
16   job was coming to closure -- about the
17   possibility of him going back on an hourly pay,
18   if he would be more happy.

19             I know that in that meeting, on March
20   22nd, Jeff asked James if he would feel more
21   comfortable or if he thought he would be more
22   happy going back to being a laborer's general
23   foreman because that was truly his area of
24   expertise. I think that James was very upset at
25   the time and I don't think James was interested

1    in entertaining any ideas or suggestions.  James
2    pretty much laid it down that he was not happy
3    and that his decision -- in that conversation,
4    he referred back to his wife many, many times,
5    on how he and his wife had had conversations for
6    a long time.

7            At that time, it was apparent to me
8    that he had been harboring some pretty ill
9    feelings for a long time.  You know, it's
10   unfortunate that he never brought them to me
11   before they exploded on March 22nd.

12       Q.   Anything else that was said in that
13   meeting, that you recall?

14       A.   Well, the meeting went on for two
15   hours.  I couldn't begin to repeat it verbatim.
16   I think that basically was the context of the
17   meeting.

18       Q.   After that, were there any other
19   meetings that you had prior to the time he left?

20       A.   The one I specifically remember was
21   the day before he left and that's when he handed
22   me a letter of resignation.  It might have been
23   the 16th, as a matter of fact.  I don't know if
24   it was the 15th or if it was the 16th, but he
25   came into my office and he handed me an

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1   envelope, which I didn't read in front of him.
2   But I closed my door and for the first time, he
3   and I were in my office one on one. He told me
4   that he felt that he was treated unfairly. I
5   told him at that time and, for the record, I
6   still believe, under oath, that the man was
7   never treated unfairly. That conversation
8   probably went on for five minutes. He, again,
9   reiterated his prior experience and the
10  conversation in that last meeting that we had
11  was completely non-confrontational. We were
12  both -- I was sorry that he was leaving the
13  company, for a lot of reasons. You know, I was
14  sorry that he had the feelings that he had. I
15  was sorry, and I'm still sorry that things
16  worked out for James the way they did, because I
17  hold a tremendous amount of respect for his
18  abilities as a labor foreman. He's the best
19  labor foreman I've ever worked with and I've
20  been in the business for 23 years. But he had
21  made his mind up. I did tell him that if things
22  didn't work out down the road, that I'd love to
23  have him back working for me as a labor foreman,
24  and he kind of smiled and said he didn't think
25  that would happen, but that was the tone and the

1    gist of that meeting.

2         Q.    In that meeting when he said he felt
3    he had been treated unfairly, did he say that he
4    felt he was treated unfairly because of his
5    race?

6         A.    Yeah.    I think he mentioned that.
7    And that shocked me because that couldn't be
8    further from the truth.    At no time was he ever
9    mistreated because of his race.    I've seen some
10   documentation that he also, I guess, is
11   contesting that his age was an issue.    That
12   simply just couldn't be further from the truth.

13              In that meeting, when he did say
14   that, I looked him in the eye and I said, James,
15   have I ever done anything to lead you to believe
16   that I've discriminated against you because
17   you're black?    And he said no.    And when he said
18   that, I again didn't pursue that because I had
19   no reason to believe that there was any truth to
20   it or there was a foundation for it.    He
21   expressed that.    We talked about it briefly and
22   that was the end of that part of the
23   conversation.

24              You know, again, in no way do I feel
25   that he was ever treated unfairly in the

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1   capacity of race or age.
 2        Q.   Did he discuss with you in that
 3   meeting or on any other occasion about a
 4   Christmas party at Robert Mitchell's?
 5        A.   Yeah.  I think he discussed that with
 6   us in the March 22nd meeting.  That was an issue
 7   that he brought up.
 8        Q.   What did he tell you and what was the
 9   response?
10        A.   He said that he was upset that he did
11   not get invited to the Christmas party.
12        Q.   And what did you say or what did Jeff
13   Cooper say?
14        A.   I didn't know why he didn't get
15   invited and I don't know that Jeff could
16   specifically at that point in time answer the
17   question, either.
18        Q.   So you didn't know why he was not
19   invited?
20        A.   No.  I'm not in charge of the -- I'm
21   not trying to be sarcastic, but I don't invite
22   people to Rob Mitchell's house.
23        Q.   Did it seem odd to you that he wasn't
24   invited?
25        A.   It did and it didn't.  Not really.
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1   It didn't seem odd to me because for a couple of
 2   reasons.  I mean, James was still a Union
 3   benefits guy.
 4             In retrospect, looking around at the
 5   people that were at Rob's house, I think
 6   everybody that was there was management,
 7   salaried, Whiting-Turner benefits.  I don't
 8   remember -- I don't remember there being any of
 9   the Union slash supervisors there.
10             Another reason it didn't seem -- it
11   didn't wave a red flag to me is because on
12   numerous, numerous, numerous occasions we would
13   get -- subcontractors would offer us tickets to
14   a hockey game or a football game or a baseball
15   game or something, a sporting event, and if they
16   were offered to me, just simply as a matter of
17   comradery if I was interested in going, I would
18   still invite the field guys, the
19   superintendents, rather than invite the project
20   managers.  So I would always request the
21   presence of my field guys.  I had more fun with
22   them.  Numerous times, I had asked James to join
23   us, Chuck, myself, and he declined every time.
24             One thing occurred one afternoon that
25   really bothered me.  On an afternoon that I had
```

1  offered him to go with us to a basketball game
2  or something, he declined, graciously declined.
3  And a few minutes later, I came walking around
4  the corner and he was talking to one the
5  secretaries and I overheard him, as I was coming
6  down the hallway, say, can you believe those
7  guys would ask me to go to whatever it was with
8  them? I don't want to spend any time with those
9  guys. And you know it startled me. It shocked
10 me. I didn't question him about it. I came
11 around the corner. He saw me. He knew I
12 overheard him. I think he was a little
13 embarrassed by it. I was certainly embarrassed
14 by it, that he said it, that I overheard it. I
15 was very sorry that that was his attitude
16 towards our team.
17      Q.   Why didn't you question him?
18      A.   It was very awkward, and I don't know
19 what kind of question you would ask somebody
20 like that. I mean, I think from what I
21 overheard, his position was pretty clear.
22      Q.   Clearly it was an indication there
23 was a problem, wouldn't you agree?
24      A.   Yeah.  That's a fair assessment.
25      Q.   When did that occur in time?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1          A.    I don't know.  I honestly don't
2    remember.  It was -- I want to say it was around
3    the middle of the job.  It wasn't in the very
4    beginning and I don't think it was near the end,
5    either.  I would have to guess it was somewhere
6    in the middle of the job.
7          Q.    Did you have problems or
8    confrontations with other guys on the job site,
9    with you personally?
10         A.    Confrontation is basically what I do
11   for a living.
12         Q.    It's what we do for a living.
13         A.    I confront people five times an hour.
14   I confront people.  Again ---
15         Q.    Let me rephrase the question.  Did
16   you have any kind of clashes, be they
17   personality based or other based, with the
18   people who you worked with at your job site?
19         A.    Are you asking me if I have ever
20   reprimanded anybody else from Whiting-Turner.  I
21   don't understand.  Again, as the role -- my job --
22   the answer is yes.
23         Q.    Let me ask it a different way:  Have
24   you been angry with other employees about things
25   that they've done and then subsequently

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1   confronted them?

2        A.   Yes.

3        Q.   Have you been angry with employees at

4   Whiting-Turner about things that they've done,

5   not necessarily in terms of they did something

6   wrong with their work, but there was some

7   problem, there was some issue ---

8             MS. CESARANO:   Let me object to form.

9        Q.   (By Mr. Pollack) Let me finish my

10  question and then if you understand it, you can

11  answer it.   Have you had problems, not

12  specifically where you said to somebody you did

13  something wrong, your work is not good, but

14  either a personality clash, something like that,

15  where you've had a conflict with someone?

16            MS. CESARANO:   Object to the form.

17  You can answer the question.

18       Q.   (By Mr. Pollack) Do you understand my

19  question?

20       A.   I do, but I think your question is so

21  vague that I'd have a difficult time giving you

22  a clear answer.   You know, I'm in the

23  construction industry.   I'm 41 years old.   I

24  have confrontations and clashes with my wife and

25  my kids.

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1            Yeah, clearly other people with

2   Whiting-Turner, there's been -- the gentleman

3   that you interviewed here just a while ago, Mr.

4   Bender, has been in my office.  The difference

5   being ---

6        Q.   He's been in your office -- you've

7   called him in or he has just come in?

8        A.   He's come in on his own.

9        Q.   Have you ever called him in?

10       A.   I don't -- I don't think I ever had

11   to call him in.

12       Q.   Have you ever had to call anyone in

13   for a problem, other than, you did something

14   wrong with your work?

15            MS. CESARANO:  Object to form.

16            THE WITNESS:  Again, with all due

17   respect, I think the question, it's a vague --

18   you're asking me a vague question.

19       Q.   (By Mr. Pollack) Well, you just

20   testified that you overheard something that Mr.

21   Bush said.

22       A.   Right.  No.  I didn't call him into

23   my office and question him, what's the problem.

24       Q.   And what you overheard, troubled you,

25   you testified to that, correct?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1      A.    That's correct.

2      Q.    It bothered you?

3      A.    Yes, it did.

4      Q.    And you did not call him in or choose

5  to discuss it with him, correct?

6      A.    Correct.

7      Q.    My question is:  Have you ever had a

8  similar kind of circumstance where something

9  happened, not necessarily that particular thing,

10  somebody refusing your tickets, where ---

11      A.    No.  To answer your question, no.  In

12  my business, it does tend to get -- it's a

13  stressful industry, very stressful, especially

14  in the management capacity.  A lot of times,

15  very often, very often, I'd say it's common that

16  there are serious confrontations on a project

17  between subcontractors, employee to employee.

18  People get -- people get emotional.  They get

19  wound up and people say things.

20          I've had people who work with me --

21  I've had people who work for me get angry and

22  curse at me.  You tend to discount a lot of that

23  stuff as just the emotions that are involved in

24  working under tight schedules in extreme

25  conditions, in 90 degree temperatures, 15 hours

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    a day.  No, it's not something that I would call
2    somebody into my office for.
3         Q.   Did you work with Mr. Bush on a
4    regular basis?
5         A.   We worked -- yeah, he was working out
6    of my office everyday.
7         Q.   You saw him everyday more or less?
8         A.   Yes.
9         Q.   Is it your testimony that up until
10   that March, 1999 meeting, you had absolutely no
11   idea that James Bush was disgruntled and had
12   problems with Whiting-Turner?
13        A.   No.  I wouldn't say that.
14        Q.   Okay.
15        A.   Let me rephrase that.  He was
16   disgruntled.  I didn't know what his problem
17   was.
18        Q.   And you didn't inquire up until that
19   meeting?
20        A.   Twice I did.  And I testified a
21   little earlier that I had made a comment to him
22   one day about his attitude and his response was,
23   I don't have an attitude.
24        Q.   Did you ask anybody else what was the
25   problem with him?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1          A.    No.

2          Q.    Let me ask you this:    When did it

3    become apparent to you that there was a problem

4    that he was feeling disgruntled or there was

5    some problem with him?

6          A.    I guess two things that occurred, his

7    attitude.

8          Q.    When did that problem become apparent

9    to you?

10         A.    I would say that his attitude changed

11   dramatically back in May.  It started to change,

12   but it didn't completely change, but it

13   continued to get worse back in May with that

14   issue with the 19 columns and it continued to

15   deteriorate.

16         Q.    Did it deteriorate -- was it kind of

17   a steady line or did it go down?

18         A.    Oh, I'd say it went down.

19         Q.    How quickly did it go down?

20         A.    Well ---

21               MS. CESARANO:  I'm going to object to

22   form.

23         Q.    (By Mr. Pollack) If you understand,

24   you can answer.

25         A.    I think it continued to go down until

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  the day he left and then it came to a head and
2  then he left.
3      Q.   But it wasn't all of a sudden, it was
4  constant from May until the day he left, it went
5  down?
6      A.   That's my opinion.
7      Q.   And you were aware of that?
8      A.   Yes.
9      Q.   You were aware of all these other
10 problems that you testified to concerning his
11 reports, concerning his performance; is that
12 correct?
13     A.   Yes.
14     Q.   And yet on the day that he told you
15 after two hours that he wanted to leave, that he
16 was unhappy and all of these reasons,
17 notwithstanding all of those problems,
18 notwithstanding the problem with his attitude,
19 your testimony is that you said well, gee, there
20 may be some other opportunities, you can
21 continue to work here; is that correct?
22         MS. CESARANO:   Objection to form.
23 You can answer.
24         THE WITNESS:   Yeah.   I mean, that is
25 correct.

1           Q.    (By Mr. Pollack) Okay.  Then let me
2      ask you this:  Because here's what baffles me,
3      and it baffled me in the last deposition and it
4      continues to baffle me.  Would it be fair to say
5      that what you described in terms of Mr. Bush as
6      an employee in this deposition is that he wasn't
7      a very good employee during the time that he
8      worked on the Sawgrass project; is that a fair
9      statement?
10          A.    No.
11          Q.    So ---
12          A.    I think that in the beginning of the
13     Sawgrass project, he did well and as the job
14     progressed and the responsibilities increased
15     and as the necessity for him to perform more
16     detailed more thorough duties, I don't think he
17     performed them well.
18          Q.    Is it a fair statement that that
19     started around May of '98 and continued until
20     the time he left?
21          A.    Yes.
22          Q.    For a period of about a year,
23     correct?
24          A.    Uh-huh.
25          Q.    Then my simple question to you, and

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1    it continues to baffle me is:  Why would you,
 2    the superintendent in charge of Mr. Bush, the
 3    assistant superintendent, your right hand
 4    person, the person that you relied on to
 5    troubleshoot for you, to take care of all these
 6    problems, why would you wait a year and you
 7    didn't even fire him, he left, a year went by
 8    and nothing was done?
 9              MS. CESARANO:  Objection to form.
10         Q.   (By Mr. Pollack) Can you explain that
11    to me?
12              MS. CESARANO:  Objection to form.
13              THE WITNESS:  James was an assistant
14    superintendent.  He wasn't a superintendent.
15    The project success and the project's completion
16    are my responsibility.  They weren't James'
17    responsibility.  Wherever I felt James was
18    deficient, I would step in.
19              We've had other assistant
20    superintendents who -- again, getting back to
21    something I mentioned earlier, people perform at
22    different levels.  Grant it, I didn't feel James
23    was excelling as an assistant superintendent,
24    but wherever he was deficient, I was there and I
25    was making sure things got done.
```

1          Q.    (By Mr. Pollack) Doing his job?

2          A.    Part of it.

3          Q.    And people excel at different levels.

4     That is true.  If I hire somebody and they are

5     not doing a job, normally wouldn't you, as a

6     boss, want to do something about that?

7          A.    Well, I tried to do things.  I tried

8     to train him.

9          Q.    And it didn't work, correct?

10         A.    Correct.

11         Q.    And it didn't work for a period of a

12    year, correct?

13         A.    Correct.

14         Q.    And as far as you knew, if he hadn't

15    walked into the trailer that day and said he was

16    leaving, he would have continued to work for

17    Whiting-Turning as an assistant superintendent

18    on that project, correct?

19         A.    No, not necessarily.

20         Q.    Did you have any intention ---

21              MS. CESARANO:  On that project?

22              THE WITNESS:  Okay.  Go ahead.

23         Q.    (By Mr. Pollack) In March of '99,

24    when he came into your trailer and said, I'm

25    resigning, was it your intention at that point

```
 1   to get rid of him?
 2        A.   No.
 3        Q.   Is it possible that Whiting-Turner
 4   didn't address all of these concerns or problems
 5   that they had with Mr. Bush because he was
 6   black?
 7        A.   No, absolutely not.
 8        Q.   So it's Whiting-Turner's policy to
 9   keep an employee on for over a year when
10   repeatedly, time after time, that employee,
11   according to your testimony, according to Mr. --
12             MS. CESARANO:  Bender.
13        Q.   (By Mr. Pollack) -- Bender's
14   testimony, isn't doing his job and isn't
15   performing; is that correct?
16        A.   I wouldn't classify it as a company
17   policy.
18        Q.   In this situation, is that what
19   happened?
20        A.   Can I finish?
21             MS. CESARANO:  Can he answer?
22             MR. POLLACK:  Yes.
23             THE WITNESS:  Allow me to answer the
24   question you've asked me.
25             You've stated -- you asked me if it
```

1   was company policy.  The company does not have a
2   written policy regarding the conditions under
3   which somebody should be terminated, but my
4   company does have a -- I'm searching for the
5   proper word.  There is an underlying unwritten
6   policy that we try -- James was a loyal
7   employee.  He showed up every day.  While he was
8   there, he worked hard.  He worked hard, and it's
9   not the company's policy to terminate a
10  reliable, hard working person, especially since
11  we -- I personally approached him and I asked
12  him to step up into a position unfamiliar to
13  him, because I felt that the man was capable of
14  performing that job.
15              What kind of a person would I be to
16  promote a guy and then turn around and fire him
17  because he couldn't fill the shoes of a job that
18  I asked him to step up to knowing that he had no
19  prior experience?  No, I wasn't going to fire
20  James at the end of that job.  At the end of
21  that job -- I wanted James to finish that job as
22  an assistant superintendent, but upon the
23  completion of that job, I was going to suggest
24  that James go back into the role of a laborer's
25  general foreman.

1          Q.    (By Mr. Pollack) Was there any record
2    that you, as his boss made, any written record,
3    of all of these problems that had occurred with
4    Mr. Bush?
5          A.    No.  We don't keep -- if you're
6    asking me if I have a personnel file on James --
7          Q.    Right.
8          A.    -- no, we don't do that.
9          Q.    Was there ever any discussion at all
10   among you or anybody that you know of at
11   Whiting-Turner to the effect that there was a
12   concern that if you took action against Mr. Bush
13   that there might be a problem because of his
14   race?
15         A.    Absolutely not.
16         Q.    Or because of his age?
17         A.    Absolutely not.  Positively,
18   emphatically, no.
19         Q.    When did the project end?
20         A.    April 15th, '99 was grand opening.
21   There was a period of time -- as a matter of
22   fact, there was a scope of work.  We had to do
23   something for the client.  Hilfiger was one of
24   the tenants who came in late.  The grand opening
25   of the project occurred and they, I think, were

```
 1   just starting their construction.  We assigned
 2   that entire build-out from start to finish to
 3   Chuck Bender, so Chuck was on the project for a
 4   couple of months beyond the completion date.  It
 5   was -- again, it was, for lack of a better term,
 6   we bailed the client out.  Our client had an
 7   anchor tenant who failed to get their contractor
 8   on board timely.  It caused them to fail opening
 9   with the mall grand opening and our client asked
10   us if we would help them out and we would.
11            At that point in time, it was my
12   opinion that Chuck had excelled throughout the
13   entire process, the entire job, and that he was
14   ready and able to be delegated the
15   responsibility of building out this space.
16            Again, the interior build-out that we
17   asked Chuck to do was very, very similar to all
18   of the work that he had done in the past for
19   Lotspeich, the company that he worked for,
20   before he came to work for us.
21        Q.   I don't know if you were present when
22   there was an equal employment opportunity
23   training that was given to the people at the job
24   site.
25        A.   Yes.
```

1          Q.    Were you present at that training?

2          A.    Yes.

3          Q.    Do you recall whether Mr. Bush was

4    present at that training?

5          A.    I recall.

6          Q.    Was he present at that training?

7          A.    He was present just prior to the

8    meeting and there were -- there were palm trees

9    that he was coordinating the installation of out

10   in front of the Regal Movie Theater and the

11   trees were planted that morning and the plumber --

12   can I strike the plumber?  One of the other

13   subcontractors realized that the trees were in

14   the wrong location.  Somebody identified that

15   the trees had been misplaced at James' direction

16   and I asked James to go out there to figure out

17   why they got put in the wrong place, to get it

18   figured out, get it squared away and come back.

19   He went out and he never came back.  He was not

20   ever specifically excluded from that meeting.

21   He was not told, go out there and don't come

22   back.  He was told to go out there and address

23   an issue that should have been quick.  And now

24   after reading some of the documentation, he was

25   so upset about it, he thought that he was --

95

1   well, I'm speculating.  He never came back to

2   the meeting.  He was not specifically excluded

3   from that meeting.

4        Q.    How soon before the meeting did you

5   send him out?

6        A.    It was immediately before the

7   meeting.  It was a situation where we were

8   getting ready to attend a meeting, somebody

9   called on the radio in a panic because there was

10   a crew waiting to do something and they

11   couldn't, and I asked James to get out there and

12   get it fixed, because he was just -- he had just

13   left it.  He had just left that area and it was

14   wrong.  And I asked him to go out there and get

15   it straightened out and then come back.

16        Q.    The people who attended the meeting,

17   were they Union, as well as non-Union people?

18        A.    No.  It was completely Whiting-Turner

19   staff, salaried staff.

20        Q.    How many blacks were at the meeting?

21        A.    There were two blacks, one Hispanic --

22   no, wait a minute.  I think there were more

23   people on site than just the Sawgrass team.  I

24   know of two blacks.

25        Q.    Who were they?

1          A.    Omar Sweeny and Shamia Blanchett were
2     there.
3          Q.    Let me ask you this:  Can you
4     understand from James Bush's perspective how
5     never getting written up for any performance
6     problem, being told that his work was good,
7     being excluded from any meetings, being not
8     invited to a Christmas party and not receiving
9     the same pay as somebody who was holding the
10    same position that he was, can you understand
11    why he might feel that there was a
12    discriminatory basis, that he was being
13    discriminated against?
14               MS. CESARANO:  Object to form.
15               THE WITNESS:  I can't -- I would not
16    presume to speculate on -- on what James -- what
17    goes on in his head.  I think that James'
18    interpretation -- I think James saw certain
19    things and he chose to interpret them the way
20    he's chosen.  I think it's very clear and very
21    obvious from an objective viewpoint, if you were
22    to look at these on a case by case basis, that
23    what he is claiming and what you're asking me
24    right now, is unfounded and it's not true.
25          Q.    (By Mr. Pollack) From your viewpoint?

1          A.    Yes, sir.

2          Q.    Were you involved at all in the

3     recruitment process for new engineers or

4     superintendents?

5          A.    Not for engineers.

6          Q.    The guys that came that spent some

7     time training, the young guys, Andy something or

8     another.

9          A.    Yeah.

10          Q.    Were you involved in recruiting them?

11          A.    No, sir.  I don't get involved in the

12     recruitment of those guys, but when he -- well,

13     I guess that's not a hundred percent true.   In

14     an interview, one of the interview processes

15     that takes place with new engineers is they'll

16     come out and visit the job site and sometimes on

17     occasion I'll walk them around the job and

18     typically, they go to lunch with the team on the

19     job.   It's a half a day process, so in that

20     light, I guess, I am involved.

21          Q.    You're not sort of involved in

22     deciding who comes?

23          A.    No, sir.

24          Q.    How many employees does

25     Whiting-Turner have?

```
 1            A.    Company-wide?

 2            Q.    Yes.

 3            A.    I don't know the exact number.   I'm

 4      going to take a stab at it, 2,500, 2,000.

 5            Q.    It's a nationwide company?

 6            A.    Yes, sir.

 7            Q.    Where is it based?

 8            A.    In Baltimore, Towson, Maryland is the

 9      home office.

10            Q.    Do you know if they have a human

11      resources department?

12            A.    I've been to Towson twice.

13            Q.    Do you know if the company does?

14            A.    I honestly don't know.

15            Q.    If you have a problem with employees

16      or personnel, is there somebody that you, as a

17      superintendent, go to?

18            A.    I would go first and foremost to Rob

19      Mitchell.

20            Q.    And has he ever directed you to

21      somebody above?

22            A.    I've never had an issue so big that

23      if I couldn't work it out, Rob and I couldn't

24      work it out, so I've never had an occasion to

25      pursue that.
```

1              Q.    Did you ever socialize with any of

2      the guys on the Sawgrass Mills project outside

3      of work?

4              A.    Sure.

5              Q.    Who did you socialize with?

6              A.    Just about everybody.

7              Q.    Did you ---

8              A.    Omar Sweeny.

9              Q.    Did you go to their homes?  Did you

10     go out, places outside of their homes?

11             A.    Usually -- usually our socializing

12     would occur via a sporting event.  Again, I told

13     you earlier that it was very common and remains

14     to be common that subcontractors or vendors

15     whose company holds season tickets to different

16     sporting events, I'm sure you encounter that in

17     your business, as well, offer us tickets and we

18     take full advantage of that.

19             Q.    So did you ever socialize with Chuck

20     Bender outside of work?

21             A.    Many times.

22             Q.    Have you ever met his family?

23             A.    I'm trying to remember the first time

24     I did meet his family.  I know his family now.

25             Q.    You say "the first time."  I gather

1  you met them on more than one occasion outside
2  of the workplace?
3        A.    Yes.
4        Q.    How many times would you say?
5        A.    With his family?
6        Q.    Yes.
7        A.    They were over to my house two
8  Sundays ago.  Prior to that, they were over to
9  my house eight weeks ago.  Prior to that on
10  young Charles' 30th birthday, we went to his
11  house, for a blow-out party.  And I believe I
12  met his wife one or two times prior to Chuck's
13  30th birthday and I'm sure you got his birthday.
14  I don't remember when that was.
15        Q.    What about Jeff Cooper?
16        A.    Jeff and I fish on occasion.
17        Q.    Have you ever been over to his house?
18        A.    I have been to Jeff's house one time
19  to pick up a cooler for the boat, as I recall.
20  But no, other than that, I have never socialized
21  with Jeff at his house.
22        Q.    And ---
23        A.    I've been to Rob Mitchell's house
24  once.
25        Q.    For that Christmas party?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1          A.    For that Christmas party.  Never

2     before have I ever been to Rob Mitchell's house.

3               MR. POLLACK:  I think that's all I

4     have.

5               MS. CESARANO:  I just have a couple

6     of questions.

7               THE WITNESS:  Okay.

8                    CROSS EXAMINATION

9     BY MS. CESARANO:

10         Q.    I want to ask you some questions

11     about pay.

12         A.    Okay.

13         Q.    When both Chuck Bender and James Bush

14     became assistant superintendents UB, they went

15     on a salary, correct?

16         A.    Uh-huh, yes, ma'am.

17         Q.    Prior to that, Mr. Bush as a general

18     laborer's foreman earned overtime, correct?

19         A.    Correct.

20         Q.    Would it be fair to say that Mr. Bush

21     as a laborer's foreman with overtime earned more

22     as a foreman than he did when he started out as

23     an assistant superintendent UB?

24               MR. POLLACK:  Object to form.

25               THE WITNESS:  Depending on the work

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    load, it is possible, yes, that he could earn

2    more money weekly on an hourly basis.  There

3    were several weeks that he did earn more money.

4        Q.   (By Ms. Cesarano) Okay.  And isn't it

5    true that you heard James Bush complain or joke,

6    depending on how you want to think about it,

7    that people under him, carpenters, foremen,

8    laborer's foremen earned more than he did as an

9    assistant superintendent?

10        A.   Yes, that is true.

11        Q.   He would say that repeatedly,

12    correct?

13        A.   Yes.

14        Q.   So going to the end of the project,

15    if he had decided to continue on as a laborer's

16    foreman at other Whiting-Turner projects, would

17    it be fair to say that he would not have

18    suffered any kind of significant pay decrease,

19    if any?

20            MR. POLLACK:  Object to form.

21            THE WITNESS:  No, he wouldn't.  His --

22    if you were to take his salary, his weekly

23    salary, and divide it by 40 hours, you would be

24    able to surmise an hourly rate.  If you were to

25    compare that, apples to apples, that hourly rate

```
 1   on a laborer's hourly rate at 40 hours, there
 2   would be a decrease in pay.
 3        Q.   (By Ms. Cesarano) What I'm asking you
 4   to do, though, however, is to compare with the
 5   overtime that foremen normally would work.
 6        A.   Yeah.  The foremen are crews, I would
 7   say, on average, work 50, I'd say 55 hours on
 8   average.
 9        Q.   Per week?
10        A.   Yes.  50, 60, but I'd say on average,
11   and I think our payroll records could reflect
12   that, so, yes, I don't think that James would
13   have suffered a loss in pay if we had converted
14   him back.
15        Q.   At the end of the project?
16        A.   Correct.
17        Q.   To a laborer's foreman?
18        A.   Yes, ma'am, that's correct.
19        Q.   Do laborer's foremen for
20   Whiting-Turner take, for example, the Sawgrass
21   Mills project, was there any week that you would
22   say they only worked 40 hours?
23        A.   There may have been a couple of
24   weeks.
25        Q.   Would that be rare?
```

```
 1         A.    Yes.
 2         Q.    Would your 55 hours per week be more
 3   of an average, including overtime?
 4         A.    The 55 hours a week, I would say, was
 5   average.   There were weeks where the labor
 6   foreman, Alvin Barber, I remember seeing weeks
 7   he worked 80 hours.
 8         Q.    And that would constitute a
 9   significant amount of overtime, correct?
10         A.    Absolutely.
11         Q.    Going back to the time period of
12   January, 1998, when you said you introduced
13   James Bush --
14         A.    Yes.
15         Q.    -- to the City of Sunrise inspectors
16   and other people as assistant superintendent.
17         A.    Correct.
18         Q.    Now, we know at that time he had not
19   received a pay increase, correct?
20         A.    Correct.
21         Q.    When you spoke to him about becoming
22   your assistant superintendent, did you ever
23   promise him a date certain when he would see a
24   pay increase in his paycheck?
25         A.    I don't have the ability.
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1          Q.    Did you, first of all?

2          A.    No, ma'am.

3          Q.    Do you have the authority to give

4     anyone a pay increase?

5          A.    No.    Not without the authorization of

6     Rob Mitchell.

7          Q.    And I assume at some point around

8     January or maybe before, you had a conversation

9     with James Bush about getting an increase in

10    pay, correct?

11         A.    Correct.

12         Q.    Did you explain to him that as an

13    assistant superintendent, he'd be on a set, flat

14    salary of 40 hours a week?

15         A.    Yes, I did.

16         Q.    Did you tell him that the rate of pay

17    and when that would take effect, would have to

18    be determined by Rob Mitchell?

19         A.    Yes, I did.

20         Q.    Again, did you tell him that that

21    would be done on a certain date or a certain

22    month?

23         A.    No, ma'am.

24         Q.    Now, at the beginning of the job at

25    Sawgrass, at what stage or complexity was the

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    work at during those initial months of January

2    and February before Mr. Bush got a pay raise?

3        A.    It was -- it was an isolated area.

4    There were, as I think I testified earlier, that

5    there were two or three subcontractors working

6    on-site, so the complexity of the work was very

7    simple.    The amount of manpower that had to be

8    tracked, I would say, was at a minimal amount

9    compared to the rest of the project.    It was the

10   very beginning.    You got to learn to crawl

11   before you can walk.    We were crawling.

12       Q.    Okay.    And, again, during these

13   January, February months of '98 when Mr. Bush,

14   you were introducing him as assistant

15   superintendent, were the job duties that he was

16   performing that you just described typical of

17   the job duties of an assistant superintendent

18   UB?

19       A.    Yes.

20       Q.    Did those duties become more complex

21   after March of '98?

22       A.    Most definitely.

23       Q.    Did you set Mr. Bender's initial

24   starting salary?

25       A.    No, ma'am.

1    Q. Did you set Mr. Bush's initial

2 starting salary?

3    A. No, ma'am.

4    Q. Now, is there a reason behind why

5 someone starting off as an assistant

6 superintendent, like Chuck Bender or like Mr.

7 Bush, would there be a reason to retain Union

8 benefits during that training period?

9     MR. POLLACK: Object to form.

10     THE WITNESS: Can you ask me the

11 question again?

12    Q. (By Ms. Cesarano) I'll rephrase it.

13 I think you testified that during the training

14 period, six months or longer, that an assistant

15 superintendent UB goes through, that person

16 remains with the Union benefits program,

17 correct?

18    A. Correct.

19    Q. Is there a reason for that?

20    A. Yes.

21    Q. What is the reason?

22    A. The reason is that if -- throughout

23 the training period, if either an employee or

24 Whiting-Turner feels that this promotion or this

25 new position isn't going to work out, the

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    company doesn't want to put the employee at a

2    disadvantage with their pension and with their

3    health benefits.

4         Q.    In your view, did James Bush ever

5    attain the kind of level of skills you felt were

6    needed to promote him into a assistant

7    superintendent CB, that is, with company

8    benefits, as a Whiting-Turner manager?

9         A.    No.

10         Q.    Does any part of your opinion have

11    anything to do with his race or his age?

12         A.    No, absolutely not.  I'm the one who

13    promoted him in the first place.

14         Q.    There was some discussion about the

15    fact that Mr. Bush never got a written write-up

16    for his errors.  Did anyone on the Sawgrass

17    Mills project get a written write-up for their

18    errors?

19         A.    No.  I don't know of anybody in the

20    company that gets a written write-up for their

21    errors.

22         Q.    Now, when Mr. Bush made the error

23    with the 19 columns and you discussed it with

24    him, was it your expectation that that mistake

25    would not happen again?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1              A.    Yes.
 2              Q.    Now, you've also been asked some
 3    questions about the fact that Mr. Bush was
 4    retained for some period of time after you
 5    became aware that he made errors, correct?
 6              A.    Yes, ma'am.
 7              Q.    And you were asked the reason for
 8    that, correct?
 9              A.    Yes, ma'am.
10              Q.    Did you ever give up on Mr. Bush?
11              A.    No, ma'am.
12              Q.    Was it your expectation that you
13    would continue to train him?
14              A.    Yes.
15              Q.    Did you ever have any intention to
16    fire Mr. Bush?
17              A.    No.
18                    MS. CESARANO:    That's all the
19    questions I have.
20                    MR. POLLACK:    I just have a few
21    follow-up.
22                    REDIRECT EXAMINATION
23    BY MR. POLLACK:
24              Q.    The training period that you referred
25    to for the assistant superintendent, is that a
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1   formal kind of training program or is it
 2   on-the-job work experience?
 3        A.   It's on-the-job.  Yeah, it's
 4   on-the-job.
 5        Q.   It's not like sitting down in classes
 6   or in seminars or anything?
 7        A.   No.
 8        Q.   Does that training program still
 9   exist?
10        A.   Yes.
11        Q.   How long does that training program
12   typically last for somebody who is an assistant
13   superintendent in training?
14        A.   It's, I think, there's no
15   predescribed period.  It's a case by case basis.
16        Q.   Well, leaving ---
17        A.   As people come to work for us who are
18   more experienced, the training period can take
19   less time.  When I say more experienced, not
20   necessarily as a general laborer's foreman, but
21   in the capacity with which we ask them to
22   perform.
23        Q.   You were just asked whether you
24   expected to continue to train Mr. Bush.  How
25   long would you have continued to train him?
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1          A.    Until I felt that he would not be
2     able to fill the role.
3          Q.    But you don't know how long that is?
4          A.    No.
5          Q.    Do you know how much Chuck Bender
6     makes now?
7          A.    No, sir, I don't.
8          Q.    Do you know whether or not, if Mr.
9     Bush had continued on as a general labor foreman
10    and had made overtime, whether or not he would
11    have made less or more on average than Chuck
12    Bender makes right now?
13         A.    I don't know how much Chuck Bender
14    makes right now.  I do know that the laborers
15    just got an increase in their pay and an
16    increase in their benefits package very
17    recently.
18         Q.    My question was:  Do you know, as we
19    sit here today, whether or not if Mr. Bush had
20    continued on as a labor foreman and were making
21    what a labor foreman makes with an average of
22    overtime that you testified to, whether or not
23    he would be making more, less or the same than
24    Chuck Bender makes, as we sit here today?
25         A.    I don't know.

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1          Q.    You testified that you don't have

2     authority to set pay?

3          A.    Correct.

4          Q.    Do you have authority to hire and

5     fire?

6          A.    I have authority to hire and fire

7     Union people.  I do not hire salaried employees

8     and I do not fire salaried employees.  If -- and

9     that is the cut point.

10         Q.    Do you know whether Mr. Bush knew at

11    the time he was working at Whiting-Turner, what

12    authority you had to do things like hire, fire,

13    authorize promotions and salary increases?

14         A.    I believe he did.  A couple of times

15    some of the other laborers had asked me for an

16    increase in pay in James' presence, and I

17    informed them of my ability or inability -- I

18    can't authorize.  The Union wages -- there's a

19    contract with the Union and their wages are

20    prescribed in that contract.  There's nothing

21    that says they can't be paid more.  They can't

22    be paid less than their contract wage.  The only

23    person who has the authority to approve -- I can

24    recommend an increase, but I do not -- I can't

25    even get a labor foreman any more money than

FERNANDEZ & ASSOCIATES COURT REPORTERS-- (305) 374-8868

1    what's in the contract without Rob's approval.

2         Q.   Do you have the authority to make
3    promotions?

4         A.   I have the authority to recommend
5    them to Rob.

6         Q.   Do you know for a fact whether Mr.
7    Bush knew, when you told him that he was going
8    to be promoted, whether or not you had the
9    actual authority to promote him?

10        A.   Yes.  I do know if he knew that or
11   not.  I told him from the very beginning that
12   all of it was contingent upon Rob Mitchell's
13   approval.

14        Q.   What did you tell him about Rob
15   Mitchell's approval?

16        A.   That I can -- that I felt that if he
17   agreed to pursue, and this is, again, in the
18   very beginning, if he was willing to pursue ---

19             MS. CESARANO:  What do you mean "very
20   beginning"?  Define that.

21             THE WITNESS:  Back in November or
22   December of '97, at the completion of the Target
23   parking lot, was when I think we first began
24   discussing whether or not he was interested in
25   becoming an assistant superintendent.  And as

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  this whole process evolves from James saying to
2  me, yeah, I think I'm interested, then there's
3  an entire evolution that occurs and he
4  understood that I did not have -- had I had the
5  authority to promote him, he would have been
6  promoted immediately.  He was, you know, back in
7  March of '98 was when the formal promotion took
8  place.
9       Q.   (By Mr. Pollack) Robert Mitchell had
10  authority to decide the pay level, correct?
11       A.   Correct.
12       Q.   And did Robert Mitchell have
13  authority to decide when the promotion would
14  take place?
15       A.   Yes.
16       Q.   And you didn't promise Mr. Bush a
17  specific date --
18       A.   No.
19       Q.   -- as to when the promotion would
20  take place?
21       A.   No, sir.
22       Q.   So Rob Mitchell was the one to decide
23  that date?
24       A.   Yes, sir.
25       Q.   Robert Mitchell had the ability, did

```
 1   he not, to make that promotion effective in
 2   March or February or January; isn't that true?
 3        A.   Or not at all.
 4        Q.   Or not at all; is that correct?
 5        A.   Yes.
 6             MR. POLLACK:  I have nothing further.
 7                  RECROSS EXAMINATION
 8   BY MS. CESARANO:
 9        Q.   I just want to clarify because
10   sometimes you didn't complete your sentences.
11             Is it true that around December, '97
12   you told Mr. Bush that his being promoted to
13   your assistant superintendent depended upon Rob
14   Mitchell's approval?
15        A.   Yes.
16             MS. CESARANO:  I have no further
17   questions.
18             MR. POLLACK:  Nothing further.
19
20        (Reading and signing were not waived.)
         (Thereupon, the taking of the deposition
21       was concluded.)
22
23
24
25
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
1                    CERTIFICATE of REPORTER
2                    -----------------------

3         STATE of FLORIDA:

4                        : SS

5         COUNTY of DADE:

6                    I, Maria Isabel Fernandez, Shorthand
          Reporter, certify that I was authorized to and
7         did stenographically report the foregoing
          deposition; and that the transcript is a true
8         record of the testimony given by the witness.
                    I further certify that I am not a
9         relative, employee, attorney, or counsel of any
          of the parties, nor am I a relative or employee
10        of any of the parties' attorney, or counsel
          connected with the action, nor am I financially
11        interested in the action.
                    Dated this 28th day of June, 2000.
12

13

14                            Maria Isabel Fernandez

15
```

Maria Isabel Fernandez
Notary Public, State of Florida
Commission No. CC 589193
My Commission Exp. 09/29/2000
1-800-3-NOTARY - Fla. Notary Service & Bonding Co.

```
18

19

20

21

22

23

24

25
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1                        READING AND SIGNING
                          -------------------
 2          I have read the above transcript, pages 1
        through 115 and I find (MARK ONE)
 3
        ( ) The transcript is true, correct, and
 4      completely accurate.

 5      ( ) The transcript is true, correct, and accurate,
        except as set forth in my List of Corrections
 6      attached hereto, citing page and line and reason
        for the correction realizing that, for that purpose,
 7      I am still under oath.

 8      _____          _____
        DATE
 9
        Sworn to and subscribed before me this _____ day of
10      _____, 2000.

11                               _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1   TO BE EXECUTED BY THE NOTARY IF THE DEPONENT DOES
 2   NOT SIGN:
 3
 4        I hereby certify that a letter with reference
 5   to reading and signing deposition was mailed to the
 6   witness through his attorney, on _____ and
 7   that witness
 8
 9   ( ) Witness refused to sign, giving the following
10   reason:
11
12   ( ) Neither the witness nor his attorney has
13   responded to request to read and sign.
14
15
16   _____        _____
17        DATE                        Notary Public
18
19   MY COMMISSION EXPIRES:
20
21
22
23
24
25
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868