## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FT. LAUDERDALE DIVISION

JAMES BUSH,
    Plaintiff

CASE NO. 00-6224-CIV-DIMITROULEAS
MAGISTRATE JUDGE JOHNSON

v.

THE WHITING-TURNER
CONTRACTING CO.,
a Maryland corporation,
    Defendant

_____ /



## PLAINTIFF'S RESPONSE TO DEFENDANT WHITING TURNER CONTRACTING CO.'s MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiff JAMES BUSH files his response to Defendant Whiting Turner Contracting Co's

["Whiting Turner"] Motion for Summary Judgment. This Court should deny the motion for

summary judgment because there are genuine issues of material fact concerning Bush's

performance as an assistant superintendent and Whiting Turner's disparate treatment of Bush.[1]

### INTRODUCTION

Plaintiff James Bush ["Bush"] is a 51-year old black male with 33 years experience in the

construction industry. (Bush, Vol. I at 20).[2] Between 1964-1997, Bush worked as a labor

foreman for some of the most prominent construction firms in Miami. (Bush Vol I. at 20-27).

---

[1] Although Bush's complaint alleges both age and race discrimination, he is electing to proceed to trial solely on his claims for race discrimination and unpaid wages. Accordingly, for purposes of this motion, the only claims at issue are the federal and state law race discrimination claims and the state law claim for unpaid wages.

[2] "Bush Vol. 1" refers to the deposition of James Bush. References to other depositions are denoted by the last name of the deponent and have been filed with the Court by Whiting-Turner or accompany this response.

1



During that time he supervised crews of as many as 90 workers and help construct various large scale commercial buildings. (Bush Vol. 1 at 5; Affidavit of Robert Murray attached hereto as Exhibit A). Among the projects Bush worked on were The Miami Center, Miami Dade Community College, the Hamilton, Miami Northwestern Senior High School, and the exclusive Santa Maria condominium (Bush Vol. 1 at 6, 20, 24, 26, 27). He also ran his own construction company for several years. (Bush Vol. 1 at 18).

In May, 1997, Whiting Turner hired Bush to work as a labor foreman on its Bloomingdales project in South Dade. (Bush Vol. I at 28). Bush was responsible for supervising cleanup, construction of the parking lot, and interior work. (Bush Vol. 1 at 30). He also was responsible for dealing with building inspectors to make sure the elevators passed inspection. (Bush Vol. 1 at 30). Bush's performance on the Bloomingdales project was exemplary. (Bush Vol. I at 40; Plotke at 2). Bush's supervisor, Eric Plotke, was so impressed with his work that he asked Bush to stay on with Whiting-Turner as an assistant superintendent at the Sawgrass Mills Mall. (Ploke at 2). Plotke made this decision based on Bush's work on the Bloomingdales project and on Bush's extensive experience in the construction industry.

At the time he was offered the job as assistant superintendent, Plotke told Bush he would receive a performance review in six months. (Plotke at 38). He also told Bush that Whiting Turner could be "a career job for him," and that he would "never have to look for work again." (Plotke at 41).[3/] Based on these representations, Bush accepted the job and began work as an

---

[3/] Plotke testified during his deposition that he told Bush that he did not have actual authority to promote Bush to assistant superintendent. (Plotke at 104). Bush, however, denied that this was true or that Plotke ever told him that. (Bush Vol. 1 at 35).

(continued...)

2

assistant superintendent at Sawgrass in <u>October, 1997</u>. (Bush vol. II at 115)[4]

Shortly after Bush was hired as assistant superintendent, Whiting-Turner hired another 29 year-old white assistant superintendent, Charles Bender, to work with him on the Sawgrass project. Bush and Bender were each responsible for different sections of the project; however, their job descriptions and titles were the same. (Plotke at 33; Bush Vol.I at 52). Bender had no previous experience in management or as an assistant superintendent prior to being offered the position with Whiting-Turner. (Plotke at 26). Nevertheless, Bender's starting salary was $2.00 per hour greater than Bush's. (Plotke at 28).

Bush's responsibilities as assistant superintendent were many and varied. He was responsible for supervising the laborers, carpenters, block masons, and other subcontractors. <u>See</u> Affidavit of Andrew Delancey, attached hereto as Exhibit B. He coordinated the sanitary

---

[3] (...continued)

There was also conflicting testimony concerning the position of assistant superintendent itself. Plotke testified that there were two categories of assistant superintendents, assistant superintendent, UB, and assistant superintendent, CB, and that a UB superintendent carried with it different benefits (Plotke at 7). He also claimed Bush and Bender were actually hired as trainees, rather than assistant superintendents. However, Bush denies he was ever told this, nor is there anything in writing to indicate he was. (Bush Vol I at 51, 68). Moreover, Plotke testified that there was no difference in the day to day responsibilities of the two categories of superintendents (Plotke at 7). Certainly these issues, which are material to the claims and defenses in the case, are properly resolved by the jury.

[4] Whiting Turner insisted that Bush's promotion to assistant superintendent did not take effect until March, 1998. However, Plotke repeatedly introduced Bush as the assistant superintendent of the Sawgrass Mills project to city inspectors and others on the job site several months prior to that time.

> Q. Do you recall if whether or not at any of those meetings [Mr. Bush] was introduced to those inspectors as the assistant superintendent of the project?
> A. Yes, he was.
> Q. Would those meetings have occurred prior to March of '98?
> A. Yes.

(Plotke at 20, 36); (Bush Vol. I at 33, 142)("He said, 'Tell nobody else you are a foreman.'").

piping and densities of the building. (Bush Vol. I at 66). He also was responsible for demolition work, blue print reading, constructing site pads for several buildings, and overseeing construction of the entry features to the complex. (Bush Vol. I at 66; Affidavit of Jacques Marcelin, attached hereto as Exhibit C.) The buildings Bush was responsible for supervising cost in excess of one million dollars. (Bush Vol. I at 118; Affidavit of Marcelin.)

In March, 1998, Bush met with Plotke and Jeff Cooper. Although Plotke had told him he would be reviewed at that time, he was not. Instead, Cooper told him he would be reviewed in six months. (Bush Vol. I at 77, 80). Cooper also told him that he was receiving a raise because he had been working as an assistant superintendent since October but had been paid as a labor foreman. (Bush Vol. I at 78). However, the raise did not include the period from October through March, when Bush had been working as an assistant superintendent. Bush was never paid an assistant superintendent's salary during that time period. (Bush Vol. II at 114-115). He also was never paid overtime, even though he remained under union contract. See Exhibit D.

Between March, 1998 and September, 1998, Bush worked a significant amount of overtime for which he was not paid. (Bush Vol I at 85). He also came in on weekends to prove that he was dedicated to Whiting Turner and in reliance that he would be reviewed. (Bush Vol. I at 85). However, Bush was never reviewed as promised, even though the company's own EEOC policy requires it conduct an annual review of all minority supervisors. See Exhibit E.

In the meantime, in September, 1998, Whiting-Turner did review Bender. (Bush Vol. I at 83). They also increased his pay to $4.70 per hour. (Bush vol. II at 54). Plotke told Bush that he ought to be reviewed, but never took any steps to review him. (Bush Vol. I at 91).

In December, 1998, Bush finally confronted Plotke about the fact that he had never

4

received a performance review and that he was making less money than Bender. (Bush Vol. I at 87, 115). Plotke told him he would look into it; however, once again nothing was done. The issue finally came to a head in March, 1998, when Bush met with Plotke, Cooper, and Robert Mitchell. Bush asked Mitchell why he was making less money than any other assistant superintendent and many of the subcontractors. (Bush Vol. I at 120-121). Mitchell did not give him an answer. Bush also asked whether his work performance had been unsatisfactory.

> Q. Did they tell you anything else during that meeting, any criticisms?
> A. No, and I asked them was it anything I did wrong or something I didn't perform that well and they said no, they had no problem with my work.
> Q. Did they try talking you into staying?
> A. They made some statements about, you know, about going further up to the next job. (Bush Vol. I at 132).

When Bush told them they should fire him if they were unhappy, Cooper and Plotke refused and asked him to stay on. (Bush Vol. I at 119). Neither Cooper nor Plotke ever told Bush that they felt he wasn't qualified to be an assistant superintendent. (Bush Vol. I at 132). Bush waited until the project was completed and then left the job the following month. Shortly thereafter, he filed his first and only Charge of Discrimination in his 33 years in construction. (Bush Vol. II at 109).

Prior to his departure, Bush received an award from Whiting-Turner for "effectively and diligently" applying the company's Quality Control Program. The company gave him a $100.00 bonus and publicly acknowledged him in its newsletter "for his high rating resulting from numerous random inspections and his use of many checklists." See Exhibit F.

**Whiting-Turner's Defense**. During their depositions, Plotke and Cooper testified at length that the reason they never reviewed or promoted Bush was because of his performance. Plotke testified that Jeff Cooper complained to him "a lot" about Bush's inability to resolve

5

issues. (Plotke at 66). He also testified that others complained to him about Bush's performance, and that he regarded these problems as "serious." (Plotke at 36, 66); see also (Plotke at 58)(noting that problems with Bush were disproportionate in severity and magnitude to others on job site). Plotke testified that these problems persisted for nearly one year. (Plotke at 89).

Plotke cited a number of areas in which he claimed Bush was deficient. For instance, Plotke testified that he had "started to keep an eye on [Bush's] quality control reports" because the errors on those reports were "disproportionate to [those of] other people." "(Plotke at 45, 49, 52). However, Plotke was at a loss to explain how Bush received an award from Whiting-Turner one month before his departure "for his high rating resulting from numerous random inspections and his use of many checklists." See Exhibit F. Plotke also testified that Bush was unable to shoot elevations and peform layout work using various tools, such as a transit. However, Bush testified that prior to working for Whiting-Turner, he had experience in shooting elevations, reading blueprints and layout, and surveying. (Bush Vol. I at 60, 63; Bush Vol. II at 111); See also Affidavit of Robert Murray.

In addition, Plotke testified that Bush developed a "a bad attitude." (Plotke at 72). He stated that he knew that Bush's attitude had changed "for some time." (Plotke at 79) However, Plotke admitted that he never made any attempt to discuss the problem with Bush, even though it had an effect on morale. (Plotke at 82)

> Q. What you overheard, troubled you, you testified to that, correct?
> A. That's correct.
> Q. It bothered you?
> A. Yes, it did.
> Q. And you did not call him in or choose to discuss it with him, correct?
> A. Correct.

(Plotke at 82-83)

6

Indeed, despite the supposed severity of Bush's problems, during the 22 months that Bush was employed with Whiting-Turner, no one from Whiting-Turner ever disciplined or reprimanded Bush. (Plotke at 92 ). To the contrary, when Bush finally confronted Plotke, Cooper and Mitchell about the disparity in treatment, they denied that there was any problem with Bush's work — and in fact urged him to stay on as an assistant superintendent with Whiting-Turner! (Plotke at 86, 90). Plotke acknowledged that he never made a record of any of the problems he experienced with Bush, even though he did so with other employees. (Plotke at 92).

> Q. You were aware of all these other problems you testified to concerning his reports, concerning his performance; is that correct?
> A. Yes.
> Q. And yet on the day that he told you after two hours that he wanted to leave, that he was unhappy and all of these reasons, notwithstanding all of those problems, notwithstanding the problem with his attitude, your testimony is that you said well, gee, there be some other opportunities, you can continue to work here; is that correct?
> A. Yeah. I mean, that is correct. (Plotke at 86).

Finally, Whiting-Turner was unable to explain why Charles Bender was promoted and received a raise, even though he also made mistakes while on the job. (Plotke at 38).

Other incidents of disparate treatment. In addition to not being reviewed, promoted, and paid the same salary as Bender, Bush also experienced a number of other subtler, albeit no less benign, incidents of disparate treatment based on his race. In January, 1998, Bush discovered an anonymous note left on his desk. The note stated in part: "Unwittingly we have been parts of broken relationships, discrimination, poverty, disease and overbearing personalities. These things exist, and as long as someone endures it and someone does it, it will go on." (emphasis added). See Exhibit G. Bush understood this to be a reference to his race.

Bush was also excluded from several social and professional events. For instance, when

7

Whiting Turner took pictures of the individuals in charge of the Sawgrass project as promotional material for the developer, Bush was the only person in his trailer to be excluded from the photograph. (Bush Vol. II at 101-102). He also was the only person in the trailer where he worked to be excluded from the company Christmas party, a fact Plotke admitted he found "odd." (Bush vol. II at 59, Plotke at 77). Bush found it particularly disturbing that he was also the only employee to be excluded from a mandatory EEOC meeting only moments before the meeting was scheduled to occur, particularly when the work which supposedly required his "immediate" attention could have been performed by a laborer. (Bush vol. II at 105-107)

There is also evidence that Whiting-Turner had a practice of excluding blacks from management positions. Although Whiting Turner employs over 2,000 people nationwide, during the time Bush was employed at Whiting-Turner, he was the only black assistant superintendent in Florida. (Plotke at 98; Bush vol II at 49). Bush never saw Whiting-Turner recruit any black recruits for management positions during the time he worked there, although he did observe a number of caucasians being recruited. (Bush vol. II at 78). In fact, during the 22 months he worked at Whiting-Turner, Rob Mitchell spoke to him only three times, even though Bush was involved in supervision of the project and was critical to its success. (Bush vol. II at 63, 65).[4]

_____

[4] Whiting-Turner claimed that Rob Mitchell did not interact with Bush or review him because he did get involved with employment issues involving union workers. However, Rob Mitchell was the one who asked Bush to stay on with Whiting Turner. (Bush Vol. II at 135). Moreover there is evidence that Rob Mitchell did get involved and met with Chuck Bender on several occasions regarding performance-related issues. (Bender at 124 - 125).

## ARGUMENT

### THIS COURT SHOULD DENY THE MOTION FOR SUMMARY JUDGMENT BECAUSE THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER WHITING-TURNER DISCRIMINATED AGAINST BUSH BASED ON HIS RACE BY FAILING TO REVIEW OR PROMOTE HIM.

The Eleventh Circuit has consistently held that summary judgment is only appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Arrington v. Cobb County, 139 F.3d 865 (11th Cir. 1998). Only when the record taken as a whole could not lead a rational trier of fact to find the nonmoving party is there no genuine issue for trial. Clemons v. Hardee County School Bd., 848 F.Supp. 1535 (M.D. Fla. 1994). Furthermore, all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party without assessing the probative value of the evidence. Id.

### I. Whiting - Turner is not entitled to summary judgment on the Title VII and FCRA claims.

To prevail on a claim of disparate treatment under Title VII and the FCRA, the plaintiff has the initial burden of proving a prima facie case of intentional discrimination by a preponderance of the evidence. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 67 L.Ed. 2d 207, 101 S.Ct. 1089 (1981). The burden is not an onerous one. Weldon v. Kraft, Inc., 896 F.2d 793 (3rd Cir. 1990). The plaintiff must show only that he is a member of a racial minority, qualified for the job for which he sought, and that others not in the protected class were treated more favorably. St. Mary's Honor Center v. Hicks, 509 U.S. 511, 113 S.Ct. 2742 (1993). The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action. Id. Once the employer satisfies this burden, the burden then shifts to the employee to establish by a preponderance of the evidence that employer's conduct constituted

9

intentional discrimination. The employee can do this either by offering direct evidence of discrimination, or by producing sufficient evidence for the trier of fact to disbelieve the employer's legitimate, nondiscriminatory explanation for its action. Reeves v. Sanderson Plumbing Products, Inc., 120 S.Ct. 2097 (2000); Arrington, 139 F.3d at 873 (proof that employer's motive masks an illegitimate, discriminatory motive may be established by circumstantial evidence). Moreover, a plaintiff may rely on the same evidence both to establish his prima facie case and to cast doubt on the employer's legitimate nondiscriminatory reasons for its action. Carter v. Three Springs Residential Treatment, 132 F.3d 635 (11th Cir. 1998).

The Eleventh Circuit has specifically addressed the burden of proof required of a plaintiff to survive a motion for summary judgment in a Title VII case. On a motion for summary judgment, if a plaintiff advances evidence establishing a prima facie case and evidence upon which a factfinder could conclude that the defendant's alleged nondiscriminatory reasons for the employment decisions are pretextual, the case should go to the jury. Batey v. Stone, 24 F.3d 1330, 1334 (11th Cir. 1994). The standard adopted in Batey has been followed by the majority of federal appellate courts. See Torre v. Casio, Inc., 42 F.3d 825, 830 (3rd Cir. 1994)("to survive summary judgment, a plaintiff . . . may prevail 'by either (i) discrediting the [employer's proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.")(emphasis added); Kline v. Tennessee Valley Authority, 128 F.3d 337, 347 (6th Cir. 1996)("the factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination")(citing Wixson v. Dowagiac Nursing Home, 87 F.3d 164 (6th Cir. 1996);

10

Washington v. Garrett, 10 F.3d 1421, 1433 (9ᵗʰ Cir. 1993)("If a plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed."); Ingels v. Thiokol Corp., 42 F.3d 616 (10ᵗʰ Cir. 1994)(citing cases).

### 1.    Bush has established a prima facie case of discrimination..

Whiting-Turner claims that Bush is unable to establish a prima facie case because he was not qualified to perform his job and because he cannot identify a similarly situated non-black employee who was treated better than he was.[5/] Whiting-Turner is wrong on both points.

The nature of the required showing to establish a prima facie case of disparate treatment by indirect evidence depends on the circumstances of the case. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L.Ed. 2d 668, 93 S. Ct. 1817 (1973).   Furthermore, while federal courts have held that objective job criteria, such as tests, may be considered in determining whether a plaintiff has established a prima facie case of discrimination on the issue of qualification, subjective criteria are best left to the later stage of the McDonnell Douglas analysis because they are more likely to mask pretext. Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3ʳᵈ Cir. 1990); accord, Mack v. Kent County Vocational and Technical School District, 757 F.Supp. 364, aff'd, 944 F.2d 897 (* Cir. 19**)("To deny the plaintiff an opportunity to move beyond the initial stage of establishing a prima facie case of employer dissatisfaction with employee performance would prevent the court from examining this dissatisfaction and determining whether it has been used as a pretext.")

The record in this case clearly establishes that Bush has satisfied his initial burden of

---

[5/]   Whiting-Turner does not contest that Bush is a racial minority for purposes of Title VII.

establishing by a preponderance of the evidence that he was qualified for the position of assistant superintendent. Prior to assuming the position, Bush had over 33 years in the construction industry (Bush Vol I at 20). Much of his experience involved helping with layout of buildings, shooting elevations, assisting carpenters, and doing work which assistant superintendents do. See Affidavit of Robert Murray. Whiting Turner obviously felt he was qualified for the position, or it would not have offered it to him.

Furthermore, Bush presented substantial competent evidence from which a trier of fact could conclude that he did his job well. Andrew Delancy, a carpenter on the Sawgrass project, stated that Bush successfully handled all the layouts and evaluations on the buildings he was in charge of. See Affidavit of Andrew Delancy. Other workers on the project also attested to his effectiveness as an assistant superintendent . See Affidavit of Jacques Marcelin. Furthermore, Bush received an award for his performance from Whiting Turner one month prior to the time he left. This evidence, coupled with Bush's extensive prior experience performing tasks which an assistant superintendent is responsible for performing, more than satisfies his ability to establish a prima facie case that he was qualified for the job of assistant superintendent.[6/]

## 2. Bush was treated differently from a similarly situated non-black employee

Bush has also clearly established that he was treated differently from a similarly situated non-black employee. It is undisputed by every witness whose deposition was taken that Bush and Charles Bender had the same job title and were hired to perform the same tasks. (Plotke at 33;

---

[6/] To the extent that Whiting Turner denies that Bush was qualified, that evidence would only be relevant to establishing a legitimate non-discriminatory reason for Bush's termination and to Bush's claim of pretext. It would not be applicable in determining whether Bush established his prima facie case. See Texas Dep't of Community Affairs v. Burdine, 450 U.S.248(1981).

12

Bush Vol I at 52). It is also undisputed that they dealt with the same supervisor and were subjected to the same standards. Weave v. Tech Data Corp., 66 F. Supp. 2d 1258, 1270 (M.D. Fla. 1999). Bender himself testified that he and Bush "had the same responsibilities, but did different buildings." (Bender at 39). For Whiting Turner to suggest that the two were not similarly situated employees borders on the absurd.

Whiting Turner argues that Bush and Bender cannot be similarly situated because Bender did not have any performance problems. Whiting Turner is wrong. Plotke testified that he had reprimanded Bender. (Plotke at 82). Bender himself testified that he was reprimanded "several times" by Plotke for his conduct. (Bender at 125). He also testified that Rob Mitchell sat down and reprimanded him after he got into an altercation with a subcontractor which resulted in him having to go to court. (Bender at 124). The issue is irrelevant, however, since the two employees, by Whiting Turner's own admission, were hired to perform, and did perform, the same job.

**3.    The reasons Whiting Turner offered for refusing to review Bush and to pay him the same salary as Bender were pretextual.**

Whiting Turner insists that race did not play a role in its decision not to review Bush or pay him the same salary as Bender. Conspicuously absent from Whiting Turner's extensive discussions of Bush's problems, however, is any indication that Bush was ever disciplined or counseled for these allegedly "serious" mistakes. On the contrary, not only did Whiting-Turner never indicate to Bush that it had problems with his performance prior to his filing a Charge of Discrimination with the EEOC, but at the time he left, Jeff Cooper, Eric Plotke, and Robert Mitchell each asked him to remain on in his capacity as assistant superintendent.

Q. Did they tell you anything else during that meeting, any criticisms?
A. No, and I asked them was it anything I did wrong or something I didn't perform

13

that well and they said no, they had no problem with my work.

Q. Did they try talking you into staying?

A. <u>They made some statements about, you know, about going further up to the next job.</u>
(Bush at 132)(emphasis added).

Whiting Turner has failed to come forward <u>with any explanation</u> -- let alone a plausible one -- as to why it never reviewed Bush or disciplined him for his alleged "serious" deficiencies. Whiting Turner's silence on this issue is deafening, and certainly sufficient to raise a genuine issue of material fact as to the credibility of its position.

Indeed, there is considerable evidence in the record to suggest that Whiting Turner believed Bush was performing his job as an assistant superintendent well. Andrew Delancey, a carpenter who worked with Bush on the Sawgrass Mills project, stated that he found Bush to be "a capable supervisor" who was "very knowledgeable about construction." See Affidavit of Andrew Delancey. He also stated that Bush knew "how to get the maximum participation from all of his employees" — a quality critical to an effective assistant superintendent. See Affidavit of Andrew Delancey.[7] Other individuals on the project also found Bush to be an effective superintendent. Jacques Marcelin indicated that Bush did a good job, and even worked on weekends and his days off to insure that the project was completed in a timely manner. See Affidavit of Jacques Marcelin Perhaps most notably, Bush received an award from Whiting-Turner <u>one month before he left</u> for "effectively and diligently" applying the company's Quality Control Program and was publicly

_____

[7] Delancey's affidavit is at odds with Plotke's testimony in several other respects. For instance, Plotke claimed that there were problems with anchor bolt locations of the structures Bush was responsible for. Delancey, however, denied that there were any such problems. See Affidavit of Andrew Delancey. Plotke also claimed that Bush had a "bad attitude" for a significant portion of the time he worked at Whiting-Turner. (Plotke at 72). However, Delancey's affidavit indicates just the opposite.

14

acknowledged in the company newsletter "for his high rating resulting from numerous random inspections and his use of many checklists." See Exhibit F. Surely if Bush's performance were as bad as Plotke suggested, the company would not have chosen to recognize him and award him a bonus one month before he left. At the least, the evidence on this issue creates a genuine issue of material fact which is not properly resolved on summary judgment.

There is also a genuine issue of material fact with regard to Bush's knowledge of the technical aspects of the job. During his deposition, Plotke testified that Bush did not know how to read blueprints and shoot elevations, which were necessary in order to perform his job. However, Bush testified that prior to working for Whiting-Turner, he had experience in shooting elevations, reading blueprints and layout, and surveying. (Bush at 60, 63; Bush vol. II at 111)., Bush's testimony was corroborated by Andrew Delancey, who indicated that Bush did all of the layouts and shot all of the elevations on the structures he was responsible for, and by Robert Murray, a construction supervisor who oversaw Bush's work for 9 years prior to his commencing work with Whiting-Turner. See Affidavits of Andrew Delancey and Robert Murray.

Moreover, Whiting Turner failed to explain how it could have continued to entrust Bush with the construction of a project the size of Sawgrass Mills Mall if he was not capable of performing his job. If, as Eric Plotke and Jeff Cooper suggest, Bush was incapable of using the most basic equipment necessary to perform his job, how did he manage to get his work done for nearly 22 months? More importantly, if Bush's performance problems were truly as serious and pervasive as Plotke and Cooper suggest, why was he never disciplined or reprimanded, but instead asked to remain on in his position as assistant superintendent? A jury could certainly find based on the record that Whiting Turner's explanation for its refusal to review and promote Bush was

15

motivated by race, or at the very least, was not credible. See Batey, 24 F.3d at 1334.

In Torre v. Casio, 42 F.3d 825 (3rd Cir. 1994), a case similar to the one before this Court, a plaintiff sued his employer for age discrimination after he was terminated. The employer claimed that it wanted to fire the employee because he kept showing up on management's problem list. However, when the employee threatened to sue, it moved him to a different position. The employer claimed the transfer was intended to save the employee's job. However, the employee presented evidence that the transfer was designed to "warehouse" him. Subsequently, the employer alleged that it had financial problems, and decided to fire the plaintiff as part of an age-neutral reduction in force.

The employer moved for summary judgment, arguing that it had legitimate non-discriminatory reasons for firing the plaintiff. The district court found the employer's explanation for the termination sufficient and granted summary judgment for the employer. The Third Circuit agreed with the district court there was substantial support in the record for the employer's explanation of the decision to transfer and terminate the employee. However, it disagreed that summary judgment was appropriate because the district court had "essentially accepted [the employer's] explanations in their entirety and failed to address a significant amount of the evidence presented by [the employee].

> [W]hile there is unrefuted evidence that [the employee's supervisors] were dissatisfied with [his] performance and wanted him fired, and there is testimony and documentary evidence supporting the other contentions, as well [,] that is not the point. Rather, looking at the facts in the light most favorable to [the employee], and drawing all reasonable inferences in his favor, the evidence at summary judgment demonstrated that [the employee] could persuade a reasonable jury that [the employer's] proffered reasons for the transfer and termination were not worthy of credence.

16

Id. at 832. See also Batey, 24 F.3d at 1330 (genuine issue of material fact concerning why employer abolished certain positions and merged them with others precluded summary judgment on sex discrimination claim); Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913 (11th Cir. 1993)(district court erred in granting summary judgment in age discrimination case where there was a genuine issue of material fact as to reason why employee who had complained about age discrimination began receiving numerous unfavorable reports and increased scrutiny).

There is clearly a genuine issue of material fact concerning Bush's performance is in conflict. Accordingly, summary judgment on this issue is clearly improper. In Vaughn v. Edel, 918 F.2d 522 (5th Cir. 1990), a case in some ways similar to the one before this Court, a black plaintiff brought a claim for race discrimination under Title VII, alleging that she was fired because of her race. The employer claimed that it had fired her because she was a poor performer. However, the employer had never "formally criticized [her] or told [her] anything" about her performance problems because she was black. The case was tried to a Magistrate Judge, who found that "had the lady been white, Texaco would . . . have counseled her and told of the problems." However, the Magistrate Judge ultimately concluded that the plaintiff's termination was not race-related, "other than the fact that I do believe had she not been black, that she would have been counselled and would have been criticized."

The Fifth Circuit reversed, holding that the Magistrate Judge erred in focusing only on the final act of firing "and in disregarding Texaco's discrimination in not counselling or criticizing" the plaintiff. Specifically, the Court found that the employer had acted in a discriminatory manner by not criticizing the employee's performance over a period of years because they did not want to risk being sued for race discrimination. Had her dissatisfied supervisors honestly reviewed the

17

plaintiff, the court noted, the review would inevitably have indicated to her that her work was deficient and given her an opportunity to try and improve. By refusing to counsel or review her performance because of her race, however, the employer acted improperly.

> Initially, Texaco's decisions not to criticize Vaughn and not to state her correct evaluations may have appeared beneficial, even — had she been aware of them — to Vaughn. . . . Ultimately, however, whether Texaco's decisions may have damaged Vaughn's employment status at Texaco will never be known. Furthermore, whether Texaco's decisions ultimately benefitted or harmed Vaughn is irrelevant. The decisions not to apply the usual procedures in Vaughn's case were racial decisions.

Id. at 524. The situation here is akin to that in Vaughn. Eric Plotke testified that it was his practice to confront employees when there was a problem. (Plotke at 80-81). (" I confront people five times an hour... Confrontation is basically what I do for a living".) Yet in this case, despite the alleged seriousness of the problem, Plotke never confronted Bush.

A jury could certainly find based on the abundance of circumstantial evidence, including the anonymous letter referencing discrimination left on his desk, the repeated instances in which he was excluded from work related activities, and Plotke and Cooper's repeated refusals to review him despite reviewing Bender that Whiting-Turner's treatment of Bush was race related, especially in light of its inexplicable insistence that he continue to work as an assistant superintendent after 22 months of problems allegedly "serious". At the least, the evidence raises a genuine issue of material fact concerning the credibility of Whiting Turner's explanation for its conduct which is not properly resolved on summary judgment.. See Reeves, 120 S.Ct. at 2097.

### 4.    Bush has presented sufficient circumstantial evidence of racial animus.

Whiting-Turner argues alternatively that it is entitled to summary judgment because Bush is unable to establish any evidence of discriminatory animus on the part of the decisionmakers.

18

Whiting Turner is wrong both factually and legally. The Supreme Court has held that an "employer"; lack of animus does not shield it from a finding of international discrimination. See Int'l Union v. Johnson Controls, 499 U.S. 187, III S. Ct 1196, 113 L Ed 2d 158 (1991); accord Vaughn, 918 F 2d at 524. The Eleventh Circuit has also clearly held that a plaintiff is not required to make a "direct showing of discriminatory intent" in order to prevail on a claim under Title VII, because to do so "would make it impossible for a plaintiff to prevail on any discrimination case based solely on circumstantial evidence." Combs v. Plantation Patterns, 106 F.3d 1519, 1536-1538 (11th Cir. 1997); Arrington, 139 F.3d at 876. The reason for this is simple. Courts have recognized that in discrimination cases, an employer's true motivations are particularly difficult to ascertain. Hairston v. The Gainesville Sun Publishing Co., 9 F.3d 913 (11th Cir. 1993). Consequently, once a plaintiff has established a prima facie case of discrimination, summary judgment on the merits is ordinarily inappropriate. Lowe v. City of Monrovia, 775 F.2d 998, 1009 (9th Cir. 1985).

The record in this case is replete with circumstantial evidence from which a jury could conclude that Whiting Turner's conduct was racially motivated. See Part 3, supra. At the least, there is a genuine issue of material fact on this issue which precludes summary judgment.

## II. Whiting Turner is not entitled to summary judgment on Bush's statutory claim for unpaid wages.

Although this Court previously denied Whiting Turner's motion to dismiss Bush's claim for unpaid wages pursuant to Fla.Stat. 448.08, it nevertheless again seeks to reargue this issue on the same grounds as it did on the motion to dismiss. This Court was not persuaded by the motion then, and it should not be persuaded now.

19

In its motion to dismiss, Whiting Turner argued: "[I]t [is] clear that Plaintiff's so-called "wage dispute" was really over the timing of his alleged "promotion" to assistant superintendent. Motion to Dismiss at 7. The Court rejected this argument and held that the complaint stated a cause of action for unpaid wages. Whiting Turner now seeks to tweek its argument by claiming that the claim for unpaid wages is not a claim for wages, but for employment discrimination. However, it is well settled that a party has a right to plead and prove any and all theories of liability allowable by law. See Resolution Trust Corp. V. Fiala, 870 F.Supp. 962 (D. Mo. 1994). Munsey v. General Telephone Co. of Fla., 538 So.2d 1328 (Fla. 2nd DCA 1989), does not hold to the contrary. The issue in Munsey was whether an employer who prevails on a claim pursuant to Fla.Stat. 448.08 where the plaintiff also alleges claims under Title VII may recover attorney's fees pursuant to that statute. The Court determined that it could not, specifically noting that "we cannot emphasize too forcefully that we are mindful of the burdens facing plaintiffs in employment discrimination lawsuits. To interpret section 448.08 as the trial court has done would impose an even greater barrier tot he plaintiff whose foe is often capable of committing substantial resources to defend the charges." To read Munsey to stand for the proposition that a plaintiff alleging discrimination claims under Title VII cannot also allege a claim for unpaid wages under Fla.Stat. 448.08 would be to distort the court's intent in that case, particularly where the unpaid wages sought are not merely an element of damage, but one of the core claims alleged by the plaintiff.

For the foregoing reasons, Defendant's Motion for Summary Judgment should be

DENIED.

> Respectfully submitted,
> DAVID H. POLLACK, ESQ.
> Attorney for Plaintiff
> The Ingraham Building
> 25 S.E. 2nd Avenue  Suite 1020
> Miami, FL  33131
>
> BY:_____
> DAVID H. POLLACK
> Fla. Bar No. 0955840

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed and faxed this _21th_ day of November, 2000 to: Sheila Cesarano, Esq., 201 S. Biscayne Blvd., 1500 Miami Center, Miami, FL  33131.

> BY:_____
> DAVID H. POLLACK
> Fla. Bar No. 0955840

21

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FT. LAUDERDALE DIVISION

JAMES BUSH,

CASE NO. 00-6224-CIV-DIMITROULEAS
MAGISTRATE JUDGE JOHNSON

Plaintiff

.

THE WHITING-TURNER
CONTRACTING CO.,
a Maryland corporation,

Defendant

_____ /

### AFFIDAVIT OF ROBERT MURRAY

STATE OF FLORIDA )
       )ss
COUNTY OF DADE )

Before me personally appeared ROBERT MURRAY, who after being first duly sworn,

deposes and says:

1.   I am the project manager for Witters Construction Company.

2.   This affidavit is based on personal knowledge.

3.   Between 1984 and 1993 James Bush worked as a labor foreman for me at Baptist

    Hospital of Miami.

4.   During that time, Mr. Bush oversaw and supervised labor crews of more than **25

    men. His responsibilities included assisting the carpenters on the job, helping

    with the layout of the buildings, doing rough form work, assisting in the shooting

    of elevations, and laying concrete.



EXHIBIT: A

5.  Mr. Bush had extensive knowledge and experience in the construction industry at
the time I hired him.

6.  Mr. Bush' performance during the nine years I worked with him was always
excellent.

7.  I found Mr. Bush to be a man I could depend on and one who gets the job done
when he tells you he will do it.

FURTHER AFFIANT SAYETH NAUGHT.


ROBERT MURRAY

SWORN TO AND SUBSCRIBED before me this 22 day of _____, 2000
by _____, ☒ who is personally known to me
or ☐ who has produced _____ as identification.

_____
Notary Public, STATE OF FLORIDA

*Print Name:* CARMEL BIRL

My Commission Expires:

2

**Affidavit**

STATE OF Florida

    ss:

COUNTY OF Florida

KNOW ALL YE MEN BY THESE PRESENTS,

That on this 7th day of August, personally came and appeared before Jacques Marcelin of Miami, Florida known, and known to me, who after being first duly sworn, deposes and says:

I Jacques Marcelin was hired by James Bush to work at Blooming Dales for whiting Turner contracting, I worked there for six months. Mr. Bush was my foreman in Sept Mr. Bush told me, he was offered a job by Mr. Eric Plotke to be an Asst Super, with him at saw grass. Mr. Bush told me if I go, will you come with me. Mr. Bush was sent to saw grass to start the work. When I got out there back in November of 1999, Mr. Bush was working on a parking lot for target store at that time it was Mr. Bush and ONE engineer on this job all the time. Some days Mr. Plotke was not there, when the parking lot was finished we started to work on phase III, Mr. Bush worked on demolition, tree transplanting, water, sanitary, lines done by another sub contractor. Mr. Bush worked on building site pads for three building Mr. Bush was given building # two and # three. Building # two was a two story building would get me to hold stick or tape while we shot elevations on the building to establish floor levels, while constructing these two buildings Mr. Bush told me, he got a raise and in six months he would receiving a review and then get another raise, he said Eric Plotke told him this, was the procedure, also Mr. Bush was given the work on main street this area has pavers, umbrella seating, cool spots, kiosk and entry features.
Mr. Bush told me the entry features cost over one million dollars, Mr. Bush gave orders on the entire area of work. The excavating the elevations installing rebar pouring concrete. Mr. Bush ordered and figured the concrete he would shoot elevations and did layout of canopy fostings and tell us how deep to pour concrete on the entry features Mr. Bush would come in on his days off to make sure this project continued on schedules, Mr. Bush told me it would make him feel real proud to see this work come out right and it did. One day while Mr. Bush and I were talking he showed me his check. I asked is that what you make, and he answered yes Eric Plotke won't give me a review or a raise like he said he would. Mr. Bush said he didn't want to quit he wanted to see the job completed, all the entry features umbrellas, kiosk, cool, spot all came out good. I did the grouting on the entry features Mr. Bush told me he was proud of the job he did for Whiting Turner.

FURTHER AFFIANT SAYETH NOT.

*Jacques Marcelin* (signature)

    Jacques Marcelin

SUBSCRIBED TO AND SWORN TO before me this 7th day of _August_ , 2000

*(signature)*

    NOTARY PUBLIC

My Commission Expires 3/15/2003

SHIRLEY ANN McCLINTON
Notary Public, State of Florida
My comm. exp. Mar. 15, 2003
Comm. No. CC817459

**EXHIBIT:** 

TO:        WHOM IT MAY CONCERN

FROM:    ANDREW DELANCY

DATE:     AUGUST 8, 2000

RE:        JAMES T. BUSH SR.

# AFFIDAVIT

I ANDREW DELANCY WENT TO WORK AT SAWGRASS PHASE
III FOR WHITING TURNER CONTRACTING CO. I WAS A
CARPENTER, AND WORKED FOR MR. JAMES BUSH. MR. BUSH
WAS THE ASSISTANT SUPERINTENDENT HE GAVE ME
INSTRUCTIONS ON THE AREA THAT I WOULD BE WORKING.
MR. BUSH SHOWED US HOW TO BUILD THE FORMS NEEDED
FOR THE PROJECT; HE DID ALL OF THE LAYOUTS AND SHOT
ALL OF THE ELEVATIONS OF THE VARIOUS STRUCTURES
THAT WAS TO BE INSTALLED. HE INSTRUCTED HIS CREW
THE CORRECT WAY TO INSTALL THE REBAR SO THAT IT
WOULD PASS THE INSPECTION THE FIRST TIME.

HE WORKED ON THE SPECIALTY PROJECTS SUCH AS
1. HE COORDINATED THE INSTALLATION OF THE ENTRY
   FEATURES
2. HE SUPERVISED THE IN STALLING OF THE UMBRELLA
   FOOTINGS.
3. HE SPEARHEADED THE INSTALLATION THE COOL SPOT. FOOTING
4. THE KIOSK FOOTING WAS ANOTHER IMPORTANT
   PROJECT THAT HE TOOK CHARGE OF.

MR. BUSH WOULD CALCULATE THE YARDS OF CONCRETE
AND ORDER IT AS WELL HAVE IT ALL POURED.
MR. BUSH NOT ONLY SUPERVISED THE LABORERS HE ALSO
SUPERVISED THE CARPENTERS BLOCK MASONS, FINISHERS
AND WORKED WITH MOST OF THE OTHER SUBS TO ENSURE
THAT THE SCOPE OF WORK THAT THEY WERE INVOLVED IN
WAS AS PER THE PLANS. I ALSO WAS INVOLVED IN THE



CORRECTIVE HARDWARE INSTALLATION IN THE BUILDINGS
# 2 AND 3

MR. BUSH GAVE ALL OF THE SAFETY MEETINGS FOR THE
PROJECT INCLUSIVE OF ALL CONTRACTORS, WHITING
TURNER ALSO.
WE NEVER HAD ANY PROBLEMS WITH ANY ANCHOR BOLT
LOCATIONS OF THE STRUCTURES.
I FOUND MR. BUSH TO BE  A CAPABLE SUPERVISOR, HE IS
VERY KNOWLEDGEABLE OF CONSTRUCTION SUBJECTS AND
WAS EASY TO WORK WITH. HE KNEW HOW TO GET THE
MAXIMUM PARTICIPATION FROM ALL OF HIS EMPLOYEES.
HE ALSO SUPERVISED THE EQUIPMENT THAT EXCAVATED
FOR THE PAVERS, HE ALSO WORKED WITH THE
ELECTRICAL AND PLUMBING CONTRACTORS I WOULD BE
PROUD TO WORK FOR MR. BUSH AGAIN.

ANDREW DELANCY
(954) 962-2619
(305) 335-2547

Penelope L Nagy
My Commission CC724132
Expires March 12, 2002

Penelope L Nagy
Personally Known
My Commission Expires 3/12/02

SOUTHEAST FLORIDA LABORERS' DISTRICT COUNCIL

INDUSTRIAL, REFRACTORY, COMMERCIAL, AND HIGHWAY AGREEMENT

Between

SOUTHEAST FLORIDA LABORERS' DISTRICT COUNCIL ON BEHALF OF LOCALS 478, 767 and 800

And

UNION CONTRACTORS AND SUBCONTRACTORS ASSOCIATION, INC.

Effective May 1, 1998 through April 30. 2000

**EXHIBIT: D**

| | | Page |
|---|---|---|
| ARTICLE 1 | CONDITIONS OF ACCEPTANCE | 1 |
| ARTICLE 2 | STRIKES AND LOCKOUTS | 2 |
| ARTICLE 3 | GRIEVANCE PROCEDURE | 2 |
| ARTICLE 4 | MAINTENANCE OF STANDARDS | 3 |
| ARTICLE 5 | WORK WEEK | 3 |
| ARTICLE 6 | FOUR TEN-HOUR WORK DAYS | 3 |
| ARTICLE 7 | HOLIDAYS | 4 |
| ARTICLE 8 | TERMINATION NOTICE | 4 |
| ARTICLE 9 | SAFETY AND SANITATION | 4 |
| ARTICLE 10 | HIRING HALL | 4 |
| ARTICLE 11 | GEOGRAPHICAL AREA OF AGREEMENT | 5 |
| ARTICLE 12 | REPORTING TIME | 5 |
| ARTICLE 13 | SHIFT WORK - Three Eights | 5 |
| | Two Nines | 6 |
| | Two Tens | 6 |
| | Two Twelves | 6 |
| ARTICLE 14 | FOREMEN | 8 |
| ARTICLE 15 | UNUSUAL WORKING CONDITION | 7 |
| ARTICLE 16 | REFRESHMENT | 7 |
| ARTICLE 17 | OVERTIME | 7 |
| ARTICLE 18 | UNION REPRESENTATIVES | 7 |
| ARTICLE 19 | JOB STEWARDS | 8 |
| ARTICLE 20 | JOINT TRUST FUNDS | 9 |
| ARTICLE 21 | LABOR/MANAGEMENT COMMITTEE | 10 |
| ARTICLE 22 | WAGES | 10 |
| ARTICLE 23 | CHECKOFF | 13 |
| ARTICLE 24 | LABORERS-CONTRACTORS COOPERATION AND EDUCATION TRUST (LECET) | 13 |
| ARTICLE 25 | AGREEMENT ADMINISTRATION TRAINING | 14 |
| ARTICLE 26 | DURATION OF AGREEMENT | 14 |



ten (10) working days, and shall be final and binding on both parties.

If the Labor Management Committee deadlocks or if no majority decision is entered, then the dispute shall be submitted for final and binding arbitration under the Labor Arbitration Rues of the American Arbitration Association.

## ARTICLE 6
## FOUR TEN-HOUR WORK DAYS

At the contractor's option, and with prior notice to the Union, he can initiate four ten-hour work days, Monday through Thursday, at straight time. Any time worked over ten hours will be at the appropriate overtime rate. Friday can be a makeup day but all hours over forty are at the appropriate overtime rate. If Friday is used as a makeup day, a minimum of ten hours will be worked, weather permitting. If the contractor determines to revert to five days of eight hours, he is required to give the union a three day notice.

3

THE WHITING-TURNER CONTRACTING CO

# THE WHITING-TURNER CONTRACTING COMPANY
## Equal Employment Opportunity Statement
### and
### Affirmative Action Program

1. It is the policy and employment practice of The Whiting-Turner Contracting Company not to discriminate against any qualified applicant for employment, or any qualified employee because of race, color, religion, age, sex, citizenship, national origin, or a disability, particularly with regard to employment, upgrading, demotion, transfer, recruitment and recruitment advertising, lay-off and termination, compensation, apprenticeship and training, and work conditions.

2. It is the policy of The Whiting-Turner Contracting Company to participate in an Affirmative Action Program set forth in Executive Order 11246 with specific attention to minority or female recruitment, training, upgrading and promotion.

3. It is the policy of The Whiting-Turner Contracting Company not to discriminate against any employee or applicant for employment because he or she is a disabled Veteran or Veteran of the Vietnam Era, or because of physical or mental handicap in regard to any position for which the employee or applicant is qualified.

4. Whiting-Turner seeks the inclusion of qualified employees on a non-discriminatory basis in any apprenticeship, on the job, night school, or supervisory programs in which the company participates to assist in locating, qualifying and increasing the skills of its employees. All female and minority employees are encouraged to refer other qualified persons for possible employment.

5. Any employee who is desirous of participating in any of the training programs, or of advancing in a particular skill or trade, or of being considered for supervisory capacity is encouraged to contact his or her job superintendent for information. In the event that the superintendent is unable to supply the information or he or she desires additional information, the Company EEO Officer, Robert J. Kimmons, can be contacted at the Main Office, 410-821-1100.

6. Any complaint of discrimination should be reported immediately to the project EEO Officer or if he or she is not readily available, contact the company EEO Officer, Robert J. Kimmons, should be contacted at the Main Office, 410-821-1100. Investigation and resolution will be made promptly upon receipt of the complaint and within the time frames established by the respective agencies.

Robert J. Kimmons
Vice President and EEO Officer

12.3



17. The Contractor shall ensure that seniority practices, job classifications, work assignments and other personnel practices do not have a discriminatory effect by continually monitoring all personnel and employment–related activities to ensure that the EEO policy and the Contractor's obligations under these specifications are being carrier out.

18. The Contractor shall ensure that all facilities and company activities are non–segregated except that separate or single–user toilet and necessary changing facilities shall be provided to ensure privacy between the sexes.

19. The Contractor shall document and maintain a record of all solicitations of offers for subcontracts from minority and female construction contractors and suppliers, including circulation of solicitations to minority and female contractor associations and other business associations.

20. The company EEO Officer shall conduct a review at least annually of all supervisors' adherence to, and performance under, the Contractor's EEO policies and affirmative action obligations.

21. The Contractor shall request the cooperation of the unions representing his employees as an aid to increasing minority and female group representation within the unions and affecting larger numbers of minority and female group referrals from the unions. The Contractor shall meet as required with the various union representatives to seek ways of increasing the number of minority and female group Journeymen and Apprentices within the unions in training programs and the referral systems.

22. The Contractor shall, when seeking new employees not covered by valid collective bargaining agreements, conduct on a personal basis, systematic and direct recruitment through public and private employee referral sources likely to yield minority and female group applicants including schools, colleges and minority and female group organizations.

23. The Contractor shall solicit, by letter and personal contact, the employment of minority group subcontractors and subcontractors with minority group representation among their employees for all projects. Information as to such sources will be obtained from minority group organizations, contractor organizations, the Small Business Administration, and other Federal and State agencies. The Contractor will, where such minority group contractors are available, offer to counsel and otherwise offer assistance to help these subcontractors to qualify when required.

24. The Contractor agrees to keep such records as are necessary to comply with, and progress under, the company's Equai Employment Opportunity Program. All such records shall be maintained for a period of three years following completion of the contract work and shall be available at reasonable times and places for inspection by authorized representatives of the appropriate governmental agencies.

12.7

THE WHITING-TURNER CONTRACTING CO.

# QUALITY AWARDS
## April - June, 1998



**Individual Awards** - to Whiting-Turner employees who effectively and diligently applied our Quality Control Program on their projects:

### Superintendents    Project    Office

| | | |
|---|---|---|
| Richard Grim | Georgetown-Utilities - Washington, DC | Washington |
| Jay Holmes | IBM Burlington - Essex Junction, VT | Baltimore |
| L. T. White | Universal City-Dr. Suess Land - Orlando, FL | Orlando |
| Greg Riddle | Rite Aid - sites in California | Irvine |
| Rick Carter | NSA Escalators - Ft. Meade, MD | Baltimore |
| James Bush | Sawgrass Mills Mall, III - Sunrise, FL | Ft. Lauderdale |
| Steve Walker | JHU Applied Physics Lab - Laurel, MD | Washington |
| Dave Mallik | Kaiser Permanente - San Juan Capistrano, CA | Irvine |
| Bob Eafrati | Columbia Mall Expansion - Columbia, MD | Baltimore |
| Dale Baker | Franklin Square Hospital - Baltimore, MD | Baltimore |
| Dwayne Haines | St. Joseph Medical Center - Towson, MD | Baltimore |
| Stan Miasek | Stafford Place - Arlington, VA | Baltimore |
| Bill Pumphrey | St. Mina Coptic Church - Holmdel, NJ | Baltimore |
| Brian Deese | CDC Infectious Disease - Atlanta, GA | Atlanta |

### Managers and Engineers    Project    Office

| | | |
|---|---|---|
| Scott Hamburg | Georgetown-Utilities - Washington, DC | Washington |
| Joe Schoenig | IBM Burlington - Essex Junction, VT | Baltimore |
| Tara Howard | Jersey Gardens Mall - Elizabeth, NJ | Baltimore |
| David Atwood | Universal City-Dr. Suess Land - Orlando, FL | Orlando |
| Dave Dement | NSA Escalators - Ft. Meade, MD | Baltimore |
| Andy Sterling | IBM - Substation #7 - Southbury, CT | Shelton |
| Ben Bogdanowicz | Hoyts Cine.-Potomac Yards - Alexandria, VA | Washington |
| Stacy Jackson | Gene Logic - Gaithersburg, MD | Baltimore |
| Robert St. John | Progressive-Campus 2 - Cleveland, OH | Cleveland |
| Thomas Fahs | Stafford Place - Arlington, VA | Baltimore |
| John Fitzgerald | Stafford Place - Arlington, VA | Baltimore |
| Todd Kelby | Harford Mem. Hosp. - Havre de Grace, MD | Baltimore |
| Mike Kulik | Stafford Place - Arlington, VA | Baltimore |
| Vicky Petrone | Amer. Trad'g Bldg. 131 - Newark, DE | Delaware |
| Ben Bogdanowicz | Hoyts Cinemas (1st Quarter) - Alexandria, VA | Washington |
| Jim Marks | St. Mina Coptic Church - Holmdel, NJ | Baltimore |
| Don Linde | Sun Microsystems - Burlington, MA | Shelton |


EXHIBIT:

THE WHITING-TURNER CONTRACTING CO.

Each of these individual winners will receive their choice of a polo shirt, baseball jacket, gym bag, canvas executive brief case, traveler's highway safety kit or a twenty-five dollar check. Congratulations to all and to their supervisors for encouraging them by submitting them for awards.

## Overall Individual Winners

*James Bush*, Superintendent, receives our congratulations for his high rating resulting from numerous random inspections and his use of many checklists. *Dave Dement*, Project Engineer, is congratulated for many random inspection reports, numerous problems avoided and identification of non-conforming work. *Dave* received high marks for customer satisfaction and his work in general. They will each receive a check for $100.00.

## Team Awards

**Gene Logic - R & D Laboratory & Office Fit-out - Gaithersburg, MD:** This was a very complex laboratory project with custom mechanical equipment, a sophisticated mechanical and electrical system, including deionized water and two new gas fired boilers. All was built "super fast track" in under four months, in order to comply with Genomic's Research Company's moving out deadline. Concurrent with accomplishing this impossible task on time, this Team was forging an excellent relationship with the Gaithersburg Building Inspectors and the Fire Marshall.
    Team members - *Jonathan Hess, Stacy Jackson, Tony Cigna, Tom Brady* and *Jim Jaco.*
    Nominated by Tim Regan

**US Naval Academy - Bancroft Hall, Phase 4 - Annapolis, MD:** This Team is responsible for renovating the fourth building of an eight building complex representing the largest student dormitory in the world. This national landmark is also found in the Historic Register. Guarantee of high quality is assured by an unbelievable, written Quality Control Program. QC Reports are submitted daily covering all work performed. The pressure and temperature requirements for the high temperature water system are one of the highest in the country, making weld inspections very critical.
    Team members - *Sam Abutaleb, Fred Nassiri, Dave Cichy, John Keith, Jim Barrett, Oscar Olmedo, Tanya Chew, Rob Stone, Aaron Glover, Mike Grey, Tom Grubb, Dave Blanchard, Wayne Kinsler* and *Kandi McCleary.*
    Nominated by Ron Eisenberg

**National Security Agency, Escalators - Ft. Meade, MD:** Suppose you had to remove and replace four operating escalators in an old building occupied by 20,000 people (visited daily by national and international dignitaries), in a lobby intersection serving three main buildings, the cafeteria entrance, an auditorium entrance, you may not impede daily operations, but you may use the 300-foot corridor for removal of the 7-ton, 40-foot trusses (they are 4' x 6' and will fit through the corridor, but the 4' x 7½' replacements must be turned on their side -- the engineer says, "it should work"), and you have all of 160 calendar days to accomplish your work, exclusive of all government holidays, of course. Oh, yes, this is the NSA director's "baby."
This Team accomplished the work in 5½ months, without damaging existing buildings or finishes. There were less than 25 items on a punchlist prepared 3-days prior to completion, there were no injuries, there were increases in the scope and price which were offset by value engineering savings that produced a reduction of the original contract sum. The government completed a performance evaluation which rates quality of work, schedule, project management, change order management, etc.; this Team scored 95 out of 100.
    Team Members - *Rick Carter, Dave Dement* and *Steve Cutair.*
    Nominated by Larry Cook

*LEFT ON MY ƷSK. JAN. 15, 1999*

Unwittlingly we have been parts of broken relationships, discrimination,
proverty, disease and overbearing personalities. These things exist,
and as long as someone endures it and someone does it, it will go on.
So learn why these things happen if you want to overcome them.
Learn and then don't stay where they are happening, but go on to
better things. This definitely can be done. Fear and helplessness
are the usual reasons we stay in bad situations-but from those two things
many other evils begin. Instead, say to yourself daily that you are able, you
are intelligent, and you are protected. It expands your consciousness to
stand up and shake off everything that has been degrading.

*A single twig breaks, but the bundle of twigs is strong.*

Blue Jacket
Shawnee Chief


EXHIBIT: