**CERTIFIED COPY**

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                FT. LAUDERDALE DIVISION

 3
                CASE NO. 00-6224-CIV-DIMITROULEAS
 4
      JAMES BUSH,                         )
 5                                        )
                                          )
 6             Plaintiff,                 )
                                          )
 7      vs.                               )
                                          )
 8      THE WHITING-TURNER CONTRACTING    )
        CO., a Maryland corporation,      )
 9                                        )
               Defendant.                 )
10                                        )
      _____)
11

12                         First Union Center--Suite 2000
                           200 East Broward Boulevard
13                         Ft. Lauderdale, Florida
                           Friday, June 16, 2000
14                         9:35 a.m. - 12:40 p.m.

15

16

17             Deposition of Charles Bender
               ----------------------------
18

19             Taken before Maria Isabel Fernandez,

20      Notary Public in and for the State of Florida at

21      Large, pursuant to Notice of Taking Deposition

22      filed in the above cause.

23                   _ _ _ _ _ _ _ _ _

24

25

      FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868
```

```
 1        APPEARANCES:
          ------------
 2
            ON BEHALF OF THE PLAINTIFF:
 3
              David H. Pollack, P.A.
 4            25 Southeast 2nd Avenue
              Suite 1020
 5            Miami, Florida 33131
              BY:  David H. Pollack, Esq.
 6
            ON BEHALF OF THE DEFENDANT:
 7
              Shutts & Bowen, LLP
 8            1500 Miami Center
              201 South Biscayne Boulevard
 9            Miami, Florida 33131
              BY:  Sheila M. Cesarano, Esq.
10

11              - - - - - - - -

12                   I N D E X
                     ---------
13
       Witness         Direct  Cross  Redirect  Recross
14     -------         ------  -----  --------  -------
       Charles Bender    3      133      142      146
15
                 Exhibits for Identification
16               ---------------------------

17                      None
                        ----
18

19

20

21

22

23

24

25

       FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868
```

```
 1 │ Thereupon:
 2 │                 CHARLES BENDER
 3 │ was called as a witness by the Plaintiff,
 4 │ and after being first duly sworn, was examined
 5 │ and testified as follows:
 6 │                 DIRECT EXAMINATION
 7 │ BY MR. POLLACK:
 8 │      Q    Good morning, Mr. Bender.  My name is
 9 │ David Pollack.  I represent James Bush in a
10 │ lawsuit that was filed against Whiting-Turner.
11 │           Before I begin, let me ask you
12 │ whether you've ever had your deposition taken
13 │ before?
14 │      A    Yes, I have.
15 │      Q    You have.  Let me ask you, what was
16 │ the context?
17 │      A    The context was there was a -- I was
18 │ at a party and there was a fight with some other
19 │ guys and I happened to be at the same party, so
20 │ I was brought in as a witness.
21 │      Q    Okay.  So you were a witness and it
22 │ was a civil case.
23 │           When was that?
24 │      A    Several years ago.
25 │      Q    Okay.  Are you pretty much familiar
```

FERNANDEZ & ASSOCIATES COURT REPORTERS-- (305)374~8868

```
 1  with how a deposition works?  Do you remember?
 2       A    More or less.
 3       Q    Okay.  Just to briefly remind you.
 4  I'm going to be asking you a series of
 5  questions.  If you don't understand anything
 6  that I ask or if it's not clear, ask me to
 7  repeat it or rephrase it.  I'll be happy to do
 8  that.
 9            From time to time, your attorney is
10  going to be interposing, I imagine, objections
11  to questions that I ask.  Those are objections
12  for the record in the event that we need a
13  written record for trial.  They are not
14  instructions to you not to answer a question
15  unless she specifically is instructing you not
16  to answer.
17       A    Right.
18       Q    Just to remind you, the court
19  reporter can't take down nonverbal gestures or
20  statements like uh-huh or nuh-uh, so you need to
21  answer affirmatively yes or no, things like
22  that.
23            That's pretty much it.  Do you have
24  any questions before we start?
25       A    No, I do not.
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

| | | |
|---|---|---|
| 1 | Q | Can you state your full name for the |
| 2 | record? | |
| 3 | A | Charles Edward Bender. |
| 4 | Q | Can you tell me, do you go by any |
| 5 | other names? | |
| 6 | A | Chuck. |
| 7 | Q | Where do you live, Mr. Bender? |
| 8 | A | I live at 7760 Northwest 14th Street |
| 9 | Pembroke Pines, Florida 33024. | |
| 10 | Q | What is your current phone number? |
| 11 | A | Area code (954) 981-9783 |
| 12 | Q | And your Social Security Number? |
| 13 | A | 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. |
| 14 | Q | How old are you, sir? |
| 15 | A | 30 years old. |
| 16 | Q | And you are currently employed with |
| 17 | Whiting-Turner; is that correct? | |
| 18 | A | Correct. |
| 19 | Q | How long have you been employed with |
| 20 | Whiting-Turner? | |
| 21 | A | A little over two years. |
| 22 | Q | Do you remember when you were hired? |
| 23 | A | February 16th? |
| 24 | Q | Of '90 --- |
| 25 | A | Eight, I believe. |

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1        Q     Who were you hired by?

2        A     I guess I'd have to say I was brought

3    into the company or I was referred to the

4    company by Eric Plotke.

5        Q     Did you know Mr. Plotke before

6    beginning work at Whiting-Turner?

7        A     Correct.  I worked for a company that

8    was working for Whiting-Turner before then.

9        Q     What company was that?

10        A     Lotspeich, L-o-t-s-p-e-i-c-h, Company

11    in Florida.

12        Q     They are a construction company?

13        A     They are an interior contracting

14    company.

15        Q     And you said you were referred to

16    Whiting-Turner by Eric Plotke?

17        A     Correct.

18        Q     I'm gathering from that that Eric

19    Plotke had some relationship, if you know, with

20    Lotspeich?

21        A     No.  Just the relationship they had

22    was Eric working for Whiting-Turner, being a

23    superintendent, and riding the job, which was

24    Bloomingdale's and Lotspeich, being a

25    subcontractor, working for Whiting-Turner.

1        Q    So Lotspeich was a subcontractor for

2    the Bloomingdale's job?

3        A    Correct.

4        Q    Now, when you say the Bloomingdale's

5    job, I'm assuming that's a mall that you're

6    talking about where Bloomingdale's was located?

7        A    It was a department store.  It was

8    one of the anchors of the Aventura Mall,

9    correct.

10       Q    Did you work on that project with

11   Lotspeich, the Aventura Mall?

12       A    I was the -- I ran the job for

13   Lotspeich.

14       Q    The Aventura Mall job?

15       A    The Bloomingdale's job.  Just so you

16   understand, Whiting-Turner was doing the anchor

17   Bloomingdale's which was part of Aventura.

18   Whiting-Turner was just doing the

19   Bloomingdale's.

20       Q    Just Bloomingdale's, but not the

21   whole mall?

22       A    Correct.

23       Q    Okay.  Let's back up for a second.

24   Let me go back before we get into sort of your

25   work history.  Can you tell me briefly what your

 1   educational background is?

 2       A     I graduated from North Miami Beach

 3   High School in 1988.  From there, I was enrolled

 4   in a carpenter apprenticeship program, which I

 5   was in for six years.

 6       Q     Who was that with?

 7       A     Carptenter's Union.

 8       Q     Forgive me for a second, but I'm not

 9   familiar with that.

10           When you apprentice, do you

11   apprentice with one particular company or one

12   particular carpenter?  How does it work?

13       A     It's just an apprenticeship program

14   that everyone that is in the Carpenters' Union

15   is required to go to.  You can work with several

16   different companies.  It just so happens that I

17   was -- I don't know if you want to say fortunate

18   enough or lucky enough, to work with the same

19   company as my apprenticeship.

20       Q     Do you find the person that you

21   apprentice or the company who you apprentice

22   under or do they find you?

23       A     No.  Basically how it worked was, I

24   went to work for Lotspeich.  And Lotspeich,

25   being a Union company, they require that I go

     FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1   into this apprenticeship program.  So I then

2   went to this apprenticeship program and stayed

3   in it until I was done, until I graduated.

4        Q    So after graduating, you then went

5   and apprenticed with Lotspeich; is that correct?

6        A    Not directly.  There was some down

7   time in between those periods.

8        Q    What occurred in that down time?

9        A    I had a job doing concrete, three or

10  four concrete slabs and panels with a company by

11  the name of Filagree Wide Slab.

12       Q    Sorry?

13       A    A company by the name of Filagree

14  Wide Slab.

15       Q    Are they here in Florida?

16       A    Correct.

17       Q    In Dade County?

18       A    They are in Broward County off of

19  State Road 84 and 441.

20       Q    How long did you have that job?

21       A    I think it was a little bit -- a

22  little bit over six months.

23       Q    After that job, what did you do?

24       A    I went into cabinet making.  I was

25  working for a company.  It was a company with a

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1   couple of gentlemen who had a warehouse off of

2   Pembroke Road, and one of my duties there was

3   building furniture.

4        Q    You graduated in 1988, and then after

5   that, you went to work with Filagree Wide Slab,

6   so in about 1989 you went to build furniture; is

7   that correct?

8        A    Probably in that same time period,

9   yes.

10       Q    What was the name of that company?

11       A    I don't remember the name.  I don't

12  think they were a company.  They were just

13  building furniture, as a subcontractor to some

14  other people.

15       Q    How long did you work with that

16  company?

17       A    It wasn't very long.  Couple of

18  months.  I'd say, four or five months.

19       Q    Then where did you go?

20       A    I went to work for Lotspeich.

21       Q    And that was the six-year apprentice

22  program?

23       A    Yeah.  That was when I was -- yeah, I

24  started shortly after I went to work for

25  Lotspeich.

```
 1         Q    So you were with Lotspeich from about
 2    1990 to 1996?
 3         A    I've been with Lotspeich since the
 4    beginning, like you said, '90, all the way up to
 5    two and a-half years ago when I stopped working
 6    for them.  I did leave them a couple of times to
 7    go do other things in between the duration of my
 8    employment with Lotspeich.
 9         Q    Let me see if I understand this
10    correctly.  In 1990, you went to work for
11    Lotspeich, you apprenticed with them for six
12    years and then you continued to work after your
13    apprenticeship with them?
14         A    Yeah.  The apprenticeship program is
15    run by the Union and I worked for Lotspeich, so
16    I went at night to the apprenticeship and then
17    worked during the day for Lotspeich.
18         Q    Okay.  During the day, what did you
19    do for Lotspeich?
20         A    Well, I mean, I don't know how you
21    want me to phrase this.  At the beginning,
22    obviously, being an apprentice, you did whatever
23    was required.  You brought material to the
24    journeymen.  You assisted them in whatever they
25    needed.  You basically worked under them.
```

1  Whatever they were doing at the time, whether it
2  be laying out, framing, hanging sheetrock,
3  anything that Lotspeich did, doors, ceilings,
4  all of those activities, worked under them.

5              And from that time, as you learned
6  more, you start doing more.  I worked
7  particularly with one guy who did a lot of
8  layout.  I worked with him, so I was fortunate
9  enough to be in that situation and I was
10  involved in extensive print reading, extensive
11  layout.  As an apprentice, I was running
12  anywhere between 25 to 50 men, training them as
13  an apprentice.

14       Q    When you say "running", what do you
15  mean?

16       A    I was in charge of the job.  I ran
17  the job for Lotspeich.  They gave me the prints.
18  They said the job is on such and such a street,
19  go do it.  I would go to the job.  I would meet
20  with the general contractor and do the job, run
21  the job, order the material, make sure the
22  manpower was adequate, layout the job, via
23  reading the blueprints.  Run the job.  Just do
24  the whole thing.  Coordinate all the work.
25  Coordinate all the labor.  Coordinate all the

```
 1     material.  Coordinate with the general
 2     contractors, the other trades.
 3          Q     So you kind of supervised the job?
 4          A     Yeah.
 5          Q     Did your work for Lotspeich, what you
 6     just described to me, meeting with the general
 7     contractor, coordinating labor and material,
 8     overall supervising the job, was that consistent
 9     throughout the time that you worked, in other
10     words, from 1990 up until you left, were you
11     doing all of those things or did your --
12     actually, let me rephrase that.
13               You had earlier said that you started
14     out working under journeymen doing sort of lower
15     level stuff; is that correct?
16          A     Correct.
17          Q     And then at some point, you started
18     to meet with general contractors, coordinate
19     labor and material and run the job?
20          A     As my knowledge increased of the
21     industry, yes, I moved up.
22          Q     Can you break down for me in time
23     when that sort of changed?
24          A     Probably around '93, '94.
25          Q     You mentioned that you were lucky
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    enough to be working under someone who, I guess,

2    taught you some of this stuff.  Who was that?

3         A    His name is Vick Lacour.

4         Q    L-a?

5         A    C-o-u-r.

6         Q    He was your boss?

7         A    Correct.

8         Q    Is he still with the company?

9         A    I'm not sure.

10        Q    Tell me what, if any, professional

11   licenses you hold in the -- or just period?

12        A    Could you rephrase the question?

13        Q    Yes.  In other words, I'm trying to

14   find out, do you have a contractor's license?

15   Do you have any sort of licenses that are given

16   through either any agencies or the State or, I

17   don't know, trade associations that license, any

18   kind of licenses, professional licenses?

19        A    There's no licenses.  I've been

20   certified through the Union.

21        Q    Tell me what certification you have?

22        A    After you go through the

23   apprenticeship and you graduate, you are a

24   certified journeyman, which means I can go work

25   anywhere in the United States with my

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    journeyman's card, it being certified under the

2    Union.

3         Q    So you're a certified journeyman

4    under the Carpenter's Union?

5         A    Correct.

6         Q    Okay.

7         A    Which I no longer am affiliated with.

8    If I ever chose to go back into the Union, all I

9    would have to do is go pay my money which is an

10   initiation fee of $300 or whatever it may be at

11   this time, and I will be back in the Union.  But

12   I do not hold any Union card or anything like

13   that.

14        Q    You voluntarily at some point stopped

15   being affiliated with the Union?

16        A    Correct.

17        Q    When was that?

18        A    Two and a-half years ago.  Actually,

19   not two and a-half, two years ago.

20        Q    Was that before or after you began

21   working with Whiting-Turner?

22        A    After.

23        Q    You had mentioned that you were

24   referred to Whiting-Turner by Eric Plotke.  I'm

25   assuming from that that -- and you said that

1   Whiting-Turner worked on the Aventura Mall -- so

2   I'm assuming from that that you either worked

3   with or had some connection with Eric Plotke on

4   the Bloomingdale's job; is that correct?

5         A    That would be correct.

6         Q    Prior to the Bloomingdale's job, did

7   you have any connection with Eric Plotke?

8         A    Nuh-uh, none.

9         Q    Other than Eric Plotke, did you work

10  with anybody else from Whiting-Turner on the

11  Bloomingdale's job?

12        A    Yes.

13        Q    Before I ask you about that, before

14  the Bloomingdale's job, did you work with any

15  people from Whiting-Turner?

16        A    Yes.

17        Q    When was the first time that you

18  worked with people from Whiting-Turner?

19        A    I would say probably -- I don't know

20  what year it was.  It was the JC Penneys at the

21  Pembroke Lakes Mall, and Whiting-Turner did that

22  project.

23        Q    Do you remember roughly how long

24  before you went to work at Whiting-Turner you

25  did work at the Pembroke Lakes Mall?

```
 1          A     That would be several years.  I'd say
 2     at least three, three years.  I can't be exact
 3     on that, though.
 4          Q     What did you do at the Pembroke Lakes
 5     Mall?
 6          A     I was in charge of all the layout.  I
 7     was in charge of working with the JC Penney
 8     representative, Danny Magrew.  In which we did a
 9     lot of coordinating and layout and verification
10     of all the fixturing and that kind of -- those
11     kind of items.
12          Q     Who from Whiting-Turner did you work
13     with on the Pembroke Lakes Mall job?
14          A     There were two -- excuse me.
15               (Thereupon, a phone interruption was
16          had in the deposition, after which the
17          deposition continued as follows:)
18          Q     (By Mr. Pollack) We were talking
19     about JC Penneys.
20               Who from Whiting-Turner worked on
21     that job with you?
22          A     There were two gentlemen, one project
23     manager by the name of Jeff Fenstimacker
24     (phonetic).  I don't know the spelling of the
25     last name.
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1        Q    It's okay.

2        A    And the superintendent was John

3    Farrara.  I believe that was his last name.  I

4    don't know the spelling on that, either.

5        Q    Let me ask you.  You said one guy was

6    a project manager and one guy was the

7    superintendent?

8        A    Correct.

9        Q    Are those generic construction terms

10   that aren't particular to Whiting-Turner?  In

11   other words, any contract job would have a

12   project manager and a superintendent?

13       A    I can't answer your question about

14   any other companies.  I don't know how the

15   contractors would staff their projects.  But

16   typically -- typically, Whiting-Turner would try

17   to have a project manager and a superintendent

18   to run a job, correct.

19       Q    Tell me what the difference is,

20   responsibility-wise, job-wise, between project

21   manager and the superintendent.

22       A    A project manager handles all

23   contracts, writing of contracts, executing of

24   contracts, all documentation and aspects

25   involving that.  They involve bidding the jobs

 1    out, getting the subcontractors.  I couldn't
 2    give you their whole job description at this
 3    time, but that's basically what they do.  They
 4    basically oversee the entire project.
 5               A superintendent's responsibilities
 6    are to set the job up in the field.  Their
 7    responsibility is making sure that the building
 8    is going in its proper location.  Overseeing all
 9    subcontractors, all labor.  Making sure that the
10    job is properly staffed with manpower.
11    Coordinating all field issues.  Working with the
12    architect.
13        Q    Hold on.  Coordinating all field
14    issues?
15        A    Working with the architect.
16    Identifying problems prior to them happening.
17    Resolving those problems.  Going to the
18    architect, the engineers, and finding solutions
19    and correcting them.  They are responsible for
20    all paperwork involving the field, daily
21    reports, accident reports, safety, holding
22    subcontractor meetings, coordinating
23    subcontractor meetings.  There's just a lot of
24    items.  I can just really keep going on and on.
25    Basically, responsible for all field issues.

1         Q      You've worked on other jobs other

2    than Whiting-Turner jobs, correct?

3         A      Correct.

4         Q      And in those companies, did they have

5    basically, the other companies, the

6    non-Whiting-Turner companies, did they have    .

7    basically the same structure, that is, a project

8    manager who is in charge of handling all

9    contracts and overseeing those kinds of things

10   and then a superintendent who does all of the

11   things that you just described?  I guess what

12   I'm asking you is:  I understand you can't talk

13   about the whole construction industry because

14   you haven't worked with every single different

15   contractor, but based on your experience with

16   the contractors that you've worked with and

17   based on your general knowledge, is that more or

18   less the same structure that Whiting-Turner has

19   the same for other contractors?

20        A      Well, like I said, I really can't

21   answer that, because I've worked with companies,

22   such as Miller & Solomon, and they had a

23   superintendent on the job and they had a guy

24   come from out of town who did their schedule who

25   wasn't working for their company who was subbed

1    out.  So you had the superintendent and then you

2    had a gentleman who did all the schedules, so

3    typically it can be done differently.  But for

4    the most part, I would say yes, there are

5    project managers and superintendents.  How each

6    company structures their jobs is different.

7        Q    Okay.  Do most companies also have

8    somebody who is designated as the assistant

9    superintendent?

10       A    I would say yes.

11       Q    On the other jobs that you worked on,

12   other than the Whiting-Turner jobs, were there

13   people who worked on those jobs as assistant

14   superintendents?

15       A    Yes.

16       Q    Okay.  You are familiar with the

17   position of assistant superintendent at

18   Whiting-Turner?

19       A    Correct.

20       Q    Okay.  Based on your knowledge of the

21   other jobs that you worked on and Whiting-Turner

22   jobs, is the job description, what an assistant

23   superintendent does, essentially the same on the

24   Whiting-Turner jobs as it was with the other

25   contractors?

```
 1        A    No.
 2        Q    Okay.  I want you to describe for me
 3   the differences.  Why don't we first start with
 4   the position of assistant superintendent at
 5   Whiting-Turner.  Can you tell me what that
 6   position involved?
 7             MS. CESARANO:  I'm going to object to
 8   form.
 9        Q    (By Mr. Pollack) Well, let me lay a
10   predicate.
11             You were hired at Whiting-Turner
12   February of '98, correct?
13        A    That would be correct.
14        Q    Okay.  What position were you hired
15   as in February of 1998?
16        A    I was hired as an assistant
17   superintendent.
18        Q    Since February of 1998 and up through
19   the present, have you held the same position at
20   Whiting-Turner?
21        A    Yes, but it's categorized
22   differently.
23        Q    Before you explain to me the
24   difference in the categorization, do I
25   understand correctly from your answer that you
```

1    are now still an assistant superintendent at

2    Whiting-Turner?

3         A     Correct.

4         Q     All right.  Before you tell me about

5    the assistant superintendent, you mentioned that

6    you were referred to the company by Eric Plotke.

7    Did you go through an interview process?

8         A     Yes, I did.

9         Q     Tell me about the hiring process, who

10   you interviewed with, that sort of thing.

11        A     On the Bloomingdale's job, Eric had

12   asked me if I was interested in going to work

13   for Whiting-Turner as an assistant.  At the

14   time, I wasn't sure.  Some time went by and he

15   called me and asked me if I was still interested

16   and I said yes.  I met with him at the Sawgrass

17   Mills job.  He asked me if I still wanted to go

18   to work for him and I said yes.  He then made a

19   call to Rob Mitchell and he spoke with Rob about

20   it and he set up an interview with him.

21        Q     With Rob Mitchell?

22        A     Yes.  That day, that day, I also

23   talked with Eric.  We went over, you know, what

24   he was looking for.  It would be somewhat of an

25   interview, I would say.  We met for some time

1    and talked about what he was looking for in an

2    assistant, that kind of thing.  I then met with

3    Rob Mitchell at the corporate office.  He

4    interviewed me.

5        Q    When you say, "We met and we talked

6    about what he was looking for", that's Eric or

7    Rob?

8        A    I met with Eric first at the job

9    site.

10       Q    And then you went to the corporate

11   office?

12       A    Yeah.  He said he can't hire me.

13   Like I said, he said he can only refer me.

14            I met with Rob Mitchell.  We did an

15   interview and he then said he would get back to

16   me.  I would say a week went by, he called me

17   and made me an offer and I went to work the next

18   day.

19       Q    When you met with Eric to talk about

20   what he was looking for, what did he tell you?

21       A    He said he was looking for an

22   assistant -- another assistant.  He said he was

23   in the process of trying to put James in the

24   same position he wanted me to be in.  I guess

25   they referred to it as the assistant

1    superintendent program.  He just explained to me
2    how many buildings were going to be going up out
3    there and what my duties might be.  Not my
4    duties; I shouldn't say duties; what my work
5    load would be, running buildings four, five and
6    six.
7         Q    There were six buildings all
8    together?
9         A    Yeah.  There were six buildings.
10   There was one -- no, two, three and then four,
11   five, 6A and 6B, which is what I did.
12        Q    So seven buildings?
13        A    No, there was ---
14        Q    One, two, three, four, five?
15        A    Two, three.
16        Q    Oh, there's no one.
17        A    Four, five.  Two, three, four, five,
18   6A and 6B, six buildings.
19        Q    Did you understand his intention to
20   be that you would be in charge of three of those
21   and somebody else would be in charge of the
22   other three or that you would be sharing
23   responsibility for all six?
24        MS. CESARANO:  Objection to form.  Go
25   ahead and answer.

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1          THE WITNESS:  I don't think it was

2     clear.  He was just basically telling me what

3     the project would involve and what he thought I

4     would be doing.  There was no definite fine line

5     of who was going to be doing what.

6          Q    (By Mr. Pollack) You said he was

7     trying to put James in the same position that

8     you were.  Did he mention Mr. Bush during that

9     conversation, either by name or by reference,

10    not by name?

11         A    Yeah.  James was standing right

12    there.  I knew James from Bloomingdale's.  He

13    was just mentioning that he was looking at

14    putting James in the same type of program I was

15    going for.

16         Q    What did he tell you about the

17    program that he was describing?

18         A    That it was an assistant

19    superintendent program that Whiting-Turner has

20    where you come on as, I guess, a probationary

21    type assistant superintendent and they, you

22    know, they train you and teach you how to be a

23    superintendent.

24         Q    How long was that?  Did he tell you

25    in that meeting how long the probationary

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1   program was for?

 2         A    No.  I had an idea, though.

 3         Q    Based on?

 4         A    They had an assistant superintendent

 5   that was on Bloomingdale's that was on the

 6   probationary period for two years, so I knew it

 7   could go as long as two years.

 8         Q    Did he describe for you what exactly

 9   the program involved?

10         A    Just being taught how to be a

11   superintendent.

12         Q    In other words, sort of on-the-job

13   training?

14         A    Correct.

15         Q    Was there any other training as part

16   of the program that you understood at that time

17   that the program involved?  In other words,

18   taking classes or going to seminars or things

19   like that?

20         A    No.  Whiting-Turner conducts seminars

21   throughout the year, but it's basically for

22   everybody.  It's not part of the training

23   program, but there is a lot of paperwork that

24   you learn how to do and things like that that I

25   wouldn't know how to do unless I was trained by
```

1    somebody who was already doing it, such as Eric

2    or another superintendent, procedures and things

3    like that.  In other words, I couldn't have --

4    unless you have some previous superintendent

5    background, nobody is going to walk in that job

6    and do it without being trained by somebody.

7         Q    So you were hired as an assistant

8    superintendent but there was a probationary

9    program that you were a part of?

10        A    I don't know if you call it

11   probationary or not, but it was like a -- I

12   don't know the word I'm looking for.  It was

13   like probationary or like an internship type

14   thing.  That's how I was hired.  I wasn't a full

15   blown assistant superintendent working under

16   Whiting-Turner.  I wasn't getting paid -- I was

17   getting paid by Whiting-Turner, but I was still

18   a Union carpenter.  They were still paying my

19   benefits.  I was still being paid weekly.

20             MS. CESARANO:  You mean Union

21   benefits?

22             THE WITNESS:  I was still getting

23   Union benefits, correct, when I was a salary

24   employee.

25        Q    (By Mr. Pollack) What was your

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1   starting salary?

2       A   I think they started me off with like

3   $17.00 an hour based on a 40-hour salary.  It

4   was either 17.00 or 17.50.  I can't remember

5   exactly.

6       Q   Did there come a point after you

7   began working as an assistant superintendent

8   that your salary increased?

9       A   Yes.

10      Q   When did that occur?

11      A   I would say it was six months or so

12   after I started working.

13      Q   What did you then earn?

14      A   I think they gave me a pay increase

15   of -- I don't remember exactly, but it wasn't

16   very much.  It was a pay increase, but it wasn't

17   a drastic pay increase.

18      Q   Did you continue to be with the

19   Carpenter's Union getting Union benefits at that

20   time?

21      A   No.  At that time, I requested -- I

22   wanted to get out of the Union, so I requested

23   if I could go and start receiving Whiting-Turner

24   benefits.

25      Q   Was that something that you could

1   have done at the beginning --

2      A    No.

3      Q    -- when you first came in?

4      A    No, it wasn't.

5      Q    What changed?

6      A    We'll have to go back, I guess, to

7   when I interviewed with Rob Mitchell. He was

8   basically explaining to me the probationary

9   period and after some time, he said, we'll look

10   at your performance and we'll evaluate, if we're

11   happy with you and you're happy with us, then we

12   will move to making you a Whiting-Turner

13   employee, receiving Whiting-Turner benefits. So

14   I requested -- I was kind of eager, and I wanted

15   to know how soon that could be possibly done.

16   He told me no less than six months, a minimum of

17   six months.

18         So at that time when my six months

19   were up, I went to Jeff Cooper and right, wrong

20   or indifferent, I wanted to know how I was

21   doing, how my performance was.

22      Q    What do you mean by right, wrong or

23   indifferent?

24      A    If I was doing good, bad, or if I was

25   completely screwing everything up, I wanted to

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    know.  So at that time, I requested that I find
2    out how I was doing.  Jeff agreed and he called
3    Rob and set up a meeting.
4         Q    So six months after you started to
5    work, you went to Jeff Cooper and asked for a
6    performance review?
7         A    Correct.
8         Q    And after that, Rob Mitchell sat down
9    with you.  Did Jeff Cooper give you the
10   performance review?
11        A    No.
12        Q    Who gave you the performance review?
13        A    Rob Mitchell, upon my request.
14        Q    What did he say?
15        A    He said he thought I was doing an
16   excellent job and he'd like me to stay on with
17   Whiting-Turner.  He explained to me, you know,
18   what he expected from assistant superintendents
19   and superintendents.  He then gave me the, I
20   guess, pay raise at that time, which at the
21   time, you know, it wasn't that much money, but
22   it was fine with me.
23        Q    Was it something like about $19.00 an
24   hour that you went up to?
25        A    I don't know the dollar figure.  At

1    that point, I was on salary and I didn't try to

2    calculate it into hours anymore. I was happy

3    being where I was at. I was happy being with

4    Whiting-Turner, so I wasn't worried about that.

5        Q    When you say you were on salary, your

6    salary is based on a 40-hour week?

7        A    Yes.

8        Q    Do you remember what that salary was?

9        A    I can't remember.

10       Q    Is it the same salary you're earning

11   now?

12       A    No.

13       Q    How many increases in salary have you

14   had since that increase?

15       A    Two.

16       Q    Two subsequent to that? In other

17   words, that increase and then two more?

18       A    Yes. We have what is called a

19   year-end review. At which time they review us

20   and if we're doing fine, they give us a raise,

21   pay increase.

22       Q    You say "they have what is called a

23   year-end review", that's Whiting-Turner?

24       A    Could you please repeat that?

25       Q    You say "they have what's called a

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  year-end review", "they" being Whiting-Turner?

2       A    Yes.

3       Q    And everybody gets one of those?

4       A    Everybody gets reviewed at the end of

5  the year, that is a Whiting-Turner -- that is,

6  whoever receives Whiting-Turner benefits.

7       Q    So people who do not receive

8  Whiting-Turner benefits do not get reviewed?

9       A    I don't know.  I guess -- I'm not

10 sure on that.  All I can speak about is my

11 situation.  When I was reviewed as an assistant

12 superintendent after six months and then it so

13 happens six months later it was the end of the

14 year and they gave me a year-end review.  I

15 don't know if that's typical for every assistant

16 superintendent.

17      Q    How do you know that everyone gets

18 reviewed at the end of the year?

19      A    I guess it's just a -- you just know

20 everybody is going up for a review.  I mean,

21 everybody knows that it was a -- I guess it

22 wasn't explained to me.  It was just an

23 observation on my part.  Everybody at the end of

24 the year was going and meeting with either Rob

25 or Jeff.

1        Q    So it's not something that you read
2    in the book somewhere that says in the end of
3    the year you get reviewed?
4        A    I can't say that.  It may say that in
5    the book, in the manual.
6        Q    That wasn't the source of your
7    knowledge of it?
8        A    No.  I was told at the end of the
9    year, I have to give you a review.  I said fine.
10        Q    And just so that I'm clear, you don't
11    know whether this end of the year review is
12    something that is particular to people who get
13    Whiting-Turner benefits or not?
14        A    Yeah, I don't know that.  I don't
15    know their procedure as far as that goes.  I
16    know -- all I know is that all the people that
17    received reviews at the end of the year were
18    full-time Whiting-Turner employees and were
19    receiving Whiting-Turner benefits.
20        Q    Could you tell me who those people
21    were?
22        A    From the trailer, at that time, it
23    was Sergio Tio, Ray Mackeen, Omar Sweeny, Eric
24    Plotke, I believe Jeff Cooper must have gotten
25    one.

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1        Q      Anybody else?

2        A      I'm not sure if Shamia and Noreen got

3    one or not.

4        Q      I'm sorry, Shamia?

5        A      S-h-a-m-i-a.

6        Q      And the last name was?

7        A      Blanchett.  I don't know how you

8    spell the last name.  B-l-a-n ---

9        Q      Blanchett?

10       A      Blanchett, yes.

11       Q      And all of these people were reviewed

12   by the same individual?

13       A      I don't know.  Well, Jeff gave us the

14   review, so obviously, Jeff had to have been

15   reviewed by somebody else other than himself.

16   Probably, if I was guessing, I'd say Rob

17   Mitchell.  But yes, Jeff does the reviews.  He

18   did the reviews on that job, I should say.

19       Q      You mentioned a trailer.  Can you

20   tell me what trailer you're referring to?

21       A      Our job site trailer that was on-site

22   for that particular job.

23       Q      When you are talking about this

24   particular job, are you talking about

25   Bloomingdale's or are you talking about a

1    different kind of job?

2        A    Sawgrass Mills.

3        Q    Other than Sergio Tio, Ray Mackeen,

4    Omar Sweeny, Eric Plotke, Jeff Cooper and Shamia

5    Blanchett and yourself, were there any other

6    people who -- well, let me back up a second.

7    This trailer, did that function as an office?

8        A    Yes.

9        Q    Other than Sergio Tio, Ray Mackeen,

10   Omar Sweeny, Eric Plotke, Jeff Cooper, Shamia

11   Blanchett, were there any other people whose

12   offices were located in that trailer?

13       A    Yes.

14       Q    Who would those people be?

15       A    Noreen Niameth.  I don't know.  I

16   don't know.  I'm sorry.

17       Q    Anybody else?

18       A    There was some people in and out.  We

19   had some interns that came and worked during the

20   summer.  Andy Haberman and Jeff Slade, were two

21   interns that we had come down from college.

22   There was another gentlemen by the name of Lee

23   Rogers who came down from up north to help us

24   out on some small items.  That was about it.

25       Q    Did Mr. Bush also have an office in

1    that trailer?

2         A    He shared an office with me, correct.

3         Q    So his office was in that trailer?

4         A    Yeah.  I'm just saying that it was

5    him and I and we were there all the time

6    together.  I'm referring to the rest of the

7    trailer.  He and I had desks that were back to

8    back.  I sat directly across from him.

9              MS. CESARANO:  Can we take just a

10   two-minute break?

11             MR. POLLACK:  Sure.

12             (Thereupon, a recess was taken in the

13        deposition, after which the deposition

14        continued as follows:)

15        Q    (By Mr. Pollack) So your desks, you

16   and Mr. Bush's desks were next to one another?

17        A    Like you and myself are sitting

18   across from each other.  We faced each other.

19        Q    For the record, we're sitting across

20   a conference table, which is, I don't know, you

21   are the construction person.  How wide is this

22   table?

23        A    I'd say it's about four and a-half,

24   five feet.

25        Q    Now, this was on the Sawgrass Mills

1    job, correct?

2         A    That would be a correct statement,

3    yes.

4         Q    I'm asking you this not to be

5    repetitious, but you know the job better than I

6    do.   The six buildings, that's the job that was

7    the Sawgrass Mills job?

8         A    That would be a correct statement,

9    yes.

10        Q    Now, tell me who was the

11   superintendent of that job site?

12        A    The general superintendent was Eric

13   Plotke.

14        Q    You said "the general

15   superintendent."   Was there another kind of

16   superintendent?

17        A    No.

18        Q    And you and James Bush were assistant

19   superintendents on that job?

20        A    Correct.   That would be correct.

21        Q    Did you have separate spheres of

22   responsibility on that job?   In other words, did

23   you have different responsibilities as assistant

24   superintendents or did you work basically

25   together?

```
 1              MS. CESARANO:  Objection to form.
 2         Q    (By Mr. Pollack) you can answer the
 3    question.
 4              MS. CESARANO:  You can answer.
 5         Q    (By Mr. Pollack) If you want me to
 6    rephrase it, if you don't understand it.  Do you
 7    understand the question?
 8         A    We had the same responsibilities, but
 9    did different buildings.
10         Q    Okay.  So you were responsible for
11    certain buildings and he was responsible for
12    other buildings?
13         A    Correct.
14         Q    Okay.  Did you have any buildings for
15    which you had joint responsibility?
16         A    No, we didn't.
17         Q    Did you perform any tasks for which
18    you had joint responsibility?
19         A    Yes.
20         Q    Which buildings of those six were you
21    responsible for?
22         A    I was responsible for building four,
23    building five, the Regal Cinema demo, building
24    6A, building 6B.  I was responsible for the Red
25    Snapper demolition in the beginning and then I
```

1   was responsible for the Red Snapper remodel.  I

2   was also responsible for the preliminary work at

3   the Burlington Coat Factory expansion.

4              MS. CESARANO:  Was that the

5   Burlington?

6              THE WITNESS:  Burlington Coat Factory

7   expansion.  I was also responsible for side work

8   in the beginning, and everybody was responsible

9   for safety.

10       Q   (By Mr. Pollack) Was there a safety

11   coordinator?

12       A   Not on that particular job.

13   Everybody was responsible for it.

14       Q   From the lowest to the highest?  You

15   have to say -- you can't shake your head.

16       A   Everybody was responsible, correct.

17       Q   Okay.

18       A   In other words, I was responsible

19   ultimately for the safety on my job, but if Jeff

20   Cooper walked by and saw something unsafe, it

21   was his responsibility to report it.  From Jeff

22   Cooper to James Bush, if they saw something

23   unsafe, you identified it and corrected it.  You

24   didn't just walk by it.  Ultimately we were

25   responsible for safety in our building.

1    Q    Who told you that you were

2    responsible for all of the buildings and

3    expansions that you just described?  In other

4    words, how did you know that you were

5    responsible for building four, five, Regal

6    Cinema demo, et cetera?

7        A    I think it was a combination of Jeff

8    and Eric.

9        Q    Was there some paper that said that

10   or they told you?

11       A    They told me.

12       Q    Do you know whether Jeff and/or Eric

13   told James Bush that he was responsible for

14   these other buildings?

15       A    Correct, they did.

16       Q    Now, you indicated that there were

17   some things that you had joint responsibilities

18   for, certain tasks; is that correct?

19       A    Yes, that is correct.

20       Q    Tell me what those things were?

21       A    We both worked together on some

22   irrigation.  We both worked together on some --

23   the kiosk.

24       Q    Where was that located?

25       A    There were two of them.  One kiosk

1    was at the Red Snapper entrance.  The other one

2    was at the front of the Cheesecake Factory.  And

3    James was doing the footings, and I helped him

4    lay those out.  And I was in charge of the rest

5    of it, installing the actual kiosk, both of

6    them.

7         Q    Any other tasks that you had joint

8    responsibility for?

9         A    I helped him re-layout building two.

10   There was a problem that they had with 19

11   footings and I had to go out there and re-layout

12   the building.

13             MS. CESARANO:  That's like re dash

14   1-a-y?

15             THE WITNESS:  Yes, re-layout.

16             MS. CESARANO:  Do it again?

17             THE WITNESS:  Yes.  Using the

18   builder's level, transit.

19             MS. CESARANO:  Versus relay?

20             THE WITNESS:  Which James was

21   involved in that building and I was out there

22   correcting the situation.

23        Q    (By Mr. Pollack) Anything else?

24        A    They poured a sidewalk behind

25   building two that ran up against the existing

1    building.  James was in charge of that and I was

2    in charge of checking the layout for all the

3    four drains which went in wrong, so I re-layed

4    that and caught the mistake and corrected it and

5    James was in charge of pouring the concrete.

6          Q    Did both you and Mr. Bush use the

7    same subcontractors for the entire project?

8          A    No, we didn't.

9          Q    Okay.  Did any of your subcontractors

10   overlap?  In other words, did both of you use

11   the same subcontractors for some things?

12         A    Yes.

13         Q    Who hired the subcontractors?

14         A    Whiting-Turner.

15         Q    Who, specifically, though, at

16   Whiting-Turner; in other words, did you do it?

17         A    No.

18         Q    Who would have been responsible for

19   hiring the subcontractors?

20         A    The project engineer is responsible

21   for that particular trade.

22         Q    Who was the project engineer, Sergio

23   Tio?

24         A    There were several.

25         Q    Who were the project engineers on the

1  Sawgrass Mills job?

2      A    Ray Mackeen, Sergio Tio, Omar Sweeny

3  and there was, like I said, the temporary -- one

4  that came in to help us out, Lee Rogers.  And at

5  the beginning, there was another project

6  engineer who left by the name of Dennis Klem.

7      Q    These guys were the ones who hired

8  and fired the subcontractors?

9      A    I wouldn't use the word fired.  They

10 contracted them.

11     Q    Did a situation ever arise where

12 there was a problem with a subcontractor?

13     A    It happens on every job.  There's

14 always problems with subcontractors.

15     Q    Not just Whiting-Turner jobs, but

16 every job?

17     A    It's universal.  But yes, sir, there

18 was always problems with subcontractors at some

19 point or another.  You always run into some.  No

20 matter how big or how small.

21     Q    Do you ever have occasion to, when

22 there are problems, big or small, to get rid of

23 those subcontractors?

24     A    No, you try not to.

25     Q    Since you've been at Whiting-Turner,

```
 1   has there ever been a subcontractor who's been
 2   terminated because they haven't ---
 3       A    We can't terminate them.  You're
 4   asking about an individual or a company?
 5       Q    Well, Whiting-Turner hires the
 6   subcontractors, correct?
 7       A    The company.
 8       Q    When you say we can't terminate them,
 9   are you referring to a particular person or are
10   you referring to the company?
11       A    I can't.
12       Q    But somebody at Whiting-Turner could?
13       A    If they are in violation of their
14   contract, they can be removed, correct.
15       Q    Do you know if that ever happened
16   since you have been at Whiting-Turner on a job
17   that you've been on?
18           MS. CESARANO:  If you know.
19       Q    (By Mr. Pollack) Right.  If you don't
20   know, you don't know.
21           MS. CESARANO:  If you know.
22           THE WITNESS:  That was a big job.
23   There was a lot going on.
24           On my job, the landscaper was
25   removed.  He wasn't doing his job.  He couldn't
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    man the job, so I had him removed.

2        Q    (By Mr. Pollack) Was that at Sawgrass

3    Mills?

4        A    No.  This is on my job right now.

5        Q    You personally removed him?

6        A    I talked to the project manager, said

7    that they could not man the job properly, that

8    they need to bring somebody else in.  At that

9    time, the subcontractor was told, we're going to

10   have somebody else come in and do your work.

11   You can't finish it.  At that point, he agreed

12   he couldn't man it, so they brought somebody

13   else in.

14            MS. CESARANO:  Not on the Sawgrass,

15   though?

16            THE WITNESS:  I can't recall anything

17   of that nature happening at Sawgrass.  I can't

18   remember.

19       Q    (By Mr. Pollack) Do you recall if

20   there were problems with subcontractors at the

21   Sawgrass project?

22       A    Yes, there was.

23       Q    Can you tell me what problems with

24   subcontractors you recall?

25       A    You're going to have to elaborate

47

1      with your question.  Problems referring to what,
2      to manpower, correct, work being done?
3              Q    Why don't we go through ---
4              A    What kind of problems are you ---
5              Q    Correct work being done.  Let's start
6      with that.  Do you recall problems with correct
7      work being done?
8              A    Yes.
9              Q    Can you tell me what those problems
10     were?
11             A    One in particular on my job, one of
12     my buildings, building five, Ron Kendall Masonry
13     and Concrete was doing concrete work, was
14     performing the footing work in building five and
15     one of the 12 footings was installed
16     incorrectly.  At that time, I went into the
17     trailer, I made the proper phone calls to his
18     office.  I contacted the structural engineer to
19     see if there was a fix to this problem.  I sent
20     an RFI to the engineer.  He sent it back saying
21     they had to come out.  I contacted Ron Kendall
22     again and I had the footing removed and
23     repoured.
24                  There was some problems in building
25     four with the steel erection.  Some of the

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1   joists weren't properly fabricated.  I, once
2   again, went to the trailer, called the
3   architect, contacted the engineer, wrote an RFI
4   to both of them and got that problem resolved
5   and we moved forward.
6          There was a problem with the main
7   street underground plumbing at the manifold.
8   There was a footing on top of the manifold that
9   could not be moved due to the steel being
10  fabricated already.  I contacted once again the
11  structural engineer, and I discussed it with
12  him, and between him and myself, we came up with
13  a viable alternative and we fixed that.
14         There was 19 footings in building two
15  that were a foot too low.  Eric Plotke handled
16  that, getting that problem resolved and I went
17  out and with the builder's level, the transit,
18  we laid out the whole part of that building.
19  The steel was already erected.  The steel had to
20  come down.  All the footings had to be fixed.
21  Me and Eric handled that resolution.
22         There were some anchor bolts in
23  building 6A, two sets of anchor bolts, which
24  were two footings that were an inch and a-half
25  off.  I once again contacted the structural

1   engineer and got a resolution and we fixed that.
2   There was two grease traps behind -- one behind
3   building two and one behind building three, that
4   were installed incorrectly.  They were installed
5   too high.  They had to be dug up, pulled out,
6   over escalated and reinstalled.  I believe Eric
7   Plotke handled that, also.

8              There was an entry feature between
9   building two and three.  There was a footing
10  that got over poured.  Jeff and Eric and the
11  structural inspector had to pull the concrete
12  out of that.  There's tons of small stuff.

13      Q    Okay.  Is there other small stuff
14  that could happen?

15      A    Yeah.  The windows of building two or
16  building three, excuse me, had to be moved.  The
17  concrete bands weren't poured properly.  South
18  Florida Glazing had to come out and remove the
19  windows and move them back.  It was an inch.

20      Q    Okay.  You told me which buildings
21  you were responsible for.  Do you know which
22  buildings Mr. Bush was responsible for?

23      A    Mr. Bush was responsible for building
24  two, building three, the building pad for
25  building one.

50

```
 1        Q     Anything else?
 2        A     You asked for the buildings.  Those
 3   are the buildings.
 4        Q     Correct.  Just the buildings.
 5              When was the first time that you met
 6   James Bush?
 7        A     I believe it was at Bloomingdale's.
 8        Q     Did you work with him at the
 9   Bloomingdale's project?
10        A     No.
11        Q     Once you began working as assistant
12   superintendent, did you spend a fair amount of
13   time with Mr. Bush?
14        A     Every day.  Almost every day, yes.
15        Q     And during the day pretty much, in
16   other words, on each day, did you spend a lot of
17   time working together?
18        A     Working together, no.
19        Q     Did you work together, though?
20        A     In certain situations.
21        Q     What percent of your time would you
22   say you worked together?
23        A     On the whole project or per day?
24        Q     Each.
25        A     Well, technically, every day we
```

1    really didn't work together, because he had his

2    responsibilities and I had mine. We would have

3    lunch together, I would say, almost every day.

4    He would sit at his desk and I would sit at

5    mine. We would converse throughout the day. I

6    would say, maybe a quarter of the day, we would

7    talk back and forth about deliveries and stuff

8    like that. If he had a delivery come to his

9    side of the building, he would call me on the

10   radio and let me know and vice versa, I would do

11   the same for him. If he needed something from

12   me or if I needed something from him, we

13   communicated like that.

14        Q    How would you describe your working

15   relationship with him?

16        A    I thought we got along great.

17        Q    When you say you got along great,

18   throughout the time that he was there?

19        A    Yes. James and I had a good

20   relationship.

21        Q    How would you describe his

22   relationship, if you know, with the other people

23   in the trailer? I'll ask you specifically. How

24   would you describe, if you know -- in fact, let

25   me do it this way: Do you know -- no, let me do

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1    it the way I was doing it.
 2              How would you describe, if you know,
 3    his working relationship with Eric Plotke?
 4         A    It was good.
 5         Q    Would you say it was good throughout
 6    the time that you were there?
 7         A    No.  I would not say that.
 8         Q    Can you tell me at what point it
 9    changed and how it changed?
10         A    When I first started, James and Eric
11    got along great.  James had a lot of respect for
12    Eric and Eric had a lot of respect for James and
13    they worked real well.  I think the time it
14    changed was the time that there was a problem in
15    building two with the 19 footings.
16         Q    When was that?
17         A    I can't recall exactly, but I have my
18    diaries.  I guess I can tell you the exact time.
19         Q    Let me see if I can jog your memory.
20    Do you recall in relation to when -- well, if I
21    represent to you that Mr. Bush left April ---
22              MS. CESARANO:  Mid-April of '98.
23         Q    (By Mr. Pollack) April of '98, does
24    that refresh your recollection as to when things
25    changed between the two of them?
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1          A     Did you say when James left in '98?
 2                MS. CESARANO:  Just to clarify, we're
 3    just agreeing that the date James resigned was
 4    on or about mid-April, 1998, or is it '99?
 5                THE WITNESS:  It's '99.
 6                MS. CESARANO:  I'm sorry.  Let's
 7    stipulate to the date to make life easy.
 8                MR. POLLACK:  Right, '99.
 9                MS. CESARANO:  It was April of '99.
10                MR. POLLACK:  Correct.
11          Q     (By Mr. Pollack) If I represent to
12    you that it was April of '99 or thereabouts --
13          A     It would have to be '98.  I would say
14    May of '98.
15          Q     Hold on.  Let's go back.
16          A     I think it was May when the problem
17    occurred.
18                MS. CESARANO:  You're giving us the
19    date for the problem, right?
20                THE WITNESS:  Correct.
21                MS. CESARANO:  Which is, again, just
22    to clarify, May of '98, approximately?
23                THE WITNESS:  I would say that would
24    be correct.
25          Q     (By Mr. Pollack) And so just to make
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

54

```
 1  sure that --
 2       A    Actually, I have to stand corrected.
 3  The problem was being resolved in May of '98, so
 4  the incident where James started and Eric
 5  started having some friction had to be about
 6  April.
 7       Q    Of '98?
 8       A    Correct, when the problem first
 9  occurred.
10       Q    Is it your recollection that Mr. Bush
11  left about a year later in April of '99?
12       A    Correct.  April 16th, he marked it on
13  his calendar.
14       Q    You saw it?
15       A    Correct.
16       Q    Go ahead and tell me how things
17  changed at that point.
18       A    In April of '98 in building two, like
19  I spoke about earlier, there were 19 footings in
20  building two that were a foot too low.  Of
21  course, that was James' building and he was
22  responsible for that.  He did his quality
23  control reports, which we all did.  James and
24  myself, we did that for the footings.  He turned
25  them in to Eric as being correct and the 19
```

```
 1    footings were wrong.  They poured them, they
 2    erected the steel and the steel was all wrong.
 3    All the steel had to come down.  Eric was, I
 4    would say, upset about that because that's a
 5    pretty big mistake.
 6              Eric spoke to James about it.  I
 7    don't know what he said.  I don't know anything
 8    about the conversation.  All I know they did
 9    speak and at that time James seemed to have had
10    a little bit of a problem with, I guess, the
11    conversation that he and Eric had.
12        Q    Why do you say that?
13        A    I guess Eric was doing his job in
14    just making sure that James knew what he did
15    wrong.
16        Q    No.  Why do you say he had a problem?
17        A    He had voiced ---
18             MS. CESARANO:  Who is he?
19             THE WITNESS:  James had voiced his
20    opinion to me about that.
21        Q    (By Mr. Pollack) What did he tell
22    you?
23        A    He said that he didn't think he was
24    wrong and that he was 52 years old and that he,
25    you know, didn't feel he should be reprimanded
```

1    for what he did.

2         Q    What, if anything, did you say?

3         A    Couldn't say a whole lot.  A mistake

4    is a mistake.  How Eric and him -- how their

5    conversation was was really none of my business.

6         Q    You were not a party to that

7    conversation?

8         A    No, I was not.

9         Q    So everything that you heard was

10   either from Eric or Mr. Bush or from somebody

11   else?

12        A    I didn't hear anything from Eric,

13   only from Mr. Bush.

14        Q    After that conversation, did things

15   remain the same, did they get worse?

16        A    I think at that time, James started

17   developing -- I think, his attitude changed a

18   little bit.

19        Q    How so?

20        A    I just think he was a little bit

21   bitter towards Eric.

22        Q    Anybody else who he was bitter

23   towards at that point, based on what you

24   believed?

25        A    That kind of started it.  At that

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    time -- at that time, it was just kind of
2    towards Eric.

3         Q    Did things stay the same, get worse?
4         A    They progressed and they got worse.
5         Q    Describe for me how that happened, or
6    what that involved?

7         A    As the job progressed, the job picked
8    up, and you get into a situation where there's a
9    lot going on and Eric, being the superintendent,
10   is responsible for all of that ultimately.
11   James and myself are working for him.  As the
12   job progressed, Eric started paying closer and
13   closer attention to what was going on and there
14   were times where he had to correct myself, as
15   well as James, and I don't think -- coming up in
16   the industry, superintendents are usually --
17   have the tendency to be a little more rough than
18   diplomatic, which I don't have a problem with.
19   I dealt with it quite often.  And Eric would
20   sometimes say things to us to correct what we
21   were doing, the work or whatever, and he wasn't
22   yelling, but I would say he had an aggressive
23   tone, which is very typical.  It's not uncommon.
24   Most superintendents are like that, to my
25   knowledge.  Let me put it that way.

```
 1              Eric gave us a lot of constructive
 2   criticism, things to make us both better.  I
 3   think I took it for what it was worth and
 4   adjusted my performance.  And I think James took
 5   it as -- well, James said, you know, I'm 52
 6   years old.  I have all the experience.  I don't
 7   need to be told those things.  Which that's his
 8   opinion.  I just heard what he said.  So I think
 9   progressively James started getting more and
10   more of an attitude and about every day or every
11   other day he talked about it and I told him
12   repeatedly, maybe you should go talk to Eric
13   about it.
14              I had two incidences with Eric where
15   I wasn't particularly happy with his decision
16   and I went directly to him and spoke to him
17   about it.  We talked about it.  We worked it
18   out.  We both were happy with what we came up
19   with.  Eric is a very approachable person, and I
20   explained that to James.  He needs to go speak
21   to Eric.  Telling me is fine.  Confiding in me
22   was fine.  But I couldn't do anything about it.
23   And here I am just a neutral party trying to do
24   my job to the best of my ability.  He needed to
25   speak to people who would be in the position to
```

```
 1   do something about it, which would be Jeff or
 2   Eric.
 3        Q    Did he tell you why he didn't speak
 4   to them?
 5        A    He said, I don't need to go complain
 6   to people.  I shouldn't have to go and complain
 7   to people.  I didn't see it as being
 8   complaining.  I saw it as working out the
 9   problem that you had with the person you were
10   having it with.
11        Q    Did Mr. Bush have problems, based on
12   your perception with other people on the job,
13   other than Eric?
14        A    I don't know if he had a problem with
15   Jeff Cooper.  I think he wasn't happy with him.
16        Q    Did he ever tell you that?
17        A    Yeah.
18        Q    Did he tell you why?
19        A    I think he was upset because he
20   didn't get a review.
21        Q    There were actually several reasons?
22             Let's start with the review.  Did he
23   tell you he was upset because he didn't get a
24   review?
25        A    Yes, he did.
```

```
 1        Q    Did he tell you that once or was
 2   there more than once where he mentioned it?
 3        A    Several times.
 4        Q    Do you remember roughly when in time
 5   he raised that as an issue to you?
 6        A    I would say it was within a couple of
 7   weeks after me getting my review.
 8        Q    When was that?
 9        A    Six months after February 16th when I
10   started.
11        Q    Of '97 or '98?  No, when you started?
12        A    I started in '98, I believe.
13        Q    So about July of '98?
14             MS. CESARANO:  It's August.
15             MR. POLLACK:  Six months.  I included ---
16             MS. CESARANO:  The eighth month is
17   August.
18        Q    (By Mr. Pollack) Around August of
19   '98, that's when you got your review?
20        A    That would be correct, yes.
21        Q    Okay.  You're right.
22             So around that time is when he
23   started, a few weeks after, complaining that he
24   didn't get a review?
25        A    He started inquiring about it,
```

```
 1  correct.
 2       Q    To whom did he inquire?  Did he
 3  inquire to you?
 4       A    Yes.
 5       Q    What did you say?
 6       A    Could you repeat that?
 7       Q    What did you say to him when he
 8  asked?
 9       A    I told him that six months was up.  I
10  wanted to know how I was doing, right, wrong or
11  indifferent, so I went to Jeff Cooper.
12       Q    Did you say anything else to him?
13       A    I said maybe you should go talk to
14  Jeff Cooper.
15       Q    Did he tell you what, if anything, he
16  had been told by either Eric Plotke or Jeff
17  Cooper when he started working for
18  Whiting-Turner with respect to being reviewed?
19       A    He basically told me everything, but
20  I can't recall hardly any of it word for word.
21  He was basically in the same situation I was.
22  We were both on probationary periods.  That was
23  it.
24       Q    Do you know whether he was told when
25  he started that he was going to be getting a
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    review six months after he began working?

2                MS. CESARANO:  Objection.

3                MR. POLLACK:  On what grounds?

4                MS. CESARANO:  It's hearsay, totally.

5    Do you know if he was told what he was told?  He

6    wasn't there.  He's speculating.

7                MR. POLLACK:  I know, but this is a

8    deposition.

9                MS. CESARANO:  My objection is it

10   calls for speculation.

11       Q    (By Mr. Pollack) You can answer.  Do

12   you know, if you know, do you know whether he

13   was told that he was going to get a review in

14   six months when he began working?

15               MS. CESARANO:  Same objection.

16               THE WITNESS:  No, I don't know.

17       Q    (By Mr. Pollack) Do you know whether

18   he ever received a review?

19       A    Well, I don't know if it was a --

20   excuse me.

21               (Thereupon, a phone interruption was

22          taken in the deposition, after which the

23          deposition continued as follows:)

24               THE WITNESS:  He received -- Jeff and

25   Eric met with him.  After I started working with

```
 1   Whiting-Turner, Jeff and Eric met with James in
 2   a meeting and I guess that's where they, I
 3   guess, they gave him a raise then is what
 4   happened.
 5        Q    (By Mr. Pollack) And you know this
 6   because he told you, Mr. Bush?
 7        A    Yes.  And they gave him a raise and
 8   made him an assistant superintendent like
 9   myself, which was shortly after, I think I
10   started in February.  They did that -- like I
11   started February 16th; they did that in the
12   beginning of March, I believe.  That was the
13   point in time they met with him.  I believe, in
14   regards to money or promotion, whatever, they
15   met with him.
16             Once again, I don't know the details
17   of the conversation.  I know James came out.  He
18   said he had a raise.  He wasn't happy and that
19   was that.
20        Q    Do you know whether when he got that
21   raise, it's your understanding that at that
22   point he was an assistant superintendent?
23        A    As myself, receiving Union benefits,
24   yes.
25        Q    At that point?
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

64

```
 1        A    Yes.
 2        Q    Do you know what his salary was at
 3   that point?
 4        A    No, I don't.
 5        Q    Okay.
 6        A    I know he got a substantial amount of
 7   raise.  He mentioned something to me about that.
 8   I thought it was pretty impressive, but
 9   obviously, he didn't.
10        Q    You don't know at that point when he
11   got the salary raise you talked about, whether
12   you two were earning the same salary more or
13   less, you don't know what your salaries were in
14   relation to one another?
15        A    No, I don't.
16        Q    When he left in '99, do you know what
17   your salaries were in relation to one another?
18        A    No, I don't.
19        Q    So you don't know whether you were
20   earning the same amount, more or less than one
21   another?
22        A    No, we didn't discuss that.
23        Q    Did he ever discuss his salary with
24   you specifically, what he was earning?
25        A    Well, I mean, I guess we could have
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

 1    figured it out, because we both did time cards.
 2    On the time cards on the heading it says your
 3    name, what you make, the hourly rate, so I guess
 4    he could have figured it out.  I never made it a
 5    point to say how much does James make a year or
 6    how much do I make a year.  I didn't compare it.
 7    It didn't matter me.
 8         Q    Did he ever tell you, I'm making less
 9    than you are?
10         A    Well, we both made less than a lot of
11    people who worked for us.
12         Q    I understand that, but my question
13    was:  Did he ever tell you, I'm making less
14    money than you are?
15         A    Well, I don't really think he said he
16    made less money than me.  He complained of the
17    fact that he made less money than a lot of the
18    carpenters that we had working for us, due to
19    the fact that they were working overtime.  But
20    then again, I noticed the same thing.  We were
21    both making less than the carpenters due to the
22    amount of overtime they were working.
23         Q    Did he ever complain about the number
24    of blacks assistant superintendents that the
25    company had?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    A    Excuse me.  I never heard him

2    complain about that.

3    Q    Did he ever complain about anything

4    related to anything to do with race?

5    A    Yes, he did.

6    Q    Those complaints, do you know whether

7    they were made to you and to other people or

8    just to you?

9    A    I would say they were made to me and

10    other people, yes.

11    Q    When did those complaints first

12    begin?

13    A    It wasn't until later on in the job,

14    almost, I would say.  I can't give you an exact

15    date or time, but it was more towards the end of

16    the job.  It was more towards -- I remember

17    specifically it being towards the end because he

18    complained to me about several things during the

19    course of us working together and it wasn't

20    until the very end to when he started bringing

21    in race.  I had explained to him that, you know,

22    we talked and I said, James, to be completely

23    honest with you, I don't think that's the

24    situation and, you know, he made several

25    comments to me and I told him -- my opinion was

1    I thought it was fabricated.

2         Q    When you say "fabricated", meaning

3    you didn't agree with it?

4         A    I didn't agree with it.

5         Q    Not that he might not have believed

6    that?

7         A    Oh, he believed it.  I think he

8    talked about it enough that he made himself

9    believe it.

10         He spoke to me about it and he spoke

11    to a lot of people in the field about it,

12    subcontractors.  He at no time ever made an

13    attempt to go to Jeff or Eric about that.  I

14    told him, where is this coming from?  Why all of

15    a sudden are you bringing this up?  What is

16    driving you to perceive this?  And he told me

17    the reasons and I couldn't see it.

18         Q    What did he tell you?

19         A    Basically that the only reason he was

20    hired as an assistant superintendent was so that

21    Eric can parade him around the job site as his

22    token black superintendent.  And working with

23    him for all these months, to me, it was just a

24    shock, that he would say that.  To me, I

25    perceived it as built-up frustration.  He wasn't

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    getting anywhere.  Let's make a statement.  He

2    wasn't getting anywhere.

3          He just wasn't -- it was frustrating --

4    it was frustration inside of him that was built

5    up and he didn't feel that he should have had to

6    have gone to Eric or Jeff, but that they should

7    have came to him.  Eric and Jeff weren't aware

8    of these situations.  They weren't aware of what

9    James was upset about.  James ---

10        Q    Well ---

11        A    They knew towards the end that he was

12   upset, because he came every day at 7:00 o'clock

13   and left at 3:30.  He wouldn't attend staff

14   meetings anymore.  He wouldn't attend

15   subcontract meetings anymore.  They knew there

16   was a problem and James refused to go to them.

17         He said that Eric brought him out

18   there, like I just said previously, to parade

19   him around as a black assistant superintendent,

20   which I felt was not a true statement.

21         He said he was treated unfairly

22   because he couldn't go to Universal Studios,

23   which I felt was an unfair statement; that he

24   didn't get invited to the Christmas party

25   because he was black.  It was just an untrue

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    statement.

2            I told James that wasn't the case.

3    In my opinion, you know, I just thought it was

4    wrong because I was in the same situation. I

5    saw everything that was going on as well as

6    James did. James was very happy when he got

7    there and Eric was very happy with him. All

8    this transpired after that incident. He was

9    entitled to his opinion. I let him talk to me.

10    I had no problems with Eric or anybody. I was

11    just a neutral party. I was friends with

12    everybody. I got along with everybody. James

13    wanted to talk to me about his problems. I was

14    willing to give him an ear to listen. I didn't

15    agree with everything he said. I just listened

16    to him. I gave him a little bit of advice. I

17    said, go talk to these peoples, tell them how

18    you feel. I liked working with James.

19        Q    Did you think his work was good?

20        A    No. I can't agree with that. You

21    have to understand the background, which I'm

22    sure you do, talking to James. I came up as a

23    skilled tradesman. I came up in the industry as

24    a skilled tradesman. I can read prints very

25    well. I can use the builder's level, all the

1    instruments required to do my job.  I can layout
2    anything.  That was another reason why I was
3    hired.

4            James was a labor foreman.  Like I
5    said, I started running work as an apprentice.
6    Running the job, nobody telling me what to do,
7    and I will build this office.  My boss would
8    say, here's the prints, go to the eighth floor
9    and do the office, carpet, walls, ceilings,
10   floors, windows, the whole thing, I would
11   coordinate the whole thing.

12       Q    Without any training?

13       A    No.  Coming up through the
14   apprenticeship.  Nobody told me what to do.
15   Nobody said, okay, Chuck, go over there and put
16   that door in, sweep that floor.

17       Q    How did you know?

18       A    Through training.  Coming up through
19   the industry.  Coming up as a craftsman.  Coming
20   up as a carpenter.

21           James came up as a laborer in the
22   laborer's Union, which laborers are used on jobs
23   to do cleaning, help out.  They are constantly
24   told what to do.  I learned to be
25   self-independent, to do this work.

1      Q      Do you know whether James Bush ever
2    had his own construction company?
3      A      He did have his own construction
4    company.
5      Q      Do you know whether when he had his
6    own construction company, he waited for people
7    to tell him what to do?
8      A      It was basically pouring concrete.
9    That was his company. He told me several times.
10      Q      My question was: Do you know when he
11    was running his own company whether he took the
12    lead or people told him what to do?
13      A      It doesn't matter. It was evident by
14    what James was doing on the job. I would handle
15    my situations. If there were problems with my
16    buildings, I would go in and resolve it myself.
17    I wouldn't run to Eric and say, I have a
18    problem, or go to the engineer and say, I have a
19    problem. James was good about that. He would
20    go to Eric and say, I have a problem or go to
21    the engineer and say, I have a problem. He
22    wouldn't follow up on it. He wouldn't write the
23    RFI's. He wouldn't track the stuff down. I
24    would call the architects. All the architects
25    and engineers knew me. I spoke to them every

1    day.  James was very rare in calling the

2    architect.  He would very rarely call the

3    engineers.  I would do the whole job.  James, if

4    he had a problem, would try to, you know, put it

5    off on somebody.  He couldn't layout.  He had

6    very limited layout experience, if any.  He had

7    all the carpenters doing the layouts and I did

8    all the layouts for him.

9              The building instruments.  Eric would

10   say, go out there and shoot this and shoot that,

11   and take James.  You and James go out there and

12   do this.  We would go out there and I'm using

13   the instruments and he wouldn't.

14             MS. CESARANO:  Speak a little bit

15   more slowly.

16             THE WITNESS:  He wouldn't want to be

17   bothered with that.  He wouldn't want to do

18   that.  Why?  My guess is, he didn't know how to

19   do it.

20        Q    (By Mr. Pollack)  Do you know that?

21        A    He never used instruments while we

22   were out there.

23        Q    Do you know whether or not?  You

24   said, "my guess is he didn't know how to do it."

25        A    Well, if I asked you to do something ---

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    Q    You can explain your answer, but my
2  question was: Do you know whether or not he
3  knew or didn't know how to do it?
4        A    Yes.  He doesn't know how to use it.
5        Q    How do you know that?
6        A    Because he couldn't set it up and use
7  it when I asked him to or Eric asked him to.
8        Q    Did anybody else tell him, that you
9  know of, you're not doing this right or you
10  don't know how to do it?
11       A    Eric took us out there several times
12  and tried to teach us how to use that instrument
13  properly.
14       Q    Did anybody ever tell him, you're not
15  following up enough with the engineers or ---
16       A    I believe Eric had spoken to him
17  about that.
18       Q    Do you know that?
19       A    I don't know that for a fact.  I saw
20  several times -- not several, I'd say, probably
21  two times, James was in the office with Eric and
22  Eric was writing an RFI for James.
23       Q    Were you present at the meeting when
24  James left Whiting-Turner?
25       A    The meeting with Eric and Jeff?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1      Q    Yes.

2      A    No, I was not.

3      Q    Were you present at another meeting?

4      A    Meeting between whom?

5      Q    Well, no, only because you asked me

6   about the meeting.  Was there some other meeting

7   that you were present at where -- were you

8   present in a meeting where James was ever told

9   you're not doing this correctly or you're not

10  doing that correctly?

11         MS. CESARANO:  Objection to form.

12     Q    (By Mr. Pollack) You can answer.

13     A    I was never in any meeting like that.

14  My statement was that Eric and James were in

15  Eric's office and I had come into Eric's office

16  to get some paperwork or something and Eric and

17  James were there and Eric was writing the RFI

18  for James.  I saw James actually doing this,

19  which is part of James' job description.

20     Q    How early on would you say you

21  believe those problems surfaced?

22     A    Which problems are you referring to?

23     Q    Well, you're saying that James didn't

24  know how to do certain things or wasn't doing

25  certain things.  How early on did that become

1    apparent to you?

2        A    May of '98, when he -- when the

3    footing was done improperly, when there was a

4    problem with the footings.

5        Q    That's when it first became apparent

6    to you?

7        A    We were at a staff meeting on a

8    Thursday.  Actually, I can't recall the exact

9    date.  We were discussing the problem with

10   building two's footings and Eric turned to James

11   and said to James, we have the problem resolved.

12   This is what we have to do.  Go out tomorrow and

13   re-lay the building out.

14           James kind of fiddled around, kind of

15   avoiding the response of what Eric said.  Eric

16   then looked down the table to Andy Haberman and

17   said to Andy, can you please go out there

18   tomorrow and layout the building?  He says, I

19   don't have that much experience with the

20   builder's level and transit.  He then turned to

21   me and said, can you please go out and re-lay

22   the building?

23           At that point, the next day I went

24   out there, he said, take James with you, and I

25   went out and re-layed out the building.

1            At the point I was re-laying out the
2    building, there were two carpenters and James.
3    I started re-laying out the building.  They were
4    helping me in the beginning.  They left.  Where
5    they went, I don't know.  Eric pulled up and
6    said, what are you doing?  I said, I'm re-laying
7    out the building.  He said, where's James at?
8    Where's the carpenter at?  I said, I don't know.
9    He wasn't out there when I re-layed out the
10   building.  Why?  Because he didn't know how to
11   use the instruments.  Because he didn't know how
12   to layout the building.
13        Q    Do you know when ---
14        A    That's when it started.
15        Q    Did you consider that to be something
16   important?
17        A    Yes.  As a superintendent, as an
18   assistant superintendent, you should -- one of
19   your strengths should be that -- being able to --
20   if you can't layout a building, how could you
21   build?
22        Q    Did you ever discuss that with Eric
23   or with Jeff?
24        A    Did I discuss it with them?
25        Q    Yes.

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    A    It wasn't my place to discuss what,
2    being able to use the instrument or James being
3    able to use the instrument?
4    Q    That you believed that he didn't know
5    how to use the instrument, he couldn't do it,
6    did you ever discuss that with ---
7    A    Yes, I did.  I discussed it with
8    Eric.  I said, I think James needs to know how
9    to use the instruments a little better.
10    Q    When did you discuss that with him?
11    A    Actually, the way it was brought up,
12    Eric said, did you and James get done doing
13    that?  I said, James left.  He went to do
14    something else.  He said, why is that?  I said,
15    I don't know.  I believe he spoke to James about
16    that.
17    Q    Did you ever discuss with either Eric
18    or Jeff ---
19    A    Eric.
20    Q    Eric that you felt that James -- did
21    you ever say, I don't think that he knows how to
22    use the instruments?
23    A    Yes, I did.
24    Q    When did you do that?
25    A    I can't recall.

1         Q      Well, was it around the same time

2     that you're talking about?

3         A      Yes.

4         Q      So around May of '98?

5         A      It was around the same time, yes.  At

6     which time, Eric then on a few occasions tried

7     to take James and myself and himself out to the

8     field and set the instrument up.

9              Eric and I walked out there.  We set

10    the instrument up.  He called James on the radio

11    and said, hey, why don't you come over, we are

12    going to shoot some angles and we are going to

13    shoot some stuff down Main Street.  And James

14    walked up and said, I know how to use that, and

15    walked away.

16        Q      What instrument are we talking about?

17        A      Transit.

18        Q      What is that?

19        A      It's a -- what would be the best way

20    to describe it?  It's an instrument used by

21    surveyors or superintendents used to swing

22    angles and degrees, minutes and seconds, to

23    layout points used for building the buildings.

24        Q      Do you know, why if you raised this

25    in 1998, May of 1998, and you consider it to be

1    something important -- well, let me ask this.

2    Did that problem get better?

3         A    Which problem?

4         Q    His ability to use the transit?

5         A    He never used it.

6         Q    Does he need to use it?

7         A    Yes, he did.

8         Q    So did that problem get better?

9         A    Eric made several attempts to try to

10   train him on that.

11        Q    My question was:  Did that problem

12   get better?

13        A    No, it didn't.

14        Q    Okay.  So over the period of a year

15   from April of '98 or May of '98 to April of '99,

16   that problem didn't get better; is that correct?

17        A    Are you referring to the problem that

18   James wouldn't use the instrument?

19        Q    Yes.

20        A    It didn't get better.

21        Q    Okay.  Were there other problems

22   work-wise with his ability to do the work that

23   he was supposed to be doing that also you felt

24   existed?

25        A    Yeah.  What we spoke about earlier.

1   He wouldn't follow up on his issues.

2        Q    And that problem surfaced around the

3   same time, May of '98?

4        A    No.  I think that was from the

5   beginning.  I don't think he did a lot of the

6   paperwork from the beginning.

7        Q    So February of '98, when you started?

8        A    Yeah.  I didn't see him doing any of

9   those RFI's in the beginning.  The only RFI I

10  saw was being written by Eric for James.

11       Q    So that problem surfaced in February

12  of '98?

13       A    I don't know if it was a problem that

14  was identified at the time, but obviously, here

15  I am doing my work, communicating with the

16  architects and engineers and James is over here

17  and he wasn't doing -- I don't believe he was

18  doing the same capacity work.

19       Q    So that problem surfaced, again, you

20  said at the beginning, around February of '98?

21            MS. CESARANO:  Objection to form.

22            THE WITNESS:  I wouldn't say it was a

23  problem at that time.

24       Q    (By Mr. Pollack) When did it become a

25  problem?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1      A      I don't think it ever became a

2    problem because everybody carried the weight.

3    Someone would always take care of it.

4      Q      Did you believe it was a problem?

5      A      I didn't believe anything at the

6    time.  I mean, if James wanted to do it that

7    way, that was his prerogative.  I felt the way I

8    was doing it was the way it was to be done.

9      Q      You just said that everybody was

10   carrying the weight.

11     A      If James didn't want to do the

12   paperwork or if James didn't want to do the

13   follow-up, that was James' decision.  He had to

14   deal with that.  But the proper way to do it was

15   to -- you're a superintendent, you're an

16   assistant superintendent, the job description is

17   to go and build that, not to sit there and ask

18   for help on every little thing or say, you know,

19   if you don't have the information, don't go ask

20   for it, you find it.  You make the phone calls.

21   You do the research.  You look at the prints.

22   You look at the specifications.  You look at the

23   submittals.  That's what you do.

24     Q      And my question is:  Did somebody

25   tell him?

1          A    Just the words that you're saying,

2     that those things were problems and that's what

3     he needed to do?

4               MS. CESARANO:  If you know.

5          Q    (By Mr. Pollack) If you know.

6          A    Eric and James, when they met -- Eric

7     and Jeff, excuse me, which is what James told

8     me, when they met with him the first time and

9     gave him that substantial raise, they explained

10    to him and they gave him constructive criticism,

11    so that he would learn how to read prints

12    better.  James didn't think he had to do that.

13    James was upset when he came out of that

14    meeting.  James told me he was upset about that,

15    because they gave him constructive criticism.

16               You get constructive criticism at the

17    year-end review because nobody is perfect and

18    there's always room for improvement.  That's

19    what Whiting-Turner bases it on, they always

20    want you to improve yourself.  They always want

21    you to better yourself.

22               Eric and Jeff gave him constructive

23    criticism.  James, you need to sit down and

24    review the prints better and start learning how

25    to read prints better.  He didn't think so.  He

1    took all of that constructive criticism as -- he

2    took it as, I don't have to learn anything.  I

3    have 34 years of experience.

4              To me, that was wrong.  You never

5    stop learning.  There's a ton of stuff in

6    construction that you need to learn, as well as

7    myself.  He took it the wrong way.

8         Q    And they told him all of this when

9    they gave him that raise in March?

10        A    I don't know exactly in detail what

11   they told him.  I just basically know what James

12   told me.  That he needed to learn prints better

13   and he needed to start brushing up on other

14   things.

15        Q    Do you know whether Eric Plotke or

16   Jeff Cooper or anybody over James Bush was aware

17   after March of 1998, when these things were told

18   to him, that he wasn't doing them?

19        A    I don't know.  It's kind of hard to

20   really find that out unless you really start

21   indulging into what James is doing every day.

22        Q    Well, did they ever say anything to

23   you about it?

24        A    To me directly, no.

25        Q    Did they ever say it to somebody else

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    that you heard?

2         A    Just what James told me, what they

3    said to him.

4         Q    How much time did Eric Plotke spend

5    in the field on this site?

6         A    He was in the field every day for

7    different periods of time. Depending on, you

8    know, what he was doing. He was doing a lot,

9    himself. As far as permitting and stuff like

10   that, he would spend as much time as he had in

11   the field whether it would be 15 minutes or

12   three hours or four hours.

13        Q    Do you think it's fair to say that he

14   had an opportunity to observe what was going on?

15        A    As far as the building being built?

16        Q    Yes.

17        A    Yes.

18        Q    Do you think it's fair to say he had

19   an opportunity to observe what the assistant

20   superintendents were or were not doing over a

21   period during the time that James Bush was

22   employed with Whiting-Turner? Do you think it's

23   fair to say that he had an opportunity to

24   observe Mr. Bush's work, yes or no?

25        A    In the field, yes.

1          Q     Okay.  So he would have known whether
2    or not in the field Mr. Bush was able to do what
3    he was supposed to do and was, in fact, doing
4    it?
5          A     No.
6          Q     Why not?
7          A     Because a lot of it was in the
8    paperwork.  He would have to go into the work
9    logs and the RFI logs and look and see whether
10   James was following up on this stuff.
11         Q     What percent of your job was
12   paperwork?
13         A     A big part.  I would say half.
14         Q     I didn't realize that.  Let me ask
15   you this:  These RFI logs, what does that stand
16   for?
17         A     It stands for request for
18   information.
19         Q     Who is requesting the information?
20         A     Whoever has the question.  If I have
21   a problem or a question, I would write the RFI
22   with my question and I fax it to the architect.
23         Q     Okay.
24         A     If there was a discrepancy in the
25   blueprints.  If there's ---

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1          Q     These RFI's, you say it's a log.  Are
2     they kept in a log?

3          A     Yes.  I think we have three or four
4     of them.

5          Q     Who reviews those?

6          A     Nobody.  How you do it is like this:
7     You take the RFI, which is a form.  You fill it
8     out.  You go to the RFI log.  You open it up and
9     it has a log, which the secretary or the office
10    manager, Shamia, would update to do it in the
11    computer, and there's a number.  You would take
12    the next available space.  If the next number
13    used was 98, you would use 99, you would write
14    99.  It's a tracking device.  You then fill out
15    the RFI with the date requested returned.  You
16    sign your name.  And what I usually do, which is
17    common practice, is carbon copy to your
18    respective engineer on that, whoever the
19    engineer on that was.

20               If I was writing an RFI on a beam
21    that was too short or something was wrong with
22    the steel, I would carbon copy Sergio Tio on
23    that.  Okay.  And I would fax it off.  When it
24    came back, the response would be in my box.
25    That was the fix.  I would copy the

```
 1 | subcontractor on that.  Here's the fix.  This is
 2 | what you need to do.  If there was a cost issue
 3 | involved, I would write a work order to them and
 4 | we would have to move forward.  That's how it
 5 | was done.
 6 |            How would Eric track that?  He would
 7 | have to go every day to the RFI log and do that
 8 | and look into that.
 9 |      Q    Are you saying that basically nobody
10 | would know whether or not the assistant
11 | superintendent was doing their work or not?
12 |      A    It would show up eventually.
13 |      Q    How, at the end of the job?
14 |      A    If the job stopped.
15 |      Q    And how would it show up?  I don't
16 | understand.
17 |      A    If what happened was like I was
18 | saying, James would go to Sergio and say, I have
19 | a problem, Sergio would just handle it.
20 |      Q    I don't understand how that relates
21 | to filling out these RFI's.
22 |      A    Because he wasn't doing it.  He
23 | wouldn't do it.  He asked Eric to do it a couple
24 | of times.
25 |      Q    It's a form?
```

1          A     Correct.

2          Q     And the form says, I need information

3     about such and such?

4          A     Correct.

5          Q     And why does filling out that form

6     require a particular expertise or skill?

7          A     I guess it wouldn't, but if you

8     didn't know how to look at the blueprints and

9     identify the problems prior to them happening,

10    if you didn't know how to resolve the problem or

11    come up with the proper question, if you didn't

12    know how to ask the question, you wouldn't get a

13    response.  If you ask a question -- what happens

14    is, let's say, there's a beam that's short and

15    the schedule is saying that the steel erection

16    has to be done by the end of the week, if you

17    don't word it properly, what happens is you get

18    a kickback or form.  Because the architect

19    doesn't understand what you're saying.  He sends

20    it back to you.  You try to write the question

21    better.  It gets into a process of going back

22    and forth.  So looking at the blueprints,

23    identifying what the problem is, writing a

24    proper RFI and faxing it over, technically, it

25    wouldn't require a skill, but it would require

```
 1    some knowledge.
 2          Q    Take your example with the beam.  If
 3    the beam wasn't -- what did you say, properly ---
 4          A    Long enough.
 5          Q    Long enough, how would that problem
 6    not surface until way down the road?  Why
 7    wouldn't it surface?  Let me ask you a different
 8    question.  Construction is in phases; isn't that
 9    correct?
10          A    Correct.
11          Q    You do a portion of the job that then
12    gets inspected, correct?
13          A    Correct.
14          Q    And then that has to get signed off
15    to go onto the next phase?
16          A    Correct.
17          Q    On a project the size of Sawgrass,
18    are those phases typically weekly, monthly,
19    yearly?  How long does a phase run?
20          A    You're using Sawgrass as an example?
21          Q    As an example.
22          A    Steel erection in one building can go
23    anywhere from four to six weeks.
24          Q    So at the end of that four to six
25    weeks that phase of steel erection would be
```

1    complete, correct?

2        A    Yes.

3        Q    And somebody would then inspect that?

4        A    Correct.

5        Q    If there were a problem with that,

6    that would surface, correct?

7        A    Correct.

8        Q    Now, what I'm trying to understand

9    is:  If there is a problem with an RFI not being

10   done, not properly ---

11       A    Oh, it was done.

12       Q    Let me ask my question.  You can then

13   answer the question.

14            If an RFI were not properly done or

15   not worded correctly, you said earlier that

16   wouldn't show up until way down the line.  If

17   the construction is done in phases, explain to

18   me how that could be?

19       A    Because James wouldn't do it.  He

20   would go to the engineer and request they do it.

21   So the engineer is doing it, following up on it,

22   doing all of James' work.  The problem was

23   resolved, the work kept moving forward.

24       Q    Am I to understand that you're saying

25   that basically he wasn't doing his work?

```
 1          A     Correct.
 2          Q     That's your testimony?
 3          A     Correct.
 4          Q     He wasn't doing his work and other
 5     people were doing it for him?
 6          A     Correct.
 7          Q     Were you one of those persons?
 8          A     No.
 9          Q     How do you know ---
10          A     I shouldn't say that.  Retract that.
11     Yes, I did help him out on his work.
12          Q     And other people did, as well?
13          A     Correct.
14          Q     Do you have firsthand knowledge that
15     that's the case?
16          A     Yes.
17          Q     Because they told you that?
18          A     It's evident.  If you look at the RFI
19     logs, you can see where I have written several
20     hundred RFI's and James had three and two of
21     them, Eric Plotke wrote.  I don't know the exact
22     amount of the RFI's, but I know there was very
23     little.
24          Q     And nobody would have known that
25     until way at the end of the job?
```

1      A   I can't say that. I'm sure maybe the

2   engineers knew. Whether they spoke about it or

3   not, it's their situation.

4      Q   I guess I'm trying to understand. If

5   what you're telling me is: He basically didn't

6   do anything and everybody else did his work for

7   him ---

8      A   You can't say ---

9      Q   Let me finish my question and then

10   you can answer the question.

11         Are you basically saying that he

12   didn't do his work?

13      A   No. I'm not saying that.

14      Q   Okay. Are you basically saying that

15   a significant amount of his work was done by

16   somebody else?

17      A   Correct.

18      Q   And I believe your testimony was that

19   that was a problem pretty much throughout the

20   time that you worked with him; is that correct?

21      A   I wouldn't say it was a problem in

22   the beginning.

23      Q   When did it become a problem?

24      A   I don't think it really ever became a

25   problem as far as RFI's and stuff went. I think

1    it became a problem when he just stopped

2    participating in the job as far as attending

3    staff meetings, attending sub meetings.  Sergio

4    came to him and asked him about if he knew any

5    concrete guys and he refused.  I'm not bringing

6    anybody to Whiting-Turner.  Then it started

7    surfacing.

8        Q    Why wouldn't it have been a problem

9    with RFI's?  I thought you said it was

10   important.

11       A    They were.  But other people were

12   handling his workload.  It was a team

13   atmosphere.

14       Q    So nobody objected to having to carry

15   the weight, his weight?

16       A    I wouldn't say that.  I would say

17   there were a few comments made.

18       Q    And nobody ever sat down and said to

19   him, why aren't you doing this, you need to be

20   doing that?

21       A    Eric Plotke, and the statement I made

22   earlier, had James in the office showing him how

23   to do the RFI's.

24       Q    And that was at the same time he got

25   a raise, wasn't it?

```
 1        A    I don't know the time frame.  I think
 2   it was -- it had to have been after.
 3        Q    How far after?
 4        A    I can't say.
 5        Q    But it's fair to say that over a year
 6   or close to a year went by after you said this
 7   big problem with the 19 pilings surfaced?
 8        A    Footings.
 9        Q    Footings, excuse me.  A year went by
10   before he left; isn't that true?
11        A    I don't know the time frame.  I know
12   it was April 16th.  I don't know the exact time.
13        Q    I believe your testimony was that
14   somewhere around May of the year before, the
15   problem with the 19 footings occurred?
16        A    Correct.
17        Q    And your testimony is that after that
18   problem for a year nobody ever thought:  Hey, we
19   have a big problem, this guy isn't doing his
20   job?
21        A    I don't know that.  I know Eric --
22   like I said, the one time I saw Eric showing
23   James how to write an RFI.  Did Eric take him
24   into his office and explain other things to him?
25   Did he mention other things to him?  I don't
```

1  know.

2          There were a lot of times I met with

3  people and James didn't know what I was doing

4  every second of the day. I didn't know what he

5  was doing every second of the day. He could

6  have very well been told by the engineers what

7  about this RFI or why didn't you write this RFI?

8  He could have been very well told by Eric or

9  Jeff, you need to follow up on this stuff.

10         It wasn't -- we weren't working side

11  by side. It wasn't Eric and Jeff standing in

12  front of both of us every time things were said.

13  Things were said to me about you should do it

14  like this or you should do it like that. Same

15  thing could have been happening to James. I

16  don't know.

17     Q    Did anybody not say anything to him

18  about these things because he was black?

19     A    No. Nobody that -- that never was an

20  issue. Never.

21     Q    Well, it just seems odd to me that

22  somebody doesn't do a lot of work, according to

23  your testimony, people are carrying the weight

24  for that person for a substantial period of

25  time, according to your testimony, and nothing

1    was ever said, nothing is -- are you aware ---

2         A    You can't say that.

3         Q    Let me ask you a different question.

4    Do you have a personnel file?

5              MS. CESARANO:  If you know.

6         Q    (By Mr. Pollack) If you know.

7         A    I don't know.  I don't know.  I'm not

8    sure.

9         Q    When you got your review, you sat

10   down with Robert Mitchell, correct?

11        A    Correct.

12        Q    Did he have any papers in front of

13   him when he was reviewing you?

14        A    He was sitting at Omar's desk and

15   there were a lot of papers on it.  I don't know.

16        Q    Did he talk to you about things that

17   you were doing well and not doing well?

18        A    Yes, he did.

19        Q    He gave you specific compliments and

20   criticisms?

21        A    Correct.

22        Q    And were those things that he said

23   specific, did he identify specific things that

24   you did well and didn't do well?

25        A    Yes, he did.

1        Q    Do you know if he referred to

2    anything when he was doing that or was it just

3    straight from his memory?

4        A    I think he had a small card.  I think

5    he was looking at a small card.  I wasn't sure.

6    We were sitting at Omar's desk and there was a

7    bunch of papers from Omar on his desk.  I

8    believe he was referring to something.

9        Q    Robert Mitchell didn't really work or

10   spend that much time on the actual job site, did

11   he?

12       A    He was out.  I wouldn't say all the

13   time, but he was out there every now and then.

14       Q    Well, is it your impression that his

15   observations during that evaluation were based

16   on what he observed or things that were told by

17   Eric and Jeff --

18       A    Correct.

19       Q    -- if you know?  The latter?

20       A    It is -- some of it was observations,

21   I'm sure, by himself, but for the majority, they

22   were given to him by Eric and Jeff.

23       Q    Because those were things that he

24   might not have known about, correct?

25       A    Correct.

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    Q    So before evaluating you, he had

2    spoken with Eric and Jeff, correct?

3    A    I don't know.

4    Q    It would appear that way?

5    A    If you're asking me to assume that, I

6    would say yes.

7    Q    And he had prepared specific things

8    that he was going to discuss with you?

9    A    There were a few notes, like I said,

10    jotted down.

11    Q    Does it strike you as at all odd that

12    if somebody like James Bush, according to your

13    testimony, was not doing a substantial amount of

14    work, according to your testimony, did not know

15    how to do certain things that were important on

16    this job, and that other people were carrying

17    that weight, does it strike you as at all odd

18    that there was never anything written down

19    documenting that problem?

20         MS. CESARANO:  Objection to form.

21    Q    (By Mr. Pollack) If I were to tell

22    you that there weren't, would that strike you as

23    odd?

24         MS. CESARANO:  Objection to form.

25         THE WITNESS:  Repeat the question.

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1       Q     (By Mr. Pollack) If I were to tell
2    you that there was nothing written down during
3    the entire time that James Bush worked for
4    Whiting-Turner, documenting any of the things
5    that you've identified here today as problems,
6    would it strike you as at all odd that that was
7    the case?
8            MS. CESARANO:  Objection to form.
9    Assumes facts not in evidence.
10      Q     (By Mr. Pollack) You can answer the
11   question.
12      A     I don't know how to answer the
13   question.
14      Q     Well, yes, it would strike me as odd,
15   no, it wouldn't strike me as odd, or I don't
16   know whether it would strike me as odd?
17           MS. CESARANO:  Objection to form.
18      Q     (By Mr. Pollack) And then you can
19   explain your answer.
20      A     No, it wouldn't strike me as odd.
21   No, it wouldn't strike me as being odd.
22      Q     Why not?
23      A     Because Eric Plotke, the
24   superintendent, really wanted to the see James
25   succeed.

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1          Q      Why?

2          A      Because he liked James.  He knew he

3     was a hard worker at Bloomingdale's.

4          Q      The same Eric Plotke who for a year

5     they weren't getting along?

6               MS. CESARANO:  Objection to form.

7     Also, contradicts the evidence.

8               MR. POLLACK:  I don't believe it does

9     contradict the evidence.

10         Q      (By Mr. Pollack) I believe your

11    testimony, sir, was that Eric Plotke and James

12    Bush had a problem about May of '98.

13         A      Eric Plotke did not have a problem.

14    James Bush had a problem.  Eric Plotke was not

15    aware of the problem for some time.

16         Q      How much time?

17         A      I can't give you an exact time.

18         Q      Well, they worked day in and day out

19    together; isn't that correct?

20         A      So if I had a problem with you right

21    now and I didn't say a word to you ---

22         Q      Wait, wait, wait.

23               MS. CESARANO:  Let him finish.

24               THE WITNESS:  Well, because ---

25         Q      (By Mr. Pollack) Stop, stop, stop,

 1   stop.

 2          In Mr. Bush's deposition, the

 3   instructions were that he answer the questions

 4   and then you can explain everything you want to

 5   say.

 6          Read back the question. I need an

 7   answer and then you can explain.

 8      A    In between that, I need to go to the

 9   bathroom. Excuse me.

10          (Thereupon, the requested portion of

11      the record was read back by the reporter.)

12      Q    (By Mr. Pollack) Your answer was?

13   Referring to Jeff Plotke and Mr. Bush, they

14   worked day in and day out together; isn't that

15   correct?

16      A    In the same trailer.

17      Q    And on the same job site?

18      A    But not together. They weren't

19   constantly coinciding with what was going on

20   every minute.

21      Q    Eric Plotke was James Bush's

22   supervisor, boss, correct?

23      A    Yes.

24      Q    Did anyone tell you, whether it was

25   James Bush or Eric Plotke or whoever, when James

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1   Bush left Whiting-Turner, do you know whether
 2   anybody from Whiting-Turner before he left said
 3   to him, we want you to stay on; we don't want
 4   you to leave?  Do you know whether anybody said
 5   that?
 6        A    Yes.  James did tell me that.
 7        Q    Did he say who told him that?
 8        A    I believe it was Jeff and Eric is
 9   what James told me.
10        Q    Did that surprise you?
11        A    No.
12        Q    So just to get your testimony clear,
13   James was, according to your testimony, unhappy?
14        A    Correct.
15        Q    And according to your testimony,
16   James was not able to do certain things that
17   were important to the job; is that correct?
18        A    I wouldn't say that he wasn't able.
19   I think the opportunity was there for him to
20   learn.
21        Q    According to you, he didn't know how
22   to do certain things, correct?  You mentioned a
23   tool.
24        A    Certain things.
25        Q    And those things were important,
```

1    weren't they, according to you?

2         A    They were.  You needed to know how to

3    use those to do the job.

4         Q    And according to you, about 50

5    percent of your work was doing these RFI

6    reports?

7         A    No, not just RFI.

8         Q    Other paperwork?

9         A    Paperwork.  We'll say paperwork.  Not

10   be specific.

11        Q    According to you, a substantial

12   amount of things that Mr. Bush didn't do, but

13   had other people do; isn't that correct?

14        A    An amount of it, yes.

15        Q    So given all of those things that he

16   didn't do a substantial amount of work, he

17   didn't know how to do certain things that were

18   important, he wasn't happy, and this has been

19   going on for a substantial amount of time, given

20   all of those things, it didn't surprise you that

21   Eric Plotke and Jeff Cooper would say, we don't

22   want you to leave, we want you to stay?

23        A    It doesn't surprise me one bit.

24        Q    Tell me why, because it surprises me.

25        A    Because James was good at what he did

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1   as a labor foreman.

2       Q    But he wasn't working as a labor

3   foreman, was he?

4       A    I know.  But they wanted to give him

5   an opportunity in the company.  They didn't

6   think because he wasn't doing everything that an

7   assistant superintendent was supposed to do that --

8   he was still a good guy.  He was a hard worker.

9           Jeff and Eric, they wanted to give

10  him an opportunity to continue to work with the

11  company.

12      Q    They had given him an opportunity for

13  a year, according to you; isn't that correct?

14      A    Absolutely, that is correct.

15      Q    How many more opportunities would

16  they want to give him?

17      A    I don't know.  I'm not them.

18      Q    You weren't surprised by that?

19      A    No, I wasn't, not one bit.

20      Q    It's not at all possible that --

21  strike that, because she's going to object.

22          MS. CESARANO:  Well, I was going to

23  say, you're getting a little argumentative.  I

24  don't know that it gets you facts.

25      Q    (By Mr. Pollack) Was it your

1   understanding that they wanted to keep him on as

2   a labor foreman?

3       A   I don't know their future plans for

4   James.

5       Q   Is that what he told you, they said,

6   we want you to stay on as a labor foreman?

7       A   I don't recall.

8       Q   Let me ask you this:  Now that you've

9   been an assistant superintendent, do you think

10   that there are certain prerequisites, things

11   that you need to have before you start that job

12   in order to be an assistant superintendent?

13       A   Skills?

14       Q   Yes, and knowledge.

15       A   I wouldn't say that you need to have.

16       Q   Let me ask you this:  You don't know

17   me long, but you've known me for about two and a

18   half hours.  Does it strike you that I can be an

19   assistant superintendent for Whiting-Turner

20   tomorrow?

21       A   It would depend on your knowledge of

22   the trade, in the industry.

23       Q   What knowledge would you need in

24   order to do that job?

25           MS. CESARANO:  I'll object to form.

1    Q    (By Mr. Pollack) You can answer the
2    question.
3         Based on your experience, as an
4    assistant superintendent.
5    A    You would need to be able to use the
6    instruments, to be able to layout, to be able to
7    check layout.
8    Q    When you say be able to use the
9    instruments, I want you to list for me which
10    instruments you need to be able to use, in your
11    opinion, in order to be an assistant
12    superintendent as a prerequisite?
13    A    I don't really think that there is a
14    list that they have that says you need to be
15    able to do this, this, this and this.  But in
16    being in the industry, you would know that to go
17    onto a job with nothing there but a field and
18    put a building pad in, put building corners in
19    and build up, you would need certain skills.
20    Being able to use a building level for
21    elevation, you need to be able to make sure that
22    the building is in the proper elevation.  You
23    couldn't do that right now.
24    Q    No.
25    A    Does that mean you couldn't be a

1    superintendent for Whiting-Turner?  No.  They

2    made an opportunity to train myself, as well as

3    James, to make sure how to properly use those

4    instruments.  Does it help?  It obviously helps

5    to be able to go into the industry where you

6    have that kind of background.  Yes, it helps.

7    If you have one point per surveyor, you have to

8    take that point and swing it 90, you need to be

9    able to use a transit.  If you couldn't use that

10   transit and there is that point, how would you

11   start that building?

12        Q    Did you know how to use the transit

13   before you ---

14        A    Correct.  I was taught in the

15   apprenticeship training program.

16        Q    At Whiting-Turner or before?

17        A    Before.

18        Q    Tell me what other things you would

19   need to know or be able to do?

20        A    Definitely have to be able to read

21   blueprints good.

22        Q    What else?

23        A    Be able to layout.

24        Q    How long does it take to learn to be

25   able to do those things?  Let's take the

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

108

1  builder's level.

2      A    I don't know.  How long did it take

3  you to become a lawyer?

4      Q    A long time.

5      A    Do you believe that there are other

6  people that learn quicker?

7      Q    Yes, I do.

8      A    Then I can't answer your question.

9      Q    Let me ask a different question,

10 then.  It's the earlier question.  An assistant

11 superintendent has responsibilities to supervise

12 a job; isn't that correct?

13     A    That will be a correct statement.

14     Q    And that person has, under the

15 superintendent, secondary responsibilities,

16 basically, for that job, correct?

17     A    Under the superintendent, correct.

18     Q    Correct.  Okay.  And going into that

19 position, is it necessary to read blueprints?

20     A    As an assistant superintendent?

21     Q    Yes, sir.

22     A    Very necessary.

23     Q    So if somebody doesn't have that

24 skill, they shouldn't have that job?

25     A    If they don't have it, no, they

1    shouldn't.  But if they claim to have it, then
2    they should be able to read it.

3         Q    And if somebody doesn't have a skill
4    doing layout, they shouldn't be able to have
5    that job?

6         A    Not necessarily.

7         Q    Why not?

8         A    Because it's -- well, I don't know
9    how to say that.  You need to have some type of
10   layout -- some type of laying out skills.  You
11   have to -- part of the job of being able to
12   check, if you have 50 footings and you need to
13   be able to verify if they are in the proper
14   place, how would you do that?  By looking at the
15   blueprints, correct?

16        Q    You tell me.

17        A    And looking at the dimensions,
18   finding the dimensions on the plans, which
19   aren't usually easy.  Sometimes you have to look
20   into them.  You have to look at the floor plan
21   and go to a detail.  You have to go out to the
22   field and verify this stuff.  And by just -- you
23   know, you have to identify the layout, knowing
24   how far to pull, how to lay the stuff out.  If
25   you didn't know how to do that, I guess you

1    couldn't do the job properly.

2            Being able to use a builder's level.

3    If you didn't know how to properly shoot

4    elevations and grades, how could you check to

5    see if the footing is in the right elevation?

6        Q    If Mr. Bush couldn't do all of these

7    things, then why did Whiting-Turner want him to

8    stay?

9        A    Why did James Bush tell them he did,

10   then?

11       Q    Do you know that he told them that?

12       A    Yes.

13       Q    Who told you that?

14       A    James Bush walked up to Eric Plotke

15   and myself when Eric called him on the radio and

16   he said, James, would you please come over, we

17   want to shoot some things and get familiar with

18   the instrument.  James just walked over to Eric

19   Plotke and myself and said, I already know how

20   to use that, and walked away.

21       Q    All right.  I already asked that

22   part.

23            But they knew that in May of 1999,

24   correct?  Eric Plotke --

25       A    They knew what?

```
 1         Q    Eric Plotke knew, according to you,
 2    that James Bush didn't know how to use these
 3    instruments, correct?
 4         A    He told Eric he did.
 5         Q    And is it your understanding that
 6    Eric didn't know how to do it?
 7              MS. CESARANO:  Objection to form.
 8         Q    (By Mr. Pollack) Let me rephrase the
 9    question.
10              Do you think Eric Plotke didn't know
11    what was going on?
12         A    To an extent, yes.  If I told you
13    that I was over here getting the job done and it
14    was getting done and you just came in and
15    checked and steels are going up and you checked
16    and everything was going fine, how would you
17    know that I was doing my job all the time, if
18    everything was still moving along and nobody was
19    complaining to you about it?  Well, I mean, you
20    couldn't really identify all the problems.  He
21    knew there was some static there, but he didn't
22    know the extent of it.
23              If I told you, I know how to do this --
24    if I told you, I know how to work that computer,
25    but you didn't actually see me physically work
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    on that computer, how could you say if I could

2    use it or not?

3        Q    If your job were to produce things

4    that require the use of that, I would know.

5        A    And I told you, again, I wrote a

6    letter on that and I handed you a letter, but

7    you didn't physically see me write that letter,

8    but the letter was done, how would you know that

9    I still could use that computer?

10        Q    Well, if I asked you to write a

11    letter every day for an entire year on that

12    computer and you needed to write it on the

13    computer to get it done ---

14        A    Okay.  And there were four computers

15    in the trailer with four engineers and it still

16    got done, how would you know?  You would have a

17    hard time unless you followed me every second of

18    every day and watched over me, which is not his

19    job.  That's our job, to be independent and get

20    that thing done.  You wouldn't know exactly what

21    I was doing or what I wasn't doing, or what I

22    was getting away with and what I wasn't getting

23    away with.

24        Q    So is it your testimony that

25    everybody else was basically doing extra work

```
 1    for James Bush?

 2         A    Not everybody.

 3         Q    Well, a fair number of people?

 4         A    I by no means stated that James was

 5    not working.  He did what he did and there were

 6    a few times when James pushed it off on other

 7    people.  He went to other people with the

 8    problem and let them handle it instead of

 9    handling it himself.

10         Q    Did anybody else ever do that?

11         A    As far as what?

12         Q    Having other people handling their

13    problems?

14         A    Sure.  I've done it, but I have

15    exhausted all of my researches.  I have called

16    everybody.  I have done everything that I

17    possibly should be doing or to my knowledge have

18    exhausted all of my research before I went to

19    Jeff or Eric.  I would make sure that all my --

20    I went everywhere.  I called up the architect,

21    and he couldn't help me.  There were times when

22    I had to get situations resolved, which I

23    couldn't, and I had to go to Jeff and Eric to

24    call the owner.

25         Q    And you got promoted?
```

1        A      And I went to Jeff or Eric and I

2    said, listen, I can't get this done.  I've

3    called the architect.  I've talked to Steve

4    Toaser (phonetic).  I've talked to the engineer,

5    whoever it might have been who I had the problem

6    with, and I'm not getting any response.  They

7    are not responding to me.  Can you please help

8    me?  Sure.

9              They call him up.  Listen, Chuck has

10   been calling you.  He's written RFI's.  He's

11   trying to get this stuff done.  He's not getting

12   it done.  Can you please help us out?  You know

13   as well as I do that sometimes it takes a person

14   of higher authority to get things done.  Yes, I

15   did go to him.  Did I walk out there and say,

16   Oh, man, there's two feet of masonry and wall

17   missing, oh, I'll just go and call Sergio and

18   keep walking down the road.  Hey Sergio, there's

19   two feet of masonry and wall missing, can you

20   handle it, and walk away.  No.  I made sure that

21   all of my responsibilities were taken care of

22   before I went to them.

23             You know what I forgot to add,

24   responsibility of an assistant superintendent is

25   scheduling.  A big part of our job is

1  scheduling.

2      Q    Did Mr. Bush not do that, either?

3      A    I have never seen him schedule.  I

4  know Eric had asked James, as well as I did --

5  Eric gave us a form, an eight and a-half by

6  eleven.  It was part of our scheduling.  And

7  then we had break-outs from there and then from

8  there, we had what we call a two-week look

9  ahead, so you can stay focused on certain

10  activities.  And James and I -- Eric gave us

11  these forms, the eight and a-half by eleven and

12  he said, I need you guys to start doing the

13  scheduling.  Part of what a superintendent does,

14  the superintendent trains you to do scheduling.

15  It's what you do.  You have to schedule and

16  coordinate all the activities.

17          I made an attempt at it.  I started

18  handwriting it.  I think James did the schedule

19  for -- I know he did the schedule at the

20  beginning.  Eric had him do some schedules.  He

21  was doing it before I got there.  At the time,

22  it was primarily just an exercise because the

23  schedules were always done.  It was to train us.

24  Later on, I started doing my own scheduling.  I

25  started doing -- like I did the schedule for the

1    bathrooms.  I did the schedules for the kiosks.
2    Myself, I produced it, and that's what we worked
3    by.  That was a big part of it.  I didn't see a
4    lot of scheduling coming from James, and that
5    was a big part of it.  Was he given the
6    opportunity?  Yes.
7        Q    Who would have reviewed those
8    schedules?
9        A    I guess the subs, the subcontractors
10   who were involved.
11       Q    Would Eric Plotke have seen those
12   schedules?
13       A    Yes.
14       Q    Was Eric Plotke the one that sort of
15   trained you on how to do the scheduling?
16       A    He gave us the format.
17       Q    So Eric Plotke would have known
18   whether you were doing the scheduling or not
19   doing the scheduling?
20       A    We did most of it by computer.  I was
21   intrigued by that.  A schedule was a big part of
22   our work.  So I went and got on the computer and
23   I started learning how to do it.
24       Q    Eric would have known whether you
25   were doing it or not doing it, correct?

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1          A    He knew I was doing it.

2          Q    And he would have known whether James

3    was doing it or not, correct?

4          A    I would say that's a fair statement.

5          Q    So, again, according to your

6    testimony, and we add one more fact, in addition

7    to doing all these other things he didn't do or

8    wasn't able to do, he also didn't do scheduling.

9    And then I repeat the question, adding that fact

10   that he didn't do the scheduling on top of all

11   the other problems ---

12         A    He did.  You said he did not.  He

13   did.  In the beginning, like I said, he did some

14   scheduling, James did, for Eric, and when I came

15   in, Eric, again, was coaching us on how to do

16   the scheduling.

17         Q    So there was no problem with James'

18   scheduling?

19         A    I don't know that.  I didn't review

20   it.

21         Q    Well, I thought you testified a

22   minute ago that he didn't do much scheduling?

23         A    He didn't do much scheduling but he

24   did some.

25         Q    But not what he should have done in

1   your opinion, correct?

2        A    Correct.

3        Q    So again, adding that fact that he

4   didn't do the amount of scheduling that he

5   should have done, on top of everything else, it

6   still doesn't surprise you that after a year ---

7        A    Is that a fact or my opinion?

8             MS. CESARANO:    You're both

9   interrupting each other.

10       Q    (By Mr. Pollack) You're right.    If

11  you tell me that -- you're correct.

12            Is there a certain amount of

13  scheduling that an assistant superintendent on

14  that job should have done?

15       A    No.

16       Q    So it would be a subjective

17  determination, you would kind of ---

18       A    I took it upon myself to do the

19  scheduling for my activities because I wanted to

20  advance with the company and I wanted to show

21  them initiative and part of that initiative was

22  being able to do scheduling.    So I took it upon

23  myself.    I went to them and told them, let me do

24  the scheduling for this and I did it, myself.

25       Q    Do you know whether Mr. Bush's

```
 1   initiative or lack of initiative had anything to
 2   do with the amount of money he was promised or
 3   the amount of reviews he got or didn't get?  Do
 4   you know that?
 5        A    I don't know that.  I know at the
 6   beginning he was very excited to be where he was
 7   at and after the incident with the footings, he
 8   was not very happy to be where he was at.
 9        Q    By the way, did you go to that
10   Christmas party --
11        A    Yes, I did.
12        Q    -- that you had mentioned earlier?
13        A    Yes.
14        Q    And did you ask James Bush why he
15   wasn't there?
16        A    I don't think I asked James Bush
17   that.
18        Q    Did you ask him anything about the
19   Christmas party?  Did you discuss the Christmas
20   party?
21        A    Yes, we did.
22        Q    Did you discuss it after it happened?
23        A    Yes.
24        Q    Who brought it up?
25        A    James did.
```

```
 1        Q    What did he say?
 2        A    He couldn't understand why he wasn't
 3   invited.
 4        Q    Did he ask you whether you were
 5   invited?
 6        A    Yes.  I told him I was.
 7        Q    Did you ask him why he didn't go?
 8        A    I knew why he didn't go.
 9        Q    Why didn't he go?
10        A    Because he told me he wasn't invited.
11        Q    So you knew why he didn't go based on
12   what he told you?
13        A    He wasn't invited.  I didn't know why
14   he wasn't invited until later on.
15        Q    When?
16        A    It was brought up and I even inquired
17   about it.
18        Q    When was it brought up?
19        A    I don't know the exact time frame.
20        Q    Was it after he left the company?
21        A    No, it was before.
22        Q    Who brought it up?
23        A    I think I asked.  I think I asked.
24   James brought it up and James was obviously
25   upset about it and I think a few people in the
```

1    trailer knew.

2         Q    Do you think he was justifiably upset

3    about it?

4         A    No.  Because the reason everyone was

5    invited is it was people who were receiving

6    Whiting-Turner benefits, is how the Christmas

7    party was set up.

8         Q    But you didn't know, though, at the

9    time you asked?

10         A    No.  I was curious as to why he

11    wasn't invited.  I wanted to know.  Obviously,

12    there had to be a reason.  And that was the

13    reason.  Everybody who was there was receiving

14    Whiting-Turner benefits.  That was the reason.

15    It was set up like that.

16         Q    Other superintendents that worked ---

17         A    There were other superintendents, I'm

18    not sure, I think he was working.  I don't know

19    where he was working.  I think he didn't get

20    invited to the Christmas party because he was

21    still receiving Union benefits.  That's the way

22    the invitations went out.  I guess when they

23    pull up a list of Whiting-Turner employees, it

24    comes up as to Whiting-Turner employees

25    receiving Whiting-Turner benefits.

1          So if I said to you, give me a list

2     of all the employees, because I'm going to have

3     a Christmas party, and you punch it up on the

4     computer and it comes up as Whiting-Turner

5     employees, you sent out invitations to those

6     employees that are receiving Whiting-Turner

7     benefits.

8          At that time, James -- I had just --

9     I was receiving Whiting-Turner benefits.  James

10    wasn't.  So he didn't get the invitation, as

11    well as other assistant superintendents.

12         Q    Where was the Christmas party held?

13         A    It was held at Rob Mitchell's house.

14         Q    Was it for all Florida or just your

15    South Florida area?

16         A    I think it was -- it's just for the

17    Florida office, but I think there were some

18    other people there that were down from out of

19    state working on jobs, one or two people, I

20    believe.

21         Q    Were there any other assistant

22    superintendents who were not receiving

23    Whiting-Turner benefits on your job site?

24         A    On our job site, Sawgrass Mills site?

25         Q    Yes.

1          A      No.    There were no other
2     superintendents, assistant superintendents,
3     excuse me.
4          Q      Were there any people other than ---
5          A      I mean, I was an assistant
6     superintendent that was receiving Union benefits
7     at first so, yes, it was James and myself in the
8     beginning.
9                 I had spoken to James several times
10    about that.  Also, he's very Union oriented.  He
11    is a very proud Union member.  I had told him
12    that I had denounced my Unionship and was he
13    going to do the same.  He didn't think so.  He's
14    been in the Union for so long.  It would make
15    sense to finish it and retire to receive your
16    pension.  He wasn't real sure.
17         Q      I'm almost done.  I'm trying to move
18    through this.
19                Since the time that you've been at
20    Whiting-Turner, have you ever had any kind of
21    disciplinary stuff happen?
22         A      Disciplinary towards me?
23         Q      Yes.
24         A      Yes.
25         Q      Can you tell me what occurred and

1    when it occurred?

2          A    I had an incident with a

3    subcontractor.  We got into some verbal

4    disagreements and it escalated almost into a

5    physical confrontation, but it didn't.  It

6    escalated further.  The guy tried to cut me off

7    the road going home.  He was coming after me.  I

8    requested that his boss -- and we talked about

9    it and worked it out.  Only because we were

10   going to be on the job.  It didn't work out.

11   The guy filed a restraining order against me,

12   which James Bush was a witness to the original

13   altercation.  As a matter of fact, James Bush

14   went to court with me voluntarily to testify on

15   my behalf.  We went to court -- actually, we

16   didn't go to court, we went to a hearing, excuse

17   me, in the judge's chambers and the case was

18   totally dismissed.  Everything that the guy

19   alleged was fabricated.  He had no lawyer.  He

20   lied in his deposition.  The judge threw it out

21   of court, totally dismissed it.

22             Rob Mitchell sat me down and talked

23   to me.  I wouldn't say it was a reprimand.  I

24   would say it was more of a, what did you learn

25   from this?  What did you learn, and how would

1    you handle it differently next time?  We know,
2    you weren't wrong, but how would you handle it?
3    That was the extent of the conversation.  I've
4    been reprimanded before in my life, but I
5    wouldn't say that was a reprimand.  I would say
6    it was more of a learning experience type
7    conversation.  Did I get reprimanded by Eric?
8    Yeah, a couple of times.  I did some stuff, just
9    not thinking.

10       Q    Work related?

11       A    Work related.  And he got on me over
12   the radio.  Everyone around me said, man,
13   doesn't that upset you?  He's doing his job.  If
14   he wasn't there, there would be a ton of
15   mistakes.  He was doing his job.  It didn't
16   upset me.  I just moved forward.  When I went to
17   see him, there was no hard feelings.  He was
18   just doing his job and I respected that.  I
19   think twice, maybe three times.  It was nothing
20   that I could say that I didn't deserve.  It was
21   just him doing his job.

22       Q    What's your current salary at
23   Whiting-Turner?

24       A    I'm not sure, to be completely honest
25   with you.

```
 1          Q    Do you know what you take home?
 2          A    I think I take home -- my paycheck
 3     comes twice a week.  It's like $1,500 every two
 4     weeks.
 5          Q    That's the net after the taxes?
 6          A    Yeah.  Actually -- yeah, that's with
 7     some subsistence.  They pay me to travel.  I get
 8     subsistence to drive to Palm Beach.  I don't
 9     have Whiting-Turner medical insurance.  I carry
10     medical insurance through my wife, yeah, so it's
11     less.  I get $56.00 a week for medical, so I
12     make about 1,300.
13          Q    The travel that you get paid for,
14     what is that for?
15          A    Any time you drive 20 miles outside
16     the radius of the office, you get subsistence,
17     so if you were driving 80 miles from the office,
18     and you would get 60 miles on that, it's 20 or
19     30 cents a mile, I believe.
20          Q    Who told you about that?  How did you
21     know that?
22          A    I asked.
23          Q    You went up and said, do I get
24     reimbursed for my travel?
25          A    When I worked in Sawgrass Mills, I
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1  lived right down the street.  It was great.  It
2  was beautiful.  It was the closest I've ever
3  worked to my house in my life.  I was ecstatic.
4  I had heard out there, one of the engineers was
5  inquiring about driving to work on Saturdays and
6  I said, oh, we get paid on Saturdays for
7  driving?  And they said yes, and I said, well,
8  I'm not worried about it, I live two minutes
9  from here.  So it didn't bother me to drive.  I
10 was more than happy to do that.
11         When I went to the job I'm presently
12 at now, it's up in Boynton Beach, Florida,
13 that's a considerable distance from my house, so
14 then I inquired as to do I get some kind of
15 travel time; do I get paid, and they said yes
16 and there's a form that I filled out and put
17 down the miles.  I get the subsistence.
18    Q    Do you know a guy named Ivan?
19    A    Ivan Dean, yes.
20    Q    What, if anything, do you know about
21 an incident or incidents between James Bush and
22 Ivan Dean?
23    A    You have it all written down.  That's
24 what I know.  Exactly what James told you, he
25 told me.

1          Q    He may have told you something
2    different than you're going to tell me.  He may
3    have told me something different than you are
4    going to tell me.  So, therefore, briefly
5    because we're almost done, can you tell me?
6          A    Briefly?
7          Q    Yes.
8          A    James went to Carmax, which was a job
9    we were doing, finishing up by the direction of
10   Eric Plotke.  He went to the job.  He met with
11   the foreman there, I guess, to find out what he
12   needed to do.  He said Ivan came up to him and
13   said -- I guess the foreman asked him what he
14   wanted James to do and Ivan said, if you can't
15   find anything to do for him, get rid of him or
16   fire him.
17        Q    Let me stop you for a second.  Were
18   you a witness to any of these things that went
19   on between Ivan and James Bush?
20        A    No.  Like I said, this is what James
21   told me.
22        Q    Okay.  Then, that's okay.  I won't go
23   into that.
24             Do you think that James Bush should
25   have been reviewed?

1       A       My opinion?

2       Q       Yes, sir.

3       A       No.  I don't think he should have

4    been reviewed.  It was six months.

5       Q       You don't think he should have gotten

6    any annual?

7       A       Annual.  That's different than

8    talking.  I got a review in six months from

9    going from assistant superintendent with Union

10   benefits to assistant superintendent with

11   Whiting-Turner benefits.  Then I got a year-end

12   review.  Are you inquiring about our first

13   review or our second review?

14      Q       Both.

15      A       Should he have gotten a year-end

16   review in my opinion?  Why not.

17      Q       So your answer would be yes?

18      A       But I don't know how the policy is

19   set up.  So I don't know how the policy is if

20   you're still receiving Union benefits.  They had

21   an assistant superintendent that had it and he

22   was working for two years.  Maybe we should ask

23   him if he got a year-end review.  Obviously, I

24   would say no, because if he didn't get a

25   probationary review, why would they give a

```
 1    year-end review?  That's how I'm basing my
 2    answer.
 3         Q    If there were problems with his
 4    performance, he should have gotten a review?
 5         A    I don't think so.
 6         Q    So, if there were problems, they
 7    should have just sort of laid out there and
 8    lingered?
 9         A    No.  I think James should have
10    identified with the proper people.  Why did
11    James let it go so long?  Why did James keep all
12    that built-up frustration for so long without
13    commenting?  Everybody that worked for that job
14    knew what was going on, except for the people in
15    the office, they didn't know.
16         Q    Except for Eric Plotke?
17         A    Why would he ---
18         Q    Except for Eric Plotke?
19         A    Why would he tell everybody in the
20    field ---
21         Q    Go ahead, I just need to know.
22              MS. CESARANO:  You interrupted him.
23              MR. POLLACK:  I know, but he said
24    "except everybody in the office", and I need to
25    know who that is.
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1           THE WITNESS:  The Sawgrass Mills

2    team.

3         Q    (By Mr. Pollack) Who specifically are

4    those people?

5         A    Omar, Sergio, Ray Mackeen, Shamia,

6    Noreen, Jeff Cooper, Eric Plotke.

7         Q    They knew?

8         A    They did not.

9         Q    They did not?

10        A    No.  They had some feelings that

11   James had some problems.

12             On several occasions, Jeff Cooper

13   would walk back to the office with me sitting

14   there and say, James, is everything okay?  Is

15   everything all right?  Yep.  Yep.  No problem.

16   Everything is fine here.  And I'm sitting at my

17   desk going Jesus Christ, James, would you just

18   tell the guy?  It started to upset me that the

19   guy would not go and tell him his problem.  I

20   hear him every day.  Why would you have so much

21   built-up frustration and anger and not tell

22   somebody?  I don't want to sound like a crybaby.

23   This isn't second grade.

24             You tell me.  If I'm upset or you're

25   upset, do you go and explain why you're upset to

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1   somebody or do you keep it bottled up?
 2        Q    It might depend on why I was upset.
 3             MS. CESARANO:  This is going nowhere.
 4             MR. POLLACK:  I think I'm done.
 5        Q    (By Mr. Pollack) Do you know if there
 6   was anybody on the site that was older than
 7   James Bush?
 8             MS. CESARANO:  Objection to form.
 9        Q    (By Mr. Pollack) You can answer the
10   question, if you understand it.  Do you
11   understand it?
12        A    John Gordy, Alvin Barber, Rigoberto
13   Vinas.
14        Q    Al?
15        A    Alvin Barber.
16        Q    Rigoberto?
17        A    Vinas.
18        Q    Tell me what they did and how old
19   they were?
20        A    John Gordy and Vinas were carpenters,
21   and Alvin Barber was a labor foreman.
22        Q    Do you know how old each of them
23   were?
24        A    At least as old if not older than
25   James.
```

```
 1          Q    So you don't know their exact ages?
 2          A    Alvin is 58 years old.
 3          Q    And John Gordy -- Vinas has one year
 4     to retire, so he's got to be 60 and John Gordy
 5     is about the same.  I'd say he's probably about
 6     59.
 7               MR. POLLACK:  I have no further
 8     questions.
 9               THE WITNESS:  Fantastic.
10               MS. CESARANO:  No.  I just have a
11     couple just for clarification.  Just a few.
12               THE WITNESS:  Okay.
13                    CROSS EXAMINATION
14     BY MS. CESARANO:
15          A    During your testimony, you were
16     discussing a problem, I think, with the 19
17     footings and you, I think said, that Eric quote,
18     handled, unquote that problem instead of James?
19          A    Correct.
20          Q    Was there anything wrong with that?
21          A    It was James' thing to handle.  It
22     was his situation to go and find out what to do
23     to rectify that situation.
24          Q    And in your view, is this a problem
25     with James' performance?
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
 1         A     It's his job.
 2         Q     You mentioned several problems and
 3    errors that occurred on the job.  You gave us
 4    several things, correct?
 5         A     Yes.
 6         Q     And as to the areas that James was in
 7    charge of, buildings two and three --
 8         A     Correct.
 9         Q     -- should or could James have
10    prevented or fixed any of those errors?
11              MR. POLLACK:  Object to form.
12              THE WITNESS:  That's his job, to make
13    sure things run correct.
14         Q     (By Ms. Cesarano) Is that a yes or a
15    no, could James have fixed any of those errors?
16         A     Physically or from a supervisor's
17    standpoint?
18         Q     From a supervisor's standpoint.
19         A     Yes.
20         Q     How would he have done that?
21         A     Well, the grease slabs that were
22    high, he could have shut them all in.
23         Q     What about the 19 columns?
24         A     Well, he was supposed to do that.  He
25    was supposed to use the builder's level or
```

1    transit or some kind of device to shoot
2    elevation, laser, to check the bottom of it and
3    to check the top of the anchor bolts prior to
4    being poured.

5         We used what is called a QC report or
6    quality control report, which you fill out. You
7    go to the blueprints and an example, column had --
8    C1 is a type F9 footing and there are several
9    types of footings on that job. Maybe F9, F10,
10   F12, F13. They all have different sizes. So
11   you would go to the blueprints and look at that
12   footing number, F9. It's a 9 by 9 by 34 inches
13   deep. The anchor bolts are four anchor bolts
14   with a six-inch projection. The anchor bolts
15   are an inch and a-quarter thick with a layout of
16   12 inches apart and 12 inches apart, and then it
17   gives an elevation of two feet below grade or
18   one foot below grade. You would take that
19   information and write it down at each interval.
20   When you finish, you would then go out into the
21   field with the instrument, be it a builder's
22   level or a laser. A laser is easier to use
23   because one person can do it instead of two
24   people having to do it. You would set that
25   laser up. You would pick up the grade, mark

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    that.   You would then go over to the footing and
2    you would stick it in the ground to the bottom
3    of the footing.
4         Q    When you say you, you, you, you mean
5    James Bush should have done this?
6         A    I did it, myself, and that was James'
7    responsibility, also.   You then shoot the bottom
8    of the footing.   It would have a reading,
9    whatever the reading was, you would write down
10   that reading.   Whatever it is, three feet below
11   grade or four feet below grade.
12        Q    On the QC report?
13        A    On the QC report, yes.   You would
14   then take that same instrument and stick it on
15   top of the anchor bolts that were formed up and
16   you would then shoot that elevation.   The
17   elevation is two feet, so you know that it's a
18   proper elevation.   You would then measure the
19   anchor bolts to make sure they are spaced
20   properly.   You would then measure the thickness
21   and write down that information.   You would then
22   calculate the cubic yards of concrete.   So you
23   know every detail of that footing.   You would
24   then measure the distance from each other.
25   There are four footings in a row and they need

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1      to be ten feet apart from center to center.  You

2      have to measure that.

3           Q     This is, again, all what an assistant

4      superintendent does?

5           A     That's what we do; correct, we check

6      that work.

7           Q     And then let's assume that it's all

8      proper, does the assistant superintendent sign

9      off on the QC report?

10          A     Correct.

11          Q     And as to these 19 improper footings,

12     had James Bush filled out a QC report saying

13     they were okay?

14          A     Yes.

15          Q     And did Eric Plotke discover later

16     that the QC report was wrong?

17          A     Yeah.  Because we went later, after

18     they had already been poured.  You have a lot of

19     them.  They want us to do one for each footing.

20     You have them in stacks, like this, because they

21     are two pages long.  What I would do -- this is

22     irrelevant.  We have a stack of them and we put

23     them in our box.  We each have a box, and we put

24     them in there.  Eric would try to go through

25     them as often as he could, to make sure there

```
 1    were no discrepancies.  But if there was a
 2    problem, it was our job to go and say, hey, your
 3    anchor bolts are all off, you need to adjust
 4    them, which I have done several times.
 5         Q    To whom?
 6         A    To the subcontractor.  You go -- we
 7    do the QC report, we find, oh, man, these
 8    footings, the bolts are off four inches, which
 9    is a lot.  You go over to the contractor and
10    say, hey, listen, whoever was in charge, your
11    bolts and footings, C1, are off, you have to
12    correct them.
13         Q    Chuck, this would be before the
14    concrete was poured, correct?
15         A    You can't do it after.  When that
16    stuff dries, it dries hard.
17         Q    The 19 column issue, had the concrete
18    already been poured?
19         A    Before or after he supposedly checked
20    it?
21         Q    After he checked it?
22         A    He checked it and then they were
23    poured and then the problem was found out.  The
24    steel was being erected on these pads and the
25    steel came above the elevation and it, all of a
```

```
 1    sudden, went like that and the steel guy didn't
 2    know what the problem was.
 3         Q    So the concrete had been poured and
 4    the problem became exacerbated, right?
 5         A    Yeah.
 6         Q    Before it was discovered?
 7         A    It was a little bit of a problem,
 8    correct.
 9         Q    Before it was discovered, correct?
10         A    Yes.  It wasn't discovered until --
11    the steel company who was erecting the steel and
12    the foreman, Jeff Justice, was the one that
13    identified the problem.
14         Q    And this was after the concrete was
15    poured, correct?
16         A    Yes.
17         Q    At that point, it was a serious
18    problem, correct?
19         A    Correct.
20         Q    Was it James Bush's job to make sure
21    that the 19 columns were with proper footings
22    before the concrete was poured?
23         A    Correct.
24         Q    And you identified various other
25    issues or problems on the job.  As to those
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    problems of buildings two and three, likewise,
2    was James Bush's job to prevent or correct those
3    errors?
4         A    Prevent or correct, correct.
5         Q    That's a true statement?
6         A    True statement.
7         Q    During your tenure at Whiting-Turner,
8    did you ever observe or hear any of the managers
9    of Whiting-Turner say or do anything that you
10   felt was racially motivated against the
11   plaintiff, James Bush?
12        A    Never.
13        Q    During your tenure at Whiting-Turner,
14   did you ever hear or observe any of the
15   management of Whiting-Turner do or say anything
16   against Mr. Bush because of his age?
17        A    Never.  The only reason I knew how
18   old James was because that's all he said, I'm 52
19   years old.
20        Q    You never heard any managers comment
21   on James Bush's age; is that correct?
22        A    Never.
23        Q    Now, is it the job of Whiting-Turner
24   managers, such as Eric Plotke, to give annual
25   appraisals to Union foremen?

```
 1        A    No.

 2        Q    If you know.

 3        A    We don't give the Union people

 4   reviews.  They have -- their pay rate is

 5   structured through the Union, which is signed by

 6   an agreement, and if the agreement says -- for

 7   example, recently they just signed a new

 8   agreement, which allows them three dollars over

 9   four years.  It broke up over quarterly periods.

10   They get so much per period.  Well, that raise

11   goes into effect and we give it to them, but we

12   don't review them.

13        Q    Now, is it a correct statement that

14   from the time you were hired until your raise,

15   approximately six months later at

16   Whiting-Turner, that you were an assistant

17   superintendent UB, meaning Union benefits?

18        A    At the time I was hired until the

19   time I got my review, six months, I was

20   receiving Union benefits, correct.

21        Q    Was your title assistant

22   superintendent UB, Union benefits?

23        A    I don't know if that was my title,

24   but I didn't have a card that said assistant

25   superintendent UB.
```

```
 1          Q     I know you didn't.
 2          A     Yeah.  I was an assistant
 3     superintendent UB.
 4          Q     Was James Bush also with that same
 5     title during this same six-month period?
 6               MR. POLLACK:  Same title being?
 7          Q     (By Ms. Cesarano) Assistant
 8     superintendent UB.  Did he have the same title
 9     as you during these first six months?
10          A     I believe so, yes.
11          Q     When you got your promotion six
12     months after you started, did you become an
13     assistant superintendent CB, meaning company
14     benefits?
15          A     After the six months, correct.
16          Q     And at that time, you withdrew from
17     the Union, correct, the Carpenter's Union?
18          A     Correct.  There's no formal ---
19          Q     You stopped paying your dues?
20          A     You stop paying your dues and they
21     kick you out.
22               MS. CESARANO:  No further questions.
23                   REDIRECT EXAMINATION
24     BY MR. POLLACK:
25          Q     The problem with the 19 pilings -- is
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    that what they are called?

2         A    Footings.

3         Q    Footings.  You said it was serious.

4    Was it serious enough that, in your opinion,

5    somebody should have been written up about it?

6         A    In my opinion?

7         Q    Yes, sir.

8         A    Was it serious enough to write

9    somebody up about it?  Yes.

10        Q    Was it serious enough that somebody

11   should have been put on probation or fired for

12   it?

13        A    No.

14        Q    Do you know whether James Bush was

15   ever written up for that problem?

16        A    I can't say.  I was not in that

17   position.

18        Q    Ms. Cesarano just asked you whether

19   James Bush had the same title as you did while

20   you were assistant superintendent UB.  Did you

21   ever hear James Bush referred to as assistant

22   superintendent UB?

23        A    Neither was I.  He was never.

24        Q    So your answer would be no?

25        A    No.  When she said that, that's why I

```
 1     had to elaborate.  There was never really -- we
 2     just knew we were assistant superintendents and
 3     we were receiving Union benefits.  They didn't
 4     introduce anybody like that.  There was no
 5     formality.  It was just assistant
 6     superintendent.
 7          Q    When you were introduced, you were
 8     introduced as assistant superintendent?
 9          A    That's just the way it was.  There
10     was no -- I don't think anybody cared if you
11     were receiving Whiting-Turner benefits or Union
12     benefits.
13          Q    Now, your testimony about the
14     appraisals and who gets appraised --
15          A    Appraised or reviewed?
16          Q    Reviewed.  Excuse me.
17               When did you learn that the reviews
18     are only for Union versus non-Union people?
19     When did you find that out?
20               MS. CESARANO:  Objection to form.
21     It's reversed.
22          Q    (By Mr. Pollack) Let me rephrase the
23     question.  She's correct.
24               You testified that depending on
25     whether or not you're a Union member receiving
```

```
 1   Union benefits you do or you don't get reviewed,
 2   correct?
 3        A    Say it one more time, please.
 4        Q    Ms. Cesarano asked you about reviews
 5   and whether or not if you're a Union -- if you
 6   get Union benefits, you get a review or you
 7   don't get a review?
 8        A    No.  She asked me if the foreman, if
 9   the Union foreman, gets reviewed and I explained
10   that we don't ---
11        Q    Right.  My question is:  When did you
12   learn that?  When did you learn that Union
13   foremen don't get reviews?
14        A    It was just an assumption I made
15   because we were going into -- we were being
16   introduced to supervision and management and
17   they were still -- they worked in the field as
18   Union employees.  They worked -- there was like
19   a division.  There's like a line.  We hired
20   carpenters out of the Union and they worked for
21   us.  There would be no reason to review them.
22   They get -- if a guy comes on a job and he's a
23   foreman -- you know, if we called the Union and
24   we say, I need a carpenter foreman and they send
25   us a carpenter foreman, he's already got the
```

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1    title.  The Union says carpenter foreman

2    receives X amount of dollars for being a

3    foreman.  If I said, give me two carpenters.

4    They send us two carpenters.  When do they get a

5    raise?  Whenever the Union says they get a

6    raise.  Whiting-Turner doesn't have anything to

7    do with that.  They don't control their pay

8    rate, so we would have no reason to review them.

9        Q    But you started out as a Union

10   assistant superintendent, correct?

11       A    Because I was going into management.

12   I was training to be a superintendent, which is

13   management.

14       Q    As was James Bush, according to your

15   understanding?

16       A    Correct.

17            MR. POLLACK:  Nothing further.

18                RECROSS EXAMINATION

19   BY MS. CESARANO:

20       Q    Did you ever tell James Bush to go to

21   Eric Plotke or any other manager and ask to be

22   appraised?  Did you tell him to do that?

23       A    Yeah, several times.

24       Q    Did he ever do that?

25       A    No.

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

1             MS. CESARANO:  Okay.  No further

2     questions.

3             MR. POLLACK:  We're done with this

4     witness.

5             MS. CESARANO:  I want to order this

6     depo and the next two, also, please.

7

8          (Reading and signing were not waived.)
           (Thereupon, the taking of the deposition
9          was concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FERNANDEZ & ASSOCIATES COURT REPORTERS--(305)374-8868

```
1              CERTIFICATE OF REPORTER
2              - - - - - - - - - - - - - - - - - - - - - - -

3        STATE OF FLORIDA:

4                      : SS

5        COUNTY  OF  DADE:

6              I, Maria Isabel Fernandez, Shorthand
   Reporter, certify that I was authorized to and
7  did stenographically report the foregoing
   deposition; and that the transcript is a true
8  record of the testimony given by the witness.
              I further certify that I am not a
9  relative, employee, attorney, or counsel of any
   of the parties, nor am I a relative or employee
10 of any of the parties' attorney or counsel
   connected with the action, nor am I financially
11 interested in the action.
              Dated this 28th day of June, 2000.
12

13

14                          _____
                            Maria Isabel Fernandez
15

16

17

18

19

20

21

22

23

24

25
```

READING AND SIGNING
-------------------

I have read the above transcript, pages 1 through 147 and I find (MARK ONE)

( ) The transcript is true, correct, and completely accurate.

( ) The transcript is true, correct, and accurate, except as set forth in my List of Corrections attached hereto, citing page and line and reason for the correction realizing that, for that purpose, I am still under oath.

_____      _____
DATE

Sworn to and subscribed before me this _____ day of _____, 2000.

_____

```
 1   TO BE EXECUTED BY THE NOTARY IF THE DEPONENT DOES
 2   NOT SIGN:
 3
 4        I hereby certify that a letter with reference
 5   to reading and signing deposition was mailed to the
 6   witness through his attorney, on _____ and
 7   that witness
 8
 9   ( ) Witness refused to sign, giving the following
10   reason:
11
12   ( ) Neither the witness nor his attorney has
13   responded to request to read and sign.
14
15
16   _____        _____
17        DATE                        Notary Public
18
19   MY COMMISSION EXPIRES:
20
21
22
23
24
25
```

FERNANDEZ & ASSOCIATES COURT REPORTERS-- (305) 374-8868