# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 00-6224-CIV-JOHNSON

JAMES BUSH,

  Plaintiff,

v.

THE WHITING-TURNER
CONTRACTING CO., a
Maryland corporation,

  Defendant.

_____/

## JOINT PRETRIAL REPORT

Defendant, **THE WHITING-TURNER CONTRACTING CO.** ("Whiting-Turner" or

"Defendant"), and Plaintiff **JAMES BUSH** ("Bush" or "Plaintiff"), pursuant to Local Rule 16.1, file

their Joint Pretrial Report.

## I. CONCISE STATEMENT OF THE CASE BY EACH PARTY IN THE ACTION

### A. Nature of the Case

Plaintiff filed the instant lawsuit alleging violations of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Count I), the Age Discrimination in Employment Act

(the "ADEA"), 29 U.S.C. § 621 *et seq.* (Count II), the Florida Civil Rights Act of 1992, § 760.01,

*et seq.* Fla. Stat. (the "FCRA") (Counts III and IV), and § 448.08, Fla. Stat. ("§ 448.08") (Count V).

Specifically, Plaintiff claims that Whiting-Turner discriminated against him as a result of his race

and age. Plaintiff has elected to drop his age discrimination claims under the ADEA and FCRA.

Accordingly, Plaintiff's only remaining claims involve race discrimination and unpaid wages.

### B. Plaintiff's Statement of the Case

Plaintiff James Bush ["Bush"] is a 51-year old black male with 33 years experience in the



construction industry.  Between 1964-1997, Bush worked as a labor foreman for some of the most prominent construction firms in Miami.  During that time he supervised crews of as many as 90 workers and help construct various large scale commercial buildings.  Among the projects Bush worked on were The Miami Center, Miami Dade Community College, the Hamilton, Miami Northwestern Senior High School, and the exclusive Santa Maria condominium.  He also ran his own construction company for several years.

In May 1997, Whiting Turner hired Bush to work as a labor foreman on its Bloomingdales project in South Dade.  Bush was responsible for supervising cleanup, construction of the parking lot, and interior work.  He also was responsible for dealing with building inspectors to make sure the elevators passed inspection. Bush's performance on the Bloomingdales project was exemplary. Bush's supervisor, Eric Plotke, was so impressed with his work that he asked Bush to stay on with Whiting-Turner as an assistant superintendent at the Sawgrass Mills Mall.   Plotke made this decision based on Bush's work on the Bloomingdales project and on Bush's extensive experience in the construction industry.

At the time he was offered the job as assistant superintendent, Plotke told Bush he would receive a performance review in six months.  He also told Bush that Whiting Turner could be "a career job for him," and that he would "never have to look for work again." Based on these representations, Bush accepted the job and began work as an assistant superintendent at Sawgrass in October, 1997.  Between October, 1997 and March, 1998, Plotke repeatedly introduced Bush as the assistant superintendent of the Sawgrass Mills project to city inspectors and others on the job site several months prior to that time.

Shortly after Bush was hired as assistant superintendent,  Whiting-Turner hired another 29 year-old white assistant superintendent, Charles Bender, to work with him on the Sawgrass project. Bush and Bender were each responsible for different sections of the project; however, their job

2

descriptions and titles were the same. Bender had no previous experience in management or as an assistant superintendent prior to being offered the position with Whiting-Turner. Nevertheless, Bender's starting salary was $2.00 per hour greater than Bush's.

Bush's responsibilities as assistant superintendent were many and varied. He was responsible for supervising the laborers, carpenters, block masons, and other subcontractors. He coordinated the sanitary piping and densities of the building. He also was responsible for demolition work, blue print reading, constructing site pads for several buildings, and overseeing construction of the entry features to the complex. The buildings Bush was responsible for supervising cost in excess of one million dollars.

In March, 1998, Bush met with Plotke and Jeff Cooper. Although Plotke had told him he would be reviewed at that time, he was not. Instead, Cooper told him he would be reviewed in six months. Cooper also told him that he was receiving a raise because he had been working as an assistant superintendent since October but had been paid as a labor foreman. However, the raise did not include the period from October through March, when Bush had been working as an assistant superintendent. Bush was never paid an assistant superintendent's salary during that time period. He also was never paid overtime, even though he remained under union contract.

Between March, 1998 and September, 1998, Bush worked a significant amount of overtime for which he was not paid. He also came in on weekends to prove that he was dedicated to Whiting Turner and in reliance that he would be reviewed. However, Bush was never reviewed as promised, even though the company's own EEOC policy requires it conduct an annual review of all minority supervisors. In the meantime, in September, 1998, Whiting-Turner did review Bender. They also increased his pay to $4.70 per hour. Plotke told Bush that he ought to be reviewed, but never took any steps to review him.

In addition to not being reviewed, promoted, and paid the same salary as Bender, Bush also

experienced a number of other subtler, albeit no less benign, incidents of disparate treatment based on his race. In January, 1998, Bush discovered an anonymous note left on his desk. The note stated in part: "Unwittingly we have been parts of broken relationships, <u>discrimination</u>, poverty, disease and overbearing personalities. These things exist, and as long as someone endures it and someone does it, it will go on." (emphasis added). . Bush understood this to be a reference to his race.

Bush was also excluded from several social and professional events. For instance, when Whiting Turner took pictures of the individuals in charge of the Sawgrass project as promotional material for the developer, Bush was the only person in his trailer to be excluded from the photograph. He also was the only person in the trailer where he worked to be excluded from the company Christmas party, a fact Plotke admitted he found "odd." Bush found it particularly disturbing that he was also the only employee to be excluded from a mandatory EEOC meeting only moments before the meeting was scheduled to occur, particularly when the work which supposedly required his "immediate" attention could have been performed by a laborer.

In December, 1998, Bush finally confronted Plotke about the fact that he had never received a performance review and that he was making less money than Bender. Plotke told him he would look into it; however, once again nothing was done. The issue finally came to a head in March, 1998, when Bush met with Plotke, Cooper, and Robert Mitchell. Bush asked Mitchell why he was making less money than any other assistant superintendent and many of the subcontractors. Mitchell did not give him an answer. Bush also asked whether his work performance had been unsatisfactory. They told him no. When Bush told them they should fire him if they were unhappy, Cooper and Plotke refused and asked him to stay on. Neither Cooper nor Plotke ever told Bush that they felt he wasn't qualified to be an assistant superintendent. Bush waited until the project was completed and then left the job the following month. Shortly thereafter, he filed his first and only Charge of Discrimination in his 33 years in construction.

4

Prior to his departure, Bush received an award from Whiting-Turner for "effectively and diligently" applying the company's Quality Control Program. The company gave him a $100.00 bonus and publicly acknowledged him in its newsletter "for his high rating resulting from numerous random inspections and his use of many checklists."

Although Whiting Turner employs over 2,000 people nationwide, during the time Bush was employed at Whiting-Turner, he was the only black assistant superintendent in Florida. Bush never saw Whiting-Turner recruit any black recruits for management positions during the time he worked there, although he did observe a number of Caucasians being recruited.. In fact, during the 22 months he worked at Whiting-Turner, Rob Mitchell spoke to him only three times, even though Bush was involved in supervision of the project and was critical to its success.

### C.   Defendant's Statement of the Case

In 1964, Plaintiff (an African-American) entered the construction industry as a laborer. From 1968 until late 1997, Plaintiff worked as a laborer foreman (a non-management position) at various construction sites. During those 33 years in the construction industry, no construction company ever offered Plaintiff the opportunity to be promoted to the assistant superintendent position, a managerial position. The assistant superintendent supervises and orchestrates the work performed by subcontractors, carpenters, and laborer foremen to ensure that the construction project follows architectural designs, plans, and time-sensitive schedules.

Whiting-Turner is a national construction company in which the vast majority of work is conducted through project-specific job sites. Whiting-Turner hires its construction employees for each specific project pursuant to the terms of various collective bargaining agreements it has entered into with several trade unions in the construction industry. All laborers and laborer foremen at Whiting-Turner projects in South Florida are hired pursuant to the collective bargaining agreement (the "Laborers' union contract") between Whiting-Turner and the Southeast Florida Laborers'

District Council for Local Union Nos. 478, 767, and 800 (the "Laborers' Union").

In May 1997, Eric Plotke, a Whiting-Turner superintendent, asked the Laborers' union to provide candidates for a foreman position in a construction project at the Bloomingdale's store in Aventura Mall. Pursuant to the request, on May 19, 1997, the Laborers' union referred Plaintiff for the position, and Plotke hired Plaintiff to be a laborer foreman at the Bloomingdale's project. Pursuant to the Laborers' union contract, Plaintiff, as a laborer foreman, earned an hourly wage of $9.82.

While at the Bloomingdale's project, Plotke witnessed Plaintiff's skills as a laborer foreman and thought that Plaintiff showed the potential to become an assistant superintendent. Whiting-Turner has 2 types of assistant superintendent positions: (1) union-benefits assistant superintendent ("assistant superintendent-UB"), a **non**-management position used for trainees during their probationary period, and (2) company-benefits assistant superintendent ("assistant superintendent-CB"), a management position.

Assistant superintendents-UB are those individuals employed pursuant to a union contract and who continue to receive union benefits; that is, assistant superintendents-UB are **not** members of management. In contrast, assistant superintendents-CB are individuals directly employed by Whiting-Turner and are members of management. The assistant superintendent-UB position is simply a probationary position where, if the employee properly performs his/her job, Whiting-Turner will promote the employee to a permanent assistant superintendent-CB managerial position. The assistant superintendent-UB position was created so that a union member could accept a promotion on a probationary basis without the fear of losing his/her union benefits (such as seniority and pension) if the employee did not meet the job requirements during the probationary period. The probationary period could last several years: in fact, Plotke had previously been an assistant superintendent-UB for over 1.5 years before he was promoted to the assistant superintendent-CB

position.

As the Bloomingdale's project was concluding, Plotke offered Plaintiff the opportunity to replace the assistant superintendent-UB, Doug Houghton (who is white and younger than Plaintiff), and become one of the two assistant superintendents at a new construction project at the Sawgrass Mills mall. Houghton was terminated for poor performance. Plotke told Plaintiff that he would recommend to Whiting-Turner's Vice President, Robert H. Mitchell, that Plaintiff be promoted to an assistant superintendent-UB so that, if Plaintiff properly performed, Plaintiff would be promoted to Whiting-Turner's management as an assistant superintendent-CB. Plaintiff was nearly 51 years old when Plotke offered him the assistant superintendent-UB position. Pursuant to Plotke's recommendation, Mitchell approved Plaintiff's promotion.

In October 1997, Plaintiff started work at the Sawgrass Mills project. During the first few months, Plaintiff had little to do. During this slow period when the project was getting set up, employees hired, and construction permits obtained, Plaintiff's salary was increased to $10.82 per hour, even though the Laborers' union contract did not require Whiting-Turner to do so.

On February 16, 1998, Whiting-Turner hired Charles Bender, a carpenter foreman, also as an assistant superintendent-UB for the Sawgrass Mills project. Like Plaintiff, Bender's salary with Whiting-Turner was based on the collective bargaining agreement (the "Carpenters' union contract") between Whiting-Turner and the South Florida Carpenters District Council (the "Carpenters' union"). Pursuant to the Carpenters' union contract, a carpenter foreman's hourly wage at the time was $16.10, 64% higher than a laborer foreman's salary ($9.82). The wage difference between a carpenter foreman and laborer foreman is due to the higher skill level that carpenters possess.

As assistant superintendents-UB, Bender and Plaintiff had the same duties, but each was responsible for 3 of the 6 buildings on the Sawgrass Mills project. Like Plaintiff, Bender was told that if he properly performed, he would be promoted to assistant superintendent-CB. According to

7

Plaintiff, Plotke stated that Plaintiff and Bender would spend at least 6 months before being reviewed and, if they properly performed their job, would be promoted to an assistant superintendents-CB.

In March 1998, Whiting-Turner decided to increase Plaintiff's wages and make him a salaried employee, even though it was not required under the Laborers' union contract. Bender's salary was $700 gross per week, which is $17.50 per hour; thus, Bender was given a 7% wage increase from the carpenter foreman's salary. Plaintiff's salary was increased to $628 gross per week, which is $15.70 per hour; thus, Plaintiff was given a 60% wage increase from the laborer foreman's salary. Plaintiff's and Bender's salary differential of $1.80 not only resulted from the disparity in the union contracts (a carpenter foreman earns $6.28 more per hour than a laborer foreman), but also due to their different skill levels.

Early in the project, Plotke observed that he had overestimated Plaintiff's capabilities and that Plaintiff was having performance problems. For example, Plaintiff failed to (i) verify the placement of anchor bolts which supported the building's structural steel; (ii) accurately measure 19 building columns causing the dismantling of 1 week's worth of work and a 3-week delay; (iii) provide sufficient QC (Quality Control) reports; (iv) properly measure the concrete on an entry feature between two buildings; (v) plant trees in the proper location and with the correct elevation; (vi) know how to use equipment that an assistant superintendent must use; (vii) correct field problems once they were identified; and (viii) supervise work to ensure that it was completed by the scheduled date. Although Plotke expressed his concerns to Plaintiff, Plotke did not take any disciplinary action, but considered Plaintiff's failing performance as caused by his lack of experience and skills in the carpenter trade. In fact, Plotke gave Plaintiff less complex tasks to perform so as to help Plaintiff succeed; however, Plaintiff continued to have below-standard performance.

In August 1998, Bender approached Whiting-Turner for his review. Since Bender had properly performed his job duties, Bender was promoted to assistant superintendent-CB. Unlike

8

Bender, Plaintiff did not approach anyone at Whiting-Turner for a performance review or promotion (presumably because of his performance problems). Moreover, Bender's promotion to management within 6 months was uncommon since Plotke himself took over 1.5 years as an assistant superintendent-UB before he was promoted.

On April 13, 1999, Plaintiff resigned from Whiting-Turner. After receiving Plaintiff's resignation letter, Mitchell asked Plaintiff to stay at Whiting-Turner. However, Plaintiff refused. This lawsuit followed.

Plaintiff has not established a *prima facie* case demonstrating that Whiting-Turner discriminated against him because of his race. Plaintiff cannot establish that he was qualified for the assistant superintendent-CB position, evidenced by his poor performance. Plaintiff also cannot show that Whiting-Turner treated similarly situated non-Black employees more favorably. Plaintiff was simply not promoted to the assistant superintendent-CB position because of his numerous performance problems. Whiting-Turner has provided legitimate nondiscriminatory reasons for its actions. Plaintiff cannot show that Whiting-Turner's actions are a pretext for discrimination.

Plaintiff does not have a claim for unpaid wages. The Court granted summary judgment for Whiting-Turner as to Plaintiff's claim that he was owed unpaid wages after March 1998. The only remaining claim for unpaid wages involves the period from October 1997 to March 1998. As the evidence will show, Plaintiff was paid his wages including overtime from October 1997 to March 1998.

## II.    BASIS OF FEDERAL JURISDICTION

Federal jurisdiction is based on 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

III.    **THE PLEADINGS RAISING THE ISSUES**

   A.     Plaintiff's Complaint.

   B.     Answer and Affirmative Defenses to Complaint.


IV.    **UNDISPOSED MOTIONS OR OTHER MATTER REQUIRING ACTION BY THE COURT**

   A.     Defendant's Motion in Limine


V.    **A CONCISE STATEMENT OF UNCONTESTED FACTS**

   1.     In 1964, Plaintiff (an African-American) entered the construction industry as a laborer.

   2.     From 1968 until late 1997, Plaintiff worked as a laborer foreman at various construction sites.

   3.     Whiting-Turner is a national construction company.

   4.     In May 1997, Eric Plotke, a superintendent at Whiting-Turner, hired Plaintiff to be a laborer foreman at the Bloomingdale's project.

   5.     Plaintiff has been a member of the Laborers' union since 1964.

   6.     While at the Bloomingdale's project, Plotke witnessed Plaintiff's skills as a laborer foreman and thought that Plaintiff showed the potential to become an assistant superintendent.

   7.     Plaintiff admits that Plotke wanted him to be his assistant.

   8.     On February 16, 1998, Whiting-Turner hired Charles Bender as an assistant superintendent for the Sawgrass Mills project.

   9.     Bender and Plaintiff had the same duties, but each was responsible for 3 of the 6 buildings on the Sawgrass Mills project.

10.    In March 1998, Whiting-Turner increased Plaintiff's wages.

11.    On April 13, 1999, Plaintiff terminated his employment from Whiting-Turner.


VI.    **ISSUES OF FACT WHICH REMAIN TO BE LITIGATED AT TRIAL**

A.    Whether Plaintiff was subjected to race discrimination.

B.    Whether Plaintiff is owed wages by Defendant from October 1997 to March 1998.

C.    The extent of Plaintiff's damages, if any.


VII.    **CONCISE STATEMENT OF AGREED ISSUES OF LAW**

The Parties agree that Title VII and the FCRA apply.


VIII.    **ISSUES OF LAW WHICH REMAIN TO BE LITIGATED AT TRIAL**

A.    Whether Plaintiff was discriminated against because of his race.

B.    If Plaintiff was discriminated against, whether Defendant is liable and, if so, the amount of Plaintiff's damages.

C.    Whether Plaintiff is owed unpaid wages by Defendant.

D.    Whether Plaintiff mitigated his damages.


IX.    **EXHIBIT LISTS**

A.    Plaintiff's Exhibit List is attached at Tab A

B.    Defendant's Exhibit List is attached at Tab B.

X.    **WITNESS LISTS**

    A.    Plaintiff's Witness List is attached at Tab C

    B.    Defendant's Witness List is attached at Tab D.


XI.    **ESTIMATED TRIAL TIME**

    The parties estimate that the trial will take 3-4 days.


**Dated**: July 16, 2001

                                              Respectfully submitted,

DAVID H. POLLACK ESQ.               SHUTTS & BOWEN, LLP
Attorneys for Plaintiff                  Attorneys for Defendant
The Ingraham Building                  201 South Biscayne Blvd.
25 S.E. 2nd Avenue, #1020            1500 Miami Center
Miami, Florida 33131                   Miami, Florida 33131
                                              (305) 358-6300
                                              (305) 347-7386 (facsimile)

By:_____     By:_____
       David H. Pollack                 Sheila M. Cesarano
       Florida Bar No. 0955840        Florida Bar No. 708364
                                      Rene Gonzalez-LLorens
                                      Florida Bar No. 0053790

MIADOCS 440706.1 RGL

## X.    WITNESS LISTS

A.    Plaintiff's Witness List is attached at Tab C

B.    Defendant's Witness List is attached at Tab D.


## XI.    ESTIMATED TRIAL TIME

The parties estimate that the trial will take 3-4 days.


Dated: July 16, 2001

Respectfully submitted,

DAVID H. POLLACK ESQ.
Attorneys for Plaintiff
The Ingraham Building
25 S.E. 2nd Avenue, #1020
Miami, Florida 33131

SHUTTS & BOWEN, LLP
Attorneys for Defendant
201 South Biscayne Blvd.
1500 Miami Center
Miami, Florida 33131
(305) 358-6300
(305) 347-7386 (facsimile)


By: _____
    David H. Pollack
    Florida Bar No. 0955840

By: _____
    Sheila M. Cesarano
    Florida Bar No. 708364
    Rene Gonzalez-LLorens
    Florida Bar No. 0053790


MIADOCS 440796.1 RGL

# EXHIBIT "A"

# DAVID H. POLLACK

Attorney at Law

JAMES F. POLLACK, ESQ.
OF COUNSEL

The Ingraham Building
25 S.E. 2nd Avenue
Suite 1020
Miami, Florida 33131

TELEPHONE:(305) 372-5900
FACSIMILE: (305) 372-5904

### James Bush v. Whiting-Turner Contracting Co.
### Case No.:33-6224-CIV-Dimitrouleas/Johnson

### PLAINTIFF'S EXHIBIT LIST

| | |
|---|---|
| Plaintiff's Trial Exhibit # 1 - Defendants First Set of Interrogatories and Plaintiff's Response thereto | No corresponding defense exhibit |
| Plaintiff's Trial Exhibit # 2 - Bush's Resume | No corresponding defense exhibit |
| Plaintiff's Trial Exhibit # 3 - Quality Control Award and Check Stubs for monetary compensation for achievement | Defendant's Trial Exhibit # 20 & 21 |
| Plaintiff's Trial Exhibit # 4 - Laborers' District of southeastern Florida Collective Bargaining Agreement | Defendant's Trial Exhibit # 9 |
| Plaintiff's Trial Exhibit # 5 - 1998 Revision to the Collective Bargaining Agreement | No corresponding defense exhibit |
| Plaintiff's Trial Exhibit # 6 - Whiting-Turner's 1995 Equal Employment Opportunity Statement and Affirmative Action Program | No corresponding defense exhibit |
| Plaintiff's Trial Exhibit # 7 - Whiting-Turner's 1999 Equal Employment Opportunity Policy and Affirmative Action Program | Defendant's Trial Exhibit # 67E |
| Plaintiff's Trial Exhibit # 8 - Whiting-Turner's 1999 Employee Handbook | No corresponding defense exhibit |
| Plaintiff's Trial Exhibit # 9 - Whiting-Turner's Superintendent Manual | No corresponding defense exhibit |
| Plaintiff's Trial Exhibit # 10 - Bush's 1998 Diary | Defendant's Trial Exhibit # 17 & 18 |
| Plaintiff's Trial Exhibit # 11 - Whiting-Turner's 3/16/98 Memo regarding pay rate increase for Bush | No corresponding defense exhibit |

# DAVID H. POLLACK

Attorney at Law

JAMES F. POLLACK, ESQ.
OF COUNSEL

The Ingraham Building
25 S.E. 2nd Avenue
Suite 1020
Miami, Florida 33131

TELEPHONE:(305) 372-5900
FACSIMILE: (305) 372-5904

| | |
|---|---|
| Plaintiff's Trial Exhibit # 12 - Bush's Pay Stubs | Defendant's Trial Exhibit # 62 (Bush's Pay stubs only) |
| Plaintiff's Trial Exhibit # 13 - Whiting-Turner's contact list | No corresponding defense exhibit |
| Plaintiff's Trial Exhibit # 14 - Memo | No corresponding defense exhibit |
| Plaintiff's Trial Exhibit # 15 - Blue Jacket. Shawnee Chief Poem/ Letter left on Bush's desk | Defendant's Trial Exhibit # 50 |
| Plaintiff's Trial Exhibit # 16 - Bush's Medical Records | No corresponding defense exhibit |

David H. Pollack

Enc.

# EXHIBIT "B"

## REVISED EXHIBIT LIST

| JAMES BUSH v. THE WHITING-TURNER CONTRACTING CO. | | **DISTRICT COURT** SOUTHERN |
|---|---|---|
| **PLAINTIFF'S ATTORNEY** David H. Pollack, Esq. The Ingraham Building 25 SE 2nd Avenue Suite 1020 Miami, Florida 33131 | **DEFENDANT'S ATTORNEY** Sheila M. Cesarano, Esq. Rene J. Gonzalez-LLorens, Esq. Shutts & Bowen 1500 Miami Center 201 South Biscayne Boulevard Miami, Florida 33131 | **DOCKET NUMBER** 00-6224-CIV-DIMITROULEAS/JOHNSON ——————————— **TRIAL DATE(S)** July 30, 2001 |
| **PRESIDING JUDGE** Judge Linnea R. Johnson | **COURT REPORTER** | **COURTROOM DEPUTY** |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | 1 | | | | Plaintiff's resignation letter (Whiting/Bush 001, 19) |
| | 2 | | | | Payroll Hours/Dollar History for Charles Bender (Whiting/Bush 005-8) |
| | 3 | | | | Payroll Earnings History for Charles Bender (Whiting/Bush 009-14) |
| | 4 | | | | Performance Review for Charles Bender dated December 1, 1998 (Whiting/Bush 0015) |
| | 5 | | | | Offer of Superintendent Position to Charles Bender dated August 24, 1998 (Whiting/Bush 0016) |
| | 6 | | | | Memo to accounting department authorizing increase in Plaintiff's salary dated March 9, 1998 (Whiting/Bush 0017) |
| | 7 | | | | Notes regarding Plaintiff's salary dated January 4, 1999 (Whiting/Bush 0018) |
| | 8 | | | | Performance Review for Charles Bender dated October 28, 1999 (Whiting/Bush 020) |
| | 9 | | | | Agreement between Southeast Florida Laborers' District Council and the Union Contractors and Subcontractors Association dated December 6, 1996 (Whiting/Bush 021-28) |
| | 10 | | | | Plaintiff's termination notice dated April 16, 1999 (Whiting/Bush 030) |
| | 11 | | | | Weekly timecard for Plaintiff for the week ending March 15, 1998 (Whiting/Bush 033) |

\* Include a notation as to the location of any exhibit not held with
the case file or not available because of size.           Page 1 of _____ Pages

| | | | | |
|---|---|---|---|---|
| 12 | | | | Weekly timecard for Charles Bender for the week ending March 15, 1998 (Whiting/Bush 036) |
| 13 | | | | Weekly timecard for Plaintiff for the week ending February 22, 1998 (Whiting/Bush 037) |
| 14 | | | | Weekly timecard for Charles Bender for the week ending February 22, 1998 (Whiting/Bush 038) |
| 15 | | | | Weekly timecard for Plaintiff for the week ending March 29, 1998 (Whiting/Bush 039) |
| 16 | | | | Weekly timecard for Charles Bender for the week ending March 29, 1998 (Whiting/Bush 040) |
| 17 | | | | Plaintiff's 1998 Diary (Whiting/Bush 158A-317) |
| 18 | | | | Plaintiff's 1999 Diary (Whiting/Bush 318-372) |
| 19 | | | | File from EEOC regarding Plaintiff (EEOC 1-186) |
| 20 | | | | Whiting-Turner Quality Awards April-June 1998 (EEOC 030, 032) (Plaintiff/Bush 87-91) |
| 21 | | | | Check stub reflecting quality award paid to Plaintiff (EEOC 031) (Plaintiff/Bush 86) |
| 22 | | | | Fax from Plotke to Camilo with attachments (Whiting/Bush 041-48) |
| 23 | | | | Notes regarding Safety Meetings and Mainstreet Work Rules (Whiting/Bush 049-60) |
| 24 | | | | Project Meeting Sign-In Sheet (Whiting/Bush 061) |
| 25 | | | | Notes regarding Safety Meetings and Mainstreet Work Rules (Whiting/Bush 062-73) |
| 26 | | | | Memo to Project Supervisor from Jennie Holland re: Weekly Safety Meetings (Whiting/Bush 074-82) |
| 27 | | | | Weekly Safety Meeting (Whiting/Bush 083) |
| 28 | | | | Handwritten notes (Whiting/Bush 084) |
| 29 | | | | Punchlist QC Inspection Reports (Whiting/Bush 085-90) |

| | 30 | | | | Schedule of Tasks for Building 4 (Whiting/Bush 091-094) |
|---|---|---|---|---|---|
| | 31 | | | | Mainstreet Work Rules (Whiting/Bush 095) |
| | 32 | | | | Safety Meeting (Whiting/Bush 096) |
| | 33 | | | | Quality Control Inspection Report (Whiting/Bush 097) |
| | 34 | | | | Quality Program Checklists (Whiting/Bush 098-99) |
| | 35 | | | | Quality Program Pre-Pour Anchor Bolt Checklists (Whiting/Bush 100-102) |
| | 36 | | | | Quality Program Checklists with attachments (Whiting/Bush 103-110) |
| | 37 | | | | Tarmac ticket no. 0348902 with attached Quality Program Checklists (Whiting/Bush 111-113) |
| | 38 | | | | Quality Program Checklists (Whiting/Bush 114-118) |
| | 39 | | | | Quality Control Inspection Report (Whiting/Bush 119) |
| | 40 | | | | Sawgrass Phase III Two Week Lookahead Schedule with attachments (Whiting/Bush 120-125) |
| | 41 | | | | Supervisor Accident Reports (Whiting/Bush 126-130) |
| | 42 | | | | Handwritten Notes (Whiting/Bush 131) |
| | 43 | | | | Timesheets (Whiting/Bush 132-133) |
| | 44 | | | | Handwritten Notes (Whiting/Bush 134) |
| | 45 | | | | Timesheet (Whiting/Bush 135) |
| | 46 | | | | Supervisor Accident Reports (Whiting/Bush 136-137) |
| | 47 | | | | Memo to All MEP Subcontractors from James Bush re: Buildings 2 & 3 Damage to Stucco Finish (Whiting/Bush 138) |
| | 48 | | | | Fax to Sheryl Gray from James Bush re: Accident Report Regarding Robert Craig Bridges (Whiting/Bush 139-141) |
| | 49 | | | | Tarmac Tickets with attached Quality Program Checklists (Whiting/Bush 142-158) |
| | 50 | | | | Passage by Shawnee Chief (Plaintiff/Bush 49, 85) |
| | 51 | | | | Union documents (Plaintiff/Bush 50-59) |
| | 52 | | | | Minutes of Superintendents' Meeting on November 4, 1998 (Plaintiff/Bush 60-63) |
| | 53 | | | | Superintendent's Manual Chapter 12 (Plaintiff/Bush 64-70) |
| | 54 | | | | Plaintiff's index (Plaintiff/Bush 71) |

| 55 | | | | Handwritten note dated February 5, 1999 (Plaintiff/Bush 72) |
| 56 | | | | Letter from Kimmons to Plaintiff dated April 15, 1999 (Plaintiff/Bush 73) |
| 57 | | | | Plaintiff's Termination Notice (Plaintiff/Bush 74) |
| 58 | | | | Documents from the Florida Dept. of Labor and Employment Security (Plaintiff/Bush 75-80) |
| 59 | | | | Fax from Plaintiff to Kimmons (Plaintiff/Bush 81-83) |
| 60 | | | | Letter from Cooper to Jones signed by Plaintiff (Plaintiff/Bush 84) |
| 61 | | | | Handwritten Notes (Plaintiff/Bush 120-124) |
| 62 | | | | Pay stubs and payroll records (Plaintiff/Bush 125-154) |
| 63 | | | | Income tax information (Plaintiff/Bush 155-196) |
| 64 | | | | Whiting-Turner Employee Handbook 1999 Edition (Plaintiff/Bush 197-207) |
| 65 | | | | Business Card of Charles Bender with attachments; Plaintiff's resignation letter, Plaintiff's resume, Notice of Right to Sue and Charge of Discrimination (Plaintiff/Bush 208-214) |
| 66 | | | | EEOC File as produced by Plaintiff (Plaintiff/Bush 215-375) |
| 67 | | | | Position Statement and attached exhibits |
| 67A | | | | Exhibit I - Laborers Union Collective Bargaining Agreement |
| 67B | | | | Exhibit II - Memo from Bender to Kimmons |
| 67C | | | | Exhibit III - Affidavits & letters from employees |
| 67D | | | | Exhibit IV - Plaintiff's resume |
| 67E | | | | Exhibit V - Whiting-Turner's EEO Policy & Affirmative Action Program |
| 67F | | | | Exhibit VI - Excerpts of Employee Handbook |
| 67G | | | | Exhibit VII - Plaintiff's Acknowledgment of Receipt of Policy |
| 68 | | | | Carpenter's Union Contract  (Whiting/Bush 530-546) |
| 69 | | | | Construction Documents (Whiting/Bush ) |
| 70 | | | | Plaintiff's Wage Information 1997-1999 |
| 71 | | | | Union Documents (Union/Bush 1-10) |
| 72 | | | | Affidavits Attached to Motion for Summary Judgment, Response to Motion for Summary Judgment and Reply Brief |
| 73 | | | | Eric Plotke's Deposition Transcript |

| | 74 | | | | Jeff Cooper's Deposition Transcript |
|---|---|---|---|---|---|
| | 75 | | | | Charles Bender's Deposition Transcript |
| | 76 | | | | Plaintiff's Deposition Transcripts (Volumes I and II) |
| | 77 | | | | All Depositions Taken In This Case. |
| | | | | | Any and all exhibits that are listed on Plaintiff's Exhibit List, subject to objections by Defendant as to admissibility at trial. |
| | | | | | All documents produced or relied upon during discovery. |
| | | | | | All documents appended as exhibits to depositions, pleadings or any other court paper. |
| | | | | | All documents necessary for rebuttal and/or impeachment. |
| | | | | | All documents necessary for good cause shown. |
| | | | | | All documents obtained through discovery in this case either by Plaintiff or Defendant. |
| | | | | | All interrogatories and answers thereto and requests to produce and answers thereto taken in this case. |
| | | | | | All documents discovered prior to trial, upon reasonable notice to opposing counsel. |
| | | | | | By inclusion of any of Plaintiff's exhibits herein, Defendant does not waive its objections to admissibility, authenticity, relevancy, or any of the grounds listed in Local Rule 16.1(E)(a) of any of the documents which may be listed by Plaintiff. |
| | | | | | Defendant reserves the right to amend and supplement this Exhibit List upon discovery of additional documents relevant to this case. |

MIADOCS 385992.1 MBD

Page 5 of _____ Pages

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

JAMES BUSH,                          CASE NO. 00-6224-CIV-DIMITROULEAS
                                     MAGISTRATE JUDGE JOHNSON
      Plaintiff,

v.

THE WHITING-TURNER
CONTRACTING CO.,
a Maryland corporation,

      Defendant

————————————————————— /

## PLAINTIFF'S WITNESS LIST

Plaintiff, James Bush, files his witness list in this action as follows::

1.    James Bush

2.    Eric Plotke

3.    Charles Bender
      Assistant Superintendent

4.    Dough Raines

5.    Bob Needham

6.    Henrietta Bush

7.    Jacques Marcellin

8.    Andrew Delancey

9.    Jim Patterson
      Superintendent, Spectrum Construction Co.

9.    Bob Jones
      General Project Manager, Sawgrass Mills Corp.

10.   Doug Houghton

Assistant Superintendent, Carpenter's Union

11.    Vijay Varkey

12.    Dr. Camille Denis

13.    Catherine Mainer

14.    Melba Hamilton

15.    Charles Teele

16.    Michael Davis

17.    Albert Huston

# EXHIBIT "D"

## WITNESS LIST

| JAMES BUSH v. THE WHITING-TURNER CONTRACTING CO. | | | | | DISTRICT COURT<br>SOUTHERN | | |

| PLAINTIFF'S ATTORNEY<br>David H. Pollack, Esq.<br>The Ingraham Building<br>25 SE 2nd Avenue<br>Suite 1020<br>Miami, Florida 33131 | DEFENDANT'S ATTORNEY<br>Sheila M. Cesarano, Esq.<br>Rene J. Gonzalez-LLorens, Esq.<br>Shutts & Bowen<br>1500 Miami Center<br>201 South Biscayne Boulevard<br>Miami, Florida 33131 | DOCKET NUMBER<br><br>00-6224-CIV-<br>DIMITROULEAS/JOHNSON<br>————————————<br>TRIAL DATE(S)<br><br>July 30, 2001 |

| PRESIDING JUDGE<br>Judge Dimitrouleas | COURT REPORTER | COURTROOM DEPUTY |

| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | | | | | Charles Bender |
| | | | | | James Bush |
| | | | | | Robert Mitchell |
| | | | | | Eric Plotke |
| | | | | | Jeff Cooper |
| | | | | | Shamia Blanchett |
| | | | | | Robert J. Kimmons |
| | | | | | Omar H. McFarlane-Sweeny |
| | | | | | Sergio Tio |
| | | | | | Noreen Niameth |
| | | | | | All witnesses identified by the Plaintiff. |
| | | | | | Rebuttal and Impeachment Witnesses. |
| | | | | | By inclusion of any of Plaintiff's witnesses herein, Defendant does not waive its right to object to any of the witnesses to be listed by Plaintiff.  Defendant reserves the right to amend this Witness List upon learning of additional persons with knowledge of the facts of this case. |

\* Include a notation as to the location of any exhibit not held with
  the case file or not available because of size.

Page 1 of _____ Pages

MIA98 56644.1 - KLL

\* Include a notation as to the location of any exhibit not held with
  the case file or not available because of size.

Page 2 of _____ Pages